REPORTER'S RECORD
VOLUME 2 OF 3 VOLUMES
TRIAL COURT CAUSE NO. D-1-GN-22-000058
COURT OF APPEALS NO. TBD

| | |
|---|---|
| EX PARTE | ) IN THE DISTRICT COURT |
| | ) |
| vs. | ) TRAVIS COUNTY, TEXAS |
| | ) |
| JESUS ALBERTO GUZMAN | ) |
| CURIPOMA | ) 126TH JUDICIAL DISTRICT |

————————————————————————————————

**WRIT OF HABEAS CORPUS**
————————————————————————————————

On the 13th day of January, 2022, the following
proceedings came on to be held in the above-titled and
numbered cause before the Honorable Jan Soifer, Judge
Presiding, held in Austin, Travis County, Texas, via
videoconference.

Proceedings reported in computerized machine
shorthand by a Texas Certified Shorthand Reporter,
Certification Number 4471.

```
 1                        APPEARANCES

 2

 3             ALL PARTIES APPEARED REMOTELY
                VIA ZOOM VIDEOCONFERENCE

 4

 5   APPEARING FOR THE APPLICANT:

 6       MS. ANGELICA COGLIANO
         SBOT NO. 24101635
 7       Cogliano Law Firm
         505 W. 12th Street
 8       Austin, Texas 78701
         Telephone:  (512) 478-0758
 9       email:  angelica@coglianolaw.com

10       MS. ADDY M. MIRÓ
         SBOT NO. 24055984
11       The Law Office of Addy M. Miró
         505 W. 12th Street
12       Austin, Texas 78701
         Telephone:  (512) 893-1883
13       email:  addy@mirolawfirm.com

14       MR. E.G. "GERRY" MORRIS
         SBOT NO. 14477700
15       The Law Office of E.G. Morris
         505 W. 12th Street
16       Austin, Texas 78701
         Telephone:  (512) 478-0758
17       email:  egm@egmlaw.com

18   APPEARING FOR THE STATE OF TEXAS:

19       MS. HOLLY TAYLOR
         SBOT NO. 00794721
20       Appellate Team Lead
         MS. NANCY NICOLAS
21       SBOT NO. 24057883
         Travis County District Attorney's Office
22       416 W. 11th Street
         Austin, Texas 78701
23       Telephone:  (512) 854-9741
         email:  holly.taylor@traviscountytx.gov

24

25
```

1                       **APPEARANCES, Continued**

2


3     *APPEARING FOR THE KINNEY COUNTY ATTORNEY'S OFFICE:*

4         MR. DAVID A. SCHULMAN
          SBOT NO. 17833400
5         Attorney at Law
          1801 E. 51st Street
6         Suite 365474
          Austin, Texas 78723
7         Telephone:  (512) 474-4747
          email:  zdrdavida@davidschulman.com
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         I N D E X

2                        VOLUME 2

3                  WRIT OF HABEAS CORPUS

4                    January 13, 2022

5                                          Page    Vol.
```

```
6   Announcements. ........................    8       2

7   Opening Statement by Ms. Cogliano .......   42       2

8   Closing Argument by Ms. Cogliano ........  159       2

9   Closing Argument by Ms. Taylor ..........  163       2

10  Closing Argument by Mr. Schulman ........  168       2

11  Court's Ruling ..........................  170       2

12  Adjournment .............................  171       2

13  Court Reporter's Certificate ............  172       2
```

```
15  APPLICANT'S WITNESSES

16                          DIRECT   CROSS    VOL.

17  KATHRYN DYER

18      By Ms. Miró ..............    43                 2
        By Ms. Taylor ............            66         2
19      By Mr. Schulman ..........            76         2

20  KRISTIN ETTER

21      By Ms. Cogliano ..........    79                 2
        By Mr. Schulman ..........           144         2
22
    PHILIP WISCHKAEMPER
23
        By Ms. Miró ..............   149                 2
24      By Mr. Schulman ..........           154         2
```

```
25
```

```
 1                    VOLUME 2 - CONTINUED

 2

 3            ALPHABETICAL INDEX OF WITNESSES

 4                              DIRECT    CROSS    VOL.

 5    DYER, KATHRYN

 6        By Ms. Miró ..............      43               2
          By Ms. Taylor ...........               66       2
 7        By Mr. Schulman ..........              76       2

 8    ETTER, KRISTIN

 9        By Ms. Cogliano ..........     79                2
          By Mr. Schulman ..........             144       2
10

      WISCHKAEMPER, PHILIP
11
          By Ms. Miró ..............    149                2
12        By Mr. Schulman ..........             154       2

13

14                 APPLICANT'S EXHIBIT INDEX

15    NO.  DESCRIPTION          OFFERED   ADMITTED   VOL.

16    A    Criminal complaint      148      149       2

17    B    Writ of Prohibition     148      149       2

18    C    TRLA Letter to          148      149       2
           Judge Ables
19
      D    Disaster Proclamation   148       88       2
20
      E    ACLU TFDP letter to      91       91       2
21         DOJ

22    F    Joaquin Castro's letter 148      149       2
           to Mayorkas and Garland
23
      G    El Paso Order re GA-37  104      105       2
24
      H    Abbott's Letter to       91       91       2
25         Biden
```

```
1                    VOLUME 2 - CONTINUED

2

3          APPLICANT'S EXHIBIT INDEX (Continued)

4    NO.  DESCRIPTION           OFFERED    ADMITTED    VOL.

5    I    Abbott's Letter to      88         89         2
          Governors
6
     J    Coe Affidavit          116        117         2
7
     K    MAC Agreements         120        121         2
8
     L    Hoffman Declaration -   82         83         2
9         Final Draft signed gh

10   O    Cash bail receipt      128        129         2

11   Q    Contempt Hearing        64         65         2
          Coe Excerpts
12
     R    Gvt. Code 7720071...   108        108         2
13        order Crime Grant
          Program
14
     S    Declaration of Elissa  119        119         2
15        Steglich

16   T    ICE Memo Jan           110        110         2

17   U    ICE Policies           111        111         2

18   W    DEMANDLETTER re         57         61         2
          Custody Ivan Ruano
19        Nava & David Vega
          Muñoz
20
     Y    Berg Affidavit         112        112         2
21
     Z    Abbott letter to        86         86         2
22        Sheriffs

23   AA   Abbott Clipmov         101        103         2

24   BB   Smith Clip             123        123         2

25
```

```
 1                     VOLUME 2 - CONTINUED

 2


 3              APPLICANT'S EXHIBIT INDEX (Continued)

 4     NO.   DESCRIPTION              OFFERED    ADMITTED    VOL.

 5     CC    Jail record, DPS          129        135        2
             ticket, Mag papers
 6           redacted

 7     DD    12/29/21 OLS Docket -     137        137        2
             Amended_Redacted
 8

 9                    STATE'S EXHIBIT INDEX

10     NO.   DESCRIPTION              OFFERED    ADMITTED    VOL.

11     1     Governor Abbott Signs     155        155        2
             Border Security
12           Funding Into Law _
             Office of the Texas
13           Governor _ Greg
             Abbott
14
       2     Army Times articles       155        155        2
15
       3     SCOTX order OLS counsel   155        155        2
16
       4     SCOTX renewed emergency   155        155        2
17           order

18     5     TX Tribune article        155        155        2
             9.27.21
19
       6     EO-GA-37 -                155        155        2
20           transportation of
             migrants during COVID
21           Image 07-28-2021

22

23

24

25
```

PROCEEDINGS

January 13, 2022

* * * * *

THE COURT:  Good morning, everyone.  We
have a few preliminary things to take up this morning;
but I'll start with some instructions and announcements.

We're holding this hearing remotely
through Zoom pursuant to the existing Emergency Orders
resulting from the pandemic, a sentence I was hoping I
wouldn't have to say in 2022.  But this hearing is being
livestreamed on the Court's YouTube channel pursuant to
the Open Courts provision of the Texas Constitution.  No
recordings of this hearing are permitted by anyone
participating or watching other than by the official
court reporter of this Court.

There has been a request by CBS Austin to
record the livestream.  Normally, we have a local rule
that deals with that, but it has to do with cameras in
the courtroom.  And cameras in the virtual courtroom
don't cause the same problems as cameras in our actual
courtroom, which can be quite cramped and crowded, and
the cameras and the reporters can get in the way of the
proceedings.

So, generally, I do allow these requests;
but I will let y'all tell me if you have any objection

1   to CBS Austin recording the livestream.

2                    *(No response)*

3                    THE COURT:  All right.  Hearing none, then

4   that request is approved.  Other than the court reporter

5   and CBS Austin, any violations of this instruction not

6   to record and other instructions are punishable by

7   contempt of court.

8                    A couple of other instructions.  When

9   you're not speaking, please mute your microphone.  That

10  does tend to improve the sound quality of the people who

11  are speaking.  Please don't speak when someone else is

12  speaking.  The court reporter can only hear one voice at

13  a time.  So if two people are speaking at once, she

14  can't get all of what either person is saying; and we do

15  have a court reporter who is trying to make a record.

16  So -- the other issue on that is just to speak at a

17  normal speed.  Don't speed up too much.  She is

18  certified for up to 250 words a minute, which is a lot,

19  but we do have lawyers clock in a lot higher than that

20  from time to time.

21                   So let me just ask if each of you received

22  and understood the procedures for remote hearings my

23  staff sent you and the instructions that I just gave

24  you.

25                   Ms. Taylor.

1           This also serves as a sound check so we'll

2   make sure we can hear you.

3           MS. TAYLOR:  Your Honor, I guess I would

4   go ahead and make an appearance for the State of Texas,

5   Holly Taylor for the Travis County District Attorney's

6   Office.  And I certainly have heard and understood your

7   instructions this morning.

8           Thank you.

9           THE COURT:  Thank you.

10          Ms. Dyer.

11          MS. DYER:  Good morning, Judge.  I have

12   not received your instructions.  I am a witness in this

13   case.  So --

14          THE COURT:  All right.  Who are you a

15   witness for?  Who has asked you to appear today?

16          MS. DYER:  Ms. Cogliano.

17          THE COURT:  All right.  Well, I think --

18   for those of you are aren't lawyers, the instructions

19   that I just gave you are the ones that you need to be

20   concerned about, not speaking too fast and not speaking

21   at the same time as anyone else.  Also, if you are

22   speaking and somebody says the word "objection," you

23   should stop speaking; the person who made the objection

24   needs to tell me briefly the nature of -- or basis of

25   their objection; and then the speaker can start again

1    when I'm done.

2                    All right.  Ms. Nicolas?

3                    MS. NICOLAS:  Good morning, Your Honor.

4    I'm appearing for the State with the Travis County

5    District Attorney's Office.  And I have received and

6    understood your instructions.

7                    THE COURT:  Thank you.

8                    Ms. Cogliano.

9                    MS. COGLIANO:  Yes, Judge.  I represent

10   Mr. Guzman Curipoma, the applicant in this case.  And I

11   also have received and understood your instructions.

12                   I also would like to bring to the Court's

13   attention that we do have an interpreter that is

14   available and certified, and we're just waiting on her

15   to finish something.  She just texted my co-counsel that

16   she is on her way to log on.

17                   THE COURT:  All right.  And is that

18   Ms. Leon, Sofia Leon?

19                   MS. COGLIANO:  Yes, ma'am.

20                   THE COURT:  All right.  So when Ms. Leon

21   appears, we will let her in to this room.

22                   Mr. Schulman.

23                   MR. SCHULMAN:  Good morning, Your Honor.

24   I have seen -- listened to your instructions.  I

25   understand them.

1            I am appearing for the Kinney County

2    Attorney's Office, and we have some objections to make

3    before the rest of the proceedings commence.

4                THE COURT:  Ms. Etter.

5                MS. ETTER:  Good morning, Your Honor.  I'm

6    Kristin Etter.  I'm an attorney with the Texas Rio

7    Grande Legal Aid, and I'm a witness this morning for the

8    applicant.  And I have understood your instructions

9    verbally that you just provided this morning.

10               Thank you.

11               THE COURT:  All right.

12               Ms. Miró.

13               MS. MIRÓ:  Good morning, Your Honor.  I am

14   here with co-counsel Angelica Cogliano representing

15   applicant.  I have received and understood your

16   instructions.

17               THE COURT:  And, Mr. Guzman Curipoma -- am

18   I saying that right?

19               MR. GUZMAN:  Good morning, Your Honor.

20               THE COURT:  Good morning.  Could you

21   please turn on your camera?

22               MR. GUZMAN:  Okay.

23               THE COURT:  Thank you.

24               MR. GUZMAN:  You're welcome.

25               THE COURT:  All right.  Do we need to wait

1    for the interpreter before we get started?

2                        MR. GUZMAN:  No, Your Honor.  It is all

3    clear, your instructions.

4                        THE COURT:  All right.

5                        Okay.  Well, let me just let y'all know

6    the state of my knowledge.

7                        I have reviewed the Application for Writ

8    of Habeas Corpus and the State's Answer to the

9    Application for Writ of Habeas Corpus, and

10   Mr. Schulman's appearance that was filed last night, I

11   think a little after 9:00.  I saw a bunch of exhibits

12   got uploaded this morning.  I have not reviewed all of

13   the exhibits.  And to the extent there's anything else

14   in the file, I have not -- I have not seen it.

15                       Sometimes things that get filed in the

16   District Clerk's Office have a lag time before they hit

17   our electronic file.  So if there is anything new in

18   there, "new" meaning newer than the last couple of days,

19   then I haven't seen it, except for the two things y'all

20   uploaded last night and made me a recipient of when you

21   eFiled them.  And that was the State's answer and the

22   appearance of Mr. Schulman.

23                       All right.  So, Mr. Schulman, I want to

24   hear your objections before we get started.

25                       MR. SCHULMAN:  Thank you, Your Honor.

1              I would point out, to begin with, that no
2    writ has issued in this case.  Although Your Honor
3    signed a document purporting to be a writ, it does not
4    comply in any way, shape, or form with Article 11.01 of
5    the Code of Criminal Procedure; and that it is not an
6    order issued by a court or judge to someone having
7    confinement of the applicant.
8              Second, we object to the proceedings in
9    general today because --
10             MS. TAYLOR:  Your Honor, may I object
11   briefly to Mr. Schulman's statement?
12             THE COURT:  Let's let him finish his
13   statement, and then I'll hear from you, Ms. Taylor.
14             MS. TAYLOR:  Thank you, Your Honor.
15             MR. SCHULMAN:  We object to the
16   proceedings because pretrial writs pertain to people in
17   physical custody or under -- under a bond they cannot
18   afford.  It's obvious that Mr. Guzman Curipoma is not in
19   physical custody nor has his presence been secured by
20   purpose of this writ.  Those are our two primary
21   objections at this point.
22             The third objection is that we object to
23   the Travis County District Attorney purporting to
24   represent the State in these proceedings.  This case has
25   nothing whatsoever to do with Travis County.  And

```
 1    although we are in a district court in Travis County and
 2    the 53rd District Attorney is charged with representing
 3    the State, the enabling statute, which I believe is
 4    43.132, does not provide that the District Attorney is
 5    the exclusive representative of the State.  We believe
 6    the Kinney County Attorney's Office is the proper
 7    representative, and we would like to proceed as counsel
 8    for the State.
 9                    (Interpreter enters the proceedings)
10                    MR. SCHULMAN:  Those are my three
11    objections at this point, Your Honor.
12                    THE COURT:  All right.  So, two things.
13    One, I do want to hear from Ms. Taylor.
14                    But, first, Ms. Leon has appeared.  And so
15    were you going to have her interpret all of the
16    proceedings for Mr. Guzman Curipoma?
17                    Yes?
18                    MS. MIRÓ:  Yes, Your Honor.
19                    THE COURT:  All right.  So let me swear in
20    Ms. Leon.
21                    (Sofia Leon sworn as interpreter)
22                    THE INTERPRETER:  I do.  And for the
23    record, my name is Sofia Leon; and my license number is
24    119.
25                    THE COURT:  All right.  And so will you go
```

```
 1    ahead and get on the Spanish channel?  And Mr. Guzman.
 2                        (Discussion in Spanish between the
 3                        interpreter and the witness)
 4                    THE COURT:  So each of y'all -- you should
 5    see at the bottom of your screen a little globe icon
 6    with the word "Interpretation" below it.  If you click
 7    on that, if you want to hear the Spanish interpretation,
 8    you click on Spanish.  If you want to hear the English
 9    interpretation, you click on English.  Or -- I think you
10    can leave it off too.  Is that right, Ms. Chipelo?
11                    JUDICIAL EXECUTIVE ASSISTANT:  I believe
12    so.
13                    THE INTERPRETER:  (Shakes head.)
14                    THE COURT:  Ms. Leon says no.
15                    THE INTERPRETER:  Everybody needs to
16    choose a language --
17                        (Simultaneous crosstalk)
18                    THE COURT:  -- [Zoom audio difficulty] --
19                    THE INTERPRETER:  I am in the English
20    channel right now.  Can you hear me?
21                    THE COURT:  Yes, I --
22                        (Simultaneous crosstalk)
23                    THE INTERPRETER:  Okay.  Everybody --
24                    THE COURT:  -- do --
25                    THE INTERPRETER:  -- needs to choose the
```

1   language.

2          THE COURT:  All right.  So everybody who

3   wants to hear English needs to be in the English

4   channel, and everyone who wants to hear Spanish should

5   be in the Spanish channel.

6          All right.  Now that that is taken care

7   of, Ms. Taylor.

8          MS. TAYLOR:  Thank you, Your Honor.

9          The Travis County District Attorney's

10   Office represents the State of Texas in criminal cases

11   in the district courts of Travis County.  The Travis

12   County District Attorney's Office is tasked with this by

13   the Texas Legislature through Article 2.01 of the Code

14   of Criminal Procedure, and that provision provides that

15   the Travis County District Attorney, or a district

16   attorney for a district, shall represent the State in

17   all criminal cases in the district courts of his

18   district and in appeals therefrom, except in cases where

19   he has been, before his election, employed adversely.

20   My boss Mr. Garza, the District Attorney of Travis

21   County, has not been employed adversely with regard to

22   this matter.

23          That statute further provides that if the

24   district attorney is notified of a criminal proceeding

25   before a judge upon habeas corpus, and if he is, at the

1   time, within his district -- which Mr. Garza is; and we

2   were notified of this habeas corpus proceeding in this

3   Court -- it provides that he shall represent the State

4   therein unless prevented by other official duties.

5   Mr. Garza is not prevented by other official duties from

6   responding to this writ of habeas corpus in this Travis

7   County District Court.

8            The Court of Criminal Appeals has held

9   that the office of a district attorney is

10  constitutionally created and protected; thus the

11  district attorney's authority cannot be abridged or

12  taken away.  And that's in the *Buntion* case, which is

13  cited in our answer 482 S.W.3d 58 at Page 76.  Thus, the

14  Travis County District Attorney's Office is statutorily

15  mandated to respond to this Application for Writ of

16  Habeas Corpus in this Travis County District Court.

17  Travis County District Attorney's Office does not

18  purport to respond in Kinney County to the actual

19  criminal case at issue.  We are -- but, however, we

20  believe that we are the appropriate state entity to

21  respond to this Application for Writ of Habeas Corpus in

22  this Travis County District Court.

23            That statute further provides in its most

24  famous language, It shall be the primary duty of all

25  prosecuting attorneys, including any special

1   prosecutors, not to convict but to see that justice is

2   done.  And we take that obligation very seriously, and

3   we intend to follow that admonition in our litigation of

4   this writ of habeas corpus in this Travis County

5   District Court.

6               Thank you.

7               MR. SCHULMAN:  May I respond?

8               THE COURT:  Mr. Schulman, you may respond.

9               MR. SCHULMAN:  Thank you, Your Honor.

10              First I would point out that this is not

11   the Travis County District Attorney at issue.  He is the

12   district attorney for the 53rd Judicial District.  That

13   office is charged with representing the State in all

14   criminal cases.  This is not a criminal case.  It's on

15   the civil docket.  And it is, under the case law of the

16   Third Court of Appeals, a civil procedure separate and

17   distinct from any criminal proceeding.  I can provide

18   that citation if Your Honor needs it.

19              That being the case, the District Attorney

20   is not statutorily or constitutionally charged as the

21   exclusive representative of the State in this

22   proceeding.

23              MS. COGLIANO:  Judge, if I may respond, as

24   well.

25              THE COURT:  You may.

1               MS. COGLIANO:  On this particular issue --

2   and I'll address the issue of the writ when the Court

3   instructs me to -- but I just wanted to point out that

4   the Court of Criminal Appeals also ruled in *Alvarez v.*

5   *Eighth Court of Appeals*, which is 977 S.W.2d 590, that

6   the district attorney, unless disqualified, shall

7   represent the state of habeas corpus within this

8   district; and, provided that if the district attorney is

9   not present, then the Court may appoint any other party

10  to represent the State in habeas corpus litigation.  But

11  that is only if the district attorney does not appear at

12  the setting and the writ was issued.

13              THE COURT:  All right.  Thank --

14              MS. TAYLOR:  May --

15              THE COURT:  -- you.

16              MS. TAYLOR:  May I respond, Your Honor?

17  I'm sore to interrupt you.

18              THE COURT:  You may, Ms. Taylor.

19              MS. TAYLOR:  Your Honor, I think

20  Mr. Schulman's assertion that a writ of habeas corpus in

21  Texas is a civil proceeding is incorrect.  I believe

22  that because the writ of habeas corpus is defined within

23  Chapter 11 of the Code of Criminal Procedure, in Texas a

24  writ of habeas corpus is not a civil proceeding as it

25  may be in other sovereigns' proceedings, but is not a

1   civil action but, in fact, is a criminal action.  It is

2   a separate criminal action, I will concede, from the

3   case -- the actual criminal case; and thus, it is

4   docketed separately with a separate cause number.  But

5   it is not a civil lawsuit.  It is a criminal proceeding.

6   It is subsidiary or separate from the actual criminal

7   case which is in a separate judicial district.

8              Thus, the Travis County District

9   Attorney's Office would not purport to represent the

10  State of Texas in the misdemeanor proceedings in Kinney

11  County.  However, this writ of habeas corpus is a

12  separate criminal proceeding.  It was filed, as the

13  application states, pursuant to Chapter 11 of the Code

14  of Criminal Procedure and the Texas Constitution, in

15  this Court, and this Court issued the writ of habeas

16  corpus.  That -- that discretionary decision has already

17  been made by this Court.  And that was -- that is filed

18  in this particular court.

19             This Court, although it is by practice --

20  as I'm sure Your Honor is familiar, although it is by

21  practice a civil court and primarily considers civil

22  cases, I see no restriction in the Texas Code for this

23  Court's practice to civil cases.  It seems to be a

24  court -- a district court of general jurisdiction.  It

25  is, however, by practice primarily handle civil cases.

1    That does not mean that this Court is either statutorily

2    or constitutionally restricted to handling civil cases.

3              THE COURT:  All right.  Let me ask you to

4    address Mr. Schulman's point that the document that I

5    signed is not a writ that complies with Section 11.01 of

6    the Code of Criminal Procedure.

7              MS. TAYLOR:  Your Honor, I think it is

8    absolutely a writ that complies with Section 11.01 of

9    the Code of Criminal Procedure.  It is a court order

10   issued by a judge who signed it issuing -- I believe it

11   expressly states that it issues the writ of habeas

12   corpus.

13             Let me jump to that document.  One moment.

14             Your Honor, I believe that it states that

15   the Application for Writ of Habeas Corpus has been duly

16   considered, and it is ordered that the application is

17   granted.  Thus, it expressly grants the Application for

18   Writ of Habeas Corpus issuing the writ.

19             I believe Mr. Schulman's complaint that it

20   directs the Clerk to do something, that is customary --

21   as I'm sure the Court is familiar -- for the Court's

22   orders to direct the Clerk to take some action as a

23   result of the court order.  So the Clerk of this Court

24   issue a writ of habeas corpus commanding the sheriff of

25   Kinney County to produce the person of Jesus Alberto

1   Guzman Curipoma either physically or if he has been

2   released on bond or recognizance and constructively

3   through his attorney.

4           So this --

5           (Reporter admonition)

6           MS. TAYLOR:   I apologize.

7           So my understanding is that this document

8   provides that the writ of habeas corpus -- the

9   Application for Writ of Habeas Corpus has been duly

10  considered, and it is ordered that the application is

11  granted.  It does direct the Clerk to take some action,

12  but I believe that is customary for court orders to do

13  this, and that is merely something that occurs as a

14  result of the Court issuing its order.

15          And the order also, as I understand it --

16  and I am looking at the proposed order at this time; so

17  if someone has the actual signed order in front of them,

18  that would be helpful -- but it directs, as I recall,

19  the Sheriff of Kinney County to produce the person of

20  Jesus Alberto Guzman Curipoma, either physically or if

21  he is or has been released on bond or recognizance, and

22  constructively through his attorney of record before

23  this Court for hearing in this Court on the legality of

24  the restraint as contested in the application.

25          So this -- this document is, in fact, an

1   order issued by this Court granting the Application for
2   a Writ of Habeas Corpus.  As such, it satisfies the
3   requirements of Article 11.01 of the Code of Criminal
4   Procedure.  That article provides the writ of habeas
5   corpus is the remedy to be used when any person is
6   restrained in his liberty.  It is an order issued by a
7   court or judge of competent jurisdiction, which this
8   district court is, which is discussed in our answer.  It
9   is directed to anyone having a person in his custody or
10  under his restraint.
11          This individual, the Sheriff of Kinney
12  County, has Mr. Guzman Curipoma under restraint because
13  he is being held on bond.  And under the definition in
14  Article 11.22 and also in case law applying that
15  provision of the Code of Criminal Procedure, a person
16  who is released on bond is still subject to restraint.
17  They are restrained for purposes of Chapter 11 of the
18  Code of Criminal Procedure.  And Article 11.01
19  continues, commanding him -- this would be the Sheriff
20  of Kinney County -- to produce such person at a time and
21  place named in the writ and to show why he is held in
22  custody or under restraint.
23          That is exactly what this court's order
24  does; therefore, it qualifies as a writ of habeas
25  corpus, and it has already been issued.

1              THE COURT:  Thank you.

2              And I believe, Ms. Cogliano, you wanted to

3    speak to this, as well.

4              MS. COGLIANO:  Yes, Judge.  I believe

5    Ms. Taylor covered a lot of what I was going to say.

6              I did want to give the Court some

7    background on the language of the writ.  It was

8    specifically chosen because it is the language that was

9    used in a writ that was issued in a Court of Criminal

10   Appeals case that ultimately decided that people that

11   are subject to the restraint, and therefore subject to

12   having to appear in court and answer to the charges

13   against them, can -- can have a claim cognizable

14   pretrial in a writ of habeas corpus.

15             And so I used the language specifically

16   from that order.  And that writ in that case that did

17   require "constructively through the attorney of record

18   for the applicant to appear," and it was ruled that he

19   was actually in restraint -- was being restrained by the

20   State of Texas as is required by Article 11.22 of the

21   Code of Criminal Procedure.

22             THE COURT:  All right.

23             Mr. Schulman, are you suggesting that

24   because -- well, first of all, do you know whether or

25   not the Clerk has issued a writ?

1              MR. SCHULMAN:  As of late last night, no.

2   As of this morning, no.

3              But may I respond directly to the language

4   of the order itself?

5              THE COURT:  Just a minute.

6              So is not the Clerk's issuance of a writ

7   at the -- at the requirement of a judge just a

8   ministerial act?

9              MR. SCHULMAN:  Respectfully, Judge, I

10  would say, yes, it's a ministerial act.  But it's still

11  not the action of the Court; it's an action by the

12  Clerk.  And specifically, as the text Ms. Taylor read

13  requires, that the order is directed to anyone having a

14  person in his custody.  Your order did not direct

15  anything at the Kinney County Sheriff.  It ordered the

16  Clerk to do something.

17             And what I would say regarding as to the

18  form is that it may have been used in a case that the

19  Court of Criminal Appeals ruled on, has no affect on the

20  writ itself.  The point is, the statute is very clear on

21  what a writ is.  We're not talking about -- it's a

22  separate and distinct question of whether the person is

23  present or how they got present.  But nothing in your

24  order directs the Sheriff of Kinney County to do

25  anything, nor -- nor does it impose on the Clerk the

1   authority to act for the Court, just to implicate --

2   excuse me, to get the process moving by issuing this.

3            But what I would say is the fact that

4   this -- the forms that are used in this county do

5   something is not important.  For years we had a form in

6   the court directing the defendant to waive off ten days

7   before sentencing; and that was in the courts as much as

8   35 years after that stopped being the law.  There has

9   never been a point in the Republic of Texas or the State

10  of Texas in which a writ was not an order by a court.

11           This is not an order by a court directed

12  to anyone having custody of the defendant.  It is,

13  therefore, not a writ.  The writ has not issued.

14           THE COURT:  All --

15           (Simultaneous crosstalk)

16           MS. TAYLOR:  Your Honor, I --

17           THE COURT:  -- right.  Ms. Taylor?

18           Yes.

19           MS. TAYLOR:  Sorry.

20           Your Honor, I think this is exactly that.

21  It is exactly an order from this Court signed by this

22  judge directing a person -- directing a person, the

23  Sheriff of Kinney County, to produce the person of Jesus

24  Alberto Guzman Curipoma, either physically or, if he has

25  been released on bond or recognizance, then

1  constructively through his attorney of record before

2  this Court for a hearing in this Court.  The Clerk is

3  merely an agent of this Court in the text of this order

4  and also in reality.  The Clerk acts upon -- only upon

5  the direction of this Court.

6          THE COURT:  All right.

7          So, Mr. Schulman, are you suggesting that

8  we need to delay this hearing until the Clerk issues the

9  writ of habeas corpus, or until this order is amended to

10 say that this Court is itself issuing a writ of habeas

11 corpus?

12         MR. SCHULMAN:  No, Your Honor.  What I'm

13 saying is, at this point, there is no writ.  There is no

14 hearing.  Not now, not if the Clerk issues that at all,

15 because I do not agree that the Clerk has the authority

16 to issue a writ of habeas corpus.

17         THE COURT:  So is it, then, your

18 contention that the language of the writ that the Court

19 signs needs to direct the Sheriff of Kinney County to

20 produce the person and not to direct the Clerk to issue

21 a writ to the Sheriff?

22         MR. SCHULMAN:  Absolutely.

23         THE COURT:  All right.  So an amended writ

24 of habeas corpus saying that would trigger a hearing

25 like this.  Is that your -- your contention?

```
 1                    MR. SCHULMAN:  I would agree with that
 2     statement.
 3                    THE COURT:  All right.
 4                    Is there a request that the Court sign an
 5     amended writ?
 6                    MS. COGLIANO:  Judge, if you give me five
 7     minutes to modify the language in our proposed writ and
 8     send it to you, the Court, I can do that very quickly.
 9                    MR. SCHULMAN:  I would also suggest that
10     this will also have to be served on the Sheriff of
11     Kinney County.
12                    THE COURT:  Well, that's assuming that
13     Mr. Guzman Curipoma did not appear.
14                    MR. SCHULMAN:  I --
15                    THE COURT:  He has appeared.
16                    MR. SCHULMAN:  I would disagree, Your
17     Honor.
18                    THE COURT:  All right.  Well, I think what
19     we'll do is we'll take a quick break to give
20     Ms. Cogliano a few minutes to prepare an amended writ
21     and perhaps to confer with her co-counsel.
22                    And how long would you like, Ms. Cogliano?
23                    MS. COGLIANO:  Judge, if you could give me
24     15 minutes, I can be completely done by then.
25                    THE COURT:  All right.  Well --
```

1          MS. TAYLOR:  Judge, may I add one more

2     thing?  Sorry.

3          THE COURT:  Sure.

4          MS. TAYLOR:  I just wanted to point out

5     that Article 11.01 states that it is an order issued by

6     a court or judge of competent jurisdiction directed to

7     anyone having a person in his custody or under his

8     restraint commanding him to produce such a person.  That

9     does not say -- state "served upon."

10          MS. COGLIANO:  And, Judge, I would point

11     out that his restraint is by virtue of documents filed

12     with the Clerk's Office in Kinney County.  We are

13     alleging the restraint is arising out of the complaint

14     that was filed.  The Court and the Clerk is the one

15     that's holding him in -- by illegal restraint by having

16     to respond to those allegations.

17          But all that being said, I want to make

18     clear I'm not waiving the position that that language is

19     superfluous.  It's legal-ease that is in writs all over

20     the State.  And this Court's intention and clear purpose

21     in signing the writ was in response to the Application

22     for Writ of Habeas Corpus, and it's titled Writ of

23     Habeas Corpus, and it is directing us to appear to

24     contest the legality of the restraint that our client's

25     experiencing right now.

```
1              THE COURT:  All right.  Well --

2              (Simultaneous crosstalk)

3              MR. SCHULMAN:  Okay.  Your Honor --

4              THE COURT:  -- we will go ahead and break

5    for 15 minutes.

6              MR. SCHULMAN:  -- may I say one more

7    thing?

8              THE COURT:  Briefly.

9              MR. SCHULMAN:  If you will grant us, in

10   essence, a running objection to the proceeding, then I

11   see no reason to go through the mechanism of having a

12   second document issued, et cetera.  We can proceed right

13   now.  I would agree to that --

14             THE COURT:  Well, you -- you've made your

15   objection, and it appears that there is a way to fix

16   that problem, at least arguably.  And rather than

17   spinning our wheels doing something that you find

18   objectionable, it seems like there ought to be an

19   opportunity to have a fix.  So --

20             MR. SCHULMAN:  Okay.

21             THE COURT:  -- I understand you may not

22   agree that the fix that they are considering will

23   actually fix the problem --

24             MR. SCHULMAN:  Well --

25             THE COURT:  -- but.
```

1          MR. SCHULMAN:  -- to -- sorry to

2     interrupt, Your Honor.

3          What I say is -- so I don't have to make

4     further objections later, I would tell the Court I don't

5     think what they propose to do fixes anything.  It's --

6     we are not contesting in any way, shape, or form that

7     Mr. Guzman Curipoma is in custody.  He certainly is in

8     custody by virtue of a personal bond as I understand it.

9          That notwithstanding, he is not in the

10    custody of the Clerk of this Court or of the Clerk --

11    District Clerk in Travis County nor of the County Clerk

12    in Kinney County.  He is in the custody of the Sheriff

13    of Kinney County.  And the fact that he's here doesn't

14    mean he was told to be here by the Sheriff in any way.

15         THE COURT:  All right.

16         So it's 9:37.  Let's go ahead and take a

17    break till about five minutes till 10:00.

18         Y'all are welcome to just turn off your

19    microphone and your cameras.  And we will start back up

20    at 9:55.

21         MS. TAYLOR:  Thank you, Your Honor.

22         (Recess taken)

23         THE COURT:  All right.  There's somebody

24    in the waiting room named Philip Wischkaemper.

25         MS. COGLIANO:  Yes, Judge.  He's our final

1  remaining witness that's going to be testifying as a

2  fact witness in the case.

3              THE COURT:  All right.  We will let him

4  in.

5              All right.  So I see that you-all have

6  uploaded a new writ that orders the Sheriff to produce

7  the person of Jesus Alberto Guzman Curipoma.

8              So, Mr. Schulman --

9              MR. SCHULMAN:  Yes, Your Honor.

10              THE COURT:  -- is it your position that

11  until that is served on the Sheriff, this proceeding

12  should not go forward?

13              MR. SCHULMAN:  Yes, Your Honor.

14              THE COURT:  All right.

15              Well, I will tell you-all that I am the

16  duty judge this week, which means that I'm not burdened

17  with other hearings.  I am here.  I am available to go

18  forward now, or I am available to postpone the hearing

19  until you-all have had an opportunity to serve the

20  Sheriff, if that's the holdup.  I don't want to get hung

21  up on a technicality.  I do want to get to the merits of

22  this issue.  And I'm going to give the Applicant the

23  option.

24              MS. COGLIANO:  Judge, just to make my

25  record, I want to first -- I -- not trying to sound

```
 1    ridiculous but object to the objection.  Our position is
 2    that Mr. Schulman is not a representative of the State
 3    and, therefore, is not a party to this litigation and,
 4    therefore, doesn't have the standing to be objecting to
 5    the form or service of anything in this case.
 6              I also want to point out that under 11.03
 7    of the Code of Criminal Procedure, want of form of the
 8    writ of habeas corpus is not ever dispositive.  It
 9    should never -- it says specifically the writ of habeas
10    corpus is not invalid nor shall it be disobeyed for any
11    want of form if it substantially appears that it's
12    issued by a competent authority, and the writ --
13              THE COURT:  Ms. Cogliano?
14              MS. COGLIANO:  Yes.
15              THE COURT:  I see Ms. Williamson shaking
16    her head, which means you're speaking too quickly when
17    you're reading for her to be able to take down what
18    you're saying.  So if --
19              (Simultaneous crosstalk)
20              MS. COGLIANO:  I apologize --
21              THE COURT:  -- you'll.
22              MS. COGLIANO:  -- Ms. Williamson.
23              THE COURT:  Sorry about that.
24              So if you'll start over and read it a bit
25    more slowly so she can make a record, that would be
```

1   great.

2                   MS. COGLIANO:   The writ of habeas corpus

3   is not invalid nor shall it be disobeyed for any want of

4   form if it substantially appears that it is issued by

5   competent authority and the writ sufficiently shows the

6   object of its issuance.  And so that very clearly states

7   that any -- you know, a clerical error or a miswording

8   that is in the writ is never going to be dispositive if

9   it's clear what it directs.  And it's obviously clear

10  what it directs because we are all here today to

11  litigate this issue, and we're all prepared today to

12  litigate this issue.

13                  I also believe that by showing up and

14  being ready and present and announcing as we're ready

15  and present to proceed with the hearing, that the State

16  waives any objection to want of form or want of service.

17                  And finally, Judge, I believe that the

18  original writ, which directs the Clerk to serve it on

19  the Sheriff, is the appropriate mechanism, just like in

20  a application for a subpoena.  Here, it wouldn't be my

21  prerogative, it wouldn't be my authority to serve a

22  judicial order on the Clerk or the Sheriff of the other

23  county.  I do -- Judge, I do believe there's other

24  mechanisms for that.

25                  But I also believe that every party here

1  is aware of the writ, is ready to litigate the writ, and
2  thereby waives any sort of claim of lack of notice in
3  this matter.
4           THE COURT:  All right.  Well, let me ask
5  Ms. Taylor, on behalf of the State, whether she agrees
6  and waives any issues on the form of the writ.
7           MS. TAYLOR:  Your Honor, I do.  I agree
8  with what Ms. Cogliano just stated.  And I do not have
9  any objections to the form of the writ.  And as I stated
10  earlier, we were notified with the writ; we were served
11  with the writ; and we are here and present on behalf of
12  the State of Texas regarding this writ.
13           I would also note that I believe
14  Mr. Schulman stated earlier that a pretrial writ was not
15  available for someone who was not in custody.  Pretrial
16  writs are traditionally and it is not infrequent that
17  they are filed to allege constitutional claims such as
18  this on behalf of people who are not in custody, who
19  are, in fact, released on some type of bond.  And one of
20  the most famous ones of those is involved in a case
21  which is cited in the Application for Writ of Habeas
22  Corpus and also in the State's answer and is probably
23  the preeminent authority at this time from the Court of
24  Criminal Appeals regarding pretrial writs and chal- --
25  and constitutional challenges brought within those

1   writs, and that is *Ex Parte Perry*, which is 41 S.W.3d 63

2   and involves an Application for Writ of Habeas Corpus

3   filed by former Governor Rick Perry.  And that writ

4   raised separation of powers claims.  And in that

5   opinion, the Court further cites -- and I believe this

6   may be in the -- what I'm citing to you right now,

7   incidentally, is the Austin Court of Appeals opinion

8   which led to the petition for discretionary review by

9   the Court of Criminal Appeals and the opinion that is --

10  that has become authority for the State on pretrial

11  writs.

12          But the Austin Court of Appeals' decision

13  is the one that discusses the issue of restraint or

14  confinement.  Very briefly and it just says there has

15  been no dispute that Governor Perry is restrained in the

16  sense required for pretrial habeas relief pursuant to

17  each of the two charges alleged in the indictment.  And

18  it's a citation to the *Weise* case, W-e-i-s-e, from the

19  Court of Criminal Appeals, observing that pretrial

20  habeas applicant was restrained of his liberty when he

21  was charged with an offense and released on bond to

22  await trial.

23          THE COURT:  All right.  Thank you.

24          Well, I do have some questions about

25  Mr. Schulman's place in this litigation.  Are you --

1              *(Brief interruption)*

2              *(Discussion off the record)*

3              THE COURT:  So, Mr. Schulman, are you

4    representing the Sheriff of Kinney County or --

5              MR. SCHULMAN:  No --

6              THE COURT:  -- who are you --

7              MR. SCHULMAN:  -- I am acting under oath

8    as an acting Assistant County Attorney in Kinney County.

9    And what I would point out to you, Your Honor, is that

10   when the writ was -- writ application was filed

11   initially, the local district attorney was not served.

12   The county attorney was served, County Attorney of

13   Kinney County was served.

14              And whether -- whether Your Honor

15   ultimately decides that the Kinney County Attorney

16   should represent the State or the 53rd District Attorney

17   should represent the State, the Kinney County is --

18   Kinney County Attorney is a real party in interest to

19   this litigation because they were the ones first served

20   with it and it -- under their auspices that the

21   defendant is being prosecuted.

22              MS. COGLIANO:  Judge, to clarify, both of

23   the representatives of the State that are claiming to be

24   the representatives of the State here were served on

25   every filing in every way.  I believe the very first

1   application that I filed I emailed it to the District

2   Attorney's Office service email and to Holly and to the

3   First Assistant of the District Attorney's office

4   because I hadn't served them officially through the

5   eFile system.

6              And then every subsequent writ after that

7   and every filing after that I included any party that I

8   thought may want to have notice of this hearing to avoid

9   any issue like this.  Me serving somebody with a

10  document does not establish their jurisdiction or their

11  authority to litigate against me.  It just means I am

12  providing notice to any party that may have an -- may

13  have an opinion on what's going on in the case, and I

14  didn't want to leave anybody out.

15             THE COURT:  All right.

16             Well, here's what I'm going to do.

17  Although I am persuaded that the Travis County District

18  Attorney has the authority to represent the State in

19  this matter, I am going to allow Mr. Schulman to speak

20  on behalf of the Kinney County Attorney's Office.  I

21  think that that will avoid the necessity of a remand if,

22  in fact, there's some question about who represents the

23  State.

24             I have read the State's answer to the

25  Application for Writ of Habeas Corpus, as I acknowledged

1   earlier, and I do see that the Travis County District

2   Attorney Office on behalf of the State, in essence, says

3   in their prayer, The State is compelled to pray that

4   this Court find that Applicant has met his burden of

5   proof and is entitled to relief.

6            And so that 32-page pleading that the

7   State has filed, with multiple attachments, is quite

8   persuasive.  The application itself is, as well.  And so

9   it does seem as though, to the extent that there is

10  anyone on the other side of the Applicant in this

11  hearing today, it would be Mr. Schulman and the Kinney

12  County Attorney's Office.  And although, as I say, I'm

13  skeptical about their authority to continue, I am

14  willing to hear them out because I don't want to get

15  hung up on technical issues.  I want to get to the

16  merits of the matter, and I want to do that today.

17           So let's go ahead.  I am overruling the

18  objections to the form of the writ.  I am signing this

19  writ that you-all have provided today that is, in

20  essence, the Second Amended Writ of Habeas Corpus that

21  commands Mr. Guzman Curipoma to appear here virtually

22  today at this hearing, which, of course, he has

23  appeared, as has Mr. Schulman and the lawyers in the

24  DA's office on behalf of the State.

25           So, that said, let's get into the heart of

```
1    the issue.  Ms. --
2                    MS. TAYLOR:  Your Honor, may I briefly
3    just -- I -- we totally respect the Court's ruling.  But
4    may I lodge, effectively, a running objection to any
5    other entity representing the State of Texas in Travis
6    County District Court?
7                    THE COURT:  Yes.
8                    And let me -- let me just say that I
9    sustain that objection.  But in the interest of what is,
10   I guess, in essence, a bill, I will allow Mr. Schulman
11   to make his points.  We do have set aside from now till
12   noon.  Generally, we say that each side gets half of the
13   time.  It does appear that the DA's office, the State,
14   is on the side of Mr. Guzman Curipoma.  So I am going to
15   essentially say that you-all have an hour and
16   Mr. Schulman has an hour.  Mr. Beck will keep track of
17   the time.  And let's go ahead and proceed.
18                   But your objection is sustained.  But then
19   for the purpose of a writ, we will -- I mean, of a bill,
20   we will go ahead.
21                   Ms. Cogliano.
22                   MS. COGLIANO:  Judge, and if I could, I
23   was going to make the same request for a running
24   objection as Ms. Taylor did for the purposes of the
25   record on behalf of Mr. Guzman Curipoma.
```

1              THE COURT:  Yes.  Your objection is

2    sustained, and your running objection is allowed.  But

3    for the purpose of the record, we are going to let

4    Mr. Schulman make his argument.

5              MS. COGLIANO:  Understood, Judge.

6              And before I begin my presentation of

7    evidence, Judge, I was hoping we could discuss how you

8    would like that to proceed, considering that the rules

9    of evidence don't apply in this case.  I have some

10   witnesses to present testimony, and what I'd like to do

11   is offer my exhibits as they testify.  And then let

12   Ms. Taylor and Mr. Schulman lodge whatever objections

13   they would at that time.  But they are not being

14   authenticated necessarily by those witnesses.  It's just

15   the mechanism that I would request the Court allow me to

16   present those exhibits.

17              THE COURT:  All right.  That's fine.

18              You may call your first witness then.

19              MS. COGLIANO:  Judge, may I give a brief

20   opening statement?

21              THE COURT:  You may.

22                      **OPENING STATEMENT**

23              MS. COGLIANO:  Judge, we're here today

24   because the State of Texas has implemented a

25   prosecutorial scheme at the border that creates a

1   separate and distinct criminal justice system solely

2   reserved for people who the authorities over -- over

3   Operation Lone Star believe to have unlawful status here

4   in the United States.

5              Under federal law, state actors do not

6   have the authority to make determinations about

7   someone's legal immigration status, nor can they run

8   afoul of the intent and the explicit directives of

9   federal immigration law.  Federal court -- federal law

10  is the exclusive jurisdiction of immigration law, and it

11  provides very clearly in the INS ways that the state

12  actors can assist in that and help with the prosecution

13  and the control of immigration in the respective states.

14  But the procedures are laid out, and this is absolutely

15  not one of those procedures.

16             And so we are going to -- we present five

17  grounds of preemption that we believe make Operation

18  Lone Star and the application of it to the prosecution

19  of my client Jesus Guzman Curipoma unconstitutional.

20             And so our first witness that we're going

21  to call is Ms. Kathryn Dyer.  And my co-counsel Addy

22  Miró is going to take her as a witness.

23             THE COURT:  All right.  Ms. Dyer.  Will

24  you raise your right hand and be sworn, please?

25                   **KATHRYN DYER,**

```
 1    having been first duly sworn, testified as follows:
 2                         DIRECT EXAMINATION
 3    BY MS. MIRÓ:
 4        Q.   Good morning, Ms. Dyer.
 5        A.   Good morning.
 6        Q.   Can you hear me okay?
 7        A.   Yes.
 8                  THE COURT:  You're a bit muffled.  You
 9    might need to get a little closer to your microphone.
10                  MS. MIRÓ:  Okay.  Is that better?
11                  THE COURT:  Keep an eye on the court
12    reporter, please.  She'll shake her head no if at any
13    point she's unable to hear you.
14                  MS. MIRÓ:  I will, Your Honor.
15        Q.   (By Ms. Miró) Ms. Dyer, can you please give us
16    your full name for the record.
17        A.   Sure.  Kathryn Dyer.  It's K-a-t-h-r-y-n, last
18    name D-y-e-r.
19        Q.   Ms. Dyer, what is your profession?
20        A.   I am a criminal defense attorney and a clinical
21    professor at the University of Texas School of Law.
22        Q.   And how long have you been practicing criminal
23    law?
24        A.   Twelve years.
25        Q.   In your 12 years of practice, about how many
```

1   people have you represented?

2       A.   I have represented hundreds of people as a

3   public defender, definitely more than a thousand.

4       Q.   And how long have you been a clinical professor

5   with the UT Law School?

6       A.   Four years.

7       Q.   And as a clinical professor, what's your role?

8       A.   At the University of Texas, I work in a

9   criminal defense clinic.  It is a practical component of

10  legal education where I teach and supervise law students

11  who represent individuals charged with crimes in Travis

12  County.

13      Q.   Ms. Dyer, are you familiar with Operation Lone

14  Star?

15      A.   Yes, I am.

16      Q.   And how are you familiar with Operation Lone

17  Star?

18      A.   I learned about Operation Lone Star in July of

19  2021.  I have traveled to one of the state prison

20  facilities that detains people charged under Operation

21  Lone Star.  I have traveled to Val Verde and Kinney

22  Counties to try to obtain information about the program

23  and, in particular, about individuals who I learned were

24  arrested pursuant to the program.  [Zoom audio

25  difficulty] -- get other information about the

1  charges -- [Zoom audio difficulty] -- their whereabouts.

2  I have participated --

3               THE COURT:  Hang on a --

4               MS. MIRÓ:  I'm sorry, Ms. Dyer.

5               THE WITNESS:  Sure.

6               THE COURT:  Hang on.

7               If y'all will -- anybody who's speaking

8  just keep one eye on Ms. Williamson.  She will either

9  waive her hand or shake her head if she can't get you.

10               You are breaking up a bit, Ms. Dyer, and

11  I'm not sure why that is.  It may be that you're not

12  close enough to the microphone.

13               THE WITNESS:  Okay.

14               THE COURT:  So let's try it again.

15               THE WITNESS:  Sure.

16               THE COURT:  I think you were just saying,

17  when you broke up, that you had traveled to Kennedy

18  [sic] County and -- I'm sure there was another county

19  there.  I can't remember what, though.

20               THE WITNESS:  Sure.

21       A.   I have been to Val Verde County and Kinney

22  County to their clerk's offices and courts.  I have

23  represented individuals charged under Operation Lone

24  Star and have participated in proceedings.

25       Q.   (By Ms. Miró) When did you first travel to

1    Kinney County and Val Verde County?

2        A.    I first traveled to them in July of 2021 and

3    then again in August of 2021.  I first went to the

4    Briscoe Unit, which is one of the state jail facilities

5    holding people, back at the end of July to observe

6    conditions.  At that time, we didn't know if there were

7    ten people being housed there or -- in prison there or a

8    thousand people.  And we couldn't get the names of

9    people imprisoned there, so we weren't able to talk with

10   people or observe the conditions.

11       Q.    How would you describe the criminal legal

12   system that you observed as you have familiarized

13   yourself in Operation Lone Star?

14       A.    I would describe it as a completely separate

15   and unequal legal system for those suspected of being

16   noncitizens and charged with the minor charge of

17   criminal trespass.

18       Q.    What were you saying, that -- can you explain

19   more about what separates those charged within Operation

20   Lone Star from those charged with crimes in general,

21   from your experience?

22       A.    Yeah.  Yes.

23             So the people that we've seen charged

24   under Operation Lone Star or arrested are typically

25   happening by DPS troopers rather than local law

1    enforcement.  They are diverted into completely separate

2    court proceedings starting from a different location

3    where magistration happens.  It's happening in a tent in

4    Val Verde County with a set of separate judges holding

5    separate court proceedings from anybody else who is

6    arrested in those counties.

7              People who are suspected of being

8    noncitizens are kept in this separate state prison

9    facility, which is unprecedented.  It's concerning

10   because the state jail facilities do not have to adhere

11   to the same procedures as county jails.  These

12   facilities are hundreds of miles away from where the

13   supposed crime occurred, where those courts are set; and

14   there are separate, nonlocal attorneys being appointed

15   to represent people.  Those appointments are happening

16   at a delayed, very slow rate because there are not

17   enough attorneys to take those cases.

18             But the bigger problem is that these

19   attorneys are all over the state of Texas.  So they're

20   not able to meet with the clients that are being, again,

21   held hundreds of miles away from the court proceedings.

22   They are not able to go pop over and get information to

23   assist in the defense.  The lawyers can't easily

24   investigate defense claims because they're not located

25   where these accusations happened.  There are language

1   barriers and shortages of interpreters, and lawyers

2   can't confer with their clients easily during any court

3   proceedings that happen because they're in different

4   locations.

5           So despite building this very separate

6   system, the delays that are happening for these clients

7   that are charged under Operation Lone Star are resulting

8   in far longer periods of pretrial detention and people

9   not having court dates for 40, 50, 60, 90 days after

10  their arrest.

11      Q.   What did you learn about the appointment

12  process when you were there -- that attorneys were being

13  appointed or not?  What did you learn about that?

14      A.   Sure.

15          So the reason why I started looking at the

16  court appointment process was that we had learned

17  through a hotline through a grassroots organization

18  called Grassroots Leadership that there are people being

19  detained since July.  And this was in August.  So being

20  detained for almost a month with no attorney and no

21  court date.  And it was extremely difficult to find

22  information about these individuals.

23          Again, their family members had reached

24  out, and I couldn't -- I would call the Kinney County

25  Clerk, the County Attorney, the JP, and ask, you know,

1   what's the status of these cases.  And they would say,

2   We have no information about the names that you've

3   given.  And so I was really concerned that these folks

4   had not gotten lawyers.  And so I went personally to

5   Kinney County to kind of demand more information about

6   the individuals that we knew were in custody.

7            While I was there, I learned that

8   routinely -- and I think probably every time -- that the

9   Kinney County judge and JP were magistrating people

10  using pre-filled forms in English.  So they would say

11  something, they would have a deputy translate it, and

12  then they would, at the end of their magistration, say,

13  you know, we need you to sign this form saying that

14  we've told you your rights.  Again, that form is in

15  English.  It was not translated.  And there was a box

16  that was pre-filled out and pre-checked that said that

17  the individual declined to request an attorney.

18           So I personally observed the judge have

19  somebody sign this pre-filled form and not offer to give

20  them an attorney.

21  Q.   Okay.  So did you have an opportunity to

22  observe the processing center -- and these are the

23  tents -- that you mentioned earlier?

24  A.   Yes.  In late July of 2021, I did get a tour of

25  the tent facility, and I was able to watch individuals

1   being magistrated in that first appearance via video

2   stream at the Sheriff's Department.

3      Q.   Can you describe what you saw --

4                    (Simultaneous crosstalk)

5      A.   Yes.

6      Q.  (By Ms. Miró) -- the tent and what it looks like

7   inside?

8      A.   Yes.

9               So the tent facility included -- there is

10  some form of air-conditioning unit, but it was a bunch

11  of cages with fences.  There were no -- there was a kind

12  of cement floor.  There were no beds.  There were no

13  chairs.  There was a phone where you can't pick up the

14  phone but you can lean in and talk into it.  And there

15  were a number of officials -- all different kinds of

16  officials -- Texas National Guard, DPS troopers, Texas

17  Emergency Management Department, Galveston Sheriff's

18  administrators -- all kind of working in this tent.  And

19  I saw people in jumpsuits being guided around.

20     Q.   And I believe you mentioned that the

21  translation was done by a DPS trooper.  Did I hear that

22  correctly?

23     A.   The magistration that I saw in Kinney County

24  was done by a sheriff's deputy.  In Val Verde County,

25  the interpretation is done via Zoom.  So -- so a person

1   would be taken to a trailer outside of the tent and sat

2   in a chair with a camera on them, and then the

3   magistrate judge would be in a different location,

4   mostly their homes.  And the interpreter would be in a

5   different location.  And everything was done via Zoom.

6       Q.   Ms. Dyer, you actually represent several

7   clients that were arrested under Operation Lone Star,

8   correct?

9       A.   Yes.

10      Q.   And so two of those clients are Ivan Ruano

11  Nava -- Ivan --

12              (Reporter clarification)

13              MS. MIRÓ:  I'll repeat.

14      Q.   (By Ms. Miró) Did you represent two clients:

15  One by the name of Ivan Ruano -- that's R-u-a-n-o --

16  Nava, N-a-v-a, and the other client --

17      A.   Yes.

18      Q.   -- David -- David Muñoz, M-u-n-o-z?

19      A.   Yes.

20              (Reporter clarification)

21              MS. MIRÓ:  David Muñoz, M-u-n-o-z.

22      Q.   (By Ms. Miró) And those two clients were

23  detained at the Dolph Briscoe Unit; is that correct?

24      A.   Yes.

25      Q.   What is the Dolph Briscoe Unit?  Is that one of

1  the facilities that you had described earlier?

2      A.   Yes.  The Dolph Briscoe Unit is located in

3  Dilley, Texas.  It's about a hundred and, I think, 80

4  miles from the County Seat in Kinney County.  It's about

5  three hours away.  And that's -- it was a state prison

6  facility that was re-purposed for housing people that

7  were charged under Operation Lone Star.

8      Q.   Was there a court date set for either client

9  soon after they were arrested?

10      A.   A court date was never set for them until

11  co-counsel that I was working with on this case

12  repeatedly called to try to get an initial appearance.

13  And so those calls started in late August or early

14  September; and these two people had been arrested in

15  July, I think, July 25th of 2021.

16      Q.   Did you ever try to reach out to the

17  prosecutors in those cases?

18      A.   Yes, I did.

19      Q.   Did you get an answer?

20      A.   I was not able to communicate about these cases

21  with the prosecutor or to engage in any negotiation.

22  And the same was true for my co-counsel.

23      Q.   So when it comes to these two particular

24  clients, how was your experience different as far as

25  navigating the court system and negotiating with

1   prosecutors from your regular criminal cases that you

2   represent?

3       A.   It was nothing like anything I had experienced

4   as a criminal defense lawyer who has practiced in

5   multiple courts in multiple jurisdictions.  Finding the

6   arrest paperwork involved multiple phone calls that did

7   not give me any information.  I did have to ultimately

8   drive down there to try to find any documentation that

9   they had even been arrested.

10              So multiple calls to the Clerk's Office,

11  the County Attorney's Office went unanswered.  You know,

12  calls and emails went unanswered even after we had filed

13  a writ of habeas corpus.  Even getting a hearing date to

14  be heard on that took weeks.  And what was particularly

15  troubling was that it was an emergency filing; that

16  these clients were entitled to immediate release under

17  Texas law; that the prosecutor had not filed the proper

18  paperwork to pursue charges.  So it was truly an

19  emergency, and yet I couldn't get anybody on the phone

20  or to put the case on the calendar.

21              So the number of delays and the amount

22  that that system has been overwhelmed has resulted in

23  days, weeks, and months of people being incarcerated and

24  these clients, in particular, being detained longer than

25  they should have been with these kinds of charges and

1   the procedural posture they were in.

2        Q.   You were eventually heard on these cases,

3   correct, on September the 28th?

4        A.   Yes.

5        Q.   Okay.  And what happened at that hearing?

6        A.   During the course of that hearing, the

7   prosecutors announced that they were going to dismiss

8   the charges against these two individuals.

9        Q.   And do you know -- do you remember why?

10       A.   Yes.  So we had --

11            MR. SCHULMAN:  Objection.  Your Honor,

12   that calls for a statement -- an answer that's without

13   her personal knowledge.

14            MS. MIRÓ:  Your Honor, the reason for the

15   dismissal was stated on the record, I would assume.  And

16   she --

17            THE COURT:  All right.  I'll allow her to

18   give her understanding of the reason.

19       A.   We had raised a number of constitutional issues

20   that the prosecutors had hoped for more time on.  When

21   we moved to the subject of whether there was probable

22   cause for the arrest of my clients, the prosecutors was

23   unable to produce evidence that amounted to probable

24   cause for the arrest.  And, at that point, they moved to

25   dismiss the cases.

1     Q.   (By Ms. Miró) And when were the cases dismissed?

2   When were the dismissals signed?

3     A.   Yes.

4          So they orally moved to dismiss at

5   approximately noon on September 28th.  The dismissals

6   were signed and filed with the County Clerk -- or the

7   Kinney County Clerk at around 1:30, 1:45 that same day,

8   that Tuesday, September 28th.

9     Q.   Were the clients released that day?

10    A.   They were not released that day.

11    Q.   Were your clients released the next day?

12    A.   They were not released the next day.

13    Q.   And is -- that was a Wednesday.

14    A.   That was Wednesday.

15    Q.   On Thursday, what did you do?

16    A.   On Thursday at approximately 3:00 p.m., we

17   notified the warden of the Briscoe Unit, Maria Ramirez,

18   that the cases had been dismissed more than 48 hours

19   prior; that any detainers had run out, and that our

20   clients needed to be released.

21    Q.   How did you notify her?  Was there a letter

22   that was sent?

23    A.   Yes.  My co-counsel Kevin Herrera sent a letter

24   to the warden at approximately 3:00 p.m. that day

25   outlining the reasons why we were demanding their

```
 1   release.
 2              MS. MIRÓ:  And, Your Honor, at this time
 3   we would like to introduce Exhibit W, the demand letter
 4   that was sent.  I can share my screen briefly.
 5       Q.  (By Ms. Miró) Ms. Dyer, can you see my screen?
 6       A.  Yes.
 7       Q.  Is that the letter that was sent to Warden
 8   Ramirez?
 9       A.  Yes, it was.
10       Q.  Okay.  And I don't want you to read it all, but
11   can you tell us a summary of it?
12       A.  Yes.
13              In short, it describes what I just
14   described, that there was a hearing on September 28th;
15   that a dismissal had been filed with the Court; that
16   more than 48 hours had run.  And then it goes through
17   and explains what the 48 hours means in terms of ICE
18   detainers and indicates that the ICE detainer request
19   had expired.
20       Q.  Okay.  Can you explain what you mean by the
21   48-hour requirement?
22       A.  Yes.
23              THE COURT:  Let me just ask.  Are you --
24              Hang on just a minute.
25              Are you offering --
```

```
1              MS. MIRÓ:  Yes --

2              THE COURT:  -- this exhibit?

3              MS. MIRÓ:  Yes, Your Honor, I'm offering

4    it.

5              THE COURT:  And the number is?

6              MS. MIRÓ:  W.  We have them by letters.

7              THE COURT:  All right.

8              MS. TAYLOR:  Your Honor --

9              MR. SCHULMAN:  May I make --

10             MS. TAYLOR:  -- the State has no --

11             MR. SCHULMAN:  -- a request?

12             MS. TAYLOR:  -- objection to that exhibit.

13             MR. SCHULMAN:  May I make a request?

14                  (Reporter admonition)

15             MR. SCHULMAN:  May I make a request,

16   please?

17                  THE COURT:  You may.

18             MR. SCHULMAN:  I understood these were

19   circulated yesterday, but I did not receive copies of

20   these exhibits.  Could someone send those to me by

21   email?

22             THE COURT:  They've been uploaded to Box.

23   You should have access to Box.  Do you, Mr. Schulman?

24             MR. SCHULMAN:  I do not, and I do not

25   access cloud -- [Zoom audio difficulty] --
```

```
1              THE COURT:  Well, this is the Court's

2   mechanism that we use for documents that are offered

3   or -- to be offered into evidence.

4              So this is in --

5              MS. MIRÓ:  Your Honor?

6              THE COURT:  -- the exhibits that you-all

7   uploaded to Box?  And it's Exhibit W --

8              MS. MIRÓ:  Yes.

9              THE COURT:  -- that's in Box under, I

10  believe it's Defendant's Uploaded Exhibits is where it's

11  sitting.  Is it really Applicant's Uploaded Exhibits?

12              MS. MIRÓ:  Yes.

13              MS. COGLIANO:  Yes, Judge.  And I -- Holly

14  and I meant to address this before the hearing, that

15  when I went to upload them into the Plaintiff's Box, I

16  think there was some confusion because prosecutor and

17  plaintiff.  And so we kind of switched -- I switched

18  boxes instead of having to take all of her exhibits out.

19              So, yes, all of the Defendant's Exhibits

20  are our exhibits.

21              THE COURT:  All right.  So we'll re-label

22  those Applicant's Exhibits.  And so Applicant's

23  Exhibit W has been offered.

24              Do you want to go ahead and share your

25  screen again so Mr. Schulman can see that?
```

```
1                    MS. MIRÓ:  Yes, Your Honor.

2                    MS. TAYLOR:  And, Your Honor, to make it

3    clear, the State has no objection to Applicant's

4    Exhibit W.

5                    MS. MIRÓ:  Mr. Schulman, do you -- we can

6    email you this one in particular.  I don't know that we

7    can email you the whole set of exhibits because it's

8    going to be too large.

9                    MR. SCHULMAN:  Okay.

10                   THE COURT:  All right.  So the --

11   Applicant's Exhibit W has been offered.  The State has

12   no objection.

13                   Mr. Schulman, do you object to Applicant's

14   Exhibit W?

15                   MR. SCHULMAN:  Your Honor, what I -- what

16   I would suggest to the Court is that, the Rules of

17   Evidence notwithstanding, none of this has any relevance

18   to constitutionality of the Governor's program, nor does

19   it have anything to do with the arrest of the Applicant

20   or the proceedings in the Applicant's case.

21                   MS. MIRÓ:  Your Honor, if you will see --

22                   THE COURT:  So -- so to the extent that

23   the objection is to the relevance of this document, that

24   objection is overruled.

25                   Do you have any other objection,
```

1    Mr. Schulman?

2                    MR. SCHULMAN:  No, Your Honor.

3                    THE COURT:  All right.  So Applicant's

4    Exhibit W is admitted.

5                    MS. MIRÓ:  Thank you, Your Honor.

6        Q.  (By Ms. Miró) Ms. Dyer, we were talking about

7    the 48-hour rule that you mentioned -- mentioned in the

8    letter.  Can you explain what that is?

9        A.   Yes.  And I will preface this with -- I am a

10    criminal defense lawyer and not an immigration lawyer,

11    but I have experienced ICE detainers with many clients.

12                    Essentially, under the Code of Federal

13    Regulations, there is a period not to exceed 40 hours --

14    48 hours, excuse me, where local authorities can

15    continue to detain somebody beyond when they would

16    normally have been released for the purposes of

17    immigration to investigate citizenship or immigration

18    status and potentially take somebody into ICE custody.

19    But it is a detainer that is lodged with the local

20    authority and states very clearly on it that the time

21    period is not to exceed 48 hours from the time period --

22    from the time that they would have otherwise been

23    released.

24        Q.   And that is excluding weekends and holidays,

25    correct?

1      A.   Yes.

2      Q.   So what were you told about the 48-hour period

3  when you inquired with the warden at Briscoe?

4      A.   Yes.

5           So we did not receive a response from the

6  letter that we sent.  And so the next day, on Friday,

7  October 1st, I went to the Briscoe Unit to speak with

8  Warden Ramirez and to advocate for our clients' release

9  since their case had been dismissed, you know, Tuesday

10 of that week.  When I met with Warden Ramirez, she

11 indicated she had never heard of a 48-hour time limit on

12 a ICE detainer and insisted that no matter how much time

13 had passed, she had to contact ICE.  And it didn't

14 matter to her how long the cases had been dismissed.

15 She said that it was her agency's position not to

16 release anybody from the Briscoe Unit and that it was

17 their policy to transfer everybody either to ICE custody

18 or the Val Verde processing center where the tent was

19 where the magistration occurred.

20     Q.   So after receiving that answer, what did you

21 do?

22     A.   I spoke with the court coordinator of the judge

23 that had heard our writ of habeas corpus who had been

24 there when the prosecution moved to dismissed case.

25 Co-counsel and I asked that judge to sign an order

1  asking for the immediate release of Mr. Ruano Nava and

2  Mr. Muñoz, given that their cases had been dismissed.

3  And I asked them to email me and the warden and other

4  parties that order.

5      Q.   Was that order immediately followed?

6      A.   That order was not immediately followed.  What

7  ended up happening is that they -- ultimately, they were

8  supposed to be released to me at the Briscoe Unit in

9  Dilley, Texas.  Ultimately, they were transferred by the

10 Texas Department of Criminal Justice and the Department

11 of Public Safety to Val Verde County to Customs and

12 Border Patrol.  So not to the processing unit -- not to

13 the Val Verde processing unit.  They were not released

14 directly from the facility as the judge had ordered.

15 Instead, they were taken to immigration, to CBP.

16     Q.   So, to be clear, ICE did not come to Briscoe to

17 pick them up.  Nobody from the federal government come

18 to pick them up.  They were actually transferred by

19 people from the State; is that correct?

20     A.   That -- that's correct.  In fact, ICE,

21 Immigration and Customs Enforcement, had lifted the

22 detainer on the two of them.  So they had indicated that

23 they were not enforcing the detainer, and they would not

24 be asking to transport these two individuals.

25     Q.   Okay.  And it is my understanding that you have

1    a motion for contempt pending on this issue; is that

2    right?

3         A.   Yes.  We filed a motion seeking a finding of

4    contempt for disobeying the court's order on October 1st

5    of 2021.

6         Q.   And that is still pending, right?

7         A.   That is still pending.

8         Q.   But you did take some testimony recently.

9         A.   Yes.  I think it was December 13th, we started

10   the contempt proceedings, and we did obtain testimony

11   from Sheriff Brad Coe of Kinney County.

12        Q.   Okay.  And is there a transcript of that

13   testimony?

14        A.   Yes.  We have a transcript of the entire

15   hearing, including Sheriff Coe's testimony.

16             MS. MIRÓ:  And, Your Honor, at this time,

17   we would like to offer Applicant's Exhibit Q, and that

18   is excerpts from that transcript.  They are uploaded

19   into Box.

20             THE COURT:  Is there any objection to

21   Applicant's Exhibit Q?

22             MS. TAYLOR:  The State has no objection,

23   Your Honor.

24             MR. SCHULMAN:  I would again object as to

25   the relevance of the exhibit.

1           THE COURT:  All right.  Well, the Court is

2   going to make a decision about what's relevant and

3   what's not at the end.  And there's no jury to prejudice

4   by irrelevant information.

5           So I will overrule that objection; and

6   Applicant's Exhibit Q is admitted.

7           MS. MIRÓ:  Thank you, Your Honor.

8       Q.  (By Ms. Miró) Ms. Dyer, what did Sheriff Coe say

9   about notifying ICE during your hearing?

10      A.   He said a few things.  But he did indicate that

11  he would try to contact ICE, and he would hold people

12  from five to ten to twelve days, or as long as ICE asked

13  for people to be hold -- be held.  And he also indicated

14  that if somebody doesn't have an ICE detainer or if an

15  ICE -- if ICE did not act on the detainer, that he would

16  contact ICE again to see if there was a mixup or if they

17  wanted the person or if they were never informed.  That

18  if they indicated at that point that they would put an

19  ICE detainer on it, that he would honor any request from

20  ICE, which is obviously the opposite of what the federal

21  law requires.

22      Q.   So -- and as an experienced attorney and

23  professor, would you say that the procedure you

24  described is a correct implementation of federal law

25  regarding ICE holds?  I think you said no.

1      A.    Absolutely not.   He absolutely is violating

2   federal law by holding people for more than the 48 hours

3   that is dictated by federal law.

4      Q.    And you mentioned that you had clients with ICE

5   holds before in other counties.  Have you ever

6   experienced anything like this in your career before?

7      A.    Never.  There are times when a jail facility

8   might not know that the ICE detainer has run; and when

9   they are informed of that, they act immediately.

10     Q.    Okay.  But that didn't happen in this case.

11     A.    That did not happen here.

12     Q.    Okay.

13              MS. MIRÓ:  At this time, I would pass the

14   witness.

15              THE COURT:  All right.

16              Ms. Taylor or Ms. Nicolas, do you-all have

17   any questions for this witness?

18              MS. TAYLOR:  I just have a few questions,

19   Your Honor.

20              THE COURT:  All right.  You may proceed.

21                   **CROSS-EXAMINATION**

22   BY MS. TAYLOR:

23     Q.    Thank you for being here, Professor.

24              Can I ask you a little bit about the

25   charges that were brought against these clients?  What

1  were they charged with?

2      A.   They were charged with misdemeanor criminal

3  trespass.  They were charged with trespass on

4  agricultural land, which is a Class C misdemeanor.  And

5  pursuant to the Governor's disaster declaration, that

6  was enhanced to a Class B misdemeanor.

7      Q.   Okay.  You talked about the Governor's disaster

8  declaration -- well, first of all, let me back up a

9  little bit.

10          Can you tell us a little bit about a

11  Class C misdemeanor?  What are some other Class C

12  misdemeanors that ordinary folks might encounter in

13  their lives?

14      A.   Yes.

15          Basic traffic infractions are Class C

16  misdemeanors.  Very minor theft is a Class C

17  misdemeanor.  It's the least serious charge that exists

18  in the state of Texas, and it carries no jail time.  It

19  is only punishable by a fine up to $500.

20      Q.   Okay.  Thank you very much.

21          So, like, if you're caught for speeding,

22  an ordinary --

23              (Simultaneous crosstalk)

24      A.   That's a --

25      Q.  (By Ms. Taylor) -- [Zoom audio difficulty] --

1      A.   -- Class C misdemeanor.

2      Q.   Thank you.

3           So -- so it was enhanced you said.  How

4  was it enhanced, just to kind of explain it for lay

5  folks?

6      A.   Sure.

7           So the enhancement is actually a

8  sentencing penalty.  So it's still a Class C minor --

9  you know, most minor offense.  But the sentencing

10  exposure, if it occurs in an area where it's been

11  declared a disaster, can be up to 180 days in jail,

12  which is the Class B penalty.

13      Q.   I see.

14           And so there -- was there a special law

15  passed to allow criminal trespass infractions to be

16  enhanced by a disaster declaration?

17      A.   I don't believe it's just -- you know, it's not

18  criminal trespass in particular.  It's -- it's just

19  based on the level of the offense.

20      Q.   That's one of the enumerated offenses that can

21  be enhanced under the --

22           *(Simultaneous crosstalk)*

23      A.   Yes.

24      Q.   (By Ms. Taylor) Right.  And specially

25  enumerate- --

1          (Reporter admonition)

2               THE WITNESS:  Sorry.

3               MS. TAYLOR:  I apologize.

4      Q.  (By Ms. Taylor) So what I was asking is but

5  criminal trespass, Section 30.05 of the Penal Code, is

6  specially enumerated in a law that allows it to be

7  enhanced by a disaster declaration, correct?

8      A.   Yes.

9      Q.   Okay.  And can you tell us a little bit about

10  that disaster declaration if you know, kind of generally

11  when that was issued and under what circumstances?

12      A.   Yes.

13               The disaster declaration was issued in the

14  spring of 2021, and it specifically designated that

15  illegal migration was causing a disaster to the State of

16  Texas.

17      Q.   Thank you.

18               And I believe the disaster declaration may

19  be one of the exhibits that's been offered in evidence

20  by Applicant.  Do you recall whether that disaster

21  declaration was part of the Operation Lone Star program

22  and enforcement initiative?

23      A.   Yes.  I believe it was.

24      Q.   And do you know -- and if you don't, no need to

25  answer, of course.

1          Do you know whether there were statements

2    made in that disaster declaration that indicated the

3    State of Texas' -- or the Governor of the State of

4    Texas' dissatisfaction with federal immigration policies

5    and intent in terms of state immigration policies?

6        A.   I would have to refresh my recollection to the

7    actual language of the declaration.

8        Q.   Okay.  Thank you.

9          So with regard to the charging documents

10   in the cases that you've dealt with, the two in

11   particular that we've talked about and any other

12   cases -- and, again, we're just talking about a

13   situation where it's your personal knowledge.

14          But with regard to the charging documents

15   that you've seen and offense reports to the extent that

16   you viewed them, how would they compare with a normal

17   criminal case in terms of their level of detail?

18       A.   They were often short on detail and also

19   oftentimes would leave out an element of the offense.

20   So it might be the location or it might be the specific

21   permission or not -- non-permission to be on the

22   property.  I observed offense reports and affidavits

23   where it was law enforcement itself saying that there

24   was not permission granted, which is not sufficient to

25   charge the offense of criminal trespass.

1    Q.   Thank you.

2         And earlier when you were discussing the

3    concept of immediate release and that your clients were

4    entitled to immediate release, I think maybe we -- there

5    wasn't any discussion about Article 17.151.  Can you

6    explain that a little bit and what that law requires

7    with regard to misdemeanor cases?

8    A.   Absolutely.  And that is the law that I was

9    vaguely referring to in my testimony.

10        But under 17.151, depending on the level

11   of offense, the prosecuting attorney has a certain

12   amount of time with which to file formal charges against

13   an individual.  And if the prosecutor has not filed

14   those charges within the time frame enumerated, then the

15   individual is entitled to immediate personal bond or

16   bond that they can afford to make.  So that's

17   essentially how you get to the individual being entitled

18   to immediate release.

19   Q.   And that's something that the Court of Criminal

20   Appeals has been pretty firm about, correct, perhaps

21   even with -- [Zoom audio difficulty] -- case from the

22   last year?

23   A.   Yes.  Absolutely.  And the Court of Criminal

24   Appeals has also enumerated that even if that -- if the

25   prosecuting attorney files the formal charge after that

1   time frame but before it's heard before the Court, the

2   individual is still entitled to release.

3       Q.   And what are those time frames again, if -- I'm

4   not sure if -- you may have already said this, and I

5   apologize.  But could you give us the time frames, kind

6   of from that statute?  The relevant ones?

7       A.   Yes.  Yes.  For a Class A misdemeanor, it's 30

8   days.  For a Class B misdemeanor, it's 15 days.  And for

9   a Class C misdemeanor, it's five days.

10      Q.   And so, just to clarify, at the end of that

11  time period, what needs to have happened; and what will

12  happen if it didn't?

13      A.   You may have to lead me a little more than

14  that.  But -- but what happens is that a judge is

15  supposed to order a personal bond or bond that -- that

16  can be made.  And when that happens, somebody is

17  supposed to be released from custody.

18      Q.   If -- if charges have -- if they have not been

19  formally charged, correct?

20      A.   Within that time frame --

21      Q.   Yes.

22      A.   -- correct.

23      Q.   Okay.  Thank you.

24              And can you talk about a typical criminal

25  trespass case not associated with Operation Lone Star?

1    What -- what would that look like in your experience, a

2    typical criminal trespass case of this level.

3        A.   So I personally haven't seen a lot of

4    Class C agricultural land trespass cases here in Austin,

5    Texas.  So I'm more familiar with Class B, which would

6    be a level that is slightly more serious.

7               But criminal trespass is still regarded as

8    a very low-level offense.  When somebody faces a

9    criminal trespass charge, I would typically advise them

10   that they are not looking at jail time.  Most

11   prosecutors aren't seeking jail time or hefty fines on a

12   case like that.  Many, many criminal trespass cases get

13   dismissed, and they are treated as much less serious

14   offenses in the criminal legal system.  It is rare for

15   somebody to be held on pretrial detention on a criminal

16   trespass case.

17       Q.   And this is perhaps obvious from the response

18   that you just gave.  But are criminal trespass

19   defendants typically given prison sentences as a

20   punishment?

21       A.   Absolutely not.  And even in the worst case

22   scenario, they're looking at one year in jail maximum;

23   and in my experience, I've never seen that sentence.

24       Q.   And that would've been on a Class A, correct?

25       A.   Correct.

1     Q.   And just to kind of go back to your earlier

2   testimony, were these defendants in Operation Lone Star

3   who were arrested as part of that operation, were they

4   held in prison?

5     A.   Yes.  They were held in a state prison facility

6   for over two months.

7     Q.   A state prison facility for over two months.

8           And how -- and you -- you did say this

9   earlier, but I just want to make sure that I understand.

10  How long of that time that they were held in the state

11  prison facility occurred after a judge ordered their

12  release due to the Article -- the Section 17.151

13  violation?

14    A.   Well, they were -- they were released because

15  their case had been dismissed.  But they would have also

16  been able to get a personal bond.  And they were in --

17  they were still in custody -- in TDCJ custody for over

18  three days.  And then they were transferred to

19  immigration custody.

20    Q.   Thanks.

21          And you mentioned earlier that -- you

22  alluded to a separate criminal justice system for

23  these Operation Lone Star criminal trespass violators

24  who were arrested.  And I think you said something about

25  you felt like it was a separate but unequal criminal

1    justice system, or something to that effect.  I don't

2    know that I completely heard or understood your

3    response.

4                    Can you explain that a little bit?

5        A.   Yes.

6                    The individuals that I've seen and

7    represented charged under Operation Lone Star have been

8    treated completely different from other people that I've

9    seen charged with crimes in Texas.  So the -- you know,

10   what we just talked about was this delay in getting to a

11   court date and to getting into a first pretrial setting.

12   For these two specific clients that I've been talking

13   about, they were arrested on July 25th, and they did not

14   get an attorney for more than a month.  They only got

15   attorneys because I went down and found them.  So they

16   are outliers in how quickly they ended up with attorneys

17   at the beginning of this operation.

18                    Similarly, you know, the time between

19   arrest and one's first court date is far longer than

20   anywhere else that I've seen in my practice.  The idea

21   that you would be arrested and magistrated and given no

22   court date and no lawyer and no access to the criminal

23   legal system, and instead are just sitting in jail, is

24   unlike anything I've ever seen.

25                    And, again, I've -- you know, I represent

1    people that are charged in kind of normal environments,

2    and there are sometimes delays, but there are lawyers to

3    advocate for release.  And here, people were held far

4    beyond the statutory requirements under 17.151, and yet

5    they had no way to access relief until we did a lot of

6    work with a team of lawyers to get appointed, to write

7    the motion -- to write the writ, to get the writ

8    calendared.  And that's just for, you know, two out of

9    thousands of people that are being imprisoned.

10                   MS. TAYLOR:  Pass the witness.

11                   MR. SCHULMAN:  May I have some questions?

12                   THE COURT:  You may.

13                        **CROSS-EXAMINATION**

14   BY MR. SCHULMAN:

15       Q.   Professor, have you reviewed any of the arrest

16   documents in the case of Mr. Guzman Curipoma?

17       A.   I have not.

18       Q.   Did you visit with Mr. Guzman Curipoma?

19       A.   I have not.

20       Q.   So you really have no knowledge where anything

21   you have testified to now has any application to the

22   incident case.

23       A.   I'm testifying about what I know about

24   Operation Lone Star.

25       Q.   Okay.  Not about this case.

```
 1        A.   I do not personally know this case.

 2                  MR. SCHULMAN:  At this point, Your Honor,

 3   I'd move to strike Professor Dyer's testimony.  It fails

 4   to -- she is called as a law professor talking about the

 5   operation.  She's therefore an expert.  Her testimony

 6   does not satisfy Daubert and Kelly.  And she can make no

 7   application to the incident case.

 8                  MS. TAYLOR:  Your Honor, just to clarify,

 9   the State has no objection to Ms. -- to Professor Dyer's

10   qualifications as an expert on this subject and does not

11   have any objections to her testimony and does not agree

12   that -- or join in that motion to strike.

13                  THE COURT:  All right.  The testimony is

14   admitted.  The objection's overruled.

15                  THE COURT REPORTER:  Judge, did you say

16   the testimony is admitted?

17                  THE COURT:  Yes.  And the objection is

18   overruled.

19                  MR. SCHULMAN:  And I have no questions of

20   the witness, Your Honor.

21                  MS. MIRÓ:  I have no further questions,

22   Your Honor.

23                  THE COURT:  All right.

24                  So anything further from you, Ms. --

25                  (Simultaneous crosstalk)
```

```
 1                    MS. COGLIANO:  Judge --
 2                    THE COURT:  -- Cogliano?
 3                    MS. COGLIANO:  -- I know that you gave us
 4    one hour.  I can definitely tailor the next testimony
 5    because Ms. Taylor covered a lot of what they were going
 6    to cover with the next witness in her cross-examination
 7    of Ms. Dyer.  But I would request that we are allowed to
 8    present, you know, what we haven't yet presented,
 9    especially considering that a large amount of the delay
10    today is due to the appearance of somebody who's not
11    here representing the State presenting argument and
12    cross-examination.
13                    THE COURT:  Yes.  I've already told my
14    staff we're going to suspend the time deadlines.
15                    MR. SCHULMAN:  That's actually --
16                    THE COURT:  So --
17                    (Simultaneous crosstalk)
18                    MR. SCHULMAN:  -- actually reasonable,
19    Your Honor.
20                    THE COURT:  All right.
21                    Ms. Cogliano, your next witness?
22                    MS. COGLIANO:  Thank you, Judge.  We're
23    going to call Kristin Etter.
24                    THE COURT:  All right.  Ms. Etter, would
25    you raise your right hand and be sworn, please.
```

1          **KRISTIN ETTER,**

2    having been first duly sworn, testified as follows:

3              THE COURT:  You may proceed, Ms. Cogliano.

4          **DIRECT EXAMINATION**

5    BY MS. COGLIANO:

6       Q.   Hi, Ms. Etter.  I'm just going to start off

7    with, do you have any knowledge about Mr. Guzman

8    Curipoma's specific case?

9       A.   No, I do not.

10      Q.   Do you have any personal knowledge about

11   Mr. Guzman Curipoma in any capacity?

12      A.   No, I do not.

13      Q.   Do you have familiarity with the operations and

14   the practices of Operation Lone Star?

15      A.   Yes, I do.

16      Q.   So let's start there.

17              How do you have any knowledge about the

18   operations and practices of Operation Lone Star?

19              MR. SCHULMAN:  May I interject one second,

20   please, Your Honor?

21              We would -- we would object to the

22   testimony on the same basis as previously offered.

23   She'd be unable to tie it to the individual case.

24              MS. COGLIANO:  Judge, we plan to tie it to

25   the individual case.  Right now we're establishing a

1    pattern of behavior that we are going to bring in facts

2    to show that Mr. Guzman Curipoma was similarly treated

3    under the same procedures and policies.

4                    THE COURT:  All right.  The objection is

5    overruled.

6        Q.  (By Ms. Cogliano) Ms. Etter, could you please

7    restart answering how you are familiar with Operation

8    Lone Star?

9        A.  Yes.

10                   I am currently employed -- I'm an attorney

11   for Texas Rio Grande Legal Aid and Special Project

12   Director of the Operation Lone Star Program within my

13   organization.  Our organization has been assigned to

14   represent approximately 751 people that have been

15   charged under Operation Lone Star.  Of that number, 743

16   of them were charged with criminal trespass.

17       Q.  And how many of those are charged with felony

18   crimes?

19       A.  Of the 751 that I just described, seven of them

20   are charged with felonies, and the rest are charged with

21   only criminal misdemeanor -- misdemeanor criminal

22   trespass.

23       Q.  So what percentage of your caseload is,

24   therefore, anything other than misdemeanor criminal

25   trespass cases?

1      A.    The misdemeanor criminal trespass cases

2   comprise 99 percent of our cases.  And it's my

3   understanding that the numbers that Ms. Dyer just talked

4   about, in terms of the people that are being detained in

5   the Texas Department of Criminal Justice facilities --

6   both the Dolph Briscoe Unit, as well as the Segovia

7   Unit -- it's my understanding that the numbers are

8   similarly reflected in those two prison units that house

9   people charged under Operation Lone Star.

10      Q.    Thank you, Ms. Etter.

11            And in your capacity as being the director

12   of Operation Lone Star cases for Texas Rio Grande Legal

13   Aid, have you had a lot of experience on the ground,

14   both for the purposes of getting people out of custody

15   and litigating their cases in court down in Kinney and

16   Val Verde Counties?

17      A.    Yes.  Well, currently, everything is being

18   conducted via Zoom.  But my organization has been

19   involved, like I said, in -- in approximately 751 cases.

20   And our representation entails every aspect of that,

21   from our initial assignment, to a person who's been

22   arrested under Operation Lone Star, up through the

23   disposition of cases.  And we have interviewed hundreds

24   and hundreds of people, obviously all of our clients,

25   and have also -- I also had opportunity to review

1  hundreds of probable cause affidavits and discovery

2  report -- offense reports, as well.

3          MS. COGLIANO:  Your Honor, at this point,

4  I'm going to pull up Defense Exhibit L, which is a

5  declaration prepared by our expert witness in this case.

6  Q.  (By Ms. Cogliano) Ms. Etter --

7          MS. COGLIANO:  Oh, at this point, we would

8  move to admit Defense Exhibit L.  Mr. Hoffman is another

9  legal professor.  He's an immigration professor at the

10 University of Houston Law Clinic who specializes

11 specifically in federal preemption litigation in the

12 immigration context.  He has reviewed the exhibits in

13 this case, the filings in this case, and -- as well as,

14 obviously, all of the federal law relating to federal

15 preemption.  And he has come -- he's laid out the law in

16 his expert declaration and concluded with a number of

17 points in how Operation Lone Star is unconstitutional

18 under the Preemption Doctrine.

19         Again, this declaration was uploaded to

20 Box, and I'd like to admit it at this point so that I

21 can ask some questions about it to Ms. Etter.

22         MS. TAYLOR:  Your Honor, the State has no

23 objection to this exhibit.  And to reference back to

24 your response to an earlier relevance objection, I know

25 that the Court -- that there's no jury here to prejudice

1   and that the Court can make its own assessments

2   concerning relevance after reviewing it.

3                 MR. SCHULMAN:  May it please the Court.

4                 Given your ruling on relevance, I would

5   only ask for a running objection to all these exhibits

6   under relevance.  I would also say that this particular

7   exhibit is inadmissible under Daubert and Kelly because

8   it does not have any bearing on the incident case.

9                 THE COURT:  All right.  So I'm going to

10  overrule the relevance objection and allow a running

11  objection on relevance.  I also am going to

12  conditionally admit Applicant's Exhibit L with the

13  understanding that if I find that it doesn't meet the

14  requirements for an expert to testify, that I will

15  ignore it.  But, short of that, it is admitted for the

16  purpose of this hearing.

17                So y'all may continue.

18                MS. COGLIANO:  Understood, Judge.

19      Q.  (By Ms. Cogliano) So, Kristin, I'm just going to

20  direct your attention to Paragraph Number 23, which is

21  our first round of violation of federal preemption law.

22  Would you mind just reading that first paragraph for the

23  record?

24      A.   Sure.

25                [As read] Only the federal government may

1    establish immigration policy - namely, the process of

2    "determining who should or should not be admitted into

3    the country" and the "conditions lawfully imposed by

4    Congress upon ... residence of aliens."  No mechanical

5    test defines the limit of state power to promulgate,

6    under their state police powers, regulations

7    incidentally affecting immigration.  But at a minimum, a

8    state is generally barred from enacting a "comprehensive

9    scheme" for immigration, i.e., a system of state laws

10   that affects "a direct and substantial impact on

11   immigration."  Operation Lone Star is prohibited as

12   such.  State actors have repeatedly referred to

13   Operation Lone Star as an initiative to enforce border

14   security and immigration policy at the state level that

15   was intended to rival or supplant federal immigration

16   policy.  OLS establishes interlocking regulations,

17   executive orders, and statutes to further that

18   intention.  OLS is then effectuated as a, quote,

19   immigration policy, end quote, through criminal

20   prosecutions.

21        Q.   Thank you.

22             And so this is our argument for field

23   preemption; that the entire immigration policy is the

24   sole field and province of the federal government.

25             And so, Kristin, I'm going to ask you.  In

1   that paragraph, they talk about how the intent of the

2   use of this policy has been expressed by state

3   officials.  Do you have any personal knowledge of

4   statements and assertions like that being made?

5       A.   Yes.  It's pretty routine that the state actors

6   involved in implementing OLS have said that numerous

7   times in numerous different forums.

8       Q.   And, to your knowledge, has Governor Abbott

9   issued official letters, directives, and communications

10  with other state and federal actors indicating the same

11  intent, to -- to enforce a state immigration policy?

12      A.   Yes, he has.

13           MS. COGLIANO:  At this point, Judge, I'm

14  pulling up what has been premarked as Applicant's

15  Exhibit Z.  This is a letter from Governor Abbott to the

16  border sheriffs talking about the implementation of

17  Operation Lone Star in May 28 -- May 28th of 2021.

18      Q.   (By Ms. Cogliano) Kristin, is this an example of

19  one of those communications that was made by Governor

20  Abbott indicating his intent to create a state

21  immigration policy?

22      A.   Yes, it is.

23           MS. COGLIANO:  And, Judge, just for the

24  interest of time, I just want to point out the part that

25  we have highlighted, which is that the Governor is

```
 1    indicating to the sheriffs that the border security
 2    issue is one of the biggest issues for him to address.
 3    And because the Biden Administration has stopped
 4    enforcing the same policies as previously were enforced,
 5    that is why he lodged Operation Lone Star and deployed
 6    personnel and resources to guard high-threat areas along
 7    the border, and not to arrest individuals for committing
 8    criminal trespass.
 9        Q.  (By Ms. Cogliano) Kristin --
10                THE COURT:  All right.  Are you
11    offering --
12                MS. COGLIANO:  Oh.
13                THE COURT:  -- Applicant's Exhibit Z?
14                MS. COGLIANO:  Yes, Judge.  I offer
15    Applicant's Exhibit Z.  Thank you.
16                MS. TAYLOR:  Your Honor, the State has no
17    objection to Applicant's Exhibit Z.
18                MR. SCHULMAN:  We have the same objection
19    for the Kinney County Attorney's Office as previously
20    stated.
21                THE COURT:  All right.  Applicant's
22    Exhibit Z is admitted.
23        Q.  (By Ms. Cogliano) And then, Kristin, a few days
24    after that communication, what was Governor Abbott's
25    next action for Operation Lone Star?
```

1    A.   I'm aware that after that, after the --

2    declaring the existence of the disaster at the border as

3    a result of the, quote/unquote, border crisis, that

4    there was then -- he then authorized to deploy the state

5    military and Texas National Guard to the border to

6    conduct these criminal trespass arrests.

7              And as was previously testified to by

8    Ms. Dyer, it also allows for each of those criminal

9    trespass charges to be enhanced by one degree of

10   punishment to the next higher punishment range pursuant

11   to the disaster declaration that he's promulgated.

12             MS. COGLIANO:   And, Judge, at this point,

13   I pulled up Applicant's Exhibit D, which is the disaster

14   proclamation.  For the purposes of this hearing, I've

15   highlighted the segments that Katy Dyer did testify to

16   where he expressly states that he -- that it is the job

17   of the federal government to secure the border; but

18   because he does not agree with the manner and means that

19   the Biden Administration was doing that, that he was

20   going to implement this disaster declaration to further

21   the goals of Operation Lone Star in securing the border.

22   Q.  (By Ms. Cogliano) Kristin --

23             THE COURT:   Hang on just a minute.

24             Ms. Taylor, is there any objection to

25   Exhibit D?

 1          MS. TAYLOR:  No, Your Honor.  No objection

 2  to Exhibit D.

 3          THE COURT:  All right.

 4          And other than your running objection,

 5  Mr. Schulman, any other objections to D?

 6          MR. SCHULMAN:  No, Your Honor.

 7          THE COURT:  All right.  Exhibit D is

 8  admitted.

 9          MS. COGLIANO:  Thank you, Judge.

10     Q.  (By Ms. Cogliano) Has Governor Abbott taken any

11  action or communications, similar to these, looking for

12  other state officials outside of Texas to participate in

13  his initiative to create a state immigration policy?

14     A.   Yes.  I'm aware that he has solicited similar

15  action from other governors asking them to send law

16  enforcement officers to Texas to assist in the arrest of

17  migrants at the Texas border.

18          MS. COGLIANO:  Judge, at this point, we

19  move to admit Applicant's Exhibit I, which is a letter

20  written from Governor Greg Abbott and Governor Doug

21  Ducey of Arizona on June 10th of 2021 soliciting the

22  help of other state governors to join in his Operation

23  Lone Star and -- by sending law enforcement personnel to

24  Texas to also be arresting people for criminal trespass

25  for the purposes of securing the border.

```
 1              And the last quote is "Texas and Arizona
 2    have stepped up to secure the border in the federal
 3    government's absence, and now the Emergency Management
 4    Assistance Compact gives your State a chance to stand
 5    strong with us."
 6              I want to point out in this letter that he
 7    also tells the other governors that they will also be
 8    enforcing federal crimes, including illegal entry and
 9    illegal reentry, which are not crimes that are the
10    province of any of the state governors.
11              So, at this point, we would move to -- to
12    admit Applicant's Exhibit I.
13              MS. TAYLOR:  No objection, Your Honor.
14              THE COURT:  All right.
15              And, Mr. Schulman, other than your running
16    objection?
17              MR. SCHULMAN:  No other objections, Your
18    Honor.
19              THE COURT:  All right.  Exhibit I is
20    admitted.
21       Q.  (By Ms. Cogliano) And the last statement,
22    Kristin, that I'd like to bring up with you:  Has
23    Governor Abbott ever communicated this intent to any
24    representative of the federal government?
25       A.   Well, not that I'm aware of, I should preface.
```

1    But what I've seen is that he -- there was a public

2    letter that he disseminated where he wrote a letter to

3    President Biden threatening to enforce immigration

4    policies for him if Biden didn't reinstate the prior

5    administration's policies.

6         Q.   And I'm pulling up on the screen what's been

7    premarked as Exhibit H, Applicant's Exhibit H, which is

8    Governor Abbott's letter to President Biden written on

9    November 17th, 2021, where he specifically states that

10   as a result of President Biden's inaction and inaction

11   by the Mexican government, he launched Operation Lone

12   Star for the purpose of helping to secure the border and

13   combat the smuggling of people and drugs in Texas.  "In

14   the absence of federal action," Governor Abbott says,

15   "Texas will continue to step up."

16             And just to reiterate, Ms. Etter, we hear

17   this language about wanting to protect Texas from drugs

18   and smugglers and guns.  Can you remind us again what

19   percentage of your case load --

20             THE COURT REPORTER:  Ms. Cogliano?

21        Q.   (By Ms. Cogliano) -- other than criminal

22   trespass?

23             THE WITNESS:  Ms. Williamson, did you need

24   some additional time?

25             *(Reporter admonition)*

```
1                    (Discussion off the record)
2                    THE COURT:  All right.  So you're offering
3        Exhibit H.  Is there -- are there any objections beyond
4        the running objection?
5                    MS. TAYLOR:  No objections, Your Honor.
6                    MR. SCHULMAN:  No, Your Honor.
7                    THE COURT:  Exhibit H is admitted.
8                    MS. COGLIANO:  At this point, I'm not
9        going to publish, but I am going to move to admit
10       Applicant's Exhibit E, which is a complaint filed by the
11       ACLU asking for a federal investigation into Operation
12       Lone Star, which was attached to Applicant's Application
13       for Writ of Habeas Corpus, which outlines not only the
14       horrific details of the implementation of the policy but
15       also, quote, several times where state actors and
16       Governor Abbott himself have made similar statements
17       that we are discussing here.
18                   So we move to admit into the record
19       Applicant's Exhibit E.
20                   MS. TAYLOR:  No objection, Your Honor.
21                   MR. SCHULMAN:  Your Honor, I have reviewed
22       the exhibit and have no other objections than those
23       previously voiced.
24                   THE COURT:  Then E is admitted.
25                   MS. COGLIANO:  So -- thank you, Judge.
```

1    Q.   (By Ms. Cogliano) Ms. Etter, in your experience,

2    then, given that the intent of Governor Abbott was to

3    create a state-based immigration system, how has your

4    knowledge of the implementation of that system to

5    prosecute people of criminal trespass cases achieving

6    that goal?

7    A.   Yes.

8         So similar to the Applicant's case, as

9    well as the 743 individuals that we represent, he's

10   implementing it through pre- -- pretextual misdemeanor

11   arrests of only suspected migrants, which then places

12   those individuals in a separate substandard and unequal

13   criminal justice system based solely on their suspected

14   immigration status.

15   Q.   And without going over too much, to reiterate

16   what Ms. Dyer said, is there anything that she described

17   about the system in Kinney County that you disagree

18   with?

19   A.   No.  And I could only add some additional

20   information if you're interested and if the Court is --

21   Q.   Sure.

22   A.   -- interested.  I know.  I agree a hundred

23   percent with what Ms. Dyer testified to.  It's

24   absolutely a separate system at every level, and it

25   really starts with the very inception of these cases.

```
1              So our clients who are civilian migrants
2   in Texas are arrested under a military operation.  So
3   we're talking about our clients being apprehended by
4   members of the Texas National Guard, in conjunction with
5   the Texas DPS officers, in a military operation and
6   apprehending them, most of them without any probable
7   cause to begin with, on these low-level criminal
8   misdemeanor trespass cases.
9              As Ms. Dyer testified, they're then from
10  that -- from the very inception of the case, they're
11  funneled into this entirely separate system that she's
12  already described with the magistration.  Our clients
13  are detained hours away from the county of prosecution,
14  as she mentioned in Dolph Briscoe.  Our clients are also
15  detained in Segovia, which is another Texas Criminal
16  Department of Justice prison facility.
17             And so what -- what happens after they're
18  detain- -- moved -- apprehended, they go through the
19  magistration process.  They're then put in prison.
20  Again, we're talking about low-level misdemeanor people
21  that have a presumption of innocence.  They are then
22  detained for prolonged periods of time as they await
23  their first court date.  And all of these court dates
24  are very specific.  You don't go back to your county
25  courthouse.  You actually have a separate OLS docket
```

1    that you have to wait for the judges to assign your case
2    to a docket or the court coordinators to assign your
3    case to a docket.  They wait months.
4              And, for example, we just had a client
5    today who has been in prison for 136 days, and today was
6    his first court date.  Not his trial.  His first court
7    date.  So we have these prolonged periods of detention
8    in very harsh conditions, I might add, in -- in these
9    prison facilities that are only authorized to detain
10   adult convicted felons.  Again, these are pre-trial
11   misdemeanor detainees that have the presumption of
12   innocence.  They are in those -- those prisons for
13   prolonged periods of time.  They have to wait until
14   their case is called.
15             We had initially started this -- Operation
16   Lone Star dockets -- these Operation Lone Star dockets
17   had started out with a group of judges that were
18   assigned by the presiding judge of the administrative
19   region, Judge Ables.  Those judges were handling all of
20   the cases for the first few months.  Those judges were
21   then removed by the local Kinney County judge in that
22   county and basically were replaced by people that he
23   handpicked, or that his commissioners were handpicked.
24   And so while the previous judges afforded our clients
25   due process and were hearing our motions and requests

1    for personal bonds, this new group of judges have not

2    and are detaining and delaying and denying any form of

3    relief that we request.

4               And so, in essence, everything about these

5    prosecutions is different from what you would normally

6    find in a typical criminal prosecution.  They have

7    basically been stripped of constitutional and statutory

8    protections that are afforded to everyone.  They are

9    then made to wait for months in prison until a court

10   date is -- is set for them.  And they are then really

11   coerced to plead guilty to an offense that they're

12   innocent of as their only mechanism to get out of

13   prison.

14       Q.   (By Ms. Cogliano) Thank you.

15              And, Ms. Etter, is this the same policies

16   and practices that are being implemented for any

17   individual that is operat- -- that is arrested pursuant

18   to Operation Lone Star?

19       A.   Yes.

20              MS. COGLIANO:  Judge, at this point, I'd

21   like to make a record.  Ms. Taylor and I have agreed to

22   stipulate to the fact that Mr. Guzman Curipoma was, in

23   fact, arrested and is being prosecuted pursuant to

24   Operation Lone Star.

25              MR. SCHULMAN:  Your Honor, I would object

1    to that stipulation because there is no evidence to
2    support it.
3              MS. COGLIANO:  Judge, the evidence that
4    we're presenting to support it is these practices.  And
5    we are going to show that he was arrested during this
6    time with these same practices and by these same
7    entities.
8              But -- but the purpose -- the legal
9    purpose of a stipulation is for a circumstance that
10   Mr. Schulman is describing, which is that we are going
11   to agree to that; and that, in and of itself, is the
12   fact of evidence that's presented in this hearing.
13             MR. SCHULMAN:  Your Honor, there is no
14   evidence that this arrest was in any way tied to
15   Operation Lone Star.  There is no evidence that the
16   officer who arrested him was not previously assigned to
17   this county or that Mr. -- or that the arrest wouldn't
18   have occurred but for Operation Lone Star.
19             MS. TAYLOR:  Your Honor, the State --
20             MR. SCHULMAN:  They have the burden --
21   they have the burden of showing that there is -- as
22   applied to Mr. Guzman Curipoma, as set out in the *Perry*
23   case, that it is applied to him.  The question in the
24   *Perry* case was whether you could bring it or not, but
25   they clearly showed that it applied to Governor Perry.

1    Nothing in this case shows that Operation Lone Star

2    applies personally to Mr. Guzman Curipoma.

3              MS. TAYLOR:  Your Honor, the -- the State

4    has --

5              THE COURT:  (Indicating.)

6              MS. TAYLOR:  Sorry.

7              THE COURT:  Give me a minute to find the

8    un-mute button.

9              So this hearing is hampered by the fact

10   that there are two lawyers or sets of lawyers who

11   purport to represent the State.  I have already ruled

12   that the Travis County District Attorney Office, I

13   believe, is properly representing the State of Texas.

14   I've allowed Mr. Schulman to participate, as well.  He

15   purports to be Kinney County's attorney.

16             MR. SCHULMAN:  Acting Assistant County

17   Attorney.

18             THE COURT:  As Acting Assisting --

19   Assistant County Attorney for Kinney County.  Kinney

20   County doesn't appear to be a party in this case, but I

21   want to consider all of the issues that Mr. Schulman is

22   raising.  And I do -- and -- but, by necessity, the

23   three-hour hearing is going to turn into a much longer

24   hearing as a result of that.

25             I understand that Ms. Cogliano and

1   Ms. Taylor, the Applicant and the State, have agreed to

2   some stipulations, and Mr. Schulman is challenging that

3   stipulation.  I will accept the stipulation as a

4   stipulation between the State and the Applicant and note

5   that the Kinney County Attorney's Office disagrees with

6   that stipulation.

7           MS. TAYLOR:  Thank you, Your Honor.

8           For the record, the Footnote 1 of the

9   State's answer does provide some explanation for the

10   State's agreement to stipulate to this -- this fact.

11   And the State did not merely rubber-stamp Applicant's

12   assertion that his arrest was part of Operation Lone

13   Star but, in fact, reviewed the arrest report in this

14   case.

15           And, in fact, it appears that Applicant

16   was arrested by a Department of Public Safety trooper

17   rather than local law enforcement.  Applicant was

18   subsequently processed and booked at a facility in

19   Val Verde County, which is used by Operation Lone Star

20   for migrant processing.  Further, it appears that

21   Applicant was, for a time, incarcerated in a State

22   prison.  And for these reasons and others, the State

23   evaluated the facts of this case and determined, based

24   on the facts, that it would agree to stipulate that

25   Applicant was arrested pursuant to Operation Lone Star's

1   enforcement operation to secure the border.

2                   MR. SCHULMAN:  I would renew the County

3   Attorney's objection.

4                   THE COURT:  And the objection is

5   overruled.

6                   Y'all may continue.

7                   MS. COGLIANO:  Thank you, Judge.

8       Q.  (By Ms. Cogliano) Ms. Etter, I want to just ask

9   you a couple of questions about the separate and

10  distinct way that the individuals charged under

11  Operation Lone Star actually being prosecuted as -- as

12  compared to the average U.S. citizen in -- in Texas

13  criminal courts.

14                  In your experience as a defense attorney,

15  when a U.S. citizen is accused -- suspected of a crime,

16  is the decision to arrest or prosecute them ever

17  determined exclusively by their race or their gender?

18      A.   No.

19      Q.   Under Operation Lone Star, is the decision to

20  prosecute ever based on gender or race?

21      A.   Yes.  It is in every instance.

22      Q.   What are the policies under Operation Lone Star

23  as far as -- as prosecuting based on gender or race?

24      A.   Yes.

25                  I've been involved in litigation where

1    troopers have testified as to the policy.  I also

2    believe it's been widely disseminated in the media that

3    Operation Lone Star only arrests single adult males for

4    criminal trespass.

5         Q.   And, Ms. Etter, in your experience as a

6    criminal defense attorney, is it ever the case that

7    every United States citizen charged with a specific

8    crime receives the same exact plea offer from the

9    prosecutor's office within a given county regardless of

10   any difference in facts, circumstances, or mitigating

11   evidence?

12        A.   No.  In my 20 years of experience, I've never

13   seen a system like this where every single plea offer --

14   by the time our clients get to actually have a court

15   date, they have been in prison for -- like I said, our

16   client today, 136 days.  But it's not uncommon that

17   they're in prison for these low-level criminal trespass

18   misdemeanors for over 100 days before a court date.

19             So typically, once they get to court, in

20   every instance, the offer that is made is a time-served

21   offer.  And I've been told that it doesn't matter if

22   they're in prison for three days or over a hundred days,

23   the offer is always going to be time served.

24        Q.   Ms. Etter, is it your experience that the

25   prosecutions of individuals under Operation Lone Star

1   treat those individuals differently than normal U.S.

2   citizens being charged with crimes in terms of arrest,

3   magistration, detention, transportation, housing, and

4   ultimately discharged from the case?

5       A.   Yes.  As I have previously testified, it's a

6   totally different, separate, substandard, unequal system

7   from the inception of the -- of the arrest, all the way

8   through the disposition, including post-disposition, as

9   well.  So, yes, it's -- it's a completely separate

10  system.

11              MS. COGLIANO:  Judge, at this point, I am

12  publishing and will move to admit Applicant's

13  Exhibit AA.  It is a 48-second clip of a statement made

14  by Governor Abbott on the news to the people of Texas

15  saying the same thing; that he has developed a new and

16  distinct criminal justice system for the purposes of

17  Operation Lone Star.

18              So, at this point, I move to admit

19  Exhibit AA.

20              THE COURT:  All right.  Are there any

21  objections other than the relevance objection?

22              MS. TAYLOR:  No objections, Your Honor.

23              MR. SCHULMAN:  The same objections, Your

24  Honor.

25              THE COURT:  All right.  The objections are

1   overruled.

2                   We are going to go ahead and take a break.

3   We usually do that for the court reporter and the

4   interpreter, if for no one else, after about an

5   hour-and-a-half; and we've been going about an

6   hour-and-a-half.  We'll take a 15-minute break.

7                   My intention is that we will continue into

8   the noon hour after that so that we can complete this

9   hearing.  So if y'all need to get a snack, you're

10  welcome to do that now.  And we'll pick back up at

11  11:45.

12                  *(Recess taken)*

13                  THE COURT:  One of the reasons I lifted

14  the time limit is I didn't want you to feel you had to

15  speak faster to get across everything you need to get --

16  get across because that just means we don't get a good

17  record.

18                  MS. COGLIANO:  Noted, Judge.  I will -- I

19  will balance all of those interests.

20                  THE COURT:  All right.  You may continue.

21                  MR. SCHULMAN:  May I, Your Honor?

22                  THE COURT:  Yes.

23                  MR. SCHULMAN:  I -- I cannot confirm the

24  authenticity of this, but I've gotten a text from --

25  from the AG's Office wanting to know why they're not

1   involved and wanting the proceedings to be suspended

2   until they can be involved.

3   　　　　　　THE COURT:  All right.  Well, that -- that

4   is noted, and we will continue.

5   　　　　　　MS. COGLIANO:  I'm going to re-pull up

6   onto the screen Applicant's Exhibit AA which, again, is

7   a 48-second clip.  And, at this point, I'll move to

8   admit Exhibit AA into evidence.

9   　　　　　　THE COURT:  All right.  Any additional

10  objections beyond the running objection?

11  　　　　　　MR. SCHULMAN:  No objection, Your Honor.

12  　　　　　　MS. TAYLOR:  No objection, Your Honor.

13  　　　　　　THE COURT:  All right.  Exhibit AA is

14  admitted.

15  　　　　　　*(Applicant's Exhibit AA playing)*

16  　　Q.  (By Ms. Cogliano) So, Ms. Etter, just to -- to

17  reiterate that, was that the Governor of Texas saying

18  that he was creating a court system and a jail system to

19  put people who come across -- to put into it people who

20  came across the border?

21  　　A.   Yes.  And I couldn't agree with him more on

22  that aspect.

23  　　Q.   Does he mention that he is putting people in

24  jail because of criminal trespass charges specifically?

25  I guess, is his goal to prosecute criminal trespass, or

1   is his goal to prosecute people for crossing the border

2   as he articulated it in that quote?

3       A.   Correct.  He has --

4                THE WITNESS:  Sorry, Ms. Williamson.

5       A.   It appears that he's specific to criminal

6   tres- -- or to coming across the border.

7       Q.   (By Ms. Cogliano) Kristin, outside of the

8   disaster declaration, has Governor Abbott issued other

9   executive orders related to Operation Lone Star

10  purporting to enforce a state immigration system?

11      A.   I'm familiar with another Executive Order that

12  he issued, GA-37, forbidding the transportation of

13  suspected migrants, and that also related to his alleged

14  disaster declaration on the border.  However, it's my

15  understanding that a federal court in El Paso has issued

16  an injunction preventing the implementation of that

17  action on preemption grounds.

18               MS. COGLIANO:  At this point, Applicant

19  will move to admit Applicant's Exhibit G, which is also

20  an attachment to the application for writ of habeas

21  corpus, which is the order granting injunction from the

22  El Paso court.

23               MS. TAYLOR:  No objections, Your Honor.

24               MR. SCHULMAN:  Same objections, Your

25  Honor.

1               THE COURT:  All right.  Exhibit G is

2    admitted.

3         Q.  (By Ms. Cogliano) Ms. Etter, within the context

4    of this distinct criminal justice system that is truly

5    an immigration enforcement system, does Operation Lone

6    Star, through its policies, implicitly require state

7    actors to make independent determinations about the

8    immigration status and legality of their arrestees?

9         A.   Yes, it does.  I would -- I would mention both

10   at its inception -- so when our clients are initially

11   arrested -- frequently, we see in probable cause

12   affidavits that they refer to the reason that they drew

13   the attention of law enforcement was because of their

14   suspected immigration status.  We see that frequently

15   throughout probable cause affidavits for our clients.

16   And so it's requiring state actors, at their inception,

17   to make those determinations.

18               In addition, we see state actors making

19   those determinations on the tail end of the case, as

20   well, as to whether or not they are agreeing to release

21   our clients when they should, in fact, be released.

22        Q.   And additional to this implicit requirement

23   that they figure out who is here legally and who is

24   illegally, is there any other state enactment or statute

25   that expressly requires such a determination by state

1    actors?

2       A.   Yes.  In fact, the Texas Government Code

3    Provision 772.0071 is the creation of the border

4    prosecution unit.  And the creation of that unit gives

5    the authority to the border prosecution unit to

6    prosecute crimes committed by people they determine to

7    not have legal status.  So that is explicitly written in

8    the Texas Government Code.

9            MS. COGLIANO:  And I am going to pull up

10   the Texas Government Code here.  This is Applicant's

11   proposed Exhibit R, which is the Government Code

12   provision creating the border prosecution unit.  And

13   under Section (E), it says that one of the sources of

14   the authority of the border prosecution is if they are

15   prosecuting someone for a crime that was "committed by a

16   person who is not a citizen or national of the United

17   States and is not lawfully present in the United

18   States."

19      Q.  (By Ms. Cogliano) Kristin, are state actors

20   allowed to independently, without guidance and review

21   from the federal government, make determinations about

22   the legality of someone's immigration status?

23      A.   No.  That is in express violation of the United

24   States Supreme Court's decision in *Arizona v. United*

25   *States*.

1          MS. COGLIANO:  And at this point, I'm just

2     going to re-pull up Applicant's Exhibit Q, which are the

3     excerpts from Sheriff Coe out of the contempt hearing

4     and call attention to the last sentence that was read

5     with Ms. Dyer's testimony.  If ICE does not want to pick

6     them up, if their hold is rescinded and we determine

7     their status is to be illegal in the United States, we

8     will contact Border Patrol.

9          Q.  (By Ms. Cogliano) Kristin, in your experience,

10    is he telling the truth there, that regardless of the

11    ICE hold, he is going to pursue some way of getting

12    these individuals deported even if their cases are fully

13    dismissed?

14         A.  Yes.  That happens in almost all of our cases.

15    Like I said, the determination is being made on the tail

16    end of the case I will mention both within the

17    Department of Criminal Justice, TDCJ, prison unit, as

18    well as then later with the Kinney County Sheriff's

19    Office.

20         Q.  And when he says he contacts Customs and Border

21    Patrol, what is he actually doing in order to get those

22    clients into the custody of Customs and Border Patrol?

23         A.  What our clients have experienced is typically

24    a situation that involves them either disposing of a

25    criminal case in the manner that I mentioned previously,

1    through a coerced guilty plea, or through the posting of

2    a bond.  Once that happens, those people are entitled to

3    immediate release from the facility where they're being

4    detained.

5              There is the issue with the 48-hour hold

6    by the ICE -- the ICE detention hold.  Many of our

7    clients, however, either have the ICE detainer rescinded

8    or have been in much longer than the 48 hours that

9    they're allowed to be helped if there is the ICE

10   detainer that's actually still in place.  Nevertheless,

11   TDCJ transportation units are transporting our clients

12   back to the border from the prison units and turning

13   them over to Customs and Border Patrol.

14             THE COURT:  All right.  Let me, while

15   we're at a pause, ask:  Are you offering Exhibit R?

16             MS. COGLIANO:  Yes, Judge.  I'm offering

17   Exhibit R.

18             THE COURT:  Any objection other than the

19   running objection?

20             MS. TAYLOR:  No objection, Your Honor.

21             MR. SCHULMAN:  Same objections, Your

22   Honor.

23             THE COURT:  Exhibit R is admitted.

24             MS. COGLIANO:  At this point, that -- I'm

25   going to move on to our more limited testimony that

1  relates to our grounds for conflict preemption.

2             And so to begin, I'm going to bring back

3  up Applicant's Exhibit L, which is our declaration from

4  Professor Hoffman.  And the next three sections,

5  Paragraph 24, 25, and 26, focus on conflict preemption.

6             First, that the Operation Lone Star

7  conflicts with federal immigration policy as far as how

8  they determine to prioritize who is subject to removal.

9             The next claim is that Operation Lone Star

10  policies are in conflict with federal policy because

11  they are frustrating the humanitarian relief part of

12  immigration policy that affords people the opportunity

13  to stay in the United States even if they entered

14  illegally in certain circumstances.

15             And, finally, we're arguing that Operation

16  Lone Star conflicts with federal immigration law by

17  ignoring and not following the federal government's

18  non-removal option -- non-criminal removal option by

19  utilizing criminal prosecution in every case that they

20  deem is worthy of expulsion from the United States.

21     Q.  (By Ms. Cogliano) Ms. Etter, we've talked about

22  a bunch of writings and statements that Governor Abbott

23  has made discussing Operation Lone Star.  I won't pull

24  them all up again to review for each of these claims.

25  But can you tell us if any of them contemplate federal

1    enforcement priorities, humanitarian efforts, or

2    non-criminal resolutions for immigration in an effort to

3    to comply with federal policy?

4        A.   No.  And, in fact, these specifically disfavor

5    the current federal policies.

6        Q.   Have the Biden Administration and ICE

7    implemented and disseminated their policies specifying

8    which individuals the federal government believes should

9    be priority for removal?

10       A.   Yes, they have.

11            MS. COGLIANO:  At this point, we are going

12   to move to admit Exhibit T, which is a memorandum from

13   ICE regarding their new policies under the Biden

14   Administration.  And I will publish that now and move to

15   admit it.

16            THE COURT:  Any objection other than the

17   running objections?

18            *(No response)*

19            THE COURT:  Hearing none, Exhibit T is

20   admitted.

21            MS. COGLIANO:  This is a January 2021

22   memorandum from the Department of Homeland Security

23   saying that the United States faces significant

24   challenges at the border.  And in light of those

25   circumstances, they need to create new policies that

1    respect human rights and due process, to adopt

2    appropriate public health guidelines and protocols, and

3    to prioritize responding to threats to national

4    security, public safety, and border security.  And the

5    memorandum outlines how they are going to go about

6    implementing those new procedures and what their

7    priorities are in their immigration policies.

8              To follow up, I am going to pull up

9    Applicant's Exhibit U, which is the subsequent release

10   from ICE on February 28th, 2021.  And I'm going to move

11   to admit Applicant's Exhibit U into the record.

12             MS. TAYLOR:  No objection.

13             THE COURT:  All right.  So Exhibit U is --

14             *(Simultaneous crosstalk)*

15             MR. SCHULMAN:  [Zoom audio difficulty] --

16             THE COURT:  -- admitted.

17             MR. SCHULMAN:  -- objection, Your Honor.

18             THE COURT:  I assumed as such.  Unless I

19   hear you speak up, Mr. Schulman, I'll assume that the

20   running objection is made.

21             MR. SCHULMAN:  Very good, Your Honor.

22   Thank you.

23             MS. COGLIANO:  This document, which also

24   outlines extensively the ground -- the policies that

25   they want to implement and why they want to implement

1  them, it says, "in executing its critical national

2  security, border security, and public safety mission,

3  the Department must exercise its well-established

4  prosecutorial discretion and prioritize its limited

5  resources to most effectively achieve that mission."

6  And this document lays out why they are no longer

7  enforcing ICE holds against individuals charged with

8  crimes like criminal trespass.

9           And, finally, I am going to publish and

10  move to admit Exhibit Y, which is a declaration that was

11  filed in federal litigation between the federal

12  government and the State of Texas regarding Operation

13  Lone Star.

14           Is it sharing?

15           And it's an affidavit of Peter B. Berg,

16  who is currently or -- or was at least August 12th of

17  2021 the Director of Enforcement and Removal Operations

18  for the Department of Homeland Security and ICE.

19           So I move to admit Applicant's Exhibit Y.

20           MS. TAYLOR:  No objection.

21           THE COURT:  Exhibit Y is admitted.

22           MS. COGLIANO:  And this is a nine-page

23  declaration that reiterates most of the content of the

24  two -- two preceding exhibits and lays out why it would

25  be a huge detriment to the federal government if they

1     were forced to remove everybody that the Kinney County

2     Sheriff's Office and the Kinney County Attorney's Office

3     want removed.

4              The Kinney County Attorney's Office and

5     the Kinney County Sheriff have filed suit in federal

6     court for an injunction asking the federal court to

7     require the federal government to comply with the

8     state's requested immigration policy showing that they

9     clearly don't understand that federal immigration policy

10    is in the province of the federal government.

11       Q.  (By Ms. Cogliano) Do the policies included in

12    these exhibits, Ms. Etter, prioritize people who pose a

13    threat to national security and de-prioritize persons

14    who are only charged with misdemeanor, non-violent

15    offenses?

16       A.   Yes.

17       Q.   Does the implementation of Operation Lone Star,

18    under the directives made by Governor Abbott and other

19    state officials, fall in line with those priorities that

20    are established by the federal government?

21       A.   No, not at all.

22       Q.   Would you say that Operation Lone Star is a way

23    for Texas to facilitate the deportation of those

24    individuals specifically de-prioritized by the federal

25    government?

1        A.    Yes, I would.  And that's based on, again, our

2    representation of close to 800 people charged under

3    Operation Lone Star.

4              Again, the majority -- over 99 percent --

5    are charged with a very low-level criminal trespass,

6    obviously a non-violent offense.  The majority of our

7    clients have never been arrested, and so they pose no

8    threat to national security and, again, a non-violent,

9    low-level criminal trespass.

10             So, no, I would say it's in direct

11   conflict with the stated priorities of the federal

12   government.

13             THE COURT:  Let me make -- let me just ask

14   a question and make sure I understand.

15             The -- the Applicant is not asking me to

16   declare Operation Lone Star unconstitutional.  In fact,

17   there's litigation pending in federal court about that,

18   as I understand it.  The Applicant is asking me to find

19   that, as applied to him, the procedures have been

20   wrongful or illegal and that he should be released from

21   the restraint as a result of the as-applied problem.

22             Do I have that right?

23             MS. COGLIANO:  Judge, specifically what we

24   are asking this Court to grant in terms of relief is a

25   dismissal of the case because of a ruling that the

1   prosecution of Mr. Guzman Curipoma, under Operation Lone

2   Star, for criminal trespass is preempted by federal law.

3   And so we're asking specifically for the prosecutions of

4   people suspected to be migrants of non-violent criminal

5   trespass charges under Operation Lone Star is

6   unconstitutional under the Supremacy Clause.

7             But this particular application, Judge,

8   correct, is only applied to Mr. Guzman Curipoma.  He is

9   the only Applicant for relief in this case.

10            THE COURT:  Thank you.

11            MR. SCHULMAN:  May I respond?

12            THE COURT:  It really wasn't a question to

13  you, Mr. Schulman.  I just was trying to get it straight

14  what they're asking for.

15            All right.  You may continue,

16  Ms. Cogliano.

17     Q.  (By Ms. Cogliano) Given the dissemination of

18  these federal prioritization policies and general

19  immigration enforcement policies, to your knowledge, was

20  Sheriff Coe of Kinney County aware of the change in

21  federal policies and whether or not ICE would be

22  enforcing holds on criminal trespass arrestees?

23     A.   I'm not sure what Sheriff Coe was aware of.

24            MS. COGLIANO:  Judge, at this point, I am

25  going to publish Applicant's Exhibit J and move for its

1    admission.  It is an affidavit of Sheriff Coe that is

2    also filed in the federal litigation.

3                 And I want to be very clear, Judge, that

4    the federal litigation is not about the entirety of

5    Operation Lone Star.  It is specifically requesting the

6    Judge to force the federal immigration units to come and

7    pick up individuals charged with criminal trespass out

8    of the Kinney County Jail.  That is their specific

9    litigation.  The specific litigation in El Paso is

10   related only to an Executive Order issued by Governor

11   Abbott directing the arrest of anyone that looks like

12   they're transporting someone, that's a migrant.  And

13   they only contested that specific provision.

14                 What we are alleging here is that a

15   combination of Executive Orders, statutes, and policies

16   implemented by the state government constitutes a full

17   immigration scheme.  And that's why the prosecutions

18   themselves of my client were unconstitutional; or, in

19   the alternative, the specific provisions of those

20   prosecutions are claim preempted by federal law.

21                 I hope that didn't make it more confusing,

22   but I was just trying to -- to lay that out for the

23   Court.

24                 And, at this point, we're going to move to

25   admit the affidavit of Sheriff Brad Coe from July 8th of

1    2021.

2                     MS. TAYLOR:  No objection.

3                     MR. SCHULMAN:  Same objection.

4                     THE COURT:  Exhibit J is admitted.

5                     MS. COGLIANO:  And in this affidavit, I

6    would call the Court's attention to -- to Paragraphs 13,

7    14, and 15 where he says his deputies have asked ICE to

8    come take custody of them.  He is not aware of a single

9    occasion when ICE has agreed to come take custody of an

10   illegal alien out of the Kinney County Jail, and that --

11                     *(Reporter admonition)*

12                     MS. COGLIANO:  Sorry.

13                     -- and that ICE has notified -- has

14   notified the Sheriff's Office that illegal aliens

15   convicted of criminal trespass would not be accepted for

16   removal proceedings because they no longer meet the

17   criteria for removal under the new policies.

18                     Judge, this is contrasted with the

19   Sheriff's testimony in the contempt hearing, which was

20   subsequent to his filing of the affidavit, in which he

21   testified that he would hold any -- any arrestee, even

22   if their cases were dismissed, in custody until ICE came

23   and picked them up, whether or not ICE wanted to.  At

24   the time he made that statement, he had already filed an

25   affidavit saying that he was fully well aware that they

1   never were going to do that.

2       Q.   (By Ms. Cogliano) Turning briefly to the usurp

3   patient of federal humanitarian relief.

4               Kristin, do you and any other individuals

5   representing people under Operation Lone Star have

6   clients who are pursuing relief through the humanitarian

7   aspects of federal immigration policy?

8       A.   Yes.  A large number of our clients came to the

9   United States to seek asylum.  And under federal law,

10  specifically 8 U.S.C. 1158, a person who wants to seek

11  asylum in the United States can arrive in the United

12  States whether or not at a designated port of arrival to

13  request asylum.  Many of our clients in this partic- --

14  that have been charged under Operation Lone Star were

15  coming to the United States to do just that.

16              And I will mention, many of our clients

17  currently have asylum applications pending.  So what

18  frequently happens to our clients after they process out

19  of Operation Lone Star state custody is, as we've

20  described, they go to CBP custody currently.  Many of

21  our clients, once they get to CBP custody, are either

22  removed to their country of origin; or if they have a

23  fear of return to their country, they're released back

24  into the United States where they are then allowed to

25  apply for asylum.

```
1            And so we currently have many of our
2   clients that have asylum cases pending that reside while
3   their asylum case is pending in the United States.
4            MS. COGLIANO:  Judge, at this point, I am
5   going to publish and then move for admission of
6   Applicant's Exhibit S, which is a declaration prepared
7   by Mr. Guzman Curipoma's immigration lawyer.
8   Mr. Guzman Curipoma's immigration lawyer is Elissa
9   Steglich.
10           And, at this point, we would move to enter
11  into the record Applicant's Exhibit S.
12           MS. TAYLOR:  No objection.
13     Q.  (By Ms. Cogliano) In this affidavit, it
14  discuss- --
15           THE COURT:  Hang on just a minute.  Hang
16  on.
17           Let me just say, Exhibit S is admitted.
18           MS. COGLIANO:  Sorry, Judge.
19           MR. SCHULMAN:  And I have the same
20  objection, Your Honor.
21           THE COURT:  Yes.
22           MS. COGLIANO:  This exhibit goes into his
23  detention, which we will end with.  But I want to point
24  out Paragraph Number 5 which says that ICE subsequent to
25  his release filed the Notice to Appear with the
```

1    Immigration Court, and Mr. Guzman Curipoma has indicated

2    to the Immigration Court that he feared to return to his

3    home country of Ecuador, and he has requested asylum and

4    related forms of immigration protections.  They are

5    currently pending, and they are in -- they are actively

6    pursuing his asylum claim.

7              One safeguard that the federal government

8    has in place to ensure that state governments do comply

9    with their priority policies is by requiring those who

10   do want to help enforce federal immigration policy to

11   sign a contract with ICE that includes specific required

12   training and supervision.

13   Q.  (By Ms. Cogliano) To your knowledge, is Kinney

14   County participating in that option, and have they

15   signed one of those agreements with ICE?

16   A.   To my knowledge, no.

17             MS. COGLIANO:  At this point, we will pull

18   Applicant's Exhibit K, which is a list from the

19   Department of Homeland Security website with all of the

20   counties in the United States that have signed such an

21   agreement.  And under "Texas," Kinney County is not

22   listed as one of the counties that has signed an

23   agreement and, therefore, in compliance with the

24   training and supervision if they intend to enforce

25   federal immigration policies.

```
 1                    THE COURT:  All right.  So you're --
 2               (Simultaneous crosstalk)
 3               MS. COGLIANO:  [Zoom audio difficulty] --
 4               THE COURT:  -- offering --
 5               MS. COGLIANO:  Yes.
 6               THE COURT:  -- Exhibit K?
 7               MS. COGLIANO:  Judge, so I move to admit
 8      Exhibit K into the record.
 9               MS. TAYLOR:  No objection.
10               MR. SCHULMAN:  Same objection.
11               THE COURT:  Exhibit K is admitted.
12               MS. COGLIANO:  The second-to-last issue of
13      claim preemption that we have to present is the
14      preemption that federal -- that the -- Operation Lone
15      Star's preempted by the federal government because
16      Operation Lone Star conflicts with the foreign policy
17      goals that are implicated and the consequences that are
18      implicated when you are enforcing a federal immigration
19      policy.
20               The federal government has more vested
21      interest in immigration policy than just the retention
22      or deportation of individuals.  Our relationships as a
23      country with other countries and individuals that are
24      foreign nationals have very direct impact on our foreign
25      relations with those countries.
```

1     Q.  (By Ms. Cogliano) So looking back, Kristin, at

2     Exhibit H, which is Governor Abbott's letter to

3     President Biden, which I will pull up --

4                    MS. COGLIANO:  And this -- highlighting.

5     Q.  (By Ms. Cogliano) Kristin, if you haven't had a

6     chance to review this particular component, I

7     understand.  But to your knowledge, do -- can you see

8     anywhere in this letter where federal foreign policy as

9     a whole, is implicated?

10    A.   Yes.  He does discuss relations with Mexico.

11                   MS. COGLIANO:  So I'll call the Court's

12    attention to the fact that every paragraph in this

13    letter to President Biden is talking about our foreign

14    policy with Mexico as a country, not just the

15    immigration status and deportation of those that are

16    entering the country illegally from Mexico.

17                   He says, "I urge you to take action to

18    protect American assets from seizure by the Mexican

19    government."  He says, "It has come to my attention that

20    the Mexican government is using militarized police

21    forces," and it requests that the Biden Administration

22    do something about it.  And he says that if Biden -- if

23    the Biden Administration does not comport with what he

24    believes is the best federal immigration policy and how

25    it impacts the relationship of the United States with

1  Mexico, that he will take matters into his own hands and

2  continue enforcing what he deems the best policies at

3  the state level.

4          Additionally, I would like to publish

5  Applicant's Exhibit BB, which is a 38-second clip of

6  Assistant -- not Assistant County Attorney -- of the

7  County Attorney, Brent Smith, testifying before the

8  Committee on Corrections discussing what he believes are

9  the main goals of Operation Lone Star and why it is

10 important.

11         At this point, I move to admit Applicant's

12 Exhibit BB.

13         MS. TAYLOR:  No objection.

14         THE COURT:  Exhibit BB --

15         MR. SCHULMAN:  Same objection.

16         THE COURT:  Exhibit BB is --

17         MR. SCHULMAN:  Well, I think --

18         THE COURT:  -- admitted.

19         MS. COGLIANO:  Thank you, Judge.

20         THE COURT REPORTER:  I'm sorry.  Judge,

21 can you say --

22             *(Applicant's Exhibit BB playing)*

23         THE COURT REPORTER:  -- that --

24             *(Applicant's Exhibit BB playing)*

25         THE COURT REPORTER:  -- one more time?

1   There's someone talking in the background.  Or maybe

2   they started the video before I heard the Judge.

3                 THE COURT:  Right.

4                 So, again, Mr. Schulman, you have a

5   running objection, so you don't need to say the

6   objection to relevance.  If you have a different

7   objection, you're welcome to say it.  But I've already

8   overruled your objection to relevance.

9                 Exhibited BB is admitted.  And you may

10   play it.

11              *(Applicant's Exhibit BB playing)*

12     Q.  (By Ms. Cogliano) Ms. Etter, is that the County

13   Attorney of Kinney County saying that his job is more

14   than just law enforcement; that it's to com- -- it's

15   militarizing the border in order to protect our national

16   security interests?

17     A.  Yes.

18                 MS. COGLIANO:  And finally, Judge, we are

19   going to move to the issue of overdetention.  And I will

20   briefly pull back up Professor Hoffman's declaration,

21   which says that "Prolonged detentions of individuals

22   arrested pursuant to Operation Lone Star disrupts the

23   federal framework, putting officers in the position of

24   holding aliens in custody for possible unlawful presence

25   without federal direction and supervision."

1          Judge, this comes directly from the United

2   States Supreme Court decision in *United States v.*

3   *Arizona* where they actually upheld that one provision of

4   the law that required -- that allowed and required for

5   law enforcement personnel making arrests to call ICE and

6   ask for their immigration policy.  The reason it was

7   upheld is because it could be read to be in line with

8   what's allowed under federal law, which is that they

9   are -- always have the First Amendment right to call and

10  communicate with ICE about someone's immigration status.

11          However, it very clearly delineated that

12  saying that pursuant to Fourth Amendment law, a

13  detention never can go beyond the scope of what it was

14  initiated for.  And since state actors do not have the

15  authority to detain people solely for immigration

16  purposes, that there can be no detention for the

17  purposes of a criminal prosecution or charge that go

18  beyond that which is specifically for only the state

19  criminal prosecution and charge.

20      Q.  (By Ms. Cogliano) Kristin, I know we've talked

21  about lot about the overdetention practices in Kinney

22  County.  Is there anything that you want to add about

23  the inability of our clients to be released even when

24  their cases are dismissed or they have been issued a

25  personal bond?

```
 1        A.    Right.

 2               As I've previously mentioned,

 3   overdetention is very frequent, and it happens very --

 4   very frequently in all of our clients' cases, I would

 5   say, or a large majority of them.  And it happens for

 6   various reasons.  It happens because there are so many

 7   different agencies that are involved in both the

 8   transportation, arrest, and detention of our clients.

 9   And it also happens because we have local state actors

10   attempting to make immigration decisions.

11               And so what will happen is frequently,

12   like I mentioned, our clients are entitled to be

13   immediately released if they post a bond and there's no

14   ICE detainer; or if there is an ICE detainer no longer,

15   you know, than the 48 hours, they're entitled to be

16   released immediately.  And that -- that is not

17   happening.  That never happens, in fact.  What we're

18   seeing is our clients are being unlawfully transported

19   by state actors back down to the border once a bond is

20   posted or once a criminal case is disposed.

21               We've had clients that have been in

22   detention up to six weeks longer than they're supposed

23   to based on paperwork errors, based on interagency

24   confusion.  And we frequently have clients that are in

25   detention unlawfully because we have state actors trying
```

1   to enforce immigration law and make determinations as to

2   our clients' immigration status.

3       Q.   Thank you.

4         MS. COGLIANO:  Judge, at this point, I'm

5   going to re-publish the declaration by

6   Mr. Guzman Curipoma's immigration attorney which lays

7   out the timeline of events regarding his release after

8   he posted a cash bond in the full cash amount of the

9   requested bail with the Kinney County Sheriff's Office.

10        So here beginning with -- with

11   Paragraph 2, she states that [As read] The Immigration

12   Clinic has represented Jesus Guzman Curipoma since

13   October 9th of 2021 when he was notified that he was

14   going to be transferred from the Briscoe Unit to the

15   custody of the U.S. Department of Homeland Security.

16   This was pursuant to a detainer that was issued on

17   September 23rd of 2021.  However, according to the

18   records, the detainer was issued subsequent to the

19   posting of his criminal bond with the Kinney County

20   Clerk on September 20th of 2021, which means that he --

21   he paid in full, a full cash bail to the court -- to the

22   Sheriff's Office for the full amount of the bond without

23   there being a detainer on him.

24        He should've been released that very day.

25   There was nothing holding him in custody.  But he was

1    continually held in custody until there was an ICE

2    detainer issued three days later, which means that if

3    ICE didn't pick him up, he should've been released on

4    September 25th, 2021.  However, we received a call from

5    him in mid-October that he was still in custody.  And he

6    was not transported to U.S. Department of Homeland

7    Security until October 10th or 11th.  On top of that,

8    Mr. Guzman Curipoma was not trans- -- was not picked up

9    by ICE when he was transported to federal immigration

10   custody.  When he was transported to the Office of

11   Immigration custody, they did take him into their

12   custody because of immigration status.  But they did not

13   determine him to be a priority to go pick up from the

14   Briscoe Unit and take that initiative on their own to

15   start removal proceedings for him.

16               And so the entire time that he was held in

17   custody, subsequent to his posting of a full cash bail

18   on September 20th of 2021, for a full 20 days he was

19   being unlawfully detained for the purposes of a state

20   immigration policy, not because of any jurisdiction that

21   the County had over his person pursuant to the criminal

22   charges pending against him.

23               I'm also going to publish Applicant's

24   Exhibit O and move to admit Applicant's Exhibit O, which

25   is simply the cash bail receipt.  And so we would move

1   to enter this into evidence, as well.

2                   MS. TAYLOR:  No objection.

3                   THE COURT:  Exhibit O is admitted.

4                   MS. COGLIANO:  And, finally, we move to

5   admit Defense [sic] Exhibit CC, which is a combined

6   prosecution unit that we have that we believe is all

7   public record and so can be admitted into court about

8   Mr. Guzman Curipoma's prosecution.

9                   Of course, pursuant to our agreement under

10  the Michael Morton Act with the Kinney County Attorney's

11  Office, we cannot admit as evidence in this case any of

12  the discovery materials, meaning the offense report or

13  any other of those privileged materials that we've

14  received in the case, without agreement from the State,

15  which we did not pursue.

16                  But at this point, I will move to admit

17  this packet, which includes the -- the criminal trespass

18  affidavit he was prosecuted under, the ticket that he

19  received for his criminal trespass charge, as well as

20  his magistration documents, his PC affidavit, his

21  affidavit of indigency, the interview regarding his

22  mental health status, and his booking documentation into

23  the Briscoe Unit, all of which shows that he was

24  arrested by DPS officers for criminal trespass pursuant

25  to a criminal trespass affidavit acquired by the

1   government solely for the purpose of prosecution under

2   Operation Lone Star.

3                   So here is --

4                   MS. TAYLOR:  Your Honor --

5                   MR. SCHULMAN:  What exhibit is this?

6                   MS. COGLIANO:  CC.  Applicant's

7   Exhibit CC.

8                   And so at this point, we would move to

9   admit Applicant's Exhibit CC.

10                  MS. TAYLOR:  Your Honor, the State has no

11  objection to the Court considering Applicant's CC.

12  However, I have not had a chance to thoroughly review

13  all of the contents of this exhibit.

14                  And in the event that it contains

15  sensitive data concerning the individuals other than

16  Applicant, such as the other individuals who were

17  arrested simultaneously with Applicant, or any other

18  sensitive data or in respect of the agreement that

19  Applicant's counsel entered into under Article 39.14

20  governing discovery, the State would respectfully

21  suggest that this exhibit be admitted under a protective

22  order or seal for the Court's review and the review of

23  the parties and their counsel -- obviously, the --

24  Mr. Schulman, as well -- rather than admitted for

25  purposes of it being available to the public, just in

```
1    case -- well, for the reasons that I just expressed.
2                    MS. COGLIANO:  Judge, I --
3                    THE COURT:  All right.
4                    MS. COGLIANO:  -- have no objection to
5    that.  And to clarify, this exhibit was not uploaded to
6    Box until our break in response to Mr. Schulman's
7    request for more affirmative evidence in the record
8    regarding Mr. Curipoma's arrest and detention.
9                    So I have no objection to it being
10   provisionally admitted or it being admitted under a
11   protective order.
12                   THE COURT:  All right.  So --
13                   MR. SCHULMAN:  May I have --
14                   THE COURT:  Hang on -- hang on just a
15   minute.  Let me just say a couple things.
16                   One is sealing documents that have been
17   admitted is difficult.  Under the Civil Procedure, Rule
18   76a has to be followed.  And the easier thing to do
19   would be to redact any -- any sensitive or -- or
20   personal information.
21                   And so I'm going to ask y'all to get
22   together and figure out if -- what, if anything, needs
23   to be redacted.  If there's some of it that the Court
24   needs to look at that you want redacted from the public,
25   we can talk about that.  But I'm assuming that the
```

1   things that you would redact aren't things that I need

2   to consider for the purpose of this hearing.

3            Let me just do a time check, because my

4   court reporter is getting tired, and I suspect the

5   interpreter is, as well, because we do usually take a

6   lunch break.

7            So let me just ask, Ms. Cogliano, how much

8   more time you need, approximately?

9            MS. COGLIANO:  Judge, that was my last

10  exhibit and question with Mr. Etter.  We have

11  Mr. Wischkaemper, which is going to be maybe a maximum

12  of seven, eight questions.  It's only to establish some

13  of the data and numbers regarding, like, the

14  prosecutions in Kinney County.

15           MS. TAYLOR:  And, Your Honor, the State

16  doesn't intend to bring any witnesses.  The State has

17  only six exhibits which have been provided to -- to

18  Applicant ahead of time and also to Mr. Schulman.  And I

19  certainly don't -- I have not been told that anyone has

20  any objections to those exhibits.  So that -- that's the

21  only evidence that the State plans to offer.  Those were

22  also attached to the answer.  So you've already seen

23  them.

24           In addition, the State intends to ask the

25  Court to take judicial notice of all of the filings in

1   this case.  And that -- that's basically the extent of

2   the State's presentation of evidence.  And other than

3   brief closing remarks, that was all we would have.

4               THE COURT:  All right.

5               Mr. Schulman, approximately how much time

6   would you like?

7               MR. SCHULMAN:  Argument?

8               THE COURT:  Just time for argument?  You

9   don't -- you don't intend to put on any witnesses?

10              MR. SCHULMAN:  I have no witnesses, Your

11  Honor.  But I have a request.

12              I'm looking at this document on -- on the

13  Box program, and it's not visible.  Most of the

14  documents are this small.  I can't search it.  So I'd

15  like someone to e-mail me the actual exhibit, please.

16              MS. COGLIANO:  Mr. --

17              THE COURT:  All right.

18              MS. COGLIANO:  -- Schulman, we'll e-mail

19  you that exhibit right now.

20              And, Ms. Taylor, I'll, for convenience

21  sake, include you on that e-mail.

22              THE COURT:  So here's what I think that we

23  will do.  I think that we will take a lunch break and

24  time for you-all to collect your thoughts for closing.

25  Then you can come back; we will see if anybody wants to

1    cross-examine Ms. Etter; and then allow you to put on

2    Mr. Wischkaemper -- I hope I'm saying that right -- and

3    then we'll do closing arguments.

4                 So let's take about an hour for lunch.

5    It's 12:33.  Let's be back at 1:30.

6                 MS. COGLIANO:  Thank you, Judge.  And

7    thank you for accommodating all of the things that have

8    come up today.

9                 MS. TAYLOR:  Thank you, Your Honor.

10                THE COURT:  All right.

11                (Luncheon recess)

12                THE COURT:  Before we go back into

13   testimony, one of the things I had asked y'all to do was

14   take a look at Exhibit CC and see if there were things

15   you could agree to redact so that you weren't concerned

16   about whatever you were concerned about before lunch.

17                MS. COGLIANO:  Judge, Mr. Schulman's

18   concern about the size of the documents in the file was

19   accurate.  They're, like, all different sizes.  And so

20   it took us a minute to do redactions.  But I'm e-mailing

21   them right now, and I expect everyone's going to be okay

22   with them.  It just took a little longer than we thought

23   because of some encryption in the file.

24                MR. SCHULMAN:  Yeah.  I got a copy, and I

25   was able to blow it up and search it.

1          MS. COGLIANO:  Of the redacted?

2     Mr. Schulman, I didn't send you the new redacted CC yet.

3          MR. SCHULMAN:  I think you redact whatever

4     you want, whatever the Court wants you to.

5          MS. COGLIANO:  Okay.

6          MS. TAYLOR:  And, Your Honor, just to

7     clarify, I was able to view all of Applicant's

8     Exhibit CC.  And I particularly had been concerned that

9     there might be things like dates of birth and personal

10    data like that associated with individuals other than

11    Ms. Cogliano's client.  And I was able to determine that

12    although there is some sensitive data in the document

13    which I believe that Ms. Cogliano is redacting or has

14    redacted, there is not any sensitive data that I found

15    associated with anyone other than their client.

16          THE COURT:  All right.  Then if you will

17    upload the redacted Exhibit CC and just put CC, paren,

18    "Redacted," we'll know that that one is the one I'm

19    admitting.  You can't delete documents from Box.  Only

20    my staff can do that.  But we'll know the correct one if

21    you write "Redacted" in the title of it.

22          MS. COGLIANO:  Judge, that's been done.

23    And "Redacted" is included at the end of the file name.

24          THE COURT:  All right.  Then that redacted

25    Exhibit CC is admitted.

```
 1                    All right.  Then I believe -- is there
 2     something you need to do, Ms. Chipelo, to make sure that
 3     Mr. Guzman Curipoma has access to the Spanish channel?
 4                    JUDICIAL EXECUTIVE ASSISTANT:  He just
 5     needs to switch back over to the Spanish channel.
 6                    THE COURT:  All right.  Good.  I think
 7     we're there.
 8                    Then I believe Ms. Etter was testifying.
 9                    And do you have any questions for her --
10     where are you -- there -- Ms. Taylor?
11                    MS. TAYLOR:  Your Honor, we do not have
12     any questions of this witness.
13                    MR. SCHULMAN:  Nor do I --
14                    THE COURT:  All right.
15                    MR. SCHULMAN:  -- your Honor.
16                    THE COURT:  All right.
17                    Anything further with this witness,
18     Ms. Cogliano?
19                    MS. COGLIANO:  Judge, we did have one more
20     exhibit that we have already e-mailed to opposing
21     counsel that we'd like to enter through Ms. Etter, but
22     that's it.  Then we'll -- we'll be done with her
23     testimony.
24                    THE COURT:  All right.
25        Q.  (By Ms. Cogliano) Ms. Etter, I'm going to pull
```

1    up what's been marked as Applicant's Exhibit DD, which

2    is a calendar for the Kinney County Courts specifically

3    designated only for Operation Lone Star cases.  And what

4    we've done is only include the page of the calendar that

5    our client Mr. Guzman Curipoma's case was listed on.

6    And we've redacted the names of all of the other

7    defendants that were included on that calendar.

8               And so, at this point, we would move to

9    admit Exhibit DD.

10              MS. TAYLOR:  No objection.

11              MR. SCHULMAN:  Your Honor, I have the same

12   objections.  That is not evidence of prosecution, and

13   it's irrelevant.

14              THE COURT:  All right.  That objection is

15   overruled.  And Exhibit DD is admitted.

16              MS. COGLIANO:  Thank you.

17       Q.  (By Ms. Cogliano) Ms. Etter, what -- what is

18   this calendar for?

19       A.   This is what I referred to in my previous

20   testimony, how all of our clients are funneled into this

21   separate criminal justice system.  And specifically,

22   they are put on a special docket.  And as you can see

23   from the top, it says "Operation Lone Star."  And so all

24   of our clients being prosecuted under Operation Lone

25   Star are assigned these dockets, and -- and they are

1    specifically entitled "Operation Lone Star" dockets,

2    setting them apart from any other case that might be

3    filed in the particular county, Kinney County in this

4    situation.

5              So, again, it's a doc- -- a docket sheet

6    that shows -- gives the person's name, cause number,

7    arrest date.  And, again, all of these are for criminal

8    trespass -- misdemeanor criminal trespass charges on the

9    special Operation Lone Star docket.

10   Q.   And, to your knowledge, does the designation of

11   Operation Lone Star docket indicate that all of these --

12   all of the people on this docket were arrested pursuant

13   to Operation Lone Star policies?

14   A.   Yes.  They would not be on this docket unless

15   they were arrested under Operation Lone Star.

16   Q.   And the Kinney County Court Honorable Judge

17   Tully Shahan, is that the judge that you were -- that we

18   heard about earlier that has been deeply involved in how

19   the dockets are running and who gets to hear cases?

20   A.   Yes.  He is the judge that removed the

21   originally assigned Operation Lone Star judges that were

22   assigned by the Presiding Judge Ables.  And he is the

23   judge that has attempted to replace them with

24   hand-picked judges of his choosing.

25              MR. SCHULMAN:  Your Honor, I object to

1    that portion of Ms. Etter's testimony.  She has no

2    personal knowledge of why the judge put these on the

3    docket, nor would she.  And the fact that the judge put

4    them on this docket does not pertain to the nature of

5    the arrest or -- or why the officer arrested them.

6        Q.  (By Ms. Cogliano) Kristin, about --

7                MS. COGLIANO:  I'm sorry, Judge.  I'll let

8    you rule on that.

9                THE COURT:  Well, I'll let you go back and

10   lay the foundation on that, if you -- if you will.

11               MS. COGLIANO:  Sure.

12       Q.  (By Ms. Cogliano) Ms. Etter, approximately how

13   many Operation Lone Star hearings have you participated

14   in since becoming the Director of Operation Lone Star

15   for --

16               THE COURT REPORTER:  I'm sorry.  I didn't

17   understand the last part of your question, Ms. Cogliano.

18               MS. COGLIANO:  Since she became the

19   Director of Operation Lone Star for the Texas Rio Grande

20   Legal Aid.

21       A.   Approximately 600.

22       Q.  (By Ms. Cogliano) Have you, in all of those

23   cases in Kinney County, received dockets that look like

24   this?

25       A.   Yes.  And I should preface, of those 600, most

1    of them were in Kinney County.  Some of them have been

2    in Val Verde County.  But regardless of its -- if it's a

3    Kinney County or a Val Verde County arrest, all of our

4    clients are listed on these Operation Lone Star dockets

5    as -- as the first court date.  For example, the

6    "Arraignment/Plea Docket," as you can see in that top

7    portion of the -- of the docket, yes.  This -- this

8    looks the same as all of the other cases that we have

9    and all of the other dockets that we've received and

10   individual clients that we have represented in Operation

11   Lone Star.

12       Q.   And in those 600 hearings that you received

13   dockets like this, have you ever had a client or seen a

14   client on those dockets that was not arrested pursuant

15   to Operation Lone Star?

16       A.   No.

17       Q.   Have you ever seen a client of yours or another

18   Operation Lone Star defendant that was put on a docket

19   that is not designated an Operation Lone Star docket?

20       A.   No.  The only exception to that is when we

21   filed writs of habeas corpus in other jurisdictions.

22   Like, for example, we have had -- because of the -- the

23   prolonged detention that our clients face without being

24   set for court in Kinney County, we have filed writs of

25   habeas corpus on behalf of several hundred of our

1    clients.  And we have been able to get -- it takes --

2    I should also mention that from the date of filing a

3    writ of habeas corpus in the Kinney County District

4    Clerk's Office, it takes approximately one month for the

5    Kinney County Clerk's Office to accept a filing.

6            So, for example, our most recent filing

7    occurred on -- in the Kinney County District Clerk's

8    Office, we submitted for filing a writ of habeas corpus

9    on November 5th.  And the Kinney County Clerk's Office

10   did not accept that filing until December 3rd.  And it

11   wasn't until December 13th that we were given a hearing

12   in the 63rd Judicial District Court pursuant to our writ

13   of habeas corpus.  So that would be the only other

14   exception.

15           But, no, other than the writ of habeas

16   corpus that we have to file in other forums, either in

17   the district court or otherwise, every time we have a

18   case that gets set for court, it's always on these

19   Operation Lone Star dockets that look exactly like this.

20   Q.   And can you tell from this document whether

21   it's the first appearance or second appearance of the

22   defendants listed?

23   A.   So -- yes.  What they've done is they -- see on

24   the top right-hand corner it says "Arraignment/Plea

25   Docket"?  And so what that is, is the arraignment is the

first court date that they are able to have in these

Operation Lone Star cases.  And you can tell because all

of these clients are set for arraignment/plea.  And if

it was another court date, it would be written, for

example, pre-trial hearing.

            But, yes, this would be the first court

date.

    Q.    And so considering that, what this indicates is

that Mr. Guzman Curipoma was arrested on September 10th

and received his first court date on December 29th of

2021.

    A.    Yes.  And that is pretty typical.  Like I

mentioned, we have clients that wait for months.  Today,

like I said, we had a client that was in custody for 136

days before he had his first court date.

            So, yes, that -- that is very typical of

these cases.

    Q.    To your knowledge, has any defendant arrested

pursuant to Operation Lone Star that wants a trial yet

received a trial in their case?

    A.    No.  There have been no trials scheduled in any

of the Kinney County cases despite the fact that as of

today, I believe -- as of Kinney County arrests through

January 9th of 2022, there have been 2,020 arrests made

in Kinney County under Operation Lone Star.  None of

1   those cases have been set for trial.

2                   MS. COGLIANO:  I'll pass the witness.

3                   MS. TAYLOR:  I apologize.  Was that

4   exhibit ever admitted?

5                   MS. COGLIANO:  Oh, that's what we were

6   doing, setting foundation.

7                   MS. TAYLOR:  Okay.

8                   MS. COGLIANO:  Judge, now I would move to

9   enter Exhibit DD.

10                  THE COURT:  Actually --

11                  (Simultaneous crosstalk)

12                  MR. SCHULMAN:  May I -- [Zoom audio

13  difficulty] --

14                  THE COURT:  -- I did -- I did admit the

15  exhibit.  There was an objection to her knowledge of

16  what this docket was about that caused me to ask for

17  foundation.  And so, in any event --

18                  MS. TAYLOR:  I would say, Your Honor, that

19  the State does not dispute Ms. Etter's extensive

20  knowledge concerning the Operation Lone Star docket and

21  this document.

22                  THE COURT:  All right.

23                  MR. SCHULMAN:  May I cross-examine or take

24  the witness on voir dire?

25                  THE COURT:  So, Ms. Cogliano, you're

1   through with questions for her?

2                   MS. COGLIANO:  Yes, Judge.

3                   THE COURT:  And, Ms. Taylor, you have

4   none?

5                   MS. TAYLOR:  No, Your Honor.  I do not

6   have any.

7                   THE COURT:  All right.

8                   Then, Mr. Schulman, you may proceed.

9                        **CROSS-EXAMINATION**

10  BY MR. SCHULMAN:

11      Q.   Ms. Etter, what knowledge do you have that --

12  on any of the cases in this docket, that the arresting

13  officer was arresting them pursuant to Operation Lone

14  Star and the County Judge just put them on?  Do you have

15  any knowledge that that didn't happen?

16      A.   Do I have any knowledge that that didn't

17  happen?

18      Q.   Correct.

19      A.   So, as I previously mentioned, in all of our

20  cases, if you are on an Operation Lone Star docket, that

21  means, given my personal experience with close to 800 of

22  these cases, that you were arrested pursuant to

23  Operation Lone Star.  So, given the fact that Mr. Guzman

24  is listed on this docket and on the top it says

25  "Operation Lone Star," that is -- that's a deduction

1   that I made.

2       Q.   Yes.  But you have no knowledge, let's say, for

3   example, the officer who arrested Mr. Guzman Curipoma

4   was in any way involved in Operation Lone Star.

5       A.   Other than it states "Operation Lone Star" on

6   the top of the docket.

7       Q.   On the docket.  But the docket is created in

8   this case, what you would say, something like three

9   months after the arrest.

10      A.   Right.  And I'm presuming that you wouldn't put

11  somebody on an Operation Lone Star docket who wasn't

12  arrested under Operation Lone Star.

13      Q.   And why would you presume that?

14      A.   Because, as I mentioned, Operation Lone Star

15  has created this separate system.  And I don't see

16  anybody else that has to be subjected to this Operation

17  Lone Star system other than individuals who are arrested

18  under Operation Lone Star.

19      Q.   Well, would you agree that it's quite possible

20  the officer arrested these people, Mr. -- Mr. Guzman

21  Curipoma and those with him, simply because of where

22  they were, when they were, and not having anything to do

23  with Operation Lone Star?

24               MS. COGLIANO:  Judge, I'm going to object

25  at this point.  I'm going to lodge my first objection.

1  I believe that the question has been asked and answered

2  several times how she came to that conclusion.

3              MR. SCHULMAN:  I'm not challenging her

4  conclusion.  I'm asking her --

5              THE COURT:  I'll -- I'll overrule the

6  objection.

7              You may answer the question.

8      A.   Could you repeat the question?  That was

9  confusing.

10     Q.   (By Mr. Schulman) What evidence do you have --

11 or what makes you so sure that, at the time he arrested

12 Mr. Guzman Curipoma, that the arresting officer didn't

13 arrest him simply because of where they were, what they

14 were doing, and had nothing to do with Operation Lone

15 Star?

16             MS. TAYLOR:  Your Honor, now I'm going to

17 lodge an objection.  I do not see how Counsel's question

18 has any relevance to the admissibility of this document.

19 The document simply represents that this individual is

20 listed on Operation Lone Star docket and doesn't say

21 anything about the motivations of the officer that

22 arrested him.

23             MR. SCHULMAN:  Your Honor, but it is the

24 motivation of the officer that's at issue in this case.

25 If the officer arrested this fella and it had nothing to

1    do with Operation Lone Star, the fact that the judge

2    later puts it on a docket does not change the fact of

3    the arrest.

4                THE COURT:  And I'm going to overrule the

5    objection, and I will give the testimony the proper

6    weight.

7                MR. SCHULMAN:  I don't believe we got an

8    answer to the question.

9        A.   I would say -- Mr. Schulman, I would direct

10   your attention to the probable cause affidavit, if you

11   had any questions about the basis of Mr. Guzman's

12   arrest, that was previously admitted into evidence --

13       Q.   (By Mr. Schulman) Right.

14       A.   -- and that should answer your question.

15       Q.   Right.  But does the affidavit in any way refer

16   to Operation Lone Star?

17       A.   Many of the probable cause affidavits do, in

18   fact, refer to Operation Lone Star.

19       Q.   Correct.  Many of them do.  But does the

20   probable cause affidavit in this case refer to Operation

21   Lone Star?

22       A.   I haven't seen it.  And so, again, I would just

23   direct your attention to that.  It's previously been

24   admitted into evidence.

25       Q.   Okay.

1          MR. SCHULMAN:  I would ask the Court to

2   take judicial notice of what is on the arrest affidavit

3   and that it does not refer to Operation Lone Star.

4          THE COURT:  So if the exhibit has been

5   admitted, then it's been admitted.  And the Court --

6          MR. SCHULMAN:  Thank you.

7          THE COURT:  -- has admitted it.

8          Anything further, Mr. Schulman, for this

9   witness?

10          MR. SCHULMAN:  No, Your Honor.  I have no

11   further questions.

12          THE COURT:  All right.  Anything further

13   for this witness, Ms. Cogliano?

14          MS. COGLIANO:  No, Judge.

15          And I just want to make sure I do this

16   for the record and move to admit all of Applicant's

17   Exhibits A through H.  I -- some of them I did admit

18   over the course of this hearing.  But those are

19   specifically the exhibits that were attached to my

20   application, and I just want to make sure I put on the

21   record that I'm moving to admit those additionally as

22   exhibits in this case.

23          THE COURT:  All right.

24          MS. TAYLOR:  The State has reviewed those

25   and has no objection to those exhibits.

```
 1              MR. SCHULMAN:  And Your Honor understands
 2   my objection.
 3              THE COURT:  I do.
 4              Exhibits A through H are admitted.
 5              MS. COGLIANO:  So, Judge, our next witness
 6   is Philip Wischkaemper, and Ms. Miró is going to be
 7   handling that direct examination.
 8              THE COURT:  All right.
 9              Mr. Wischkaemper, would you un-mute
10   yourself and raise your right hand, please?
11                    PHILIP WISCHKAEMPER,
12   having been first duly sworn, testified as follows:
13                    DIRECT EXAMINATION
14   BY MS. MIRÓ:
15     Q.   Would you please state your name and spell it
16   for --
17              Can you hear me okay?
18     A.   I can.
19     Q.   Okay.  Would you please state your name and
20   spell it for the record?
21     A.   It's Philip, with one "L," Wischkaemper,
22   W-i-s-c-h-k-a-e-m-p-e-r.
23     Q.   Mr. Wischkaemper, what is your profession?
24     A.   I am the Chief Defender for the Lubbock Private
25   Defender Office for the next five-and-a-half months.
```

1      Q.    And what does the Lubbock Private Defender

2   Office generally do?

3      A.    We are a 501(c)(3) nonprofit corporation that

4   contracts with Lubbock County to do all of their

5   indigent defense for adults.

6      Q.    Is LPDO involved in Operation Lone Star?

7      A.    We are.

8      Q.    And how so?

9      A.    Back in July, the Indigent Defense Commission

10  contacted our executive director and asked if we would

11  be the central clearinghouse for the assignment --

12  recruitment, assignment, and payment of attorneys as --

13  as a part of Operation Lone Star.

14     Q.    And so, to this date, is there any other

15  organization appointing attorneys to represent Operation

16  Lone Star clients?

17     A.    Not that I'm aware of.

18     Q.    In preparation for this hearing, did we ask you

19  to review the details and the number of appointments

20  that your office has handled so far?

21     A.    You did.

22     Q.    And would you say -- how many cases are pending

23  under Operation Lone Star that your office has appointed

24  attorneys to as of Monday of this week, which would have

25  been the 11th of January?

1     A.   Actually, I think it was the 10th.

2            But as of the -- as of Monday, we had

3 processed 2518 cases.

4     Q.   Okay.

5     A.   Again, most of those, I think, are still

6 pending.  But there -- there have been some pleas of

7 that 2518.

8     Q.   How many of those cases are misdemeanors?

9     A.   Of the vast majority, 2326 show to be

10 misdemeanors.

11     Q.   So would that be about 92 percent of the cases?

12     A.   About 92 to 95 percent.  I went to -- I went to

13 law school because I couldn't do math.  But that sounds

14 about right.

15     Q.   I can't do math either.  I'm hoping my number

16 is correct, but I think it's correct.

17           So of those misdemeanor cases, would you

18 say that over 95 percent of those are for criminal

19 trespass?

20     A.   The vast majority, yes.  I would say 95 percent

21 are criminal trespass cases.

22     Q.   So let's say that somebody goes into a

23 property, for example, and breaks a fence or destroys

24 some kind of property.  While they're committing

25 criminal trespass, what would they be charged with?

1    A.    Very likely criminal mischief would be my

2    guess.

3    Q.    Okay.  Are there any cases -- any of the

4    misdemeanor cases that you have seen criminal mischief?

5    A.    In my perusal of -- of the 2500 or so this

6    morning, I didn't see any criminal mischiefs.  I saw

7    some other misdemeanors, possession of marijuana,

8    unlawfully carrying a weapon, resisting arrest, things

9    like that, but -- but no criminal mischief.

10    Q.    And based on the numbers, would you say that

11    there are 192 felony cases pending under Operation Lone

12    Star?  Would that --

13                     (Simultaneous crosstalk)

14    A.    That --

15    Q.  (By Ms. Miró) -- correct?

16    A.    That's correct.  We -- that's what we counted

17    was 192.

18    Q.    Okay.  And of those 192 cases, how many of the

19    accused are United States citizens?

20    A.    By our count, we can confirm -- or believe we

21    can confirm 132 of those 192 are U.S. citizens.  We

22    weren't able to determine the nation of origin of seven

23    of those 192, which leaves 53 non-citizens charged with

24    felonies.

25    Q.    Okay.  So that would be that -- again, math --

```
 1   non -- non-citizen felony cases would be about

 2   2.1 percent of all the felony cases?

 3       A.   Yeah.  Between 2.1 and 2-1/2 percent,

 4   2-1/2 percent maximum.

 5       Q.   Of the felony cases, are there any criminal

 6   mischief cases?

 7       A.   I didn't see any criminal mischief cases.  I

 8   saw organized crime, prohibited substance in a penal

 9   institution, evading in a vehicle or watercraft,

10   smuggling -- lots of smuggling of persons, UUMVs,

11   possession of a controlled substance.  There was an

12   arson, tampering, prohibitive weapon charge.  But no

13   criminal mischief charges that I saw.

14       Q.   Okay.  And those -- okay.

15            Are we talking there about felonies or

16   misdemeanors?

17       A.   These -- these were felonies.  These were the

18   other felonies that I saw as I went through the -- the

19   2518 cases.  But I did not see a criminal mischief --

20                (Simultaneous crosstalk)

21       Q.   (By Ms. Miró) [Zoom audio difficulty] --

22       A.   -- whether misdemeanor or felony.

23       Q.   -- or felony.  Okay.

24            So I just want to confirm based on your

25   count as of Monday.  So 98 percent of the criminal
```

1    prosecutions under Operation Lone Star are misdemeanor

2    criminal trespass cases against non-citizens; is that

3    correct?

4        A.   Closer to 95 percent --

5                    *(Simultaneous crosstalk)*

6        Q.  (By Ms. Miró) Ninety-five --

7        A.   -- are -- right.

8                    MS. MIRÓ:  I pass the witness.

9                    THE COURT:  All right.

10                    Ms. Taylor, any questions of this witness?

11                    MS. TAYLOR:  No questions of this witness,

12    Your Honor.

13                    THE COURT:  Mr. Schulman?

14                    MR. SCHULMAN:  Thank you, Your Honor.

15                    **CROSS-EXAMINATION**

16    BY MR. SCHULMAN:

17        Q.   Mr. Wischkaemper, do you have any personal

18    knowledge of the circumstances of the arrest in this

19    case?

20        A.   No.

21        Q.   Have you reviewed any of the arrest documents?

22        A.   Not in this case.

23        Q.   Thank you.

24                    MR. SCHULMAN:  No further questions.

25                    THE COURT:  All right.

```
 1                    Anything else, Ms. Miró?
 2              MS. MIRÓ:  Not at this time, Your Honor.
 3              THE COURT:  All right.
 4              So, Ms. Cogliano, do you rest?
 5              MS. COGLIANO:  Yes, Judge.  We rest.
 6              THE COURT:  And, Ms. Taylor?
 7              MS. TAYLOR:  Your Honor, the State would
 8    offer the six exhibits which are attached to the State's
 9    answer.  And those have been served on both parties.
10    And I can walk through them if you like and show them on
11    my screen.
12              THE COURT:  All right.  Is there any
13    objection to the State's six --
14                    (Simultaneous crosstalk)
15              MS. COGLIANO:  No --
16              THE COURT:  -- exhibits?
17              MS. COGLIANO:  -- [Zoom audio difficulty].
18              MR. SCHULMAN:  Your Honor, I have no
19    objection for purposes of the hearing.
20              THE COURT:  All right.  So State's
21    Exhibits 1 through 6 are admitted.
22              MS. TAYLOR:  Your Honor, I would also ask
23    that you take judicial notice just of all the filings in
24    this case, including the writs that this Court has
25    issued.
```

1              THE COURT:  The Court takes judicial

2    notice of its file in this case.

3              Anything further, Ms. Taylor?

4              MS. TAYLOR:  The State rests.

5              THE COURT:  All right.

6              Mr. Schulman?

7              MR. SCHULMAN:  Prior to resting, I would

8    renew our objection to all expert testimony and evidence

9    derived therefrom under both Daubert and Kelly.  None of

10   the experts have tied it up and related it to this case

11   at all.

12             MS. COGLIANO:  Judge, my response to that

13   is simply that Daubert and Kelly arise out of the Texas

14   Rules of Evidence.  And the Texas Rules of Evidence

15   don't apply in this case other than the Rules of

16   Privilege.  And so there is no need to comport with the

17   requirements of Kelly and Daubert.  And, of course, I

18   expect the Court to review the document and take from it

19   what -- what's deemed appropriate.

20             THE COURT:  All right.  The objection is

21   overruled.

22             Anything further, Mr. Schulman?

23             MR. SCHULMAN:  Yes, Your Honor.

24             At this point, I would advise the Court

25   that pursuant to Section 402.010 of the Government Code,

1   which admittedly pertains to the const- -- challenges

2   to the constitutionality of State statutes, the --

3   Section 402.010 demonstrates a legislative intent that

4   the AG must be involved when there's a claim that a

5   prosecution is unconstitutional.

6               That is the claim in this case, and we

7   would suggest that Your Honor may not enter a judgment

8   without involving the Attorney General.

9               THE COURT:  All right.  Hang on just a

10  minute.  I'd like to pull up that statute.

11              MS. TAYLOR:  Your Honor, I would note that

12  this challenge is to an executive initiative involving

13  multiple proclamations, declarations, and orders, and

14  not to a specific state statute.  So I'm not a hundred

15  percent sure that this provision applies.

16              THE COURT:  All right.  And my

17  understanding of the statute -- and I wanted to pull it

18  up to look at it -- is if the challenge is to the

19  constitutionality of a statute, then the AG has to be

20  noticed.

21              But my understanding of this case is that

22  it's not to the constitutionality of a statute.  It's to

23  the impact of various provisions of Operation Lone Star

24  to this particular individual.  So it's an as-applied

25  challenge, not a challenge to the constitutionality.

1    And -- and specifically 402.010(b) says a court may not

2    enter a final judgment holding a statute of the state

3    unconstitutional before the 45th day after the date

4    notice required by Subsection (a) is served on the

5    attorney general.

6              But that is -- that is not what y'all are

7    asking me to do.  You're not asking me to enter a final

8    judgment holding a statute of this state

9    unconstitutional.  So I'm going to --

10             MR. SCHULMAN:  May I say one more thing,

11   Your Honor?

12             I -- I would say that the Applicant is

13   absolutely asking you to declare the statute

14   unconstitutional as applied to him, and he is being

15   prosecuted pursuant to the criminal trespass statute.

16   They are, therefore, asking you to declare that statute,

17   as applied to Mr. Guzman Curipoma, unconstitutional.  We

18   think the Attorney General should be involved.

19             THE COURT:  All right.  I'm going to deny

20   the request.

21             How long would you each like for a closing

22   argument?  Is ten minutes enough?

23             MS. COGLIANO:  Yes, Judge.

24             THE COURT:  All right.  Ms. Cogliano, then

25   you may proceed.

1              **CLOSING ARGUMENT**

2              MS. COGLIANO:  You know, Judge, we really

3     appreciate your patience today, because we have had to

4     cram a lot of evidence into this hearing that we've been

5     experiencing over several months.  And I know that,

6     objectively, it seems unreasonable that this is

7     potentially happening, but that's why we wanted to go

8     through each and every exhibit that we prepared for the

9     Court.  Because what is happening at the border and what

10    happened to Mr. Guzman Curipoma at the direction of our

11    State government is so beyond the realm of -- of how the

12    criminal justice system is intended to exist in Texas

13    and how the immigration system of our country is

14    developed under federal law.

15             *Arizona v. State* is very, very clear, and

16    the group of enactments that we are alleging

17    collectively violate federal law is -- is targeted at a

18    group of individuals who are simply existing at the

19    border and targeting them specifically without asking

20    the federal government on guidance on how to

21    appropriately do that in the State of Texas.  We are not

22    sitting here saying that the State of Texas can never

23    protect its citizens from people unlawfully being on

24    their property.

25             But that is not what the intent of the

1    State of Texas is here, and we know that because all of
2    the interested parties that represent the State of Texas
3    have said that to anybody who will listen.  Governor
4    Abbott has expressly said it to other state governors.
5    He's expressly said it to the President of the United
6    States.  He has expressly said it to his own
7    constituents.  And so right on its face, we know that
8    his intent and the motivation behind this program is to
9    usurp federal law.
10                   In application it is absolutely doing that
11   during the prosecution of my client in this case.  The
12   grounds that we raised are that he has been subject to
13   an unlawful state immigration scheme, which is
14   absolutely what happened to Mr. Guzman Curipoma.  He was
15   pro- -- he was arrested and prosecuted specifically
16   attributable to a program that only wants to arrest
17   people that look like migrants.
18                   We claimed that he -- his prosecution is
19   illegal because it encroaches on federal enforcement
20   priorities.  Mr. Guzman is exactly the kind of person
21   that the new Biden federal policies say that we are
22   de-prioritizing for removal; that all of our resources
23   and all of our need to figure out how to deal with the
24   immigration crisis we're in was reviewed by the federal
25   government and all of the people that are trained and

1   hired to develop these policies.  And they came out and

2   they said, We do not think that criminal trespass is

3   good enough use of our resources and our money, and it

4   risks harming people that aren't U.S. citizens and

5   people that are U.S. citizens.  And so he is definitely

6   implicated in the federal preemption based on

7   enforcement priorities.

8                As far as frustrating the humanitarian

9   goals of federal immigration policy, Mr. Guzman is a

10  great candidate for asylum.  He came here for the

11  purpose of asylum.  He has an attorney representing him

12  in his --

13               I'm sorry.  I see you.

14               -- representing him in his asylum case.

15  And he was deprived of the opportunity to apply for his

16  asylum for an extended period of time because he was

17  unconstitutionally detained pursuant to this program.

18  Similarly, the federal non-criminal removal policies

19  currently in place specifically state that criminal

20  trespass violations should not subject people to

21  anything except non-criminal removal.

22               And as far as unlawful detention is

23  concerned, Judge, this is an egregious case of unlawful

24  detention.  Mr. Guzman Curipoma had no representation;

25  he was being held without any information; and he posted

1    a full cash bond to the County.  He got a receipt; and

2    he had family members calling trying to get him out of

3    custody, and he couldn't do it.  And the only reason he

4    couldn't get out of custody is because Sheriff Coe,

5    County Attorney Brent Smith, and the rest of the actors

6    participating in Operation Lone Star decided that they

7    didn't think people charged with criminal trespass

8    deserved to be released when they are entitled to be.

9    And that is only because they wanted to transport him

10   and other individuals like him to Customs and Border

11   Patrol.

12              The evidence is overwhelming, Judge, that

13   all of the intent and application of Operation Lone Star

14   is disenfranchising non-violent individuals that are

15   just existing at the border.  And this is especially

16   true for Mr. Guzman Curipoma, but it is true of all

17   2,000 individuals that are being arrested pursuant to

18   the statute for non-violent misdemeanor offenses.

19              And so we respectfully ask the Court to

20   remember that the Applicant and the representative for

21   the State have stipulated to the fact that he was

22   arrested pursuant to Operation Lone Star and to -- and

23   to grant relief in this case to Mr. Guzman Curipoma

24   because the State of Texas has done him a terrible

25   disservice already.  And the longer that he remains

1    subject to this unconstitutional restraint that he is

2    currently subjected to, the longer it is going to be

3    before he can move on and prove that this was an

4    inappropriate thing that happened to him.

5            THE COURT:  Thank you.

6            Will you give me just a minute?  You may

7    have seen me fumbling.  It looks like my computer has

8    lost power.  So just a minute.

9            *(Off the record)*

10           THE COURT:  So, Ms. Taylor.

11                   **CLOSING ARGUMENT**

12           MS. TAYLOR:  Thank you, Your Honor.

13           So I would initially note that with regard

14   to the Attorney General's involvement, the State would

15   call the Court's attention to *State v. Stephens*; and I

16   don't know that it has a S.W.3d cite yet, but it's

17   numbers PD-1032-20 and PD-1033-20 out of the Court of

18   Criminal Appeals.  It's an opinion that was handed down

19   on December 15th, 2021.

20           In that case, the Court considered the

21   question of the Attorney General's involvement in

22   certain types of cases on the district level.  And the

23   Court held that absent the consent and deputization

24   order of a local prosecutor or the request of a district

25   or county attorney for assistance, the attorney general

1    has no authority to independently prosecute criminal

2    cases in trial courts.

3            The Court further held "Any attempt to

4    overlap the Attorney General's constitutional duties

5    with county and district attorneys' constitutional

6    duties in the sense of a Venn diagram of sorts is

7    unconstitutional.  Practically speaking, any overlap is

8    necessarily invitational, consensual, and by request; a

9    county or district attorney must request the assistance

10   of the Attorney General."

11           And for the record, the District Attorney

12   of Travis County has not requested the Attorney

13   General's assistance in this matter.

14           Moving on to the question of cognizability

15   of this pre-trial writ, we have already mentioned

16   *Ex Parte Perry*, which is a critical case out of the

17   Court of Criminal Appeals on this issue.  And we have

18   also already discussed, collectively, that Applicant's

19   claims could be characterized as an as-applied

20   constitutional challenge.

21           Applicant has today established, in the

22   State's opinion, that he has been arrested, processed,

23   detained, and is currently restrained as part of

24   Operation Lone Star.  Applicant has a strong argument

25   that his claim falls within the exception allowing a

1    Court to consider an as-applied challenge in a pre-trial

2    writ as discussed in *Ex Parte Perry*.  In that case, the

3    Court of Criminal Appeals said that certain types of

4    as-applied challenges may be raised by pre-trial habeas

5    because the particular constitutional right at issue in

6    the as-applied challenge is the type that would be

7    effectively undermined, if not vindicated, prior to

8    trial.

9              Ms. Etter testified today that, I believe,

10   there were over 2,000 arrests under OLS, under Operation

11   Lone Star so far; and no trials have been scheduled in

12   Kinney County.  This Applicant, who the record reflects

13   has been under restraint for months on a misdemeanor

14   trespass charge, is unlikely to face trial any time soon

15   in Kinney County, Texas, where the justice system has

16   been overwhelmed by over 2,000 Operation Lone Star

17   misdemeanor arrests.  And, therefore, we think

18   Applicant, upon that showing and all the numerous delays

19   and procedural irregularities, has a very good case that

20   it falls within the exception outlined for the type of

21   case that would be effectively undermined, if not

22   vindicated, prior to trial, the exception outlined in

23   the *Ex Parte Perry* case.

24              Further, we would note that granting

25   relief in this case would not deprive the Kinney County

1   law enforcement officials of their ability to

2   investigate, arrest, and prosecute criminal trespass

3   violations under ordinary and lawful procedures and in

4   recognition of the due process rights at issue.

5               I think that the evidence today has also

6   shown that the orders, proclamations, and statements

7   made by Governor Abbott, DPS agents, and other Texas

8   officers and officials confirm that the purpose of the

9   Operation Lone Star trespass arrest program, which

10  resulted in Applicant's arrest and detention, and the

11  enhancement of his criminal trespass charges pursuant to

12  a disaster proclamation issued by the Governor of Texas,

13  that the purpose of that program is to identify, arrest,

14  detain, and punish migrants illegally present in Texas

15  in order to, quote/unquote, secure the border and to

16  send -- and this is a quote from Governor Abbott; this

17  is contained within Applicant's Exhibit E, and it's an

18  excerpt -- to send a message that if they come across

19  the border in the State of Texas, they are not going to

20  be caught and released like under the Biden

21  Administration.  They are going to be spending time

22  behind bars.

23               The plain intent -- and I'm -- end quote.

24               The plain intent of the above described

25  executive directives and administrative actions is to

1    authorize and direct state and local law enforcement to

2    apprehend individuals on pre-textural criminal trespass

3    charges based on their perceived illegal immigration

4    status, funnel migrants --

5                        (Reporter admonition)

6                   MS. TAYLOR:   I apologize.

7                   -- funnel migrants arrested under

8    Operation Lone Star through a parallel criminal justice

9    system with frequent delays, separate jurists, and

10   procedural irregularities not used for any other state

11   offenders, and incarcerate arrested individuals for

12   weeks or months in state prisons without arraignment or

13   trial on their state offense and without federal

14   direction or supervision and in contravention of federal

15   immigration policies and procedures in the case of

16   *Arizona v. United States.*

17                   Although federal law allows state and law

18   enforcement officers to cooperate with the Attorney

19   General in the identification, apprehension, detention,

20   or removal of aliens not lawfully present in the United

21   States -- and this is a quote from a Fifth Circuit

22   opinion, *Villas at Parkside Partners v. City of Farmers

23   Branch, Texas* -- the United States Supreme Court has

24   held that unilateral state action to detain exceeds any

25   coherent understanding of the term "cooperation" under

1   federal law, end quote.

2              In sum, Texas' Operation Lone Star program

3   amounts to unilateral state action to identify, arrest,

4   detain, and punish aliens perceived to be not lawfully

5   present in the United States without federal direction

6   or supervision and in contravention of federal

7   immigration policies and procedures.  As such, the

8   Operation Lone Star program unlawfully encroaches on

9   federal immigration law, policy, and procedures, which

10  is constitutionally reserved to the United States

11  Government under the Supremacy Clause.

12             The State of Texas may have understandable

13  frustrations with the problems caused by illegal

14  immigration at our border.  Nevertheless, the state --

15  and this is a quote from *Arizona v. United States* -- may

16  not pursue policies that undermine federal law.

17             For the above reasons and in light of its

18  obligations under Texas law to ensure that justice is

19  done, the State is compelled to pray that this Court

20  find that Applicant has met his burden of proof and he

21  is entitled to relief.

22             Thank you.

23             *(Reporter clarification)*

24             THE COURT:  Relief.  Entitled to relief.

25             All right.  Mr. Schulman.

1          MR. SCHULMAN:  Thank you, Your Honor.

2                    **CLOSING ARGUMENT**

3          MR. SCHULMAN:  First, I would advise the

4     Court that, in my opinion, the *Stephens* case cited by

5     Ms. Taylor is in opposite in that it pertained to the

6     AG's authority to initiate prosecutions.  The question

7     in this case is whether the AG has a right to defend

8     prosecutions as being constitutional.

9               Second, we would reurge our initial

10    argument that, despite what happened this morning, the

11    writ was never issued.  And the purpose of this hearing

12    is to determine whether it should issue the writ.  We

13    would suggest to you that there is no connection

14    whatsoever between this prosecution in Travis County

15    other than the fact that all the lawyers live here.  On

16    the other hand, the case is 100 percent connected to

17    Kinney County, and that is the county to which the writ

18    should be returnable.  Your Honor should decide not to

19    rule on the merits but to change the return to Kinney

20    County District -- to the District Court in Kinney

21    County and let that Court decide the constitutionality

22    of the arrest of Mr. Guzman Curipoma's arrest.

23               Finally, irrespective of the other

24    arguments, the Applicant has not met his burden of

25    showing that anything is unconstitutional as applied to

1    him.  Exhibit DD does not pertain in any way to what was

2    involved in the officer's motivation or assignment at

3    the time of the arrest.  On the other hand, Exhibit CC

4    demonstrates that the Applicant was not arrested by a

5    military officer.  He was arrested by a DPS trooper in a

6    railcar in a UPS railyard, along with, I believe, nine

7    other individuals.

8              So there's no evidence the DPS trooper was

9    not acting on probable cause to affect a justifiable

10   arrest under state Law.  There is no evidence that the

11   DPS officer was not assigned to the district which

12   includes Kinney County prior to Operation Lone Star.

13   Neither of the exhibits attached to the State's answer

14   or -- or Exhibit CC demonstrate any connection between

15   Operation Lone Star and this Applicant.

16              There is no evidence that the defendant

17   was arrested because of Operation Lone Star; no evidence

18   that the defendant would not have been arrested if there

19   was no Operation Lone Star.  And as applied to

20   Mr. Curipoma, the operation of the statute is not

21   unconstitutional as applied to him.

22              Thank you.

23              THE COURT:  All right.

24              I do make the findings requested by the

25   Applicant and agreed to by the State and award the

1    relief requested by the Applicant and agreed to by the

2    State.

3            If y'all will prepare an order and send it

4    to me that provides the relief that you've requested,

5    then I will sign it.

6            MS. COGLIANO:  Yes, Judge.  I will prepare

7    that right away.

8            THE COURT:  All right.  Thank y'all.

9            Y'all are excused.

10           *(Hearing concluded)*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    STATE OF TEXAS       )

2    COUNTY OF TRAVIS     )

3         I, Michelle Williamson, Official Court Reporter in

4    and for the 345th District Court of Travis, State of

5    Texas, do hereby certify that the above and foregoing

6    contains a true and correct transcription of all

7    portions of evidence and other proceedings requested in

8    writing by counsel for the parties to be included in

9    this volume of the Reporter's Record in the above-styled

10   and numbered cause, all of which occurred remotely via

11   videoconference in open court or in chambers and were

12   reported by me.

13        I further certify that this Reporter's Record of the

14   proceedings truly and correctly reflects the exhibits,

15   if any, offered by the respective parties.

16        WITNESS MY OFFICIAL HAND this 17th day of January,

17   2022.

18

19
                          /s/ Michelle Williamson_____
20
                          Michelle Williamson, CSR
21                        Texas CSR #4471
                          Expires:  01/31/2024
22                        Official Court Reporter
                          345th District Court
23                        Travis County, Texas
                          P.O. Box 1748
24                        Austin, Texas 78767
                          Telephone:  (512) 854-9373
25
```

# *Law Office of E. G. Morris*

2202 LAKE AUSTIN BLVD.
AUSTIN, TEXAS 78703
OFFICE (512) 478-0758
FAX (877) 497-8347
www.egmlaw.com

E. G. "GERRY" MORRIS
BOARD CERTIFIED CRIMINAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
egm@egmlaw.com

ANGELICA COGLIANO
OF COUNSEL
aac@egmlaw.com

SUZANNE M. SPENCER
OF COUNSEL
sms@egmlaw.com

MARIAH ANGER
OFFICE MANAGER
mca@egmlaw.com

CHANTAL E. AGUILAR
LEGAL ASSISTANT
cea@egmlaw.com

Monday, March 14, 2022

Hon. Deanna Williamson, Clerk
Court of Criminal Appeals of Texas
201 W. 14th St., Austin, Texas 78701

> Re:   ***State ex rel Brent Smith v. Judge Jan Soifer,*** No. WR-93, 354-02
> ***In re State Ex Rel Brent Smith v. The Court of Appeals for the Third Judicial
> District*** *(No. WR-(93,354-04).*

Dear Ms. Williamson:

I am in receipt of a letter efiled in the first referenced case and dated March 14, 2022, although filed on March 13, 2022, from Acting Ass't County Attorney for Kinney County David A Schulman. It is not evident from the face of the document whether his filing was some sort of supplementary brief or just an attempt by the writer to address the members of the court on a personal level. However, it is clearly intended to persuade the court to take a particular action in the case, so, on behalf of the accused in, *The State of Texas v. Jesus Alberto Guzman Curipoma, (Third Court of Appeals (No. 03-22-00032-CR.*, I submit this response.[1]  I ask that my response be routed to the court in the same manner as that of the original letter from Counsel from Kinney County.

I too have read all the filings in the various related cases and have also received extensive information about the proceedings in the criminal courts of Kinney County related to arrests occasioned by Operation Lone Star. I have been practicing criminal defense law for almost 44 years. During that time, I have been honored by my peers to serve as the president of the Texas Criminal Defense Lawyers Association (TCDLA) and the National Association of Criminal

---

[1] Kinney County suggests in its letter that the court consolidate with the first referenced case and others its challenge to the ruling in this case by Application for Writ of Prohibition urging the Court of Criminal Appeals to, in effect, reverse a decision by the Third court of appeals in this case. *In re State Ex Rel Brent Smith v. The Court of Appeals for the Third Judicial District (No. WR-(93,354-04).*  Consequently, my response is filed in that case, in which I am one of the attorneys of record.

Appx. 322

Defense Lawyers (NACDL).   Relevant to the issues at hand, during my term as president of NACDL and in the years before in other officer's positions, I had the opportunity to oversee projects where court watchers were assigned to observe the proceedings in various jurisdictions which were represented to us as engaging in particularly egregious denials of due process. I regularly read reports from the court watchers describing what they observed and approved some sort of litigation or other judicial intervention by NACDL.   While those reports were upsetting and warranted legal redress, none of the situations that I reviewed approached the degree and magnitude of the denial of rights I've observed in Kinney County in connection with Operation Lone Star.   I am saddened and frankly, embarrassed that such a situation is occurring in the state of my birth and of my continuous residence for 69 years.   It reminds me of the stories I've read about the abuses that occurred regarding people of color in this state in bygone eras which I had assumed were no longer occurring because as a society, we've advanced beyond that.   However, my assumptions were wrong.  This situation rivals any that have preceded it.

My information about the Kinney County situation comes from the cases that lawyers in my office are personally handling, reports from other lawyers that I know and trust and from reports generated by the American Civil Liberties Union.   Those circumstances are very succinctly described in the filing in this court titled, The Response of Real Parties in Interest Opposing Relator's Application for Writ of Prohibition in *In re State ex rel. Brent Smith, Relator, Judge Jan Soifer, Respondent, 438 Habeas Petitioner, Real Parties at Interest, No. WR-93,354-02.*  I direct the courts attention to that filing and will not repeat in detail its contents here.   However, in partial summary, defendants are being held in custody in some cases for months without counsel and without a proper charging instrument having been filed.   Appointment of counsel after arrest is routinely delayed and ranges between 2 and 139 days.   Charging instruments are filed usually between 30 and 90 days on Class A misdemeanor offenses.   In 73 cases complaints alone have been pending between 153 and 208 days.   Generally, cases are set for arraignment between 90 and 120 days after arrest.   At arraignment, defendants are offered the opportunity to plead guilty for "time served" to be released for jail regardless of whether the cases have merit. If they refuse to give up their rights associated with trial, they remain in jail indefinitely.   To date, few if any trials have been scheduled in Kinney County and none have taken place.   Thus, the length of the actual sentence of incarceration served, depends on how fast the court dockets the case for arraignment or trial rather that the particularized facts of the case.

Hearings on writs of habeas corpus to enforce the clear dictates of Article 17.151 C.C.P. which commands the release on personal bond or a reduced bond where no charging instrument has been filed, with the writs returnable to Kinney County have not proven to be an adequate remedy.   Months long delays have occurred from the filing of the writs to a hearing date, defeating the purpose of the remedy.   Judges appointed to handle the cases who've expressed a willingness to grant relief have been removed through efforts of Kinney County officials.   Judges in Kinney County now simply refuse to set habeas petitions for hearing or do so after lengthy delay.   Nowhere among the voluminous filings offered to this court by Kinney County is any denial of the existence of these circumstances.   Instead, it attacks the remedy authorized by statute employed to challenge the illegal detentions.

Unlawful detention or prosecution is not without a legal remedy.   From grade school we've heard of the "great writ" the origins of which date back to the Magna Carta.   Through the history of Anglo-Saxon jurisprudence, writ of habeas corpus has been held up as the ultimate remedy

against government oppression which cannot be made unavailable except in extraordinary circumstances. What my client and others have sought to do is make effective use of the great writ.

As a young lawyer, I often found myself with time on my hands and I occupied myself by undertaking such odd tasks as reading the entire text of the Texas Code of Criminal Procedure. It was during one of those reading sessions that I first stumbled on Art. 11.06 C.C.P. which makes a writ, prior to indictment, returnable to any county in the state. I can't say that I understood the importance of that article when I first read it. Over the years I had discussions with several lawyers with more experience than I and of greater accomplishment about where that article fits into the statutory scheme. I learned that most believed it to be the last resort to preserve the effectiveness of the great writ where a prosecution has been brought in a county that is unable or unwilling to provide a meaningful hearing on a writ petition.

When I learned of the circumstances in Kinney County, it struck me that the situation warranted the admittedly unusual step that it authorized by the plain, unambiguous language of Art. 11.06. Accordingly, I urged the lawyers who are associated with me or otherwise look to me for guidance to utilize the procedures authorized by that statute to vindicate the constitutionally guaranteed rights of the individuals they represent. Counsel for Kinney County asserts that we should not be able to utilize the writ of habeas corpus procedure so authorized, because neither he nor other prosecutors have ever heard of it. I suggest that neither he nor his peers have ever seen a situation like that in Kinney County. I further venture to guess that many of the prosecutors he has spoken with would not allow such a situation to persist in their jurisdictions.

The situation the court is confronted with may come before you infrequently, but the issue of giving effect to the clear language of a statute is not a novel one. Counsel for Kinney County seems to put forth no other argument than, the legislature made a poor choice in authorizing this procedure. It is not this court's providence to pass judgment on the wisdom of a statute. However, if it were, approving a remedy that that ensures the availability of writ of habeas corpus to secure fundamental due process rights to those accused of a crime seems to reflect sound judgement. Of course, no argument can be convincingly made that Art. 11.06 doesn't authorize the procedure we've followed in these cases. The language of the statute is as simple, clear, and unambiguous as the proverbial Ned's First Reader.

If Kinney County wants to prosecute 3,000 people for criminal trespass, that is a decision for the leaders of that county to make. However, whether they will be allowed to do so while denying the basic rights to which all accused are entitled, is to be determined by the courts. Art. 11.06 allows full, timely access to duly elected district courts. Those unlawfully incarcerated in Kinney County have become pawns in the larger political debate about whether the Biden administration is adequately addressing border crossings. It is consistent with the core purpose of the writ of habeas corpus to ensure that the rights of individuals are not extinguished by the whim of political leaders yielding to the mood of the moment. And further, in the parlance of rural East Texas where I was raised, what is happening in Kinney County just ain't right.

Rather than attacking the remedy, Kinney County can eliminate the grounds for relief by scrupulously honoring and enforcing the rights of the individuals with the same zeal and expenditure of resources that they have devoted to initiating the prosecutions. We ask this court

to deny the relief requested by Kinney County, give effect to the plain meaning of Art. 11.06, and thus assure the continued vitality of the great writ.

Respectfully submitted,

_____

E. G. Morris
SBN#14477700
505 W. 12th St. Suite 206
Austin, Texas 78723
(512)478-0758
egm@egmlaw.com

Counsel for Jesus Alberto Guzman Curipoma

Appx. 325

## CERTIFICATE OF COMPLIANCE

This is to certify that: (1) this document, created using Microsoft Word software, contains 1773 words, excluding those items permitted by Rule 9.4 (i)(2)(B), Tex.R.App.Pro., and complies with Rules 9.4 (i)(2)(B) and 9.4 (i)(3), Tex.R.App.Pro.; and (2) on March 14, 2022, a true and correct copy of the above and foregoing letter has been transmitted via the eService function on the State's eFiling portal, to each of the following individuals:

1. Judge Jan Soifer (jan.soifer@traviscountytx.gov)
2. Holly Taylor (holly.taylor@traviscountytx.gov)
3. Addy Miro (addymiro@msn.com);
4. David A. Shulman (zdrdavida@davidschulman.com);
5. Angelica Cogliano (coglianodefense@gmail.com);
6. Robert Doggett (rdoggett@trla.org);
7. Kristin Maria Etter (ketter@trla.org);
8. Rachel Garza (rgarza@trla.org);
9. Billy Pavord (BPavord@trla.org);
10. Michelle Norred (michelle.norred@oag.texas.gov);
11. Kimberly Gdula (Kimberly.Gdula@oag.texas.gov);
12. Laura Kiick (laura.kiick@oag.texas.gov);
13. William Wassdorf (will.wassdorf@oag.texas.gov);
14. Christopher Hilton (christopher.hilton@oag.texas.gov);
15. Brent Smith (bsmith@co.kinney.tx.us);
16. Laurie K. English (lke112da@gmail.com);
17. Casey Solomon (casey.solomon@oag.texas.gov);
18. Edward Marshall (edward.marshall@oag.texas.gov).

_____
E. G. Morris

NO. _____

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE_____** |
| | § | |
| | § | **JUDICIAL DISTRICT COURT OF** |
| | § | |
| **JESUS ALBERTO GUZMAN** | § | **TRAVIS COUNTY, TEXAS** |
| **CURIPOMA** | | |

## APPLICATION FOR WRIT OF HABEAS CORPUS

TO THE HONORABLE JUDGE OF SAID COURT:

Applicant Jesus Alberto Guzman Curipoma, by and through undersigned counsel, presents this pretrial Application for Writ of Habeas Corpus pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Article VI of the United States Constitution, Article 1, Sections 10 and 19 of the Texas Constitution, and Chapters 21 and 45 of the Texas Code of Criminal Procedure.

## I.     Applicant is detained illegally.

Applicant is illegally confined and restrained of his liberty by State of Texas, who has charged him with the misdemeanor crime of criminal trespass in the *State of Texas v. Jesus Alberto Guzman Curipoma*, case number 10726CR, Kinney County, Texas. He was arrested and charged by complaint with a misdemeanor.     (See: Exhibit A)  Article 11.22 of the Code of Criminal Procedure defines "restraint" for the purposes of pretrial habeas corpus litigation as "the kind of control which one person exercises over another, not to confine him within certain limits, but to subject him to the general authority and power of the person claiming such right." Mr. Guzman Curipoma's liberty is restrained by virtue of his obligation to appear in court and respond to these charges brought against him by the State of Texas.

Appx. 327

## II.     This Court has jurisdiction to issue the writ.

Article V of the Texas Constitution gives some courts jurisdiction to issue the writ of habeas corpus. Section 5 of Article V says, "Subject to such regulations as may be prescribed by law, the Court of Criminal Appeals and the Judges thereof shall have the power to issue the writ of habeas corpus." Section 8 says, "District Court jurisdiction consists of exclusive, appellate, and general jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body." This gives the district court "plenary" power to issue the writ of habeas corpus. Ex parte Schmidt, 109 S.W.3d 480, 482 (Tex. Crim. App. 2003).

Additionally, Article 11.05 of the Code of Criminal Procedure says, "The Court of Criminal Appeals, the District Courts, the County Courts, or any Judge of said Courts, have power to issue the writ of habeas corpus; and it is their duty to grant the writ under the rules prescribed by law." While Article 17.151 provides that an applicant "confined on a charge of misdemeanor" **can** be sought from "the county judge of the county in which the misdemeanor is charged to have been committed," it provides only that the application "may" be so made, and therefore, the provision is not mandatory. Jurisdiction to entertain a petition lies in all other county and district courts and judges. *See Ex parte Williams*, 786 S.W.2d 781, 782 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd) (district court has and can exercise habeas jurisdiction concerning prosecution pending against applicant in county court); *see also Ex parte Gomez,* No. 07-16-00196-CR, 2016 Tex.App. LEXIS 11461 (Tex.App. – Amarillo Oct. 20, 2016).

The Code of Criminal Procedure likely articulates that a county judge *can* hear applications for writs of habeas corpus simply to add an *additional* jurisdiction from which those being unconstitutionally detained can obtain relief. The legislature perhaps also intended to indicate a *preference* for such applications to be filed in front of the court in which the criminal case is pending

2

Appx. 328

absent good cause, though there is no support for this in the code or caselaw reviewed by undersigned counsel.[1]

Here, there is an abundance of good reason to look for relief outside of the jurisdiction in which the applicant is facing the underlying charge. Kinney and Vel Verde County and District Courts have been inundated with criminal cases arising out of Operation Lonestar – an initiative developed by Governor Abbott and DPS to target and arrest migrants at the border. As detailed in the Kinney County Attorney's application for a writ of prohibition, attached to this filing as Exhibit B, the average number of new criminal cases in Kinney County is under 100, whereas there have been *thousands* of arrests in just that county thus far under OLS.[2] Currently, it is taking **at minimum** 6 weeks to be heard after filing an application for writ of habeas corpus, despite the expedited and extraordinary nature of habeas relief.

In order to accommodate the dramatic influx of cases resulting from Operation Lone Star (OLS), the Presiding Judge of the Sixth Administrative Judicial Region recently assigned three visiting judges to take on some of the caseload. However, quickly after, Judge Shahan of Kinney County relieved those judges of their duties, exacerbating the already tenuous and increasingly unconstitutional backlog. Exhibit C to this filing includes the letter from Judge Shahan removing the additional judges, as well as a letter from Texas Rio Grande Legal Aid – the organization handling the vast majority of OLS Cases – to Presiding Judge Ables detailing the scheduling debacle in the Kinney

---

[1] This is suggested by language in *Ex parte Smallwood*, 87 Tex. Crim. 268, 283 S.W. 293 (1920): "Under our procedure, applications for writs of habeas corpus in misdemeanor cases should be made to the county judge of the county in which the applicant resides." However, such language most likely reflects the reluctance of the Court of Criminal Appeals to exercise its original habeas jurisdiction rather than a well-considered policy of preference for county rather than district courts. Cf. *Ex parte Phelper*, 433 S.W.2d 897, 898 (Tex. Crim. App. 1968) (citing Smallwood for proposition that Court of Criminal Appeals will not exercise its original jurisdiction given availability of county and district courts and judges).

[2] Additionally, in that filing, the County Attorney incorrectly and bizarrely asserts that he is entitled to have the Court of Criminal Appeals direct the local visiting judges to not grant relief in *any* case involving an application for pre-trial writ of habeas corpus. Exhibit A, p.7. This in and of itself constitutes good cause to have the applications heard in another county.

County courts.

Should this Court believe good cause is required to grant this application and set the matter for hearing outside of Kinney County, it certainly exists here. Applicant is unlikely to receive an expedited hearing on this Application for Writ of Habeas Corpus in the county in which the underlying case is pending. Additionally, the interested parties have already been conducting these hearings via zoom even in front of the local court, so there is no added inconvenience, expense, or detriment to the Sate in granting this application and setting the mater for an expedited virtual hearing.

### III.   Mr. Guzman's arrest and charge under is unconstitutional because it occurred under the authority of "Operation Lonestar," a program authorized by Governor Abbott that violates the Supremacy Clause of the United States Constitution.

### A.  Federal preemption is an appropriate basis for pretrial habeas corpus relief

A pre-trial writ of habeas corpus is an appropriate avenue for relief when that relief is based upon the assertion that the charging instrument relies on an unconstitutional state statute, rule, or other legislation. *Ex parte Smith,* 178 S.W.3d 797, 801 (Tex. Crim. App. 2005); *See also Ex Parle Weise,* 55 S.W.3d 617, 620 (Tex. Crim. App. 2011). Constitutional claims may be raised pretrial if they are facial challenges or if the underlying rights would be effectively undermined if not vindicated before trial. *Ex parte Perry,* 483 S.W.3d 884 (2016).

The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution of Laws of any State to the Contrary notwithstanding.

Thus, a state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67

4

(1941), or if it regulates "the activities of the Federal Government," *Mayo v. United States,* 319 U.S. 441, 445 (1943).

## B.  Regulating immigration is an area of exclusive federal control

The Constitution affords Congress the power to "establish an uniform Rule of Naturalization."  U.S. Const., art. I § 8, cl. 4.  It also affords the President of the United States the authority to "take Care that the Laws be faithfully executed."  U.S. Const., art. II § 3. Congress has exercised its authority over immigration to make laws governing the entry, admission, presence, status, and removal of noncitizens within the United States by enacting the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 et seq., and other laws regulating immigration.  These laws codify the Executive Branch's authority to inspect, investigate, arrest, detain, and remove noncitizens who are suspected of being, or found to be, unlawfully in the United States.  See 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231, 1357.

Federal law also creates criminal sanctions for those who facilitate the unlawful entry, residence, or transportation of noncitizens within the United States.  See 8 U.S.C. §§ 1323, 1324, 1327, 1328.  The States and their political subdivisions cannot obstruct or discriminate against the execution of federal immigration laws.  See *Arizona v. United States*, 567 U.S. 387, 394-95 (2012). State laws that have attempted to supplement federal immigration law with parallel state criminal penalties for immigration offenses have, thus, been struck down by courts. *See e.g., Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524 (5th Cir. 2013) (en banc); *Arizona*, 567 U.S. at 400-410; *We Are America v. Maricopa Cty. Bd. of Sup'rs*, 297 F.R.D. 373, 387 (D. Ariz. 2013). Texas courts have granted relief in the criminal context when state criminal enforcement has intruded into Congress's comprehensive federal immigration system. *See Hernandez v. State*, 613 S.W.2d 287, 290 (Tex. Crim. App. 1980); *see also Ex parte Johnson*, 591 S.W.2d 453,

454 (Tex. 1979).

## C.  Operation Lone Star was implemented by the Texas Government to "secure the border"

Mr. Guzman Curipoma's arrest was directed by "Operation Lone Star," Governor Greg Abbott's mass arrest program targeting the U.S.-Mexico border and buttressed by an emergency declaration suspending basic legal rights of people suspected to be migrants. In unequivocal language, Operation Lone Star (OLS) directs state law enforcement personnel to specifically target men (and only men) who appear to be foreign nationals from Mexico or Central America for arrest and detention on misdemeanor charges for the purpose of "securing the border." Governor Abbott's executive order, attached as Exhibit D, declared a state of "disaster" based on "federal government policies" and federal "inaction" that he claimed had led to "a dramatic increase in the number of individuals unlawfully crossing the international border." The disaster declaration described OLS as intended to "deter illegal border crossings."

OLS exploits the Texas legal system to reach Governor Abbott's singular goal of creating a new class of "criminal aliens" that can be deported quickly and prevented from returning. The program has resulted in a separate and unequal criminal legal system for individuals suspected of entering the United States unlawfully. In this farcical alternative, constitutional rights are suspended, and due process is non-existent. This month, the American Civil Liberties Union, Texas Civil Rights Project, and Texas Fair Defense Project jointly requested a federal investigation into OLS under Title VI of the Civil Rights Act. The complaint, attached as Exhibit E, clearly and effectively details the development and implementation of Governor Abbott's initiative.

## D.  Operation Lone Star violates the Supremacy Clause by preempting federal immigration policy.

The application of the state criminal trespass penalties under Operation Lone Star is pretextual and a clear attempt to regulate migration by Texas authorities acting in direct conflict

6

with federal immigration law. Like the invalid law in *We Are America*, the government's use of criminal trespass in this case is an attempt to utilize state officials to "secure the border" and criminalize unlawful presence and entry itself. *See* 297 F.R.D. at 387.  In response to this initiative by Governor Abbott, Joaquin Castro and 25 other members of the United States Congress called upon the Department of Justice to "review and investigate Governor Abbott's Operation Lone Star program regarding both its likely violation of the Supremacy Clause and its treatment of migrants, especially in regards to an individual's constitutional right to due process" in a letter attached to this filing as Exhibit F.

The Department of Justice has already begun civil litigation in federal court over Governor Abbott's "border security" initiatives, successfully acquiring an injunction precluding the application of one of Governor Abbott's executive orders, No. GA-37, restricting the ground transportation of suspected migrants. The complaint, attached as Exhibit F, alleges the executive order "obstructs the Federal Government's arrangements... and directly interferes with the administration of federal immigration law." In granting the injunction, Judge Cardone rejected the State of Texas's argument that the border prosecutions were valid because they were conducted for the purpose of managing and improving public health rather than to enforce immigration policy. The Federal District Court's order, attached as Exhibit G, determined that "[r]egardless of the object of the [Governor's executive order], its effect is clear" and "any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause."

Operation Lone Star's intent and effect is clear. The Texas Government is restraining the liberty of thousands of individuals under the guise of criminal trespass prosecutions in an attempt to usurp federal immigration legislation and strong arm the federal government into enacting policies that Governor Abbott would prefer. In his own letter to President Biden

Appx. 333

detailing Operation Lone Star, attached as Exhibit G, Governor Abbott threatened that "in the absence of federal action, Texas will continue to step up."  In an attempt to secure support from other State governments, and convince them to similarly violate the Supremacy Clause, Governor Abbott authored a letter, attached as Exhibit H, in which he admitted that "securing our border with Mexico is the federal government's responsibility. But the Biden Administration has proven unwilling or unable to do the job… [therefore,] Texas and Arizona have stepped up to secure the border in the federal government's absence." In his own communications and public statements, Governor Abbott has acknowledged his efforts through Operation Lone Star violate the United States Constitution's Supremacy Clause.

Mr. Guzman Curipoma, an oil engineer with a masters degree and no criminal history, is in pursuit of his valid and strong asylum claim. The unlawful charges against him were brought in a misguided and unconstitutional endeavor to create a State based immigration policy.

WHEREFORE, PREMISES CONSIDERED, Applicant prays that this Honorable Court will grant and issue a Writ of Habeas Corpus to the Sherriff of Kinney County to produce the person of Jesus Alberto Guzman Curipoma, either physically or, if he is or has been released on bond or recognizance, then constructively through his attorney of record before this Court for hearing in this Court on the legality of the restraint as contested in the application.

Respectfully submitted,
/s/ Angelica Cogliano
Angelica Cogliano, SBN 24101635
E.G. Morris, SBN 14477700
Addy Miró, SBN 24055984
Attorneys for Applicant
505 West 12th Street, Suite 206
Austin, TX 78701

8

# VERIFICATION

STATE OF TEXAS                    §
                                 §
COUNTY OF TRAVIS                  §

"My name is Angelica Cogliano and I am the Petitioner in the above-styled and numbered *Application for Writ of Habeas Corpus*. I have read the above and foregoing application, and I hereby swear that the facts contained therein are true and correct."

_____
Angelica Cogliano
SBN 24101635

Executed on January 4, 2022.

_____
Notary Public in and for the State of Texas

CHANTAL AGUILAR
Notary Public, State of Texas
Comm. Expires 04-17-2023
Notary ID 131978314

NO. D-1-GN-22-000058

| | | |
|---|---|---|
| EX PARTE | § | IN THE 126TH |
| | § | |
| | § | JUDICIAL DISTRICT COURT OF |
| | § | |
| JESUS ALBERTO GUZMAN CURIPOMA | § | TRAVIS COUNTY, TEXAS |
| | § | |

## Order Granting Habeas Corpus Relief

On this date, the Court heard the application for habeas corpus relief filed by Jesus Alberto Guzman Curipoma. Guzman Curipoma appeared via Zoom in person and through his counsel, Angelica Cogliano,, E.G. Morris, and Addy Miro, and the State of Texas appeared through Travis County Assistant District Attorneys Holly Taylor and Nancy Nicolas. Attorney David Schulman announced that he was appearing as an acting Assistant County Attorney for Kinney County.

Having signed the Writ of Habeas Corpus and set it for hearing on the merits, and having considered the application and its attachments, the State's answer, the pleadings on file, the testimony, admissible evidence, stipulations agreed to by Applicant and the State, and the argument of counsel, the Court FINDS that Applicant Guzman Curipoma has met his burden of proof and is entitled to the relief requested.

It is therefore ORDERED that the misdemeanor trespassing case pending against Applicant, *State of Texas v. Jesus Alberto Guzman Curipoma,* Case Number 10726CR, in Kinney County, Texas, be dismissed without delay.

Signed on January 13, 2022.

Jan Soifer, Judge Presiding

Appx. 336









 **Greg Abbott** ✔
@GregAbbott_TX
🗳 Governor candidate, TX

Texas Border Wall update:

New Border Wall Construction Begins near West Texas Town.

This is in addition to the new program to arrest and jail illegal immigrants arrested for trespassing in Texas.

breitbart.com/border/2021/07… via @BreitbartNews



breitbart.com
**New Border Wall Construction Begins near West Texas Town**
EAGLE PASS -- Site preparation work for one segment of Abbott's recently announced border wall project is visibly underway south of the city.

6:57 PM · Jul 23, 2021 · Twitter Web App

Appx. 341



**Greg Abbott** ✔
@GregAbbott_TX
📮 Governor candidate, TX

Meeting with @TDEM, @TXMilitary, @TxDPS, & the Texas Commission on Jail Standards about our plan to catch and jail illegal migrants crossing the border.

The Biden administration caused this crisis, Texas is stopping it.



2:41 PM · Jul 26, 2021 · Twitter Web App

**216** Retweets    **38** Quote Tweets    **1,046** Likes



**Greg Abbott** ✔
@GregAbbott_TX
🏛 Governor candidate, TX

The Texas Dept. of Public Safety continues to arrest illegal migrants coming across the border and sending them to jail.

Here is an example from this morning with @TxDPS working with the Kinney County Sheriff's Office.

**Kinney County Sheriff's Office**
23m · 🌐

This is happening! 17 Illegals this morning.
At the Kinney County Sheriffs Office.
Judge Narci Villarreal magistrated  each illegal alien.
Thank you DPS for all your help.

+5







**Greg Abbott** ✔
@GregAbbott_TX
🗳 Governor candidate, TX

Texas National Guard is authorized to arrest illegal immigrants trespassing in Texas.

They arrested these in the Rio Grande Valley.

We opened thousands of jail beds for all of the new arrests.

They are also working with @TxDPS to seal border regions.



7:17 PM · Oct 10, 2021 · Twitter for iPhone

**659** Retweets   **96** Quote Tweets   **3,658** Likes



 **Greg Abbott** ✔
@GregAbbott_TX
🔖 Governor candidate, TX

···

Texas Dept. of Public Safety arrest illegal immigrants hiding in rail cars.

They will be put behind bars, not sent to Border Patrol for catch & release.

@TxDPS, along with the Texas National Guard, have made thousands of arrests this year through #OperationLoneStar.





**Jay Root** ✓
@byjayroot

Some background: there have been questions about this document I obtained showing the @TxDPS policy only arresting adult males not traveling as part of family units. #txlege

| | |
|---|---|
| **From:** | Fernandez, Noe |
| **To:** | |
| **Cc:** | |
| **Subject:** | FW: Criminal Trespass Checklist |
| **Date:** | Tuesday, July 20, 2021 6:57:00 PM |
| **Attachments:** | criminal trespass checklist.docx |

Good evening Sergeants,

This form is to be completed by those arresting anyone in Val Verde County for Criminal Trespass.

As a reminder, this will only be filed on adult males not traveling as family units.

Thanks in advance,

Lieutenant Noe Fernandez
Highway Patrol
Del Rio

12:54 PM · Aug 24, 2021 · Twitter for iPhone



**Brent Smith**
October 9, 2021 · 🌐

···

**Chad Prather** ✓
October 9, 2021 · 🌐

It's time to equip the Texas Guard to defend our Texas border. It's time to equip Texas militias. It's time to equip Texas citizens. The time is upon us. The federal government has abandoned Texas. The governor is full of shit. The Haitian migrants have stated that they are ready for war. Are we?

👍❤️ 17                          6 Comments  4 Shares

👍 Like                          ↱ Share

**Ray Zavadil**
Working on it brent. Will be geaded do an soon with some of my guys. We need to talk
Like   28w                          👍

**Donna Granchay Baird**
Ready. I don't know anyone without a gun and the will to use it against the bad guys.
Like   28w                          👍



**Brent Smith**
September 21, 2021 · 🌐







**Kinney County Sheriff's Office**
November 18, 2021 at 12:44 AM · 🌐

**Adam Rodriguez** November 17, 2021 at 1:10 PM · 🌐

Gotta love deer hunting in South Texas 💂 💂 Age and score please. 💂

Flag Status: Full-Staff            **Español**    **Contact**

## Office of the Texas Governor | Greg Abbott

**Home**    **Governor Abbott**    **First Lady**    **Initiatives**    **News**    **Organization**

Home    News
Governor Abbott, DPS, Texas National Guard Mark One Year Anniversary Of Operation Lone Star ()

# Governor Abbott, DPS, Texas National Guard Mark One Year Anniversary Of Operation Lone Star

March 4, 2022 | Austin, Texas | Press Release

Governor Greg Abbott, the Texas Department of Public Safety (DPS), and the Texas National Guard today mark the one-year anniversary of Operation Lone Star (OLS)—an unprecedented, comprehensive mission to address the Biden-made crisis at Texas' southern border. Officially launched on March 4, 2021, OLS integrates DPS assets, including Texas Highway Patrol Troopers, Special Agents, Texas Rangers, Rotary and Fixed Winged Aircraft and Tactical Boat Teams, along with the Texas National Guard and local law enforcement to secure the border.

Since the launch of OLS, multi-agency efforts have led to more than 208,000 migrant apprehensions, along with more than 11,800 charges for criminal offenses— including more than 9,300 felony charges. Members of notorious gangs like the Texas



**Governor Abbott's Operation Lone Star Anniversary Message**

Appx. 353

Chicano Brotherhood, Bloods, Mexican Mafia, MS-13, and others have been taken off the streets. DPS has arrested sex offenders, weapons traffickers, previously convicted and deported criminal immigrants, drug dealers, and other wanted criminals. In the fight against fentanyl, DPS has seized over 269 million lethal doses throughout the state.

Governor Abbott <u>released a video</u> to commemorate the achievements of the mission, Texas law enforcement, and soldiers.

"We launched Operation Lone Star to do the job that Washington would not," said Governor Abbott. "Within weeks of taking office, President Biden turned our southern border into a porous mess where criminal aliens wandered across the Rio Grande River without anyone to interdict them. I refused to stand by and let our state be overrun by criminals and deadly drugs like fentanyl. Texans have never backed down from a challenge, and we won't start now, because our efforts are stemming the tide of illegal drugs and criminals flooding into Texas. Thank you to the many men and women who are protecting our southern border, including the DPS troopers, Texas National Guardsmen, Texas sheriffs, and all the law enforcement officers who serve and protect us every day."

"I thank Governor Abbott for his tremendous leadership in protecting the people of Texas by working to secure our southern border," said DPS Director Steven McCraw. "One year into this mission, DPS has arrested thousands of dangerous criminals, apprehended tens of thousands of illegal immigrants,

and seized dangerous contraband. Let it be very clear – an unsecured international border with Mexico is the most significant threat to the state of Texas."

"The Texas National Guard soldiers and airmen are proud to stand alongside DPS and other agencies in protecting the people and property of Texas," said Maj. Gen. Tracy Norris, the Adjutant General of Texas. "We continue to construct fencing and barriers, turn back and apprehend migrants, and do the job we were sent here to do—we are Texans serving Texas."

Since the initial launch of Operation Lone Star in March 2021, the Governor, DPS, and the Texas National Guard have increased the comprehensive efforts of the mission.

On March 17, 2021, Governor Abbott expanded OLS to include efforts to crack down on human trafficking and illegal border crossings. State agencies were directed to work with local law enforcement, communities and private landowners to prevent, detect, and interdict transnational criminal activity flowing between the ports of entry.

On May 31, 2021, Governor Abbott issued a disaster declaration for counties along Texas' southern border to free up additional resources to help address the epicenter of the crisis. The Governor's disaster declaration also directed the Texas Health and Human Services Commission not to provide state licensing for the federal government's program of housing unaccompanied alien children.

On June 10, 2021, Governor Abbott held a Border Security Summit in Del Rio with leaders from DPS,

the Texas National Guard, and the Texas Division of Emergency Management. The summit brought together Texas sheriffs, police chiefs, county judges, mayors, district attorneys, and landowners to hear from state officials on the actions that the State of Texas is taking to secure the southern border and address the ongoing humanitarian crisis. The Governor invoked the <u>Emergency Management Assistance Compact</u> with the State of Arizona during the summit. Under this interstate compact, Governor Abbott and Arizona Governor Doug Ducey continue to ask other states to send law enforcement officials to assist them in making arrests.

The Governor also announced that DPS, with the assistance of the Texas National Guard, would begin arresting individuals trespassing on private property. In July, Governor Abbott opened the first jail booking facility of its kind in the state in Val Verde County. At the facility, individuals who are arrested for committing border-related crimes in the surrounding region are booked and magistrated, then transferred to the Briscoe or Segovia TDCJ Unit. Governor Abbott launched a <u>second jail booking facility in Jim Hogg County</u> in February 2022.

<u>In June 2021, Governor Abbott announced plans to construct a border wall</u> in Texas. Just six months later, the Governor debuted the construction of the Texas border wall in Rio Grande City. The Governor also directed the Texas National Guard to begin construction on a temporary border barrier. To date, the Texas National Guard has constructed more than eight miles of fencing and has secured signed agreements for an additional 62 miles. Additionally, the State of Texas recently acquired 1,700 unused

32-foot-tall panels that will be used for the border wall. These panels were originally intended for President Trump's border wall, but President Biden halted construction once he took office.

In July 2021, Governor Abbott issued an Executive Order restricting ground transportation of migrants who pose a risk of carrying COVID-19 into Texas communities.

In September 2021, Governor Abbott announced the availability of $100 million in grant funding for local governments through the OLS Grant Program to enhance interagency border security operations supporting OLS, including the facilitation of directed actions to deter and interdict criminal activity and detain non-citizens arrested for state crimes related to the border crisis.

That same month, Governor Abbott signed House Bill 9 into law, which provides an additional $1.8 billion in state funding for border security over the next two years, leading to nearly $3 billion in funding being allocated to border security in Texas.

Operation Lone Star was crucial to addressing the Haitian migrant crisis that occurred in Del Rio last September. A massive surge of migrants began gathering at the International Bridge in Del Rio with about 7,000 arriving in a single day. In the two days that followed, that number nearly doubled to about 13,500 migrants, mostly from Haiti. Governor Abbott ordered DPS and the Texas National Guard to mobilize additional resources including roughly 1,000 DPS personnel in the area and some 650 DPS vehicles were put into place to form a steel barrier of

Appx. 357

protection. The surge included approximately 400 additional Texas National Guard soldiers and 40 Humvees, to assist in deterring criminal activity, flanking the area and keeping the region secure.

Additional actions to secure the border by Governor Abbott include:
•   Signing a law to make it easier to prosecute smugglers bringing people into Texas
•   Signing 15 laws cracking down on human trafficking in Texas
•   Signing a law enhancing penalties for the manufacturing and distribution of fentanyl
•   Taking legal action to enforce the Remain in Mexico and Title 42 policies in Texas

Home    Governor    First    Initiatives    News    Organization    **Contact**
          Abbott      Lady

**Office of the Texas Governor**          Employment          Where the Money Goes

P.O. Box 12428
Austin Texas 78711          Site Policies          TRAIL Search
(512) 463-2000          Accessibility          Texas Veterans Portal

          Report Fraud          Texas.gov
          Site Map          RSS Feed

f    t    ▶    in    ◻    ••

Appx. 358

Flag Status: Full-Staff      Español   Contact

## Office of the Texas Governor | Greg Abbott

Home   Governor Abbott   First Lady   Initiatives   News   Organization

Home   News   Governor Abbott, DPS Launch "Operation Lone Star" To Address Crisis At Southern Border ()

# Governor Abbott, DPS Launch "Operation Lone Star" To Address Crisis At Southern Border

March 6, 2021 | Press Release

Governor Greg Abbott and the Texas Department of Public Safety (DPS) today launched Operation Lone Star to combat the smuggling of people and drugs into Texas. The Operation integrates DPS with the Texas National Guard and deploys air, ground, marine, and tactical border security assets to high threat areas to deny Mexican Cartels and other smugglers the ability to move drugs and people into Texas.

"The crisis at our southern border continues to escalate because of Biden Administration policies that refuse to secure the border and invite illegal immigration," said Governor Abbott. "Texas supports legal immigration but will not be an accomplice to the open border policies that cause, rather than prevent, a humanitarian crisis in our state and endanger the lives of Texans. We will surge the resources and law enforcement personnel needed to confront this crisis."

This decision follows a meeting last month between Governor Abbott and DPS Director Colonel Steve McCraw where they discussed strategies to enhance safety and security along the border.

Appx. 359

Home        Governor      First        Initiatives    News         Organization **Contact**
            Abbott        Lady

**Office of the Texas Governor**

P.O. Box 12428
Austin Texas 78711
(512) 463-2000

Employment                    Where the
                              Money Goes
Site Policies                 TRAIL Search
Accessibility                 Texas Veterans
                              Portal
Report Fraud                  Texas.gov
Site Map                      RSS Feed





Case 1:22-cv-00397-RP Document 1-5 Filed 04/27/22 Page 212 of 241



☰ MENU

Foster Care Scandal    Border Inspections    Roe v. Wade    Uninsured COVID-19 Patients    Coronavirus Tracker

## OPERATION LONE STAR

# Texas empties prison to prepare to detain immigrants arrested during ramped-up border enforcement

> The prison — Dolph Briscoe Unit in Dilley — will have capacity for about 1,000 people.

BY **REESE OXNER**    JUNE 17, 2021    2 PM CENTRAL

COPY LINK



A Honduran migrant holds his daughter's hand at an immigration checkpoint in Nuevo Laredo. 📷 Miguel Gutierrez Jr./The Texas Tribune

Appx. 361

*Sign up for The Brief, our daily newsletter that keeps readers up to speed on the most essential Texas news.*

4/24/22, 2:47 PM
Texas empties prison to hold detained immigrants | The Texas Tribune
Case 1:22-cv-00397-RP Document 1-5 Filed 04/27/22 Page 213 of 241

Texas officials have emptied a prison to prepare it to hold immigrants arrested by state troopers as Gov. Greg Abbott ramps up the state's law enforcement presence on the border.

Officials began transferring prisoners Wednesday from Dolph Briscoe Unit in Dilley — a small city around an hour drive southwest of San Antonio — to other facilities with available capacity so the prison can be used as a central holding facility for immigrants arrested as part of Abbott's Operation Lone Star, Texas Department of Criminal Justice spokesperson Jeremy Desel said in a statement. It will be used to hold immigrants who have been charged with state or federal crimes, he said. It is unclear what charges these could entail, and Desel could not confirm whether that would include low-level charges.

Officials have not yet started detaining immigrants in the facility, but it will have capacity for about 1,000 people. Desel confirmed the facility has no air conditioning, which is true about many prisons in the state. Weather forecasts for the area show highs surpassing 100 degrees next week.

The Texas Tribune thanks its sponsors. **Become one**.

"The state of Texas continues to deal with a record-high influx of individuals illegally crossing the border," Desel said in the statement. "To address the ongoing crisis, Governor Abbott is directing state resources to arrest and confine those individuals crossing the border unlawfully and who have committed a state or federal crime."

Plans for the prison were first reported by Keri Blakinger, a reporter with The Marshall Project.

The clearing of the prison began Wednesday — the same day that Abbott announced details of his plan for a Texas border wall, saying he would reallocate $250 million in funds from the TDCJ budget as a "down payment" while also soliciting private donations.

Appx. 362

"State leadership has assured the agency that this is a temporary measure, and the money will be reappropriated without a negative impact on TDCJ," Desel said.

Abbott referenced the available prison beds during his press conference Wednesday and said that the state may "need staff to staff those jail beds as well as others that may come up." He said some states may send jail or enforcement officers to work with state agencies and local officials to meet staffing demands.

Desel said the prison's current staff members — who total around 230 — will continue to staff the facility, and no external officers will be enlisted at this time. The TDCJ will provide "appropriate services" to those detained in the prison in conjunction with the Windham School District and the University of Texas Medical Branch, Desel said. But he said he couldn't give details on what those services would include.

President Joe Biden and Abbott have continued to publicly spar over immigration policies as the number of immigrants crossing the border has increased. In March, Abbott launched Operation Lone Star, which deployed the National Guard and "air, ground, marine and tactical border security assets" to the border. The Republican governor declared the situation at the border a disaster on May 31. Biden's administration has threatened legal action over Abbott's previous order instructing state agencies to yank child care licenses from facilities that serve migrant children.

In his order, Abbott instructed the Texas Department of Public Safety to enforce all state and federal laws on trespassing, smuggling and human trafficking and ordered two state criminal justice commissions to provide guidance and request "any necessary" waivers to give counties "the flexibility needed to establish adequate alternative detention facilities."

The Texas Tribune thanks its sponsors. **Become one**.

Appx. 363

Case 1:22-cv-00397-RP Document 1-5 Filed 04/27/22 Page 215 of 241

"The Texas Department of Criminal Justice (TDCJ), like other state agencies, is ready to assist in Operation Lone Star," Desel said.

*Politics reporter James Barragán contributed to this article.*

## READ MORE

## Quality journalism doesn't come free

Perhaps it goes without saying — but producing quality journalism isn't cheap. At a time when newsroom resources and revenue across the country are declining, The Texas Tribune remains committed to sustaining our mission: creating a more engaged and informed Texas with every story we cover, every event we convene and every newsletter we send. As a nonprofit newsroom, we rely on members to help keep our stories free and our events open to the public. Do you value our journalism? Show us with your support.

**YES, I'LL DONATE TODAY**

The Texas Tribune thanks its sponsors.
**Become one**.

Appx. 364



Donate

Contact Us

Advertise

© 2022 The Texas Tribune

**SOCIAL MEDIA**

Facebook

Twitter

YouTube

Instagram

LinkedIn

Reddit

Join our Facebook Group, This Is Your Texas.

**INFO**

About Us

Our Staff

Jobs

Who Funds Us?

Strategic Plan

Republishing Guidelines

Code of Ethics

Terms of Service

Privacy Policy

Send us a confidential tip

Corrections

Feeds

Newsletters

Audio

Video

Appx. 365

SUBSCRIBE   SIGN IN   Search

SUBSCRIBE

SIGN IN

U.S.

# Texas Jails Fill With Migrants as Border Arrests Overwhelm Courts

Of 1,500 trespassing arrests under Operation Lone Star, 3% have led to convictions, while hundreds wait weeks or months in jail



Surge in Migrant Families at U.S. Southern Border Tests Border Cities

Border cities like Brownsville, Texas, saw their resources stretched as they work to manage the growing number of migrant families crossing the U.S.-Mexico border in March. WSJ's Michelle Hackman reports. Photo: Verónica G. Cárdenas

*By* *Elizabeth Findell* Follow *and* *Alicia A. Caldwell* Follow
Nov. 8, 2021 8:00 am ET

🖨 PRINT   A𝐀 TEXT

▶ Listen to article (6 minutes)

DEL RIO, Texas—Texas Gov. Greg Abbott's effort to use state law enforcement to enforce immigration law by arresting migrants for trespassing is overwhelming local courts and resulting in few convictions.

Appx. 366

☰                                                          SUBSCRIBE   SIGN IN   🔍

Most of the rest are waiting weeks or months in jail for their cases to be processed.

As of Nov. 1, some 1,006 migrants were jailed under the initiative. The state has focused resources for Operation Lone Star in two border counties, Kinney and Val Verde. Of them, 53% have been there longer than 30 days and 14% longer than 60 days, according to court records. Two men from Cuba were in jail 98 days after they were arrested.

It is unusual for people arrested on misdemeanor charges in Texas to stay in jail for more than a few days, according to defense attorneys and prosecutors. Single men from Honduras or Mexico—a category that includes most of the Operation Lone Star arrestees—are usually deported in a day or two when caught by the Border Patrol. Only the federal government has the authority to deport foreigners. Some men jailed under Operation Lone Star end up being released in the U.S. while they pursue immigration cases, lawyers for the migrants said.

A spokeswoman for Mr. Abbott said the Republican governor "initiated a new policy of arrest and jail—instead of President Biden's catch and release program—to stop this revolving door and deter others considering entering illegally."



Texas law-enforcement officials monitoring a rail line last month in Kinney County.
PHOTO: ELIZABETH FINDELL/THE WALL STREET JOURNAL

Appx. 367

Mr. Abbott announced the effort last spring, as the number of illegal border crossings started to soar. He has taken an aggressive stance in wanting to jail migrants, including requesting permission from city officials in Del Rio to



☰

SUBSCRIBE    SIGN IN



Del Rio officials declined, saying the Border Patrol was already handling the situation, according to Mr. Lozano.

The Texas National Guard, which is controlled by the governor, is working in tandem with state troopers on the border. Other states have deployed National Guard troops to the border in the past, but they generally have helped federal authorities with tasks including vehicle maintenance and monitoring surveillance cameras. Texas is the first to implement a strategy of arresting illegal border crossers on trespassing charges. It has deployed thousands of troopers and guard troops in the effort.

NEWSLETTER SIGN-UP

## Notes on the News

Keep up with major developments in Ukraine, plus today's headlines, news in context and good reads, free in your inbox every day.

PREVIEW                                                                    SUBSCRIBE

Mr. Abbott this year shifted more than $250 million from various corners of the state budget, including Texas' prison system, to help pay for Operation Lone Star. The Republican-controlled state legislature approved an additional $3 billion for border security.

County attorney offices working on Operation Lone Star have just a few staffers who are accustomed to small caseloads. Kinney County, population 3,659, has seen more than 1,000 misdemeanor arrests in two months. Previously, the county clerk hadn't received a single misdemeanor criminal case for about three years, officials there said.

To help, the state has lent prosecutors to counties and brought judges out of retirement to hear cases remotely.

Advertisement - Scroll to Continue



### What Is "Zero-Trust" Cybersecurity?

Inside the "never trust, always verify" approach to security eve should know.

**PAID PROGRAM: DELOITTE**

Of 170 Operation Lone Star cases resolved as of Nov. 1, about 70% were dismissed, declined or otherwise dropped, in some instances for lack of evidence, according to court records. The remaining cases ended in plea agreements

Appx. 368

☰                                                                              SUBSCRIBE   SIGN IN   Search 🔍

In two cases, Val Verde County Attorney David Martinez refused to prosecute after evidence showed migrant defendants were directed onto private property by officials before their arrests, he said. Body-camera footage in one showed troopers waving two men and a woman from Venezuela through an open gate.

"The body language of the trooper was welcoming and then they turn around and arrest him," Mr. Martinez said, noting that people have to know they are unwelcome to be guilty of trespassing.

At a hearing last month in Kinney County, retired county Judge Vivian Torres ordered the release of four migrants because their charging documents were faulty and raised questions about the length of time they have waited in jail.

"These individuals have been in custody since Aug. 22, which I dare say is a violation of their rights," Judge Torres said.

A prosecutor agreed to dismiss charges in those cases.



Arrests under Operation Lone Star can occur on the properties of landowners who have agreed to join the state's efforts.
PHOTO: ALICIA A. CALDWELL/THE WALL STREET JOURNAL

Appx. 369

Arrests have occurred on the properties of landowners who have agreed to join the state's efforts, including ranches and a rail yard where migrants often hide on trains from Mexico.

Troopers have been ordered by the state to arrest only single men, leaving women, families and unaccompanied children to be arrested and processed by Border Patrol agents.



Migrants seeking asylum walked along a road in Del Rio, Texas, after crossing the Rio Grande in September.
PHOTO: JULIO CORTEZ/ASSOCIATED PRESS

There are no publicly available government records of what has happened to several hundred migrants arrested for trespassing whose cases were dismissed or who were released from jail on bond.

Federal immigration authorities have said removal decisions are made on a case-by-case basis.

Kristin Etter, a lawyer with Texas RioGrande Legal Aid, said some migrants who likely would have been deported had they been immediately caught by the Border Patrol are waiting in the U.S. after being released by state authorities.

"A lot of our clients have actually benefited from Operation Lone Star as far as their immigration case," said Ms. Etter, whose group has represented more than 500 Operation Lone Star arrestees.

TEXAS AND MIGRANTS

Appx. 370

*Related articles, selected by WSJ editors*

- Texas Arrests Migrants Crossing the U.S. Border for Trespassing (July 22)
- Texas Governor Says State Will Build a Wall Along Mexico Border (June 16)
- Biden Administration Threatens to Sue Texas Over Shelters Housing Immigrant Children (June 8)

**Write to** Elizabeth Findell at Elizabeth.Findell@wsj.com and Alicia A. Caldwell at Alicia.Caldwell@wsj.com

*Appeared in the November 9, 2021, print edition as 'Texas Jails Fill With Migrants Under State Policy'.*

Appx. 371

SUBSCRIBE    SIGN IN    Search

ADVERTISEMENT                                                                    Dianomi

Americans, These Big-
Box Stores are
Overcharging You

MoneyWise



Is your current credit card
skimping on rewards?
Find a new card.

NerdWallet



Texas: The List Of The
Top Financial Advisor
Firms Is Out

smartasset



The Highest Paying Cash
Back Card Right Now

CardCritics




Do You Have Enough To
Retire? Use Our Free
Retirement Calculator.

Personal Capital



Stocks Fall as Steve Jobs'
Prediction Coming True

Altimetry




Appx. 372

WAYFAIR:
Extra 15% off + free shipping at Wayfair

TURBOTAX:
Save up to an additional $15 with TurboTax April 2022

H&R BLOCK TAX:
H&R Block Tax Sale - Up to 20% off tax software

TARGET:
Up to 60% off - Target Promo Code

SAMSUNG:
30% off smartphones + free shipping - Samsung promo code

AT&T INTERNET:
Get an extra $50 Reward Card with AT&T Internet Promo Code

BACK TO TOP ⌃

## THE WALL STREET JOURNAL.

English Edition ▾
Edition
English

SUBSCRIBE NOW

SIGN IN

**WSJ Membership**
WSJ+ Membership Benefits
Subscription Options
Why Subscribe?
Corporate Subscriptions
Professor Journal
Student Journal
WSJ High School Program
Public Library Program
WSJ Live

WSJ Membership Benefits
Customer Center
Legal Policies

**Customer Service**
Customer Center
Contact Us

**Features**
Newsletters & Alerts
Guides
Topics
My News
RSS Feeds
Video Center
Watchlist
Podcasts
Visual Stories

Advertise
Commercial Real Estate Ads
Place a Classified Ad
Sell Your Business
Sell Your Home
Recruitment & Career Ads
Coupons
Digital Self Service

About Us
Commercial Partnerships
Content Partnerships
Corrections
Jobs at WSJ
News Archive
Register for Free
Reprints & Licensing
Buy Issues
WSJ Shop

      

**Dow Jones Products**   Barron's | BigCharts | Dow Jones Newswires | Factiva | Financial News | Mansion Global | MarketWatch | Risk & Compliance
WSJ Pro | WSJ Video | WSJ Wine

Privacy Notice | Cookie Notice | Copyright Policy | Data Policy | Subscriber Agreement & Terms of Use | Your Ad Choices | Accessibility

Copyright ©2022 Dow Jones & Company, Inc. All Rights Reserved.

BACK TO TOP ⌃

English Edition ▾

Appx. 373



SUBSCRIBE  SIGN IN  

     

| WSJ Membership | Customer Service | Tools & Features | Ads | More |
|---|---|---|---|---|
| WSJ+ Membership Benefits | Customer Center | Newsletters & Alerts | Advertise | About Us |
| Subscription Options | Contact Us | Guides | Commercial Real Estate Ads | Commercial Partnerships |
| Why Subscribe? | | Topics | Place a Classified Ad | Content Partnerships |
| Corporate Subscriptions | | My News | Sell Your Business | Corrections |
| Professor Journal | | RSS Feeds | Sell Your Home | Jobs at WSJ |
| Student Journal | | Video Center | Recruitment & Career Ads | News Archive |
| WSJ High School Program | | Watchlist | Coupons | Register for Free |
| Public Library Program | | Podcasts | Digital Self Service | Reprints & Licensing |
| WSJ Live | | Visual Stories | | Buy Issues |
| | | | | WSJ Shop |

WSJ Membership Benefits

Customer Center

Legal Policies



SIGN IN

Copyright ©2022 Dow Jones & Company, Inc. All Rights Reserved.



Appx. 374

Case 1:22-cv-00397-RP Document 1-5 Filed 04/27/22 Page 226 of 241

# THE EPOCH TIMES



Kinney County Attorney Brent Smith in his office in Brackettville, Texas, on Oct. 29, 2021. (Charlotte Cuthbertson/The Epoch Times)

PREMIUM · **IMMIGRATION & BORDER SECURITY**

# In Pursuit of a Secure Border: Small Texas County Leads Charge Against Border Crime

By [Charlotte Cuthbertson](#) | November 11, 2021  Updated: November 11, 2021    A A  Print

KINNEY COUNTY, Texas–Charging an illegal immigrant with a misdemeanor such as criminal trespass sounds simple enough.

But throw 1,008 cases at a small county with a jail that has 14 spaces and a court system that usually handles six or seven cases per month–using Microsoft Word–and the wheels start to fall off.

Appx. 375

On June 10, when Texas Gov. Greg Abbott directed state troopers to start arresting illegal aliens–on charges including trespass, criminal mischief, and evading on foot–officials in Kinney County jumped on the idea.

County Sheriff Brad Coe was keen to stick illegal immigrants with any charges he could to deter them from coming to his county.

"We're going to try to hold these people accountable," Coe said. He also wanted to get them in the system because the illegal aliens captured in Kinney County have evaded Border Patrol, so they're unknown.

Since January, ranchers and local law enforcement had seen an unprecedented increase in the number of illegal aliens traversing the county, and they'd given up on expecting federal solutions. Local ranchers, tired of cut fences and property damage, signed affidavits allowing the sheriff and the Texas Department of Public Safety (DPS) to press charges on their behalf.

Although Abbott announced the Operation Lone Star border security initiative in June, it took almost two months to secure enough jail space and for the DPS to work out the process. The state set up a temporary 100-bed detention center in neighboring Val Verde County and cleared out the 1,000-bed Briscoe Unit in Dilley.

Meanwhile, in July, almost 10,000 illegal aliens evaded Border Patrol in the Del Rio Sector, according to preliminary Customs and Border Protection numbers.

By August, DPS was ready to start the initiative in Val Verde and Kinney counties. In Kinney, DPS assigned a small team to work the brush near the U.S.–Mexico border in areas of high foot traffic. The officers quickly started arresting an average of 25 illegal aliens per day from private ranches, often at night.

At the sheriff's office, state troopers and local jail staff took about two hours to complete the paperwork and magistrate seven Mexicans who were arrested late on Aug. 7. They'd been walking for two days before being caught on a ranch.

Appx. 376

Case 1:22-cv-00397-RP   Document 1-5   Filed 04/27/22   Page 228 of 241

Texas State Troopers complete paperwork after arresting illegal immigrants for criminal trespass on a local ranch, at the Kinney County Sheriff's Office in Brackettville, Texas, on Aug. 8, 2021. (Charlotte Cuthbertson/The Epoch Times)

Two said they had already tried crossing a month ago but got caught by Border Patrol and expelled. Another man, who said he was aiming to get to New York, said this was his third time trying to get through. He said his cousin intended to pay the $4,000 smuggling fee upon his delivery to New York.

Several said they'll probably try again, while others weren't as enthusiastic. They all said a "travel agent" on the Mexican side of the border directed them on where to cross, gave directions of where to walk, and had planned to coordinate a vehicle pick-up for them.

Appx. 377

At first, Kinney County Justice of the Peace Narce Villarreal came down to the sheriff's office in the middle of the night to magistrate the groups before DPS transported them the 30 miles to the Val Verde facility. But the hours became untenable and the sheriff's office parking lot was overwhelmed with detainees, so the whole process was moved to Val Verde.

From Val Verde, the illegal aliens would eventually be transported 126 miles to the Briscoe Unit in Dilley while they waited for their court hearing. Subsequently, some were then transported another 200 miles to the Segovia jail facility in Edinburgh.

Illegal immigrants wait to be magistrated on trespassing charges in Kinney County outside the Sheriff's Office in Brackettville, Texas, on Aug. 6, 2021. (Charlotte Cuthbertson/The Epoch Times)

Appx. 378

## The Prosecution

Meanwhile, Kinney County Attorney Brent Smith was scrambling to take up the flood of new cases. He had started the job in January and was building the backend process on the fly. He had to go to the county commissioners to request a software system that would streamline the paperwork on the cases–Word documents had become too unwieldy under the volume. He contacted two other county attorneys to double-check that his complaints were solid.

Smith said he's filed around 900 charges for criminal trespass since August, with more pending, and has had to rely heavily on Mason District Attorney Tonya Ahlschwede, who is part of Texas's border prosecution unit, to keep up.

Former chief of the Del Rio Border Patrol Sector Austin Skero, who retired at the end of July, also joined the unit as an investigator.

After a misdemeanor arrest, Smith examines the evidence in the case file from the sheriff's office or DPS. If it's determined that trespass occurred, he'll file a complaint against the individual for trespassing, which is a Class B misdemeanor. The charge is elevated if the individual has a deadly weapon, is found more than 100 feet past the property line on agricultural land, or if the alleged crime took place during a disaster (the county has been in a perpetual state of disaster since April).

Once charged, the suspect will make a plea, and if he pleads guilty, he'll most likely get time served and be turned over to Immigration and Customs Enforcement (ICE).

It's not a hefty penalty, but "we're hoping they avoid our county," Smith said.

The maximum punishment for a Class B misdemeanor in Texas is 180 days in jail and a $2,000 fine, whereas a Class A is one year in jail and a $4,000 fine.

Appx. 379

Case 1:22-cv-00397-RP   Document 1-5   Filed 04/27/22   Page 231 of 241

Recent trail camera photos of illegal aliens provided by ranchers in Kinney County, Texas. (Courtesy of ranchers)

As the cases have piled up, it has become a race against time for Smith.

"If they don't make bail, they're in jail the whole time until trial," he said. From the time of the arrest, he has 30 days to file a Class A misdemeanor complaint against a detained individual before the habeas corpus statute requires a personal recognizance (PR) bond to be set and the individual released.

In some cases, Smith received the arrest files from DPS on day 29, or even beyond day 30. In other cases, the complaints were filed within the 30 days, but the inmate had bonded out of jail and was nowhere to be found.

Appx. 380

Logistics and lack of manpower were the bottlenecks, he said.

"Because what the state did, when they planned on this process, they got the jails set up, they got defense attorneys funded, but not one prosecutor was there to get the prosecution set up for this," he said.

"So we're playing catch up, trying to get the resources at the same time to do everything–versus the defense had everything set up from the very beginning."

On Oct. 14, Abbott announced $36.4 million in grant funding toward border prosecutions and 12 border counties, including more than $3.1 million in grant money to Kinney County, as part of Operation Lone Star.

But the money doesn't just appear in the county bank account. It's grant money that requires an application process, and the county must carry the costs in the meantime.

Smith has already spent more than his annual office supplies budget (about $1,200) on file folders for the trespass cases.

## Court Proceedings

The first of Kinney County's cases came up on the court docket during the last week of October. They were conducted over video conference with retired judges coming in to fill the gaps.

On Oct. 26, Judge Vivian Torres sat on the virtual bench. The cases proceeded slowly, with frequent pauses for the translator to ensure the defendant understood the goings-on.

Defense lawyer Sylvia Delgado had arranged a plea deal for several defendants that reduced their charge from a Class A to a Class B misdemeanor and a sentence of "time served," with court costs being waived.

The defendants pleaded guilty, and the judge agreed to the plea deal terms, which included a 72-day sentence, which had been served.

Delgado said she's been assigned about 190 cases so far by the Lubbock Public Defenders' Office and has been focusing on getting the first ones out of jail because they'd been detained so long.

Appx. 381

She said she meets her clients via Zoom video conference. "And I tell them specifically: 'You have not been forgotten. I'm your attorney, I'm going to work to get you out,'" Delgado told The Epoch Times on Oct. 28.

Delgado said she lets them know that she'll attempt to get them released on a no-fee PR bond, try to get charges reduced, and, if they want to plead guilty, ask for time served.

"And then, unfortunately, when I go back to see them before docket, a lot of them are gone," she said. Of her 18 clients for the Nov. 2 court docket, she has only been able to follow up with the six who are still in jail.

"I met with Joselito, and Joselito had told me, 'Well, Ms. Delgado, I just want to plead guilty and get sent back to Mexico. I just want to go back to Mexico.'

"So I was looking for Joselito. And he's nowhere to be found."

She was told by the other inmates that Joselito was transferred to ICE, while others had returned to Mexico after bonding out.

Appx. 382

Defense lawyer Sylvia Delgado (bottom-right) speaks during an arraignment hearing for an illegal alien charged with criminal trespass in Kinney County, on Oct. 28, 2021. (Screenshot/The Epoch Times)

Other defense attorneys have also said they had no idea where their clients were after they bonded out.

The region's district attorney, Suzanne West, told The Epoch Times that she believes inmates who bond out are released to ICE.

ICE didn't confirm that it was taking custody of the inmates, or what happened next. A spokesperson said the agency is following the enforcement priorities set out by the Biden administration.

Appx. 383

"In Texas and elsewhere, ICE conducts an individualized determination in each case to assess whether arrest and removal is warranted. This determination includes an assessment of aggravating and mitigating factors, as well as a determination of whether the person is removable under the law," ICE spokesperson Monica Yoas stated in an email to The Epoch Times.

"ICE fully respects the civil rights and liberties of all people when conducting this assessment."

The Texas Department of Criminal Justice, which operates the Briscoe and Segovia jails, said that as of Oct. 29, the Briscoe unit held 654 illegal alien inmates, with 536 from Kinney County, 105 from Val Verde, 10 from Zavala, and three from Frio County. In Segovia, all 291 illegal alien inmates are from Kinney County.

Delgado said she has asked for an investigator to help on the ground to find the missing people and has meanwhile obtained a continuance in court for their hearing dates.

"If they're truly lost, like we don't ever hear from them again, we don't know what happened. If I can't really find out, then they're probably just going to keep getting reset," she said.

"So I suppose a warrant may issue, but we're not there yet. We're just not there in that system yet."

Most of the defendants on the next several dockets, totaling about 60 cases, had their cases dismissed because defense lawyers argued that the complaints were deficient as they lacked the landowner's name.

Smith later said he was disappointed that the name of the ranch wasn't sufficient for the court, as he was hoping to avoid naming the landowner in public records. The landowner's name is usually included in the arrest file, which the lawyer can access.

"A lot of ranchers are concerned about cartel retribution, possibly, if their name comes up in complaint after complaint after complaint" he said.

"So we can still refile it and prosecute once we correct that information. But you know, they're not going to show up."

Appx. 384

Smith's office scrambled to amend the 900 complaints already filed to include the landowner name and the GPS location of the alleged offense.



A total of 52 illegal immigrants from Mexico and Honduras wait to be booked for criminal trespass after being arrested by Texas State Troopers on local ranches, at the Kinney County Sheriffs Office in Brackettville, Texas, on Aug. 8, 2021. (Charlotte Cuthbertson/The Epoch Times)

Defense lawyers appeared to change tack on the Nov. 2 docket and entered "not guilty" pleas for all their clients who were still present.

The judge subsequently ordered the release of each defendant on a no-fee PR bond and set a pre-trial hearing for Nov. 18.

Appx. 385

Ahlschwede, from the border prosecution unit, told the court on Nov. 2 that several illegal aliens who had been released from jail after paying a cash bond have since been arrested again for criminal trespass in Kinney County.

Smith said one man was released after paying a $4,000 cash bond. "Then we re-arrested him 10 days ago. And despite it being a multiple offense, they gave a $500 bond. Well, we filed the motion to revoke [the bond] once we got the case file–which was 10 days after it occurred," Smith said.

The man had been released three days prior to receiving the motion.

"By the time we got the file, he was already gone. Who knows where he's at now," Smith said.

Coe said his office has been juggling a steady stream of people coming in to pay cash bonds with wads of crisp $100 bills.

"Some of them are $5,000. Where are they getting the money?" he said. At one point, he had more than half a million dollars in cash sitting in his vault.

"I'd bet there's a 99 percent chance that they don't show up [to court]," Coe said of the released illegal alien defendants.

"They'll probably end up in places like Michigan, Missouri, West Virginia, Washington –we'll never see them again. So are we doing this all in vain? I mean, it's doable. It's very, very new. It's just getting the mechanism rolling."

Appx. 386

Kinney County Sheriff Brad Coe sets up a pop-up vehicle checkpoint near Brackettville, Texas, on Aug. 16, 2021. (Charlotte Cuthbertson/The Epoch Times)

## Impact

Coe said he hoped the convictions might be a roadblock for illegal aliens if they ever tried to file for some type of assistance or become U.S. citizens.

"That'd be a check mark against them. Some type of consequence has to be there," he said.

However, in reality, having a trespass conviction on record will act more like a speedbump, according to former immigration judge Andrew Arthur, who is now a resident fellow in law and policy for the Center for Immigration Studies.

Appx. 387

"Generally, this isn't going to have any effect on them from an immigration standpoint, but again, sleeping in a room with 30 guys for six months really does have a way of concentrating one's attention," Arthur told The Epoch Times on Oct. 27.

Even if the Texas legislature passes a bill that would enhance punishment to a third-degree felony for illegal alien trespassers, the impact on future immigration status would be negligible, Arthur said.

"But again, anything that impedes people's ability to enter the United States, anything that's going to require them to be detained pretrial, or imprisoned post-trial, is going to be a deterrent," he said.

"Now, how strong a deterrent effect that is remains to be seen."

Arthur said the deterrent effect was worth the taxpayer dollars spent on the trespass prosecutions.

"The problem is that Texas is doing the job that the federal government should be doing."

## Volume

The majority of Border Patrol apprehensions along the southwest border occur in Texas. Of the more than 1.6 million illegal alien apprehensions in fiscal year 2021, Border Patrol apprehended almost 958,000, or 58 percent, crossing into Texas.

Customs and Border Protection doesn't publish the number of illegal aliens that Border Patrol agents have detected but who subsequently evade apprehension, but the internal numbers have sat at around 50,000 per month this year, according to an inside source. It's impossible to estimate the number of those who aren't detected at all.

Within the Operation Lone Star border effort, the DPS had made 7,744 criminal arrests as of Oct. 14, including 1,300 for criminal trespass and 6,339 on felony charges. State troopers had been involved in 822 vehicle pursuits, mostly chasing smugglers who were transporting illegal aliens.

Appx. 388

Kinney County has charged significantly more illegal aliens with trespass than Val Verde County so far, which started the initiative at the same time. Other counties, such as Frio and Zavala started prosecuting more recently, while Uvalde and Brooks counties are considering getting started but are strapped with the same lack of resources that Kinney County has experienced.

Smith said the volume of prosecutions coming from Kinney County were a result of the county officials caring about the issue.

"They want to do something more about it than just close your eyes and not watch what's happening to your county," he said.

Smith said he's been accused by a defense lawyer of being racist for prosecuting illegal aliens.

"The criminal complaints make no mention of immigration status or hinge on race. If you come down to Kinney County and trespass on private property, we'll arrest you too," he said in a statement on Oct. 26.

Delgado, the defense lawyer, said she hadn't seen any malfeasance, despite the scramble to pull everything together.

"It's a big ship and it's making a large turn in a small canal. And so we are all working really hard to get things moving. And I believe it is starting to unclog," she said.

Smith predicted that the system will be much more robust within a couple of months.

"What we're working on right now is tweaking the language of the complaints, researching everything, making sure there's nothing else they [the defense] can pick at," he said.

"Now, will this Operation Lone Star continue for the next three years? Probably so. Unless the federal government decides to actually follow the laws passed by Congress– which at the moment they're not doing.

"The only realistic solution to this crisis will require deploying all of the Texas military on the border and actually prevent the illegal entries from occurring. Right now, it's like trying to build a dam after the flood gates have already been opened."

Appx. 389

4/24/22, 3:04 PM
Case 1:22-cv-00397-RP Document 1-5 Filed 04/27/22 Page 241 of 241
In Pursuit of a Secure Border: Small Texas County Leads Charge Against Border Crime

**AROUND THE WEB**



Texas Launches No out of
Pocket Cost Solar Program

**Sunnyside**

1 Simple Trick That Cuts
People's Electric Bill By Up
To 90%

**Electric-Saver.com**

Doctor Tells Man He's
Infertile, then Realizes Why
His Three Sons Look
Familiar

**BleacherBreaker**

Plastic Surgeon Tells: If You
Have Wrinkles, Do This
Immediately (It's Genius!)

**Beverly Hills MD**

Texas: Government is
Helping Homeowners Get
Solar Panels at No Cost

**Finance Daily**

Doctors Stunned: 72 Year
Old Grandma Reduces Her
Dark Spots With This
Method

**GundryMD**

Appx. 390