**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **ERASTO ARROYO BARCENAS;** | § | |
| **MELVIN AMADOR RODAS; IVAN RUANO** | § | |
| **NAVA; NOLIS LEYVA-GONZALEZ; JOSE** | § | |
| **CARLOS GOMEZ-COLORADO; JOSE LUIS** | § | |
| **DOMINGUEZ-ROJAS; MELVIN AMAYA** | § | |
| **ZELAYA; JESUS CURIPOMA; OSCAR** | § | |
| **SERRANO MARTINEZ; CHRISTIAN IVAN** | § | |
| **RUIZ-RODRIGUEZ; ISRAEL BAYLON** | § | |
| **ARELLANO; JOSE LOPEZ LOZANO;** | § | |
| **MIGUEL LOPEZ LOZANO; FRANCISCO** | § | |
| **VILLALPANDO RAMOS; CESAR GALINDO** | § | |
| **ESCOTO,** | § | |
|      **Plaintiffs,** | § | |
|      **Individually and On Behalf of the Class** | § | |
|      **of Those Similarly Situated,** | § | |
| | § | |
| **VS.** | § | **Case No. 22-397** |
| | § | |
| **STEVEN MCCRAW in his individual capacity;** | § | |
| **GREG ABBOTT in his individual and official** | § | |
| **capacities; BRYAN COLLIER in his individual** | § | |
| **capacity; BRAD COE in his individual capacity,** | § | |
| **and KINNEY COUNTY, TEXAS** | § | |
|      **Defendants.** | § | |

---

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

---

TO THE HONORABLE JUDGE OF SAID COURT

Plaintiffs file this First Amended Complaint against Defendants for causes of action arising from arrest and over-detention, seeking declaratory relief, injunctive relief, class certification and money damages, in support of which Plaintiffs would show the Court the following;

## I.    INTRODUCTION

1.    Under the guise of state criminal trespass law but with the explicit, stated goal of punishing migrants based on their immigration status, Texas officials are targeting migrants. Using state criminal law, the state of Texas and participating counties have created, and are carrying, out what is, in reality, a system of state immigration enforcement that targets Black and Brown– primarily Latino– individuals for prosecution and enhanced punishment. Under this program, called "Operation Lone Star" (OLS), Texas has arrested more than 5,000[1] people on misdemeanor state criminal trespass charges that were incarcerated in TDCJ Briscoe and Segovia Units. Texas has created a separate criminal prosecution and detention system for these individuals, with separate criminal dockets, separate public defender assignments, separate jails (converted state prisons), and even a separate "criminal migrant processing facility" for booking. This separate system is riddled with civil rights violations, including fraudulent probable cause affidavits, failure to appoint counsel, failure to timely file charges, over-incarceration, and even the unilateral replacement of judges. Hundreds of those arrested have waited in jail for weeks or months without a lawyer, or without charges, or without bond, or without a legitimate detention hold or without a court date.

---

[1] This number is taken from the weekly Briscoe/Segovia active confinee census, Appx. 1-20.  Compare Abbott's representation that OLS has "led to more than 208,000 migrant apprehensions."  https://gov.texas.gov/news/post/governor-abbott-dps-texas-national-guard-mark-one-year-anniversary-of-operation-lone-star

2.      The trespass arrests themselves are pretextual and regularly lack probable cause—including cases in which law enforcement has directed individuals from public property to a certain location, only to then arrest them for trespass once they get there. In a word, entrapment. Arrest records show profiling based on race/color, national origin, and/or immigration status, including with numerous descriptions of observing or receiving reports of "undocumented migrants" (which they refer to as "UDMs").  Virtually all of those arrested to date are Latino and Black men and are migrants.

3.      State and local officials began implementing the OLS trespass arrest program in approximately July 2020. The program is now backed by approximately $3 billion in state funding through 2023, with planned expansion to other counties. Officials have said they plan to continue the program for years; one state official recently termed it "indefinite."  Texas is the first state to operationalize a unilateral state immigration policy of this magnitude, using state criminal law to target Black and Brown immigrants for punishment.

4.      While Defendant Abbott and DPS have claimed that OLS has taken "dangerous individuals" off our streets, they have provided little proof to substantiate such statements. They have fought two dozen public records requests from news organizations that would give a clearer picture of the operation's accomplishments or failures.  While Governor Abbott claims that OLS has led to "208,000 migrant apprehensions,"[2] records from the Briscoe and Segovia Units used to house migrants arrested under OLS show 4,798 incarcerated through April 8, 2022.  The alleged "success" of OLS is wildly exaggerated.

5.      Plaintiffs seek to certify classes to 1) Enjoin OLS's unconstitutional arrest and incarceration  and 2) recover damages for illegal over-detention.

---

[2] https://gov.texas.gov/news/post/governor-abbott-dps-texas-national-guard-mark-one-year-anniversary-of-operation-lone-star

## II.   PARTIES

6.   Plaintiff Erasto Arroyo Barcenas is an individual resident of Mexico.

7.   Plaintiff Melvin Amador Rodas is an individual resident of Florida.

8.   Plaintiff Ivan Ruano Nava is an individual resident of Texas.

9.   Plaintiff Nolis Leyva-Gonzalez is an individual resident of Mexico.

10. Plaintiff Jose Carlos Gomez-Colorado is an individual resident of Texas.

11. Plaintiff Jose Luis Dominguez-Rojas is currently incarcerated in Edinburg, Texas under OLS.

12. Plaintiff Melvin  Amaya Zelaya is an individual resident of Honduras.

13. Plaintiff Jesus Curipoma is an individual resident of Texas.

14. Plaintiff Oscar Serrano Martinez is an individual resident of El Salvadore.

15. Christian Ivan Ruiz-Rodriguez is an individual resident of Texas.

16. Israel Baylon Arellano is currently incarcerated in Edinburg, Texas under OLS.

17. Jose Lopez Lozano is currently incarcerated in Edinburg, Texas under OLS.

18. Miguel Lopez Lozano is currently incarcerated in Dilley, Texas under OLS.

19. Francisco Villalpando Ramos is currently incarcerated in Dilley, Texas under OLS

20. Cesar Galindo Escoto is currently incarcerated in Edinburg, Texas under OLS.

21.  Defendant Greg Abbott is an individual resident of Austin, Texas.  He can be served with Summons at Office of the Governor, State Insurance Building, 1100 San Jacinto, Austin, TX  78701.

22.     Defendant Steven McCraw is an individual resident of Austin, Texas.  He can be served with Summons at 7321 Twilight Shadow Dr., Austin, TX  78749.

23.    Defendant Bryan Collier is an individual resident of Huntsville, Texas. He can be served with Summons at 101 Briar Meadow, Huntsville, TX  77320.

24.    Defendant Brad Coe is an individual resident of Brackettville, Texas.  He can be served with  Summons at 206 E. Third St., Brackettville, TX 78832.

25.    Defendant Kinney County is a Texas county that may be served through the County Judge Tully Shahan.  He can be served with Summons at 501 S. Ann St., Brackettville, TX  78832.

## III.    JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

27.    The proposed Class exceeds 100 persons.  Pursuant to 28 U.S.C. § 1332(d)(6), the aggregate amount of the Class Members' claims substantially exceeds $5,000,000.00 and thus, exceeds the requisite amount in controversy outlined in § 1332(d)(2).

28.    Venue is proper in this Court under 28 U.S.C. §1391(b)(1) as the county in which any Defendant resides, in that Defendant Abbott is a resident of Travis County, Texas and all remaining Defendants are residents of Texas.

## IV.    STATEMENT OF FACTS

29.    The OLS trespass arrest program is one facet of the state of Texas's broader effort to usurp federal law and unilaterally create a state immigration policy and unilaterally engage in immigration enforcement without authority or oversight from the Federal Government. In March 2021, Texas Governor Greg Abbott ordered the large-scale deployment of Texas Department of Public Safety ("DPS") troopers and members of the Texas National Guard to Texas communities

along the border with Mexico.[3] By August, the state had deployed more than 1,250 DPS troopers to border communities and had also deployed National Guard troops, with plans to increase the National Guard presence to up to 2,500 troops.[4]  In May 2021, Governor Abbott declared a state of "disaster" based on "federal government policies" and federal "inaction" that he claimed had led to "a dramatic increase in the number of individuals unlawfully crossing the international border." The disaster declaration described Operation Lone Star as intended to "deter[] illegal border crossings."[5] Abbott made it clear that he would step into the shoes of what he deemed an "inactive Federal Government."

30.     Abbott stated in a press release in March 2022 that he "launched Operation Lone Star <u>to do the job that Washington would not</u>" (which presumably, is not to arrest trespassers). "Within weeks of taking office, President Biden turned our southern border into a porous mess where criminal aliens wandered across the Rio Grande River without anyone to interdict them." (emphasis added)[6]

31.     State and local officials, including Governor Abbott, have been clear: the underlying purpose of the OLS trespass arrest program is to deter migration and punish migrants for coming to the United States. From officials' public statements and the system's design and implementation, it's plain that the trespass program is a pretextual use of state criminal law, with the underlying interest of harming Black and Brown migrants.

---

[3] Press Release, Office of the Texas Governor, *Governor Abbott, DPS Launch "Operation Lone Star" to Address Crisis At Southern Border*, Mar. 6, 2021, https://gov.texas.gov/news/post/governor-abbott-dps-launch-operation-star-to-address-crisis-at-southern-border.
[4] Texas House Appropriations Committee Hearing.  H.B.9. Relating to making supplemental appropriations relating to border security and giving direction regarding those appropriations.  Aug. 24, 2021, https://tlchouse.granicus.com/MedialPlayer.php?view_id=46&clip_id=22334 (Testimony of Office of the Governor Budget Director Sarah Hicks at approx. 2:46:00)
[5] Gov. Greg Abbott, Proclamation by the Governor of the State of Texas, May 31, 2021, at 1-2, https://gov.texas.gov/uploads/files/press/DISASTER_border_security_IMAGE_05-31-22.pdf.
[6] Press Release, Office of the Texas Governor, https://gov.texas.gov/news/post/governor-abbott-dps-texas-national-guard-mark-one-year-anniversary-of-operation-lone-star

32.     Under the program, DPS officers collaborate with the Texas National Guard and county sheriff's offices to arrest Black and Brown migrants on state misdemeanor criminal trespass charges. Virtually all of those arrested on trespass charges are Black or Brown, the overwhelming majority of whom are Latino, and virtually all of those arrested are migrants. State troopers' affidavits evidence racial profiling: they describe observing groups of "undocumented migrants" and note Latino ethnicity as apparently relevant to arrest. Arrests lack probable cause: in many instances, law enforcement in fact directed those arrested to a particular place or otherwise gave them the impression they had permission to be on the property, only to then arrest them for trespassing. The state is literally constructing the conditions for a criminal charge, which is entrapment.  At Governor Abbott's direction, the Texas National Guard has set up fences on private property for the purpose of establishing the "notice" element of state criminal trespass. In other words, the state is attempting to make crossing property criminal where it was not before, to enable the arrest of migrants.  Once arrested, individuals are channeled into a separate criminal system that is designed by OLS only for migrants. Instead of being booked into the county jail, the ordinary site for pretrial detention, they are taken to a separate processing center specifically for the OLS arrest program, which DPS terms the "criminal <u>migrant</u> processing center."[7] (emphasis added).  After magistration (the initial appearance), they are taken by the Texas Department of Criminal Justice ("TDCJ")—the state prison system—to one of two state prisons hours away that have been converted to jails to hold migrants. In June, the Dolph Briscoe Unit ("Briscoe"), located in Dilley, Texas, transferred non-migrant prisoners to other facilities to make room for those arrested under the OLS trespass system.[8] Briscoe has capacity

---

[7] Kinney County initially conducted en masse magistrations in a parking lot rather than sending individuals to the processing center for magistration. See, e.g., Greg Abbott (@GregAbbott_TX), Twitter (Aug. 6, 2021, 11:35 AM), https://twitter.com/GregAbbott_TX/status/1423684063760719885. 1
[8] Reese Oxner, Texas empties prison to prepare to detain immigrants arrested during ramped-up border

for about 1,000 people. When Briscoe became full, TDCJ also began holding individuals at the Segovia Unit in Edinburg, Texas.[9]  Counties then prosecute those arrested for state criminal trespass, on charges that prosecutors have enhanced by one misdemeanor class because of the pretextual disaster declaration predicated on migration and state law providing for disaster enhancements. The entire criminal process takes place in a separate criminal system specifically for the trespass arrests.  Prosecutions take place along a separate track from ordinary criminal cases in the county, on dedicated dockets, with a different pool of public defenders and with different judges. The criminal process is under greater centralized state control than ordinary misdemeanor criminal trespass prosecutions, which are run by counties.

33.    The criminal process is rife with civil rights violations that have led to extreme, outrageous delays in cases that often end in dismissal or non-prosecution. As of November 1, 2021, roughly 70% of resolved cases had been dropped; meanwhile, 53% of those jailed on November 1 had already been detained for more than 30 days.[10] Many of those detained languished in jail for weeks without an attorney or without the ability to communicate with their attorney. Kinney County waited more than a month to file charges against migrants, in violation of state law, leading to weeks-long delays before arraignments at which individuals may be released. Once a judge ordered release, physical release from detention is likewise delayed.

34.    In September 2021, the Texas Legislature passed, and Governor Abbott signed, H.B. 9, a bill which appropriated $1.8 billion in funding to the OLS trespass arrest system and other aspects of Operation Lone Star over the next two years. This funding includes more than

---

enforcement, The Texas Tribune, June 17, 2021, https://www.texastribune.org/2021/06/17/immigrationprison-border-jail/.
[9] Honest Austin News, Texas Holds 850 Migrants on State Charges as it Opens Up More Prison Capacity, Honest Austin, Sept. 27, 2021, https://www.honestaustin.com/2021/09/27/texas-prisonsoperation-lone-star/.
[10] Elizabeth Findell & Alicia A. Caldwell, Texas Jails Fill With Migrants as Border Arrests Overwhelm Courts, Wall Street Journal, Nov. 8, 2021, https://www.wsj.com/articles/texas-jails-fill-with-migrants-as-border-arrests-overwhelm-courts-11636376402.

$301 million for the Texas National Guard for a two-year period and almost $139 million for DPS for a one-year period.[11]   Funding has since increased to $3 billion for "border security efforts."  The Kinney County Attorney has stated he expects the arrests to continue for the next three years.[12]  As a DPS official stated on December 4, Operation Lone Star is "indefinite."[13]

35.     The program is set up to continue for years, and state officials have repeatedly stated and followed through on expanding it beyond Val Verde and Kinney Counties to other counties in Texas.[14]  Absent federal intervention, it provides a blueprint for other Texas localities and other states to join in similar use of the criminal system to discriminate against Black and Brown migrants and seek to effectuate a separate, punitive state immigration system.  Governor Abbott called upon all Texas sheriffs to join him in a "summit" to train them in implementation of the OLS program.  Abbott called upon other state governors to send more law enforcement for OLS.

36.     In the OLS trespass arrest program, DPS is the primary agency that arrests individuals on criminal trespass charges. As of December 2, 2021, DPS had arrested 2,106

---

[11] An Act Relating to Making Supplemental Appropriations Relating to Border Security and Giving MDirection Regarding Those Appropriations, H.B. 9, 2d C.S. (2021),Nhttps://capitol.texas.gov/tlodocs/872/billtext/pdf/HB00009F.pdf#navpanes=0 (providing funding for aspects of the OLS trespass arrest program for a two-year period); Press Release, Office of the Texas Governor, Governor Abbott Signs Border Security Funding Into Law, Sept. 17, 2021,https://gov.texas.gov/news/post/governor-abbott-signs-border-security-funding-into-law.
[12] Charlotte Cuthbertson, In Pursuit of a Secure Border: Small Texas County Leads Charge Against Border Crime, The Epoch Times, Nov. 11, 2021, https://www.theepochtimes.com/in-pursuit-of-a-secureborder-small-texas-county-leads-charge-against-bordercrime_4084276.html+&cd=1&hl=en&ct=clnk&gl=us (Kinney County Attorney Brent Smith saying, in the context of migrant arrests, "Now, will this Operation Lone Star continue for the next three years? Probably so. Unless the federal government decides to actually follow the laws passed by Congress–which at the moment they're not doing.").
[13] Operation Lone Star Briefing, Dec. 2, 2021, at 24:10, https://www.facebook.com/watch/live/?ref=watch_permalink&v=409242960930203.
[14] E.g., Operation Lone Star Briefing, Oct. 28, 2021, at 12:34,https://www.conchovalleyhomepage.com/news/operation-lone-star-dps-to-hold-fifth-briefing/s DPS gives briefing on ongoing operations at the border (describing state officials' efforts to expand the OLS trespass arrest program to Brooks County,); Operation Lone Star Briefing, Nov. 18, 2021, at 5:41:00 https://www.valleycentral.com/news/local-news/texas-dps-to-hold-briefing-on-operation-lone-star-focuson-apprehension-numbers/rrest numbers at the border | KVEO-TV (valleycentral.com), (DPS official stating that OLS trespass arrests began in Val Verde and Kinney Counties and that "soon we'll expand to other counties"); Hearing on H.B. 9, supra n.3 (Office of the Governor Budget Director Sarah Hicks testifying at 2:49:00, "The vision is that as we go and as we get the agreements in additional counties along the border, we could go up to 3 intake centers and up to 3 total jails.").

people for the OLS trespass arrest program.[15] As of 2019, Kinney County Sheriff Brad Coe was using "Stonegarden"[16] deputies for border enforcement[17] Stonegarden is the name of a Dept of Homeland Security operation to enhance border security.  However, Coe was not operating in conjunction with the Dept of Homeland Security, but outside of it.  The Kinney County Sheriff's Office is directly involved in arresting individuals for the Operation Lone Star trespass arrest program, and the County Attorney prosecutes migrants arrested in the County for trespassing.

37.    Under the OLS trespass arrest program, at the direction of Governor Abbott and DPS Director McCraw, state and local actors collaborate to target for arrest individuals they believe to be adult male migrants traveling not as part of a family unit. The criminal trespass arrests have a one-level enhancement in misdemeanor class due to Governor Abbott's declaration of a state disaster based on migration, and prosecutors' understanding of state law enhancements. A DPS briefing in December 2021 stated that over 2,200 people had been arrested on state criminal trespass charges under Operation Lone Star.[18]  In March 2022, an Abbott press release stated that "[s]ince the launch of OLS, multi-agency efforts have led to more than 208,000 migrant apprehensions."[19]  There is no breakdown as to how many of these "migrant apprehensions" are related to any type of alleged crime.  However, in a review of the lists of persons incarcerated in Briscoe and Segovia units (the TDCJ Units designated for OLS "migrant arrests") through March 2022, they reflect approximately 2,887 arrests, 2,518 of whom

---

[15] Operation Lone Star Briefing, December 9, 2021, at 2:28, https://www.facebook.com/watch/live/?ref=watch_permalink&v=277771827651145&t=0 (reporting and showing corresponding data for December 2, 2021).
[16] Stonegarden is a Dept of Homeland Security operation to enhance border security.
[17] Vanessa Croix, Rise in Human Smuggling Cases Stretching Kinney Cty. Resources, KENS 5 (June 27, 2019), https://www.kens5.com/article/news/human-smuggling-cases-stretching-kinney-countyresources/273-f2a5b625-1496-46b9-a51e-f2020199c207.
[18] Operation Lone Star Briefing, December 9, 2021, at 2:28, https://www.facebook.com/watch/live/?ref=watch_permalink&v=277771827651145&t=0 (reporting and showing corresponding data for December 2, 2021), at 2:41.
[19] https://gov.texas.gov/news/post/governor-abbott-dps-texas-national-guard-mark-one-year-anniversary-of-operation-lone-star

were arrested for criminal trespass.  Over 80% of those arrested were for criminal trespass with no other charges.  *Id.*

38.     Public statements by Governor Abbott, who created and implemented the OLS trespass arrest program with the assistance of Director McCraw, demonstrate the program's intent to target individuals for arrest and punishment under state criminal trespass law based on color/race, national origin, and immigration status. Many arrests lack probable cause for criminal trespass–for example, in many cases because law enforcement directed individuals to, or permitted their entry on, private land. The state has also sought to criminalize conduct in order to arrest migrants by building fences on property near the border, to fulfill an element of the criminal trespass statute, and the arrest process is otherwise highly irregular, including in the Governor's and Director McCraw's authorization for the state National Guard to conduct misdemeanor trespass arrests. In Kinney County, the county sheriff and the county attorney are both deeply involved in the OLS trespass arrests in their law enforcement role and complaining witnesses, as property manager or owner, in multiple cases.

39. The outcome of the program is severe racial disparities: the individuals arrested to date are people of color, primarily Latino and also Black migrants. Affidavits from arresting DPS troopers indicate profiling, with descriptions of observing "undocumented migrants" and troopers' apparent presumption that Latino men are particular targets for arrest under the program. As this direct, indirect, and outcome-based evidence together shows, arrests under the migrant arrest program subject individuals to discrimination on the basis of race/color, national origin, and immigration status, in violation of the United States Constitution.

40.     State officials have been explicit: the goal of the OLS trespass arrest program is to arrest migrants. Statements from Governor Abbott and DPS officials make plain that state actors'

intent in initiating and carrying out the OLS trespass arrest program is to target for arrest recently arrived migrants, using the vehicle of state criminal trespass law, in order to deter migration and to punish migrants for crossing into the United States—not to neutrally enforce state criminal trespass law. Statements from Governor Abbott to this effect include:

- "We launched Operation Lone Star to do the job that Washington would not," said Governor Abbott. "Within weeks of taking office, President Biden turned our southern border into a porous mess where criminal aliens wandered across the Rio Grande River without anyone to interdict them."[20]

- "Our efforts to secure the border through Operation Lone Star would not be possible without our local partners as well as the Texas Department of Public Safety troopers and Texas National Guard soldiers on the ground who work tirelessly on the frontlines to make our border and the entire state safer. We will continue to do whatever it takes to secure the border and keep communities safe in the wake of President Biden's prolonged inaction."[21]

- In a news appearance, Governor Abbott stated, "We are employing state law, as opposed to federal law, because when we make an arrest under federal law we typically have to turn people over to the federal authorities, and they just release them, they go across the border, and they come back across the border, etc. So what we have done is we actually created additional jail cells and we created a court system down in South Texas. We are arresting people coming across the border illegally, and we are jailing them in jails in the state of Texas, sending the message that if they come across the border in the state of Texas, they're not going to be caught and released like under the Biden administration, they're going to be spending time behind bars."[22]

- In another news appearance, Governor Abbott similarly stated, "So what Texas is doing—we're not playing games anymore. I've deployed the National Guard as well as the Texas Department of Public Safety, and we have a new program in place because the Biden administration plan is to catch and release. The Texas plan is to catch and to jail. So we are arresting and jailing, the program has already begun, it took a few weeks to set up because we actually had to set up an entirely new booking system, we had to get judges involved in the process, magistrates too—who would magistrate these people. We had to open up a former prison that has now a thousand jail beds that we're starting to fill up. We are arresting people every single day, and we're arresting for trespass."[23]

---

[20] https://gov.texas.gov/news/post/governor-abbott-dps-texas-national-guard-mark-one-year-anniversary-of-operation-lone-star
[21] Greg Abbott Roundtable, March 10, 2022.
[22] Greg Abbott (@GregAbbott_TX), Twitter (Sept. 28, 2021, 10:51 AM)
https://twitter.com/GregAbbott_TX/status/1442879549692338191 (sharing an interview in which he provides this quote at 0:46–1:25).
[23] Greg Abbott (@GregAbbott_TX), Twitter (July 25, 2021, 1:50 PM),

- Governor Abbott also stated in a news appearance, "I'm going to be back down on the border again tomorrow, working to make sure that we are accelerating the process of building the wall, accelerating the process of arresting these people who are coming across the border because somebody has to step up and secure the border, because the Biden administration has completely abandoned its responsibility to his fellow Americans."[24]

- A tweet from July 23 describes "the new program to arrest and jail illegal immigrants arrested for trespassing in Texas."[25]

- "Meeting with @TDEM, @TXMilitary, @TxDPS, & the Texas Commission on Jail Standards about our plan to catch and jail illegal migrants crossing the border. The Biden administration caused this crisis, Texas is stopping it."[26]

- "The Texas Dept. of Public Safety continues to arrest illegal migrants coming across the border and sending them to jail. Here is an example from this morning with @TxDPS working with the Kinney County Sheriff's Office." The tweet then shares a screenshot of a Kinney County Sheriff's Office Facebook post with several pictures of 17 men lined up, dressed in white jail garb in front of white vans and under the guard of law enforcement, stating, "This is happening! 17 illegals this morning. At the Kinney County Sheriff's Office. Judge Narci Villarreal magistrated each illegal alien. Thank you DPS for all your help."[27]

- "The Texas Department of Public Safety & Texas National Guard are taking unprecedented steps to ensure the safety of our communities & secure the border. Illegal immigrants caught trespassing into Texas will be arrested & sent to jail."[28]

- A video on the Governor's Twitter account includes a graphic, "SYSTEM TO ARREST AND JAIL ILLEGAL IMMIGRANTS," and an accompanying voiceover states, "We created a system to arrest and jail illegal immigrants who are trespassing in Texas."[29]

---

https://twitter.com/GregAbbott_TX/status/1419369434414731266 (sharing a Fox News interview in which he provides this quote at 00:00–00:40).

[24] Greg Abbott (@GregAbbott_TX), Twitter (July 16, 2021, 3:46 PM),
https://twitter.com/GregAbbott_TX/status/1416137109602250764 (sharing a Fox News interview in which he provides this quote at 00:30–00:51).

[25] Greg Abbott (@GregAbbott_TX), Twitter (July 23, 2021, 6:57 PM),
https://twitter.com/GregAbbott_TX/status/1418722056003280896.

[26] Greg Abbott (@GregAbbott_TX), Twitter (July 26, 2021, 2:41 PM),
https://twitter.com/GregAbbott_TX/status/1419744773200617478.

[27] Greg Abbott (@GregAbbott_TX), Twitter (Aug. 6, 2021, 11:35 AM),
https://twitter.com/GregAbbott_TX/status/1423684063760719885.

[28] Greg Abbott (@GregAbbott_TX), Twitter (Sept. 28, 2021, 10:51 AM),
https://twitter.com/GregAbbott_TX/status/1442879546923338191.

[29] Greg Abbott (@GregAbbott_TX), Twitter (Oct. 8, 2021, 10:33 AM),
https://twitter.com/GregAbbott_TX/status/1446498871606059011  (sharing a video with the corresponding text and voiceover at ~ 00:20). Appx. 345

- "Texas National Guard is authorized to arrest illegal immigrants trespassing in Texas. They arrested these in the Rio Grande Valley. We opened thousands of jail beds for all of the new arrests. They are also working with @TxDPS to seal border regions." An accompanying photograph shows ten migrants seated on the ground, with two members of the Texas National Guard in the background.[30]

- "Texas Department of Public Safety & Texas National Guard arrest illegal immigrants trespassing on private property. We put them behind bars, not catch & release. Texas continues to secure our border."[31]

- "Texas Dept. of Public Safety arrest illegal immigrants hiding in rail cars. They will be put behind bars, not sent to Border Patrol for catch & release. @TxDPS, along with the Texas National Guard, have made thousands of arrests this year through #OperationLoneStar."[32]

- An email from a DPS official on July 20, at the start of migrant arrests, recorded the agency's policy of "arresting . . . in Val Verde County for Criminal Trespass . . . only . . . adult males not traveling as family units."[33]  DPS and Texas National Guard officials' public statements further confirm that the agencies are specifically targeting migrants for arrest:

- A DPS spokesperson explained in September, "Operation Lone Star . . . the reason why it began is the turn of, in January, we were seeing an influx of migrants coming in."[34] The spokesperson further explained that DPS is identifying areas "for the ones that are trying to avoid detection. They're doing it for a reason, and we're looking for them."[35]

- Also in October, a DPS official said, "We did speak to some of those individuals that were in the temporary processing center, and they did say that right now—what they're anticipating is, what they expect is that they're going to get turned over to USBP. And when they do, they get returned back to Mexico, and then they cross back days later or weeks later. But when they find out that they're being arrested by DPS for a state charge, their demeanor changes. They're not expecting that. So the message is getting across. They know that now it's a lot more challenging for them to get across because they will be arrested if they do encounter DPS."[36]

---

[30] Greg Abbott (@GregAbbott_TX), Twitter (Oct. 10, 2021, 7:17 PM), https://twitter.com/GregAbbott_TX/status/1447355631309045761.
[31] Greg Abbott (@GregAbbott_TX), Twitter (Oct. 14, 2021, 12:30 PM), https://twitter.com/GregAbbott_TX/status/1448702868568088581.
[32] Greg Abbott (@GregAbbott_TX), Twitter (Oct. 26, 2021, 2:27 PM), https://twitter.com/GregAbbott_TX/status/1453080838648877064.
[33] Jay Root (@byjayroot), Twitter (Aug. 24, 2021, 12:54 PM), https://twitter.com/byjayroot/status/1430227046928719879.
[34] Tex. Dep't of Public Safety, Operation Lone Star Briefing, Sept. 16, 2021, at 1:15, available at https://www.valleycentral.com/news/local-news/dps-tmd-to-give-updates-operation-lone-star-at-firstbriefing/?fbclid=IwAR03g0OqcPMJEDp7l6gTMEENqA3MIIpUiqAFMjYenzctSnYzlKBR8Y63C28.
[35] *Id.* at 8:30.
[36] Operation Lone Star Briefing, Oct. 28, 2021, at 10:30, available at https://www.valleycentral.com/news/local-news/operation-lone-star-dps-holds-fifthbriefing/?fbclid=IwAR2pCBMhmfjH4T5bcs8nE7N7XGSzMX4ULXStzuSeUI1JQSiVUXtXbGpIL_s.

- In October, a Texas National Guard official said, "We are always trying to attempt to turn back and push or repel illegal immigration to an extent. There is times where they've already made land or they've already come onto the property and we can no longer turn back." In such cases, he stated, the National Guard will refer the individual to DPS in the first instance.[37]

- An October DPS press release described how "DPS has recently had significant interactions with migrants hiding in railcars to attempt to escape detection," including "an incident on Oct. 24, in which DPS personnel in Kinney County found 19 migrants" and one on October 25 when DPS encountered "20 migrants."[38]

- In an October statement, DPS Director Steven McCraw said, "We continue to work to secure the border and arrest people who have entered our country illegally and trespassed on private land."[39]

- In a November statement, Defendant McCraw similarly said, "The state of Texas is sending a message to anyone who is thinking of crossing into our country illegally: If you are caught on private property, you will be arrested for criminal trespass and put in jail.[40]

41. This understanding among state and local actors that the OLS trespass arrest program is about punishing migrants makes plain that state and local entities have designed the program to target migrants and implement it accordingly.

- Kinney County Attorney Brent Smith frequently describes the humanitarian situation in the county as "an invasion" by Latino and Black migrants that requires a response of force and aggression. In promoting the local disaster declaration, Smith told local media, "We're being invaded."[41]  On his personal Facebook page, Smith shared a post calling on Texans to take up arms. "It's time to equip Texas Militias. It's time to equip Texas citizens…. The federal government has abandoned Texas…The Haitian migrants have stated that they are ready for war. Are we?"[42] In another post, Smith shared an image of a U.S. Border Patrol agent on horseback using ropes as whips against a Haitian migrant in

---

[37] *Id.* at 15:50.
[38] Press Release, Tex. Dep't of Public Safety, DPS, TMD Discuss Railcars, Staging Personnel at OLS Weekly Briefing, Oct. 28, 2021, https://www.dps.texas.gov/news/dps-tmd-discuss-railcars-stagingpersonnel-ols-weekly-briefing.
[39] Press Release, Tex. Dep't of Public Safety, TMD, DPS Provide Update on Progress of OLS at Weekly Briefing, Oct. 14, 2021, https://www.dps.texas.gov/news/tmd-dps-provide-update-progress-ols-weeklybriefing.
[40] Press Release, Tex. Dep't of Public Safety, DPS, TMD, & TDCJ Discuss OLS Arrest and Detention Process, Nov. 19, 2021, https://www.dps.texas.gov/news/dps-tmd-tdcj-discuss-ols-arrest-and-detentionprocess.
[41] Vanessa Croix, Kinney Co. officials issue disaster declaration, calling on state leaders for help, CBS Kens5, April 21, 2021, https://www.kens5.com/article/news/special-reports/at-the-border/kinney-coofficials-issue-disaster-declaration-calling-on-state-leaders-for-help/273-1ac31fd5-c37d-4221-8675-d201ab40f6d3.
[42] Brent Smith, Chad Prather Post, Facebook (October 9, 2021), https://www.facebook.com/permalink.php?story_fbid=10110887423143708&id=16717258.

Del Rio, Texas. The image included text which read: "Del Rio's Newest Hero."[43] Mr. Smith has described "two different types of invasions that are going on," one in "Val Verde County, where the Haitians were," where people "want to claim asylum" and one in Kinney County where, purportedly, people do not want to claim asylum.[44] Mr. Smith explained that the County recently declared anew a state of disaster "with the amount of Haitians and caravans coming this way"--particularly evincing racist animus in his focus on Black Haitian migrants since the overwhelming number of those arrested for traveling through the county are Latino.[45]

- In November, the Kinney County Sheriff's Office's Facebook page re-shared a video depicting a group of brown-skinned people walking through brushland captioned, "Gotta love deer hunting in South Texas…Age and score please."[46] One comment on the post reads, "Looks like deer to me." Comments on the post, including one by County Public Information Officer, Matt Benacci, make clear that viewers of the KCSO Facebook page understand the people in the video to be migrants. The post is particularly concerning given that Kinney County Attorney Brent Smith has asked, "What do you think's going to happen when illegal aliens, hundreds of thousands of illegal aliens, are on those properties while [hunters are] trying to hunt?"[47]

42.     Texas is criminalizing travel that previously was not, by putting up fences to establish the element of notice for state criminal trespass. One element of criminal trespass in Texas is "notice that the entry was forbidden," which may be fulfilled by "fencing or other enclosure obviously designed to exclude intruders or to contain livestock."[48] Governor Abbott has thus directed the Texas National Guard to set up fences on private land along the border, in order to create the conditions for criminal trespass charges where they did not exist before.[49]

---

[43] Brent Smith, Del Rio's New Hero, Facebook (September 21, 2021), https://www.facebook.com/permalink.php?story_fbid=10110849118601318&id=16717258.

[44] Gateway Pundit, Kinney Co. TX Sheriff TX Takes Historic Action to Fight Back Against Illegal Invasion, YouTube, Oct. 18, 2021, https://www.youtube.com/watch?v=jiTvH3jOXzE&list=UUMaLetBcZ8fqsoIryB015og&index=4&ab_channel=GatewayPundit.

[45] Id.

[46] Kinney County Sheriff's Office, Facebook (Nov. 17, 2021, 1:10 pm), https://m.facebook.com/story.php?story_fbid=1054471385310603&id=159181914839559.

[47] Robert Montoya, Border County Struggles with Security as Abbott Postures, Tex. Scorecard (July 15, 2021), https://texasscorecard.com/state/border-county-struggles-with-security-as-abbott-postures/.

[48] Tex. Penal Code    30.05(a)(1), (b)(2)(B).

[49] Hearing on H.B. 9, supra n. 2, ~ 2:44:55 (Texas Office of the Governor budget and policy director testifying, regarding temporary fencing, "again, it provides the notice of criminal trespass, with enhanced penalties where a disaster is declared").

43.     On April 6, 2022, Greg Abbott announced a plan to begin busing migrants arrested pursuant to OLS to the steps of the U.S. Capitol in what he called an "unprecedented" response to illegal immigration.  Obviously, this evidences his real intent in that he would not be sending busloads of people arrested for trespassing to Washington D.C.

## V.     OPERATION LONE STAR (OLS) IS UNCONSTITUTIONAL

44.     Arrests under OLS are severely racially disparate: the arrests are of Black and Brown men. Trespass arrest affidavits authored by DPS troopers reveal these racial disparities and also show clear indications of profiling based on race and national origin. The ACLU completed an initial analysis in approximately December 2021 of DPS trooper affidavits providing arresting officers' accounts of 168 OLS arrests, 96 of them occurring in Kinney County.[50]   The affidavits demonstrated stark racial disparities in arrests: all arrests were of people of color, and almost all were of Latino men. 98% were recorded as "H/M" (Hispanic male) and 2% as "B/M" (Black male). In the Kinney County arrests specifically, 33% described country of origin and/or perceived immigration status: 29% included perceived immigration status, and 8% included country of origin. (These totals for each category equaled more than 100% because some narratives included for example, both perceived race and perceived immigration status.) Beyond these bare statistics, the descriptions in the affidavits' arrest narratives strongly indicated racial profiling. For example:

---

[50] While affidavits in the OLS trespass arrest program, like similar arrest records, are in theory available to the public, in practice, news sources report that obtaining them has proven highly challenging. Local news states that the Kinney County attorney has "[i]n some cases . . . received the arrest files from DPS on day 29 [after arrest], or even beyond day 30 [after arrest, the date when charges must be filed in certain criminal cases]." Charlotte Cuthbertson, In Pursuit of a Secure Border: Small Texas County Leads Charge Against Border Crime, The Epoch Times, Nov. 11, 2021, https://www.theepochtimes.com/in-pursuit-of-a-secure-border-small-texas-county-leads-charge-againstborder-crime_4084276.html.

- "Trooper Austin Melvin responded . . . in reference to multiple people seen trespassing by National Guardsmen posted on the property. Upon arriving, I observed multiple Spanish males sitting near the following latitude/longitude." [51]

- "Trooper Jimenez saw 6 Hispanic males trespassing on the Bordelon Crossing property. . . . I saw a Hispanic male open the closed gate to the residential property. The six adult males were undocumented migrants UDM's from Venezuela."[52]

45.     Both sets of affidavits suggested that the individual's perceived ethnicity was relevant to the DPS trooper's understanding that that person was not welcome on the property. Two other affidavits also described observing, and then arresting, Latino men.

46.     DPS troopers' arrest narratives also strongly indicated profiling on the basis of national origin, including perceived immigration status. The arrest narrative in two affidavits stated, "I . . was advised of a group of non-citizens trespassing on X Bar H Ranch in Kinney County." Several arrest narratives described observing "undocumented migrants." For example, three affidavits stated that a member of the National Guard informed the affiant "that 22 undocumented migrants (UDMs) emerged from marked private property" and stated, "upon arriving, I saw 22 UDMs." Another arrest narrative recounted, "I . . . was notified by [a DPS trooper] of several undocumented migrants trespassing on the property. . . . Upon arrival, I located three undocumented migrants."

47.     Subsequently, on February 23, 2022, the ACLU supplemented its written complaint with an analysis of an additional 316 trespass arrest affidavits —277 from arrests in Kinney County.  ***100% of the arrests in Kinney County were recorded as "H/M" (Hispanic male)***.  In 31% of cases in Kinney County, the arrest narrative describes the individual's country of origin and/or perceived immigration status: 7% specify the country of origin, and 24% note

---

[51] While the affiant is Trooper Melvin, the affidavit—like several others—is written in both the first and third person.
[52] While the affidavit refers to six men, Val Verde County records only include affidavits for five men.

perceived immigration status. The affidavits without reference to a protected class are typically barebones and boilerplates, leading to misleadingly lower statistics.  As before, beyond the bare statistics, the descriptions in the arrest affidavits indicate racial profiling. Descriptions from arresting officers imply that individuals' perceived immigration status was relevant to the decision to initiate law enforcement action or to arrest. As before, numerous affidavits casually describe individuals as "undocumented" or otherwise describe their perceived immigration status—often apparently based on sight or, as above, appearing to find immigration status as relevant to the arrest determination. The ACLU noted that the list reflecting arrests based on color/race/immigration status was "far from exhaustive." Some examples of these patterns are:

- "I made contact with the Hispanic males and found they were not part of a family unit and were undocumented migrants from Mexico."

- "I . . . apprehended four suspected illegal aliens. After further investigation, Texas DPS confirmed the four individuals were trespassing on the Burr Ranch and were illegal aliens."

- "While working Operation Lone Star at the gravel pit, National Guard Randy Cantu encountered possible non-citizens. Cantu escorted the non- citizens to Trooper Sylvia Alaniz and Prob. Trooper Cassandra Armas."

- Law enforcement describes being "advised of a group of non-citizens trespassing."

- "I observed 3 undocumented adult males walking."

- "I saw seven undocumented adult males jumping a clearly marked fence with a 'no trespassing' sign."

- "[A] total of 2 undocumented male migrants were located."

- "I arrived on scene and observed 5 UDAs [undocumented adults]" and "all other UDAs [except a family unit] were placed under arrest."

48.     DPS troopers' emphasis on perceived immigration status evinces discriminatory policing in two ways. First, troopers' statements that they are observing "undocumented

migrants"—where the overwhelming majority of those they arrest are Latino—indicate that they are instead using racial profiling to identify those they term "undocumented migrants," whom they in turn target for arrest and prosecution. The use of ethnicity as a proxy for immigration status is evident in an affidavit that states that a member of the National Guard informed the trooper "that a group of 4 undocumented migrants were(sic) seen trespassing on the Bordelon Crossing property . . . While on patrol, I saw one adult Hispanic male sitting and that was found to be single and not part of a family unit." There is no way to ascertain immigration status through sight, and the narratives' conclusory assertions indicate that officers are instead relying on racial profiling.  Second, it indicates that DPS troopers view immigration status as relevant to these state law enforcement arrests for state criminal trespass violations.

49.    Notably, Kinney County Attorney Brent Smith recognizes that the troopers' references to immigration status are indicia of racial profiling. In response to criticism that the migrant arrest cases are racially motivated, he falsely claimed that "[t]he criminal complaints make no mention of immigration status."[53]  Obviously, Smith knew that his actions in targeting migrants based on immigration status were unconstitutional.  Additionally, both the county attorney and the county sheriff of Kinney County are complaining witnesses in some affidavits. Kinney County Attorney Brent Smith is the complaining witness—that is, the person pressing charges for criminal trespass—in at least five cases. Further, in July 2021, Kinney County Sheriff Brad Coe publicly mentioned three arrests for trespass on County Attorney Smith's ranch, pursuant to Kinney County's efforts to begin arresting migrants for trespass—presumably making Mr. Smith the complaining witness in those cases as well. The ACLU's original complaint documented three cases in which Sheriff Coe was the complaining witness. In the

---

[53] Press Release, Kinney County Attorney, Oct. 26, 2021, https://www.facebook.com/photo/?fbid=125607406514360&set=a.125607456514355.

additional affidavits reviewed, the ACLU found five additional cases in which Sheriff Coe was the complaining witness.  This dual involvement is, at minimum, yet another concerning irregularity. It is especially so given Kinney County's key role in creating as well as implementing the OLS trespass arrest program.

50.     Statements by public officials regarding the intent of the program, the implementation of the program, and the outcomes of that implementation demonstrate that arrests under the OLS trespass arrest program are discriminatory on the bases of race and national origin, including perceived immigration status. This evidence of discrimination in criminal trespass arrests under OLS violates the constitutional rights of a class of persons as described herein.

51.     Once individuals are arrested under the OLS trespass program, they are channeled into a criminal system that is entirely separate and distinct from the ordinary criminal legal process and pretrial detention system for state misdemeanor charges. Those arrested under the OLS trespass program are not taken to county jails, as is the ordinary process for misdemeanor arrests; instead, they are booked into a separate processing facility in Val Verde County, which DPS calls a "criminal <u>migrant</u> processing facility"[54] (emphasis added).  At the processing facility, they are magistrated by judges designated specifically for the OLS trespass program. From the processing facility, they are then transported to state prisons that state actors have converted to pretrial jails specifically for OLS. They are placed on separate dockets specifically for OLS criminal trespass arrests, with separate arraignments. They are appointed counsel through a separate system established by the state specifically for OLS arrests, not from the pool of lawyers eligible for appointment to indigent defendants in Kinney County.

---

[54] Nov. 18 Operation Lone Star Briefing, supra n. 15, ~ 1:45, https://www.valleycentral.com/news/localnews/texas-dps-to-hold-briefing-on-operation-lone-star-focus-on-apprehension-numbers/.

52.     In the separate criminal system that state and local officials have established specifically for trespass arrests under OLS, there have been systemic violations of individual rights. Among other shortcomings, state and local officials have failed to vindicate individuals' right to counsel, have failed to timely file charges, and have failed to timely release individuals from custody. Snapshot data shows the extreme delays in this separate system. The Wall Street Journal reported that 53% of the 1,006 people detained on November 1 under the OLS trespass arrest program (533 people) had been jailed longer than 30 days, 14% (141 people) longer than 60 days, and 2 people–both Cuban migrants–for 98 days.

53.     In Texas, every county is required to establish an Indigent Defense Plan (IDP), which controls all procedures related to eligibility for and involving appointed counsel for indigent people accused of crimes.[55]  Each county involved in OLS accordingly has an IDP prescribing the county's methods for appointment of counsel, which predates its participation in OLS. But individuals arrested under OLS are not appointed counsel according to the local IDP.[56] Instead, the Texas Supreme Court has issued an order purporting to modify statutory provisions of the Code of Criminal Procedure specifically "for individuals arrested under Operation Lone Star." This order purports to modify Texas law "to authorize the Executive Director of the Texas Indigent Defense Commission ('TIDC') to approve procedures for appointing counsel that differ from an affected county's procedures"; "to waive . . . requirements to maintain a public appointment list and to appoint only from that list"; "to authorize TIDC to approve and establish an alternative program for appointing counsel"; and "to authorize TIDC as an additional entity permitted to designate an existing governmental entity or nonprofit corporation" as a public

---

[55] Tex. Code Crim. P. art. 26.04.

[56] Texas Indigent Defense Commission, Procedures for Appointment, Supervision, and Compensation of Counsel to Defendants Arrested Under Operation Lone Star Pursuant to the Texas Supreme Court's Border Security State of Disaster Emergency Order (Sep. 24, 2021), available at http://www.tidc.texas.gov/media/8d98da945cd5899/ols-counsel-appointment-procedures-9-24-21.pdf.

defender's office and also as "a managed assigned counsel program to appoint counsel."[57] The purported legal basis of this order is a state statute that permits the supreme court to "modify . . . procedures for the conduct of any court proceeding affected by a disaster,"[58] and Governor Abbott's declaration of disaster based on migration.  Accordingly, counsel is instead appointed by retired judges across the state who have temporary authorization from the Texas Supreme Court to perform magistration hearings, but who are not "appointing authorities," according to the local IDP.[59] Once these retired judges have appointed counsel, lawyers are assigned through a statewide system orchestrated by state agencies, most notably OCA and TIDC, both of which are based in Austin, in coordination with TDEM, which operates the Val Verde Processing Center. TIDC has contracted with the Lubbock Private Defenders Office (LPDO), a nonprofit organization, to manage the assignment of counsel for OLS prosecutions but not for any other prosecutions in the "participating counties."[60] The LPDO is based in Lubbock, 350 miles north of the Val Verde Processing Facility where initial magistration hearings occur. Lawyers appointed to represent OLS trespass defendants maintain offices throughout the state of Texas, and virtually all cases are assigned to lawyers who are not approved to take criminal cases through the IDPs of the "participating counties."[61]  In short, no part of the process for appointing counsel that applies to people arrested under the OLS trespass program is the same as the procedure used for any other person arrested in those exact same counties whose arrest is not designated as being

---

[57] Emergency Order Regarding Indigent Defense and the Border Security State of Disaster, Misc. Docket No. 21-9104 (Tex. Aug. 30, 2021), https://www.txcourts.gov/media/1452716/219104.pdf; Renewed Emergency Order Regarding Indigent Defense and the Border Security State of Disaster, Misc. Docket No. 21-9123 (Tex. Oct. 12, 2021), https://www.txcourts.gov/media/1453005/219123.pdf.

[58] Tex. Gov't Code Ann.   22.035(b) (West 2019); Emergency Order Regarding Indigent Defense and the Border Security State of Disaster, supra n. 55 (citing this statutory provision as authority).

[59] Emergency Order Regarding Indigent Defense and the Border Security State of Disaster, supra n. 116,1.

[60] See Jolie McCullough, Thanks to local politics and a railroad, rural Kinney County accounts for most of Texas' migrant arrests, Tex. Tribune, Sept. 2, 2021, https://www.texastribune.org/2021/09/02/texasimmigration-arrests-jail-kinney-county/.

[61] These attorneys are quite literally spread throughout the entirety of the state, including in Bowie County, Dallas County, Harris County, and Travis County. The two undersigned counsel currently receiving appointments for OLS cases through LPDO reside and practice primarily in Travis County.

related to OLS. Instead of adding attorneys for Kinney County, to whom anyone on the docket may be assigned, the state has created a separate system specifically for these cases.

54.     As of November 18, 1,071 people were detained under Operation Lone Star, with 535 at Briscoe and 536 at Segovia.[62]  In the latter part of 2021, the Texas Jail Project gathered facts regarding the egregious prison conditions from about 68 detained people at Briscoe and Segovia and their family members.[63] Benjamin Drachman, the Jail Project staffer who speaks with detainees and family members, concluded "that people in Briscoe and Segovia are desperate," explaining that they "had not received any help for months and were eager to talk to [him]. Some of the stories are traumatizing."[64] In addition, seven people arrested under OLS have provided declarations detailing similarly atrocious conditions. Food, medical care, and telephone access are all inadequate.   As of April 2022, those jail numbers have increased to approximately 2,887.

### A.     VIOLATIONS OF 4TH AMENDMENT, EQUAL PROTECTION AND DUE PROCESS

#### 1.   Fourth Amendment Violations

55.     "If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent."  *Arizona v. United States*, 567 U.S. 387, 407, 132 S. Ct. 2492, 2505, 183 L. Ed. 2d 351 (2012).  The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process. For example, the Attorney General can exercise discretion to issue a warrant for an alien's arrest and detention "pending a decision on whether the alien is to be removed from the United States." *Arizona v. United States*, 567 U.S.

---

[62] Nov. 18 Operation Lone Star Briefing, supra n. 13, at 10:00. This total may include individuals detained for smuggling or other non-trespass crimes at Briscoe.
[63] See generally Drachman Decl
[64] See generally Drachman Decl. par. 10

387, 407, 132 S. Ct. 2492, 2505, 183 L. Ed. 2d 351 (2012).  And if an alien is ordered removed after a hearing, the Attorney General will issue a warrant. See 8 CFR § 241.2(a)(1). In both instances, the warrants are executed by federal officers who have received training in the enforcement of immigration law. See §§ 241.2(b), 287.5(e)(3).

56.     In the *Arizona* opinion, the Court examined a section of an Arizona law (Section 6) which attempted to provide state officers even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers. Under state law, officers who believe an alien is removable by reason of some "public offense" would have the power to conduct an arrest on that basis regardless of whether a federal warrant has issued or the alien is likely to escape. This state authority could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case. This would allow the State to achieve its own immigration policy. The result could be unnecessary harassment of some aliens (for instance, a veteran, college student, or someone assisting with a criminal investigation) who federal officials determine should not be removed.  *Arizona*, 567 U.S. at 408. "This is not the system Congress created." *Id*.

57.     Congress has put in place a system in which state officers may not make warrantless arrests of aliens based on possible removability except in specific, limited circumstances. *Id*. at 410, citing *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941).  In *Hines*, the Court noted that an important consideration in assessing the unconstitutionality of the state's exercise of authority in that case was that the "legislation deals with the rights, liberties, and personal freedoms of human beings, and is in an entirely different category from state tax statutes or state pure food laws regulating the labels on cans." *Id*. at 68.  Clearly, the instant case

deals with the rights, liberties and personal freedoms of human beings, putting it into a category of higher scrutiny.

58.     The Fifth Circuit acknowledges that "absent express direction or authorization by federal statute or federal officials, state and local law enforcement officers may not detain or arrest an individual solely based on known or suspected civil violations of federal immigration law," *City of El Cenizo,* 890 F.3d at 189. (citing *Santos v. Frederick County Board of Commissioners*, 725 F.3d 451, 465 (4th Cir. 2013).   "Thus, the seizure in *Santos* violated the Fourth Amendment because the officers detained Santos "before dispatch confirmed with ICE that the warrant was active."  *City of El Cenizo,* 890 F.3d at 189.  The Fifth Circuit cited with approval *Meledres v. Arpaio*, 695 F.3d 990, 1000 (9ᵗʰ Cir. 2012) for the proposition that unilateral detention "based solely on reasonable suspicion or knowledge that a person was unlawfully present in the United States" was a constitutional violation and noted that in *Meledres*, "as in *Santos*, there was no federal request for assistance before the seizure."  890 F.3d at 189.

59.     It is clear that the OLS process of unilateral detention "based solely on reasonable suspicion or knowledge that a person was unlawfully present in the United States" is a violation of the Fourth Amendment.  In the case *sub judice*: Plaintiff Martinez was "located and detained" as a "migrant." (emphasis added). He was arrested, along with five others, on the Union Pacific Railway.   There were three males and three females.   The three female "trespassers" were transported to the Border Patrol Station in Brackettville.   The three males were all arrested and sent to the Val Verde Processing Center.  *Id*.  The probable cause affidavit for Plaintiff Barcenas states that a state trooper was "notified by DPS SOG of nine migrants trespassing on the Dos Angeles Ranch."  *Id*.  (emphasis added).  The probable cause affidavit charging Plaintiff Becerra

reflects that that he was also one of the "nine <u>migrants</u>" on the Dos Angeles Ranch.  *Id*., (emphasis added). Plaintiff Santana was also identified as one of the "nine <u>migrants</u>."  The probable cause affidavit charging Plaintiff Rodas with trespass reflects that troopers "had apprehended a group of <u>Undocumented Persons</u> (UDPs)" on a ranch...The defendant was one of the UDP's in the group." *Id*. (emphasis added).  Plaintiff Pineda was also identified as one of the <u>Undocumented Persons</u> in the group.  *Id*.  The probable cause affidavit charging Plaintiff Colorado with trespassing identifies him as one of two "<u>Illegal Aliens</u>," stating that the "landowners wished to pursue trespassing charges on the <u>Aliens</u>."  *Id*. (emphasis added).  "There were two civilians armed with long rifles and two <u>illegal aliens</u> lying prone with their hands on their heads."  *Id*.  (emphasis added).  The probable cause affidavits for these Plaintiffs reflect detention and arrest based upon immigration status.

### 2.  <u>Equal Protection Violations</u>

60.    In *Arizona*, the Supreme Court noted the "constitutional safeguards" that applied to immigration enforcement, including that officers "may not consider race, color or national origin" in implementing its laws.  567 U.S. at 411.  The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises. "Thus we have treated as presumptively invidious those classifications that disadvantage a 'suspect class.'"  *Plyler v. Doe*, 457 U.S. 202, 216–17, 102 S. Ct. 2382, 2394–95, 72 L. Ed. 2d 786 (1982).  "Everyone accepts that a detention based on race, *even one otherwise authorized by law*, violates the Fourteenth Amendment's Equal Protection Clause."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1731, 204 L. Ed. 2d 1 (2019).  The Constitution "prohibits selective enforcement of the law based on considerations such as race."  *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996).

61.     The implementation of the OLS system has resulted in systemic discrimination on the basis of color, race and/or national origin.   Arrests under OLS are severely racially disparate: the overwhelming majority (if not all) arrests are of Black and Brown men. Trespass arrest affidavits authored by DPS troopers reveal these racial disparities and also show clear indications of profiling based on race and national origin. The ACLU completed an initial analysis in approximately December 2021 of DPS trooper affidavits providing arresting officers' accounts of 168 arrests—96 in Kinney County.   The affidavits demonstrated stark racial disparities in arrests: all arrests were of people of color, and almost all were of Latino men. 98% were recorded as "H/M" (Hispanic male) and 2% as "B/M" (Black male). For Kinney County, of the 96 arrest affidavits analyzed, 33% described country of origin and/or perceived immigration status: 29% included perceived immigration status, and 8% included country of origin. (These totals for each category equaled more than 100% because some narratives included for example, both perceived race and perceived immigration status.). As previously discussed, the descriptions in the affidavits' arrest narratives strongly indicated racial profiling beyond the bare statistics. For example:

- The affidavits for five individuals stated, "Trooper Austin Melvin responded . . . in reference to multiple people seen trespassing by National Guardsmen posted on the property. Upon arriving, I observed multiple Spanish males sitting near the following latitude/longitude."

- Affidavits for several men stated, "Trooper Jimenez saw 6 Hispanic males trespassing on the Bordelon Crossing property. . . . I saw a Hispanic male open the closed gate to the residential property. The six adult males were undocumented migrants UDM's from Venezuela."

62.     Both sets of affidavits suggested that the individual's perceived ethnicity was relevant to the DPS trooper's understanding that that person was not welcome on the property. Other affidavits also describe observing, and then arresting, Latino men.

63.     DPS troopers' arrest narratives also strongly indicated profiling on the basis of national origin, including perceived immigration status. Many arrest narratives described observing "undocumented migrants." Others include:

- "I . . .was advised of a group of non-citizens trespassing on X Bar H Ranch in Kinney County."

- "I observed a group of undocumented persons (UDPS) cross over a chain that enclosed the property."

- "22 undocumented migrants (UDMs) emerged from marked private property… upon arriving, I saw 22 UDMs."

- "[U]ndocumented migrants seen trespassing by National Guardsmen… I observed 13 undocumented migrants traveling through the . . . [p]roperty."

- "I . . . was notified by [a DPS trooper] of several undocumented migrants trespassing on the property. . . . Upon arrival, I located three undocumented migrants."

64.     Subsequently, on February 23, 2022, the ACLU supplemented its written complaint with  analysis of an additional 316 trespass arrests affidavits —277 from arrests in Kinney County.  ***100% of the arrests in Kinney County were recorded as "H/M" (Hispanic male).***  In 31% of cases in Kinney County, the arrest narrative describes the individual's country of origin and/or perceived immigration status: 7% specify country of origin and 24% note perceived immigration status. At least one analyzed affidavit in Kinney County specifies race, stating, "I made contact with the Hispanic males and found they were not part of a family unit and were undocumented migrants from Mexico." As before, many of the affidavits not including a description of a protected class are simply barebones, and others indicate racial profiling of a type not included in the statistics. Almost always, the descriptions from arresting officers imply that individuals' perceived immigration status was relevant to the decision to initiate law enforcement action or to arrest:

- "I . . . apprehended four suspected illegal aliens. After further investigation, Texas DPS confirmed the four individuals were trespassing on the Burr Ranch and were illegal aliens."

- "While working Operation Lone Star at the gravel pit, National Guard Randy Cantu encountered possible non-citizens. Cantu escorted the non- citizens to Trooper Sylvia Alaniz and Prob. Trooper Cassandra Armas. The non-citizens were identified as . . . "

- "Trooper Melvin made contact with the males and identified them as undocumented persons from Mexico."

65.    As before, numerous probable cause affidavits describe individuals as "undocumented" or otherwise describe their perceived immigration status—often apparently based on sight or, as above, appearing to find immigration status as relevant to the arrest determination. For instance:

- I observed 3 undocumented adult males walking."

- "I saw seven undocumented adult males jumping a clearly marked fence with a 'no trespassing' sign."

- "[A] total of 2 undocumented male migrants were located."

- "I arrived on scene and observed 5 UDAs [undocumented adults]" and describes how "all other UDAs [except a family unit] were placed under arrest."

## B.    DEFENDANTS ABBOTT AND MCCRAW SUED IN INDIVIDUAL AND OFFICIAL CAPACITIES

66.    "[I]ndividuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action. *Ex parte Young*, 209 U.S. 123, 156-157, 28 S. Ct. 441, 452, 52 L. Ed. 714 (1908).  An official is a proper party to suit when "his power by virtue of his office

sufficiently connected him with the duty of enforcement. *Id.* at 161.

67. The following tweets and statements address the direct involvement of both Abbott and McCraw with the enforcement of OLS (in addition to those in section IV, incorporated by reference):

- A DPS Tweet referenced the "enhanced [OLS] operations" as necessary "to stop the flow of migrants entering TX illegally." And it said the "heavy presence on the river" is part of "Operation Lone Star, a state-funded Abbott-led <u>initiative to guard the Texas-Mexico border</u>" (emphasis added).

- The DPS website shows a picture of a boat blockade with the following statement: "Under Texas Gov. Greg Abbott's command, the Department of Public Safety has formed a boat blockade on the Rio Grande to keep undocumented migrants out of South Texas."

- While initially limited to two counties along the southern border, Texas DPS Director Steve McCraw said his department would expand the practice to other areas of the Rio Grande Valley, including Brooks and Webb counties.

- From Governor Abbott's website: "Governor Abbot's actions to secure the border include: signing laws that provide $3 billion in funding for Texas' border security efforts; launching Operation Lone Star and deploying thousands of National Guard soldiers and Texas Department of Public Safety troopers; arresting and jailing illegal migrants trespassing or committing other state crimes in Texas…"[65]

- Also from Governor Abbott's website: "Since the initial launch of Operation Lone Star in March 2021, the Governor, DPS, and the Texas National Guard have increased the comprehensive efforts of the mission. Governor Abbott launched a second jail booking facility in Jim Hogg County in February 2022."

- From a news briefing by Director McCraw: "Texas continues to work diligently to secure our southern border under the leadership of Governor Abbott and these briefings provide an opportunity for us to share tangible evidence of how combined local and state operations being conducted are protecting communities across the nation."

- Governor Abbott wrote a letter in May 2021 to all of the sheriffs in Texas inviting them to a "Border Security Summit" hosted by Abbott to address OLS.
- Governors Abbott and Ducey (Arizona) wrote a letter in June 2021 to governors that were part of an Emergency Assistance Management Compact requesting them to provide law enforcement assistance for OLS.

---

[65] https://gov.texas.gov/news/post/governor-abbott-opens-operation-lone-star-jail-booking-facility-in-jim-hogg-county.

- Governor Abbott wrote a letter in November 2021 to President Biden stating that "[i]n the absence of federal action, I will continue to step up" to enforce immigration laws.

- Governor Abbott announced plans on April 6, 2022 to bus illegal immigrants to the nation's capital.[66]

68.     Defendants Abbott and McCraw have had direct and ongoing connections with the enforcement of the unconstitutional OLS program.  According to his "disaster proclamation" regarding the implementation of OLS, Defendant Abbott is the one that "deployed 1,000 troops from the Texas Department of Public Safety (DPS) and hundreds of soldiers from the Texas National Guard to the border," and he is the one that "directed DPS to initiate Operation Lone Star and devote additional law enforcement resources towards deterring illegal border crossings and protecting our border community." In his letter to all Texas sheriffs inviting them to a "Border Security Summit," Abbott reiterated that he initiated OLS and deployed the DPS and National Guard to the border.  Defendant McCraw is the Director of the Texas Department of Public Safety and is directly involved in deploying and supervising DPS officers implementing OLS.  DPS "is carrying out the mission of OLS on the border counties" in Texas.[67]  Both Defendants are sufficiently connected with the enforcement of OLS to make them proper parties.

## C.     NO SOVEREIGN IMMUNITY

69.     Plaintiffs sue Defendants Abbott and McCraw in their official capacities in order to seek prospective relief to redress ongoing violations of federal law.  State sovereign immunity is not boundless and one of its  limits is the *Ex parte Young* doctrine. 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The doctrine grants a federal court jurisdiction over a lawsuit against a "state official in his official capacity if the suit seeks prospective relief to redress an ongoing

---

[66] https://www.washingtonpost.com/nation/2022/04/06/texas-migrants-bus-dc/.

[67] https://www.dps.texas.gov/news/dps-tmd-tdcj-discuss-ols-arrest-and-detention-process.

violation of federal law." *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 450–51 (5th Cir. 2022). *Ex parte Young* is a "necessary exception" to sovereign immunity, preventing state officials from using their state's sovereignty as a shield to avoid compliance with federal law. *Id.* The "premise" of the doctrine, which applies to state officials but not to the states themselves, is that a "state official is 'not the State for sovereign-immunity purposes' when 'a federal court commands [him] to do nothing more than refrain from violating federal law.' " *Id.* at 451. "In determining whether the doctrine of *Ex parte Young*" applies, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645, 122 S. Ct. 1753, 1760, 152 L. Ed. 2d 871 (2002). "[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Planned Parenthood*, 24 F.4th at 451.

### D.   CLASS REPRESENTATIVES

#### 1. Standing

70.   The Plaintiffs have standing to seek declaratory and injunctive relief to enjoin OLS as they were each arrested pursuant to the OLS program and put into the "alternate" OLS criminal system.  Enjoining Defendant Abbott and the State of Texas from pursuing OLS would stop this systemic injury.   Plaintiffs seek prospective relief to redress an ongoing violation of federal law.  Plaintiffs Israel Baylon Arellano, Jose Lopez Lozano, Miguel Lopez Lozano, Francisco Villalpando Ramos and Cesar Galindo Escoto remain in custody as a result of the OLS program and are suffering a direct and current injury as a result of their arrest and detention. Their injury is capable of being redressed through injunctive relief.   *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51, 111 S. Ct. 1661, 1667, 114 L. Ed. 2d 49 (1991).

### 2. Numerosity

71.     The requirements of Fed. R. Civ. P. 23(a)(1) are satisfied for the class in that there are too many Class Members for joinder of all of them to be practicable.  These Class Members exceed over 2,000 in number.  Records from the Briscoe and Segovia units reflect incarceration of approximately 2,887 persons under OLS through March 2022.  Of the approximately 2,887 men arrested, over 80% were arrested <u>only</u> for criminal trespass.

### 3. Commonality

72.     The claims of the Class Members in the class raise numerous common issues of fact and/or law, thereby satisfying the requirements of Fed. R. Civ. P. 23(a)(2).  These common legal and factual questions, which may be determined without the necessity of resolving individualized factual disputes concerning any Class Member, include, but are not limited to, the following common contentions:

- Whether the implementation of OLS resulted in constitutional deprivations to detainees under the Fourth Amendment.

- Whether the implementation of OLS resulted in constitutional deprivations to detainees under the Fourteenth Amendment.

### 4. Typicality

73.     The claims of the named Plaintiffs are typical of the unnamed Class Members because they have a common source and rest upon the same legal and remedial theories, thereby satisfying the requirements of Fed. R. Civ. P. 23(a)(3).  For example, the named Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all Class Members were injured or damaged by the same wrongful practices in which Defendants engaged, namely the

unconstitutional arrests/detentions and the failure and refusal to honor the detainees' Fourth Amendment and Fourteenth Amendment rights secured under the U.S. Constitution.

### 5. Adequacy of Representation

74.     The requirements of Fed. R. Civ. P. 23(a)(4) are satisfied in that the named Plaintiffs have a sufficient stake in the litigation to vigorously prosecute their claims on behalf of the Class Members and the named Plaintiffs' interests are aligned with those of the proposed Class. There are no defenses of a unique nature that may be asserted against Plaintiffs individually, as distinguished from the other members of the Class, and the relief sought is common to the Class.  Plaintiffs do not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and have no conflict with any other member of the Class.

75.     Further, Plaintiffs have retained competent counsel experienced in the issues that are the basis of this litigation with respect to: the OLS system, the "alternate" criminal justice system, representation of immigrants in general, and civil rights litigation.  Angelica Cogliano, Addy Miro and E.G. Morris have been representing defendants charged with criminal trespass under OLS since the operation's outset, including many of the plaintiffs named in this suit. They have significant familiarity with the prosecutions occurring in Kinney County, as well as the logistics surrounding the detentions of those incarcerated in the Dolph Briscoe and Segovia Units. They have been personally involved in attempting to get the release of OLS defendants who were being illegally detained under state law, and have litigated many of these Constitutional issues at the state level.

76.     Co-counsel Susan Hutchison and S. Rafe Foreman have been practicing law in the area of civil rights for over thirty-four years each.  They have been involved in representing

individuals harmed by constitutional deprivations through trial and many appeals, addressing constitutional violations, qualified immunity and *Monell* issues, as well as federal statutory civil right issues, including in the following cases: *Morris v. Dallas County, TX,* Case No. 3:11cv00527, Northern District of TX; *Nagel v. Harris County*, Cause No. 2007-08301, Harris County District Court; *Bailey v. Metro One Loss Prevention*, Cause No. DC-20-04393, Dallas County District Court; *Clark v. Champion National Security, Inc*., Case No. 3:17cv01802, Northern District of TX; *Hernandez v. Aaron Kloesel*, Case No. 5:20cv00034; Southern District of TX; *Doe v. William Marsh Rice University*, Case No. 4:19cv00658, Southern District of TX; *Garcia v. City of Lubbock, TX*, Case No. 5:20cv00053, Northern District of TX; *Langiano v. City of Fort Worth, TX*, Case No. 4:21cv00808, Northern District of TX; *Brannan v. City of Mesquite, TX*, Case No. 3:19cv01263, Northern District of TX; *Dyer v. City of Mesquite, TX*, Case No. 3:15cv02638, Northern District of TX; *Arnone v. The County of Dallas County, TX*, Case No. 3:17cv03027, Northern District of TX;  *Ruiz v. City of San Antonio, TX*, Case No. 5:21cv00855, Western District of TX;  *Schrader v. TX Dept of Public Safety*, Case No. 4:20cv00160, Northern District of TX;   *Mott v. Tesmec USA, Inc*., Case No. 017-304893-18, Tarrant County District Court; *Doe v. Huntington ISD*, Case No. 9:19cv00133,  Eastern District of TX; ; *Ream v. City of Heath*, Case No. 3:14cv04338, Northern District of TX; *Lincoln v. City of Colleyville, TX*, Case No. 4:15cv00819, Northern District of TX; *Lopez v. Ameritech Millworks, LP*, Cause No. 096-269739-13, Tarrant County District Court; *Clark v. Charter Communications, LLC*, Case No. 3:17cv01085, Northern District of TX;  *McPartlin v. Rhonda Hunter*, Case No. 3:15cv3042, Northern District of TX; *Mohamed v. Irving ISD*, Case No. 3:16cv2283, Northern District of TX; *Bryant v. Danny Gillem*, Case No. 2:18cv122, Northern District of TX; *Hobart v. City of Stafford*, Case No. 4:09cv03332, Southern District of TX; *Hernandez v. Baylor University*, Case

No. 6:16cv69, Western District of TX; *Eaves v. United Technologies Corp,* Case No. 3:19cv1153, Northern District of TX; *Lyons v. Hillard, Inc. dba AutoNation Ford,* Arbitration; They established and settled a class action lawsuit in *Alaniz v. Sam Kane Beef Processors, Inc.;* Case No. 2:07cv00335, Southern District of TX (this was not a civil rights case).

### 6. Predominance and Superiority

77.     All of the requirements for Fed. R. Civ. P. 23(b)(3) are satisfied because the common factual and legal issues identified above are sufficiently cohesive to warrant adjudication by representation. In particular, the Plaintiffs and the Class Members have suffered a common cause of injury, namely the violation of their Fourth Amendment and Fourteenth Amendment rights caused by the common course of conduct engaged in by Defendants. The Class Members' legal claims arise exclusively under the United States Constitution and, therefore, do not involve the application of other states' laws which may have varying degrees of liability and proof. Class action treatment is also superior to other available methods for the fair and efficient adjudication of this controversy, because individual litigation of the claims of all Class Members is economically unfeasible and procedurally impracticable.  The likelihood of individual Class Members prosecuting separate claims is remote and, even if every Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation in such cases.  Additionally, individual litigation would also present the potential for varying, inconsistent or contradictory judgments while magnifying the delay and expense to all parties and to the court system, thus resulting in multiple trials of the same legal issue and creating the possibility of repetitious litigation.   As a result, the desirability to concentrate litigation in this forum is significantly present. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance of a class

action.  Relief concerning Plaintiffs' rights under the laws herein alleged and with respect to the

Class would be

### E.    INJUNCTIVE/DECLARATORY RELIEF

78.    In seeking an injunction, Plaintiffs can show (1) a substantial likelihood of

success on the merits, (2) a substantial threat that Plaintiffs will suffer irreparable injury if the

injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction

might cause the Defendants, and (4) that the injunction will not disserve the public interest.

*Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005).

Plaintiffs have set forth sufficient facts and argument in their Complaint to demonstrate a

substantial likelihood of success on the merits, both through federal pre-emption and

constitutional violations.

## VI.    ARREST AND INCARCERATION PURSUANT TO OLS

79.    Plaintiffs' class claims for damages in this section encompass the unconstitutional

implementation of OLS as well as claims based upon over-incarceration as part of the OLS

system.

### A.    ADDITIONAL FACTS

80.    Individuals prosecuted under OLS have a right to counsel under both the federal

Constitution[68] and Texas law.[69] The United States Supreme Court has held explicitly that in

Texas, the initial bail-setting hearing is a point at which the Sixth Amendment right to counsel

attaches and that counsel must be appointed within a reasonable time after that hearing.[70]   State

law requires the appointment of counsel within three working days of a request for appointed

---

[68] *See generally Gideon v. Wainwright*, 372 U.S. 335 (1963) (establishing right to appointed counsel in state criminal prosecutions).

[69] Tex. Code Crim. Pro. Ann. art. 1.051(c) (providing right to appointed counsel for all indigent people charged with crimes). 5

[70] *Rothgery v. Gillespie Cty.,* 554 U.S. 191, 213 (2008).

counsel.[71] Despite these legal requirements, there have been widespread, egregious failures to appoint counsel in the OLS trespass arrest program. People arrested pursuant to the OLS trespass program have faced dramatic delays in, and in some cases outright refusal of, appointed counsel.

81.     Hundreds of indigent arrestees have waited more than a month to be appointed counsel after requesting a lawyer at their initial bail-setting appearance.[72] In September, an attorney at Restoring Justice, a public defense organization with many clients in the OLS trespass arrest program, stated that most of their assigned clients had "sat in prison without attorneys for nearly six weeks."[73]   Most of these individuals were unaware of any aspect of the criminal process and their rights, including that they could bond out.[74]

82.     Because people detained receive no notice from the court or detention facility of who their court-appointed lawyer is or whether someone has been appointed at all, they frequently resort to calling non-profit organizations to try to determine whether they have a lawyer and who it might be. The problem is so endemic that LPDO has established a separate toll-free phone number exclusively for OLS detainees to call and inquire whether they have a lawyer yet and who that might be.[75]   Hundreds of people arrested under OLS were detained without counsel and without charging documents for longer than state law allows them to be detained without being formally charged with a crime.[76]

83.     At least one subset of 155 people arrested in Kinney County in August 2021 were forced to submit involuntary waivers of counsel at the magistration (the initial appearance).[77]

---

[71] Tex. Code Crim. P. art. 1.051(i).
[72] Jolie McCullough, Migrants arrested by Texas in border crackdown are being imprisoned for weeks without legal help or formal charges, Tex. Tribune, Sept. 27, 2021,  https://www.texastribune.org/2021/09/27/texas-border-migrants-jail/.
[73] Id.
[74] Id.
[75] Operation Lone Star Indigent Defense, Lubbock Private Defenders Office, https://www.lpdo.org/projects-8.  Appx. 583-585
[76] Compare Findell & Caldwell, Texas Jails Fill With Migrants, supra n. 11 (tallying time in detention under Operation Lone Star) with Tex. Code Crim. P. art. 17.151 (establishing mandatory release timelines).
[77] Jolie McCullough, Thanks to local politics and a railroad, rural Kinney County accounts for most of

The county judge, Tully Shahan, presided over the initial bail-setting hearings for the first several weeks of arrests in Kinney County.[78]  Judge Shahan performed these hearings in groups, under a tree in a parking lot, using a sheriff's deputy to interpret parts of the proceeding.[79]  He required everyone to submit a waiver of appointed counsel in English, a language that most of those detained under the OLS trespass arrest program do not understand with fluency; the waiver had already been filled out by a county employee before the hearing began, and Judge Shahan did not provide the opportunity to change it.[80]  Those who "submitted" a waiver were only able to request counsel weeks later, from the Briscoe prison unit, and then waited several more weeks to actually have an attorney appointed to represent them.[81]

84.    Within this separate, makeshift criminal system, state and local agencies are failing to follow basic rules of criminal procedure and to protect the rights of those charged. Kinney and Val Verde County prosecutors denied due process guarantees by failing even to file charges for a huge number of people who were detained. For hundreds of people, that failure, in combination with severely dilatory appointment of counsel, resulted in weeks of detention past the date at which release was required.[82]  Delays across the criminal process continue. Most recently, on November 30, 2021, the Texas Tribune reported that more than 90 men arrested

---

Texas' migrant arrests, Tex. Tribune, Sept. 2, 2021, https://www.texastribune.org/2021/09/02/texasimmigration-arrests-jail-kinney-county/.

[78] See Tex. Judicial Branch, About Tex. Courts, https://www.txcourts.gov/about-texas-courts/trial-courts/ (explaining, "The Texas Constitution provides for a county court in each of the 254 counties of the state, though all such courts do not exercise judicial functions. In the more populous counties, the county judge may devote his or her full attention to the administration of county government.").  Appx. 645-646

[79] Jolie McCullough, Thanks to local politics and a railroad, rural Kinney County accounts for most of Texas' migrant arrests, Tex.as Tribune, Sept. 2, 2021, https://www.texastribune.org/2021/09/02/texasimmigration-arrests-jail-kinney-county/.

[80] Jolie McCullough, Migrants arrested by Texas in border crackdown are being imprisoned for weeks without legal help or formal charges, Tex. Tribune, Sept. 27, 2021, https://www.texastribune.org/2021/09/27/texas-border-migrants-jail/.

[81] Jolie McCullough, Thanks to local politics and a railroad, rural Kinney County accounts for most of Texas' migrant arrests, Tex. Tribune, Sept. 2, 2021, https://www.texastribune.org/2021/09/02/texasimmigration-arrests-jail-kinney-county/.

[82] Arelis Hernandez et al., Hundreds of migrants held for weeks without charges as Texas's border crackdown overwhelms justice system, Wash. Post, Sept. 30, 2021, https://www.washingtonpost.com/nation/2021/09/30/texas-migrant-arrests-release/.

under the OLS trespass program had their first court date canceled because two Kinney County officials tested positive for COVID-19.[83]   An October press release by Kinney County even referred to "the piles of cases that have stacked up as a result of Operation Lone Star."[84]

85.     With Kinney County prosecutors dilatory in filing charges and Judge Shahan's chosen judges denying applications for relief, migrants have continued to be detained for long periods of time.[85]   The results of prolonged pretrial detention in dire conditions are hardly surprising. In one illustrative instance, around 150 men against whom the Kinney County prosecutor had failed to file charges during the statutorily prescribed period of time filed a joint writ of habeas corpus in district court. When the writ was heard on December 13, 2021, the men had been held for between 76 and 107 days.[86]   At the hearing, the prosecutor's office did not refute that it had failed to file timely charges.[87] The court nonetheless denied the writ. By the time the appellate court issued an emergency decision reversing that denial on January 24, 2022, all but four of the appellants no longer had live claims.[88]   Of the moot cases, 133 had been resolved by pleas of no contest or guilty, according to defense lawyers, to ensure an end to detention.[89]   131 of those who entered pleas had been held for over 100 days.  This in spite of the fact that prosecutors never even purported to have filed charges within the required

---

[83] Jolie McCullough, Coronavirus shuts down legal proceedings in latest misstep for Texas border crackdown, Tex. Tribune, Nov. 30, 2021, https://www.texastribune.org/2021/11/30/texas-migrantsarrests-coronavirus/?mc_cid=be5170f623&mc_eid=612589b377.
[84] Press Release, Kinney County Attorney.
[85] J. David Goodman, *Cases Dismissed, Judges Replaced: Texas Struggles to Prosecute Migrants*, New York Times, Jan. 27, 2022, https://www.nytimes.com/2022/01/27/us/texas-migrants-operation-lone-star.html.  If prosecutors fail to file charges within 15, or, at most, 30 days for misdemeanors of the kind charged in OLS prosecutions, Texas law requires that the defendants be released on personal bond or that their existing bonds be reduced to affordable amounts.
[86] *EX PARTE [NAME REDACTED], et al.*, No. 04-21-00579-CR, 2022 WL 202720 at *1, (Tex. App.Jan. 24, 2022).
[87] *Id*. at 3.
[88] *Id*. at 2.
[89] Advisory for Suggestion of Mootness for 140 Appellants and Response for Remaining Four Appellants, at 1, *EX PARTE SIFUENTES, et al.*, No. 04-21-00579-CR, 2022 WL 202720 (Tex. App. Jan. 24, 2022). https://search.txcourts.gov/SearchMedia.aspx?MediaVersionID=be2db5cb-a9fe-441a-b147-61943ce69f74&coa=coa04&DT=Response&MediaID=f8f5d3dd-926e-46ec-94f0-45470bef60f9.

timeframe of 15 or 30 days. Similar delays continue: one individual in custody as of mid-February had been held more than 164 days.

86.      Texas law requires prosecutors to file charges within a certain timeframe, the number of days varying depending on the classification of the charge, or to allow the person to be released on a personal bond if charges have not been filed within the timeframe.[90] Alternatively, prosecutors can allow the bond to be reduced to an amount affordable for the defendant.[91]  As University of Texas law professor Jennifer Laurin recently put it, the goal of this law is to protect criminal defendants' right to a speedy trial,[92] a fundamental aspect of due process.[93]  While trespassing is typically a Class B misdemeanor, for which state law requires the filing of charges within fifteen days, with enhancement to a Class A misdemeanor–as may occur if the alleged offense allegedly took place in a declared disaster area–prosecutors argue that state law extends the filing deadline to thirty days.[94] Those detained pursuant to OLS must therefore be released either on bond or by a reduced bail amount if the state is not prepared to prosecute within 15 or, at most, 30 days.[95]  Yet, several hundred individuals arrested under the OLS trespass program were detained far past either filing deadline. By September 27, 2021, Brent Smith, the Kinney County misdemeanor prosecutor, had filed charges against, at most, 75 people out of over 700 who had been arrested by Kinney County under the OLS trespass

---

[90] Tex. Code Crim. Proc. art. 17.151; *Ex Parte Gill*, 413 S.W.3d 425 (Tex. Crim. App. 2013) (holding that the judge abused his discretion when he failed to comply with art. 17.151).  Appx. 586-616

[91] See *Id*. Presumably, that would also include a personal bond if a judge has determined the person is indigent as is the case with the majority, if not the entirety, of the people who have been arrested as part of Operation Lone Star.

[92] Jolie McCullough, After Delay, Texas to Begin Releasing Migrants Held in Violation of State Law under Gov. Greg Abbott's Border Crackdown, Tex. Tribune (Oct. 1, 2021), https://www.texastribune.org/2021/10/01/texas-migrants-jail-greg-abbott/.

[93] *Barker v. Wingo*, 407 U.S. 514, 515 (1972) (citing *Kloper v. North Carolina*, 386 U.S. 213 (1967)).

[94] Tex. Penal Code § 30.05 (criminal trespass); Tex. Penal Code § 12.50 (enhancement for committing a crime in a declared disaster area). Governor Abbott declared and continues to renew and expand his declaration stating that all border counties are disaster areas. Proclamation, Governor Abbott Renews Border Security Disaster Declaration in October 2021 (Oct. 28, 2021), https://gov.texas.gov/news/post/governor-abbott-renews-border-security-disaster-declaration-in-october-2021.

[95] Tex. Code of Crim Proc. art. 17.151(2), (3).

program and were still detained.[96]   A generous estimate places Smith's charging rate at that time at slightly above 10 percent, meaning that the County likely violated state statute and the due process guarantees of the federal and state constitutions with respect to nearly 90 percent of the Kinney County OLS trespass arrests during this period.[97]   Smith blamed the failure to file charges by the statutory deadline on missing information in the probable-cause affidavits, or other information necessary to make a charging decision. Neither explanation excuses Kinney County from its statutory obligations, nor acknowledges that the County could have complied with the statute by reducing the bail amount or requesting a personal bond.[98]

87.     The lack of charges in these cases further frustrated detainees' due process rights first because many of them sat waiting for a lawyer beyond the date at which they were entitled to release and then because the attorneys who finally were appointed were stymied from applying for clients' release. Attorneys were told they could not file habeas petitions on behalf of their clients—simply because clerks had no case numbers for the unfiled misdemeanors, even though pretrial writs of habeas corpus are distinct legal matters. Criminal defense attorneys at Texas RioGrande Legal Aid persisted and filed an application for pretrial writs of habeas corpus on behalf of 300 clients they had been appointed to represent, each of whom had been arrested and detained beyond the statutory deadline without charges being filed–and thus for each of whom ongoing detention was illegal.[99]   Though each person had been arrested and magistrated

---

[96] Jolie McCullough, Migrants Arrested by Texas in Border Crackdown are Being Imprisoned for Weeks without Legal Help or Formal Charges, Tex. Tribune (Sept. 27, 2021), https://www.texastribune.org/2021/09/27/texas-border-migrants-jail/.
[97] See Hernandez et al., Hundreds of Migrants Held for Weeks Without Charges as Texas's Border Crackdown Overwhelms Justice System, Wash. Post.
[98] Id.
[99] Verified Application for Pretrial Writs of Habeas Corpus, *Ex Parte Augustin Chavarria-Uribe, et al.,* Cause 5121 (63rd Judicial Dist. Sept. 22, 2021). When release was ordered at the September 28 hearing, petitioners had been detained between 29 and 60 days. Id. At the hearing, petitioners took the stance that they were entitled to release at 15 days and Kinney County argued that the offense had already been enhanced so the petitioners were being held under the Class A misdemeanor criminal offense of trespass. District Judge Andrade agreed with the County and found prosecutors had 30 days to file charges. Jolie

for misdemeanor criminal trespass, not a single one had been formally charged.[100]   After the writs were filed, Val Verde and Kinney County prosecutors agreed to the release of 243 people who had not been charged at either the 15- or 30-day mark.[101]   The district judge granted the petitioners' motion for release on no-cost bond, agreeing that prosecutors were required to file charges within the statutory limit and had not done so in the vast majority of cases. [102]   This hearing, and the eventual releases, provided relief for a portion of those who had experienced weeks and months of denial of due process and loss of liberty in this shadow criminal system. Despite this public loss on a grand scale, prosecutors for Kinney County continue to fail to file charges entirely in some cases.[103]

88.     The irregularities in this system extend even to the judicial assignments process and the identity of the judges themselves. The state courts reassigned judges to process, on dockets separate from ordinary county misdemeanor cases, OLS trespass arrest cases in the two counties in which the arrests occur, Val Verde and Kinney. In Kinney County, in the face of unfiled charges and speedy trial violations, those judges have granted motions for release. Kinney County officials grew dissatisfied, and, as a result, County Judge Shahan, began–outside

---

[100] McCullough, Texas Court Orders Release of More than 200 Migrants Imprisoned in Gov. Greg Abbot's Border Security Clampdown, Tex. Tribune (Sept. 28, 2021), https://www.texastribune.org/2021/09/28/texas-migrants-prison-release/. The distinction was ultimately irrelevant for these petitioners, however, because of the amount of time that had passed between filing and the hearing.

[100] Verified Application for Pretrial Writs of Habeas Corpus at 2, Ex Parte Augustin Chavarria-Uribe, et al., Cause 5121 (63rd Judicial Dist. Sept. 22, 2021).

[101] Jolie McCullough, Texas Court Orders Release of More than 200 Migrants Imprisoned in Gov. Greg Abbot's Border Security Clampdown, Tex. Tribune (Sept. 28, 2021), https://www.texastribune.org/2021/09/28/texas-migrants-prison-release/. Based on the agreements with county prosecutors, people arrested in Val Verde County were to be released after 15 days and people arrested in Kinney County were to be released after 30 days. Jolie McCullough, After Delay, Texas to Begin Releasing Migrants Held in Violation of State Law Under Gov. Greg Abbott's Border Crackdown, Tex. Tribune (Oct. 1, 2021), https://www.texastribune.org/2021/10/01/texas-migrants-jail-greg-abbott/.

[102] See Id.

[103] Jolie McCullough, In Latest Blunder, Charges Dropped Against Migrants Arrested in Texas Governor's Border Crackdown Because of Faulty Paperwork, Tex. Tribune (Nov. 4, 2021), https://www.texastribune.org/2021/11/04/texas-border-migrants-charges-dropped/ (reporting on thirty dismissed cases and an unknown number of releases on November 2 because no charges had been filed within thirty days).

PLAINTIFFS' SECOND AMENDED COMPLAINT                                                    Page 44

of the process provided for by Texas law–to refashion the bench as he saw fit by replacing visiting judges. Judge Shahan's actions in removing duly-appointed visiting judges with whom he disagreed and instead seating his preferred replacements undermines the independence of the judiciary in OLS trespass cases, and other cases. Texas law vests the power to reassign multiple judges to handle cases in counties with a backlog of cases in two people: the Chief Justice of the Supreme Court and the Presiding Judge of the administrative judicial region where the backlogged county is located.[104] A county judge, by contrast, may appoint one visiting judge to handle cases when county dockets are overstretched.[105] If the county judge seeks to appoint a visiting judge to a pending case, they must show good cause.[106] Under these circumstances, the parties are entitled to notice and a hearing.[107] Pursuant to this statutory scheme, in July 2021, the Chief Justice of the Supreme Court of Texas assigned dozens of judges to conduct magistration in border counties.[108] In August and September 2021, the presiding judge of the relevant administrative judicial region–Judge Stephen Ables–assigned three judges to hear misdemeanor cases for one year in Kinney County.[109] Kinney County Judge Shahan did not seek to appoint a judge. Confronted with mass civil rights violations, the three visiting judges appointed by Judge Ables granted release in a number of cases.[110] On December 7, 2021, Kinney County Attorney Brent Smith filed an Application for Writ of Prohibition and Motion for

---

[104] Tex. Gov't Code    74.052, 74.054, 74.056, and 74.057. The duration of the assignment is dictated by the terms of the assignment order. See Mangone v. State, 156 S.W.3d 137, 139–40 (Tex. App.—Fort Worth 2005, pet. ref'd).
[105] Tex. Gov't. Code    26.024(a).
[106] Tex. Gov't Code    26.022(a). *Id.*
[107] Tex. Gov't Code    26.022(b). These rules apply in counties where there are no statutory county courts and all duties of the county court rest with the county judge. Tex. Gov't Code    26.021. *Id.*
[108] Judicial Assignments for Proceedings under Article 15.17, Code of Criminal Procedure, Misc. Docket 21-9080, (Tex.., July 20, 2021), https://www.txcourts.gov/media/1452518/219080.pdf.
[109] Presiding Judge Ables' assignment orders for Schild, Torres, Wright, Appx. 104 and 106
[110] Findell & Caldwell, Texas Jails Fill With Migrants, supra n. 11; Jolie McCullough, Hundreds of migrants accused of trespassing languish in Texas prisons. A county judge's new approach might prolong their detention, Tex. Tribune (Dec. 10, 2021), https://www.texastribune.org/2021/12/10/texas-bordersecurity-migrant-prisons/

Stay of Proceedings Below, referencing the visiting judges' decisions in favor of detained people and seeking to prevent all three from granting any further relief in pending cases.[111]   The same day, before any decision had been issued on the Writ, County Judge Shahan relieved the visiting judges appointed by Judge Ables and canceled the court dates scheduled before them.[112]   Judge Shahan then handpicked five judges to serve in Kinney County.[113]   Judge Shahan's actions subverted the distribution of judicial assignment power under Texas law, threatened to subject detained people to still further delays, and undermined the bench's integrity and appearance of impartiality.

89.    Irregular delays in proceedings persist even after individuals are ordered released. The Kinney County Sheriff's Office and TDCJ have repeatedly failed to timely release OLS arrestees. Time and again, those who have been granted personal bond, paid bail, or had their cases dismissed have remained confined in the absence of any legal authority for their detention and, in at least one instance, in the face of a court order mandating release. In short, in this separate system, unlawful prolonged detention is routine.

90.    To try to effectuate release, defense attorneys who have learned that their clients remain detained have been forced to shuttle for days between the County Sheriff's Office; the

---

[111] Application for Writ of Prohibition and Motion for Stay of Proceedings Below, *In re State ex rel. Brent Smith*, Ct. of Crim. App. Tex., WR-93, 354-01 (Dec. 7, 2021), at 1-2, 5-6, attached as Appx. 107-120. In the Application for a Writ of Prohibition and Motion for Stay of Proceedings Below, Smith fails to supply either an account of occurrences or documents from any individual case to justify the issuance of a writ or imposition of a stay. Devoid of facts, the filing fails to satisfy the threshold requirements for a petition seeking extraordinary relief. See Tex. R. App. P. 52.3(g).

[112] Shahan Order and Letter, attached as Appx. 121. This purported termination clearly conflicted with the one-year duration specified in each of the visiting assignment orders issued by Presiding Judge Ables. Since the period of these three judges' assignment had not elapsed, not even Judge Ables, let alone Judge Shahan, had authority to terminate their authority over their cases. See *Beard v. Beard*, 49 S.W.3d 40, 50 (Tex. App.—Waco 2001, pet. denied) (finding no provision "that authorizes a presiding judge to remove an assigned judge or to terminate his authority, once given," asserting that the assignment order controls as to the parameters of the assignment, and noting that to give the presiding judge authority to replace one assigned judge with another at any time would "undermine the judicial independence of all assigned judges").

[113] Jolie McCullough, Hundreds of Migrants Accused of Trespassing Languish in Texas Prisons. A county judge's new approach might prolong their detention, Tex. Tribune (Dec. 10, 2021).

newly devised Val Verde Processing Center; and the TDCJ facilities, Briscoe and Segovia.[114]  In

many cases, defense attorneys' release advocacy has been stymied not just by OLS' improvised

and convoluted custodial arrangements, but by misinformation from TDCJ as to their clients'

release status. Attorneys who have won personal bonds for their clients report having been told

by TDCJ that their clients had been released from custody only to find, days later, that those

same clients had in fact been transferred to another TDCJ facility, with no plan for their

release.[115]

91.     The following is an excerpt from the Response of Real Parties in Interest

Opposing Relator's Application for a Writ of Prohibition, *In re State ex rel. Brent Smith, Relator,*

*Judge Jan Soifer, Respondent, 438 Habeas Petitioners, Real Parties in Interest,* No. WR-93,354-

02, filed March 10, 2022.   Of the 3,245 persons who had been booked through the OLS

processing centers in Del Rio and Hebbronville at the time of the filing of the Response, 2,722

(84%) were charged in Kinney County. As of the Response filing date, there had not been a

single trial of an OLS trespass case. Instead, an ad hoc system emerged to dispense justice. It

operates as follows:  (1) arresting officers take OLS detainees to a tent in Val Verde County

where they appear before a specially designated OLS magistrate via video link for proceedings

pursuant to Tex. Code Crim P. Art. 15.17;  (2) the magistrates set bond for persons charged with

misdemeanor trespass and no criminal history at generally between $1,000 and $10,000; (3) the

pretrial detainees, who are almost always indigent, have no means of posting bond, and are

transferred more than 100 miles away from the county of arrest to await trial in state prison

---

[114] Respondents' Response in Opposition to Relator's Emergency Petition for Writ of Mandamus, at 3–4,
In re [REDACTED], Relators, No. 21-0918, 2021 WL 5177611 (Tex. Oct. 25, 2021) (No. 21-0918)
(defense counsel submitted an affidavit attesting that she spent eight days communicating with the
Sheriff's Office, Processing Center, and TDCJ Facility, trying in vain to secure clients' release after
issuance of personal bonds).
[115] Affidavit of Neha Dubey,

facilities, the first time this has been done in Texas history; (4) the Texas Supreme Court issued an order under which counsel are appointed to represent OLS detainees, yet significant delays in appointment of counsel routinely occur, and appointment after arrest ranges between 2 and 139 days; (5) usually between 30 and 90 days after arrest, the Kinney County Attorney files an information alleging Class B misdemeanor trespass with an enhancement if convicted to Class A penalty due to the disaster Proclamation, providing a maximum possible sentence of one year in jail; (6) generally between 90 and 120 days after arrest, judges set the cases for arraignment, where each OLS detainee is offered a sentence of "time served" in exchange for a guilty plea; and (7) counsel for detainees must advise their clients that the only way to contest the trespass charge is to remain in jail.  73 of the 438 Habeas Petitioners still had no charging instrument filed against them as of the date of the filing of the Response. Complaints alone had been pending in those 73 cases for between 153 and 208 days, with no information filed.

92.     "Article 17.151 is mandatory; if the State is not ready for trial within [15] days of the beginning of the defendant's detention, the defendant accused of a [class B misdemeanor] must be released on personal bond or by reducing the required bail amount." *Ex parte Lanclos*, 624 S.W.3d 923, 927 (Tex. Crim. App. 2021).  In *Ex. Parte Eric Uriel Sifuentes*, *et al.*, No. 04-21-00579-CR, 2022 WL 202720 at *1, (Tex. App.—San Antonio Jan. 24, 2022),  even though 153 OLS detainees in that case were jailed between 114 and 153 days in violation of Article 17.151, all but four had pleaded no contest to leave jail prior to issuance of the appellate mandate directing their immediate release. The 153 *Sifuentes* petitioners applied for habeas relief due to violation of Article 17.151 on November 5, 2021, but the clerk did not accept the filing until December 5, 2021, a hearing was not granted until December 13, 2021, and the appealable order

denying habeas relief was not made of record on the court's docket until after December 22, 2021.

93.     On February 28 and March 1, 2022, defense counsel in *438 Habeas Petitioners* filed Article 17.151 applications in the 63rd District Court of Kinney County. As of the date of the filing of the Response on March 10, 2022, those filings had not yet even been accepted by the Kinney County District Clerk, and counsel were notified that the writs would not be heard at least until April 22, 2022, or 53 days after filing, when Article 17.151 requires release after as little as 15 days' detention.

94.     In partial summary, those arrested are being held in custody in some cases for months without counsel and without a proper charging instrument having been filed. Appointment of counsel after arrest is routinely delayed and ranges between 2 and 139 days. Charging instruments are filed usually between 30 and 90 days on Class A misdemeanor offenses. In 73 cases complaints alone have been pending between 153 and 208 days. Generally, cases are set for arraignment between 90 and 120 days after arrest. At arraignment, defendants are offered the opportunity to plead guilty for "time served" to be released for jail regardless of whether the cases have merit. If they refuse to give up their rights associated with trial, they remain in jail indefinitely.  To date, few if any trials have been scheduled in Kinney County and none have taken place.  Hearings on writs of habeas corpus to enforce the clear dictates of Article 17.151 C.C.P. which commands the release on personal bond or a reduced bond where no charging instrument has been filed, with the writs returnable to Kinney County have not proven to be an adequate remedy.  Months long delays have occurred from the filing of the writs to a hearing date, defeating the purpose of the remedy.  Judges appointed to handle the cases who've expressed a willingness

to grant relief have been removed through efforts of Kinney County officials. Judges in Kinney County now simply refuse to set habeas petitions for hearing or do so after lengthy delay.

## B. CLASS REPRESENTATIVES

### 1. <u>Standing</u>

95.     Plaintiffs as a class are continuously injured by being a) arrested and incarcerated based upon race, immigration status and/or national origin; and b) incarcerated past their release dates, past the dates that bond is posted, past the dates of pleas, past the dates that charges have been dismissed and by being denied the right to counsel and other constitutional deprivations. As described in great detail in this Complaint, the constitutional deprivations are traceable to the Defendants' challenged behavior and likely to be redressed by a favorable ruling. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2556, 204 L. Ed. 2d 978 (2019). A favorable ruling would require the release of those currently incarcerated past release dates as well as releasing those arrested and incarcerated as a result of their race, immigration status and/or national origin.

### 2. <u>Violations of Named Plaintiffs' Rights, Subclasses</u>

96.     The Class Members relating to over-incarceration can be divided into five specific subclasses:  over-detention after a cash bond is posted; over-detention after a plea has been entered; over-detention after the charges have been dismissed; over-detention after a personal bond and over-detention as a result of denial of/withholding information on right to counsel.

#### a)  Over-incarceration after a cash bond is posted

##### i.  Jesus Curipoma

97.     Mr. Guzman-Curipoma was arrested without a warrant for criminal trespass in Kinney County, Texas on September 9, 2021. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons

under "Operation Lone Star," as described previously in this Complaint.  Mr. Guzman-Curipoma paid the full amount of cash bail - $2,000.000 – to the Kinney County Sherriff's Office on the same day that he was arrested – September 9, 2021. No ICE detainer had been issued, so Mr. Guzman-Curipoma was entitled to release immediately.  However, the Sherriff of Kinney County and the Warden of the Dolph Briscoe Unit refused and/or delayed his release. On September 23, 2021, an ICE detainer was suddenly issued for Mr. Guzman-Curipoma, which expired after 48 hours.  Mr. Guzman-Curipoma illegally remained in custody, all the way through October 9, 2021, only being released after exhaustive efforts by defense counsel.  Mr. Guzman-Curipoma is a class representative for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally over-incarcerated.

### b)  Over-incarceration after a personal bond is posted

#### i.  Erasto Arroyo Barcenas

98.    Mr. Barcenas was arrested without a warrant for criminal trespass in Kinney County, Texas on September 9, 2021. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint.  A Kinney County Judge ordered Mr. Barcena's release from state custody on October 12, 2021.  However, the Warden of the Dolph Briscoe Unit refused and/or delayed his release.  Mr. Barcenas' attorneys were forced to file a Petition for Writ of Mandamus compelling Bryan Collier, Executive Director of TDCJ, to direct the release of Mr. Barcena.[116]  The Petition was filed on October 21, 2021 detailing the efforts of Mr. Barcena's attorneys to obtain his release.  Mr. Barcenas is a class representative

---

[116] See Appx. 122-144, Petition for Writs of Mandamus for Barcenas, Bercerra and Rodas.

for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally over-incarcerated.

### ii.  Melvin Amador Rodas

99.     Mr. Rodas was arrested without a warrant for criminal trespass in Kinney County, Texas on September 9, 2021. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint.  A Kinney County Judge ordered Mr. Rodas' release from state custody on October 12, 2021.  However, the Warden of the Dolph Briscoe Unit refused and/or delayed his release.  Mr. Rodas' attorneys were forced to file a Petition for Writ of Mandamus compelling Bryan Collier, Executive Director of TDCJ, to direct the release of Mr. Rodas.  The Petition was filed on October 21, 2021 detailing the efforts of Mr. Rodas' attorneys to obtain his release.   Mr. Rodas is a class representative for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally over-incarcerated.

### iii.  Jose Luis Dominguez-Rojas

100.    Mr. Dominguez-Rojas was arrested without a warrant for criminal trespass in Kinney County, Texas on December 24, 2021. After he was arrested, he was taken to the Segovia Unit in Hidalgo County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint. Mr. Dominguez-Rojas is still being held on that criminal trespass arrest despite the case not being timely filed against him. He was not appointed counsel until March 4, 2020, despite requesting representation at magistration, and sat in custody for four months before getting his first court date. Mr. Dominguez-Rojas is a

class representative for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally over-incarcerated.

### c)  Over-incarceration after a plea has been entered

#### i. Christian Ruiz-Rodriguez

101.    Mr. Rodriguez-Ruiz was arrested without a warrant for criminal trespass in Kinney County, Texas on September 24, 2021. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint.  A Kinney County Judge ordered Mr. Rodriguez-Ruiz' release from state custody on December 3, 2021. Despite having requested an attorney be appointed the day of his arrest, Mr. Rodriguez-Ruiz did not get an attorney assigned until October 8, 2021. Mr. Rodriguez-Ruiz entered a plea of nolo contendere on January 12, 2022 and received a punishment of 80 days in custody with credit for time served. As he had been in custody for 111 days at that time, and there was no detainer from Immigration and Customs Enforcement (ICE), Mr. Rodriguez-Ruiz was entitled to release on that day. Sometime between January 14 and January 21, an ICE detainer was issued. Mr. Rodriguez-Ruiz was still not released even after the expiration of the untimely-issued detainer, despite exhaustive efforts by his appointed counsel. Mr. Rodriguez-Ruiz was not released until January 25, 2022 – over two weeks after he was entitled to release under State law.  Mr. Rodriguez-Ruiz is a class representative for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally over-incarcerated.

### d) Over-incarceration after the charges have been dismissed

#### i. Ivan Ruano Nava

102.     Mr. Ruano Nava was arrested for criminal trespass in Kinney County, Texas on July 25, 2021. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint. Mr. Ruano Nava was not provided a court appointed attorney until several months later, on September 20, 2021, and remained in custody without a court date or case filed against him for during that time. Mr. Ruano Nava's charges were dismissed on September 28, 2021, after the prosecution failed to prove that he was arrested pursuant to probable cause at a habeas corpus hearing. On September 30, 2021, Mr. Ruano Nava's defense counsel sent a demand letter to the Warden Ramirez of the TDCJ Dolph Briscoe Unit, as well as Kinney County Sheriff Coe, explaining that the ICE detainer expire after 48 hours from the time the defendant is eligible for release. The following day, after Mr. Ruano Nava had still not been released, Judge Shahan of the 63rd District Court ordered Mr. Ruano Nava released immediately into the custody of one of his attorneys who was waiting outside of the pretrial prison unit. Jail personnel ignored the order, and instead transported him themselves directly to Customs and Border Patrol in violation of state law. A contempt proceeding is currently pending in the 63rd District Court against Sheriff Coe and the Warden Ramirez stemming from their actions. Mr. Ruano Nava is a class representative for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally over-incarcerated.

### e)     Over-incarceration as a result of denial of/withholding information on right to counsel

### i.  Melvin Joel Amaya Zelaya

103.    Mr. Amaya Zelaya was arrested without a warrant for criminal trespass in Kinney County, Texas on December 25, 2021. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint.  Mr. Amaya Zelaya then remained then remained in custody without an appointed attorney, discovery, or a court date for months until he was finally assigned counsel on March 4, 2020. Texas. Mr. Amaya Zelaya is a class representative for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally over-incarcerated.

### ii.  Oscar Serrano Martinez

104.    Mr. Martinez was arrested without a warrant for criminal trespass in Kinney County, Texas on October 28, 2021. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint. Mr. Martinez-Sandoval is a class representative for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally over-incarcerated.

### iii.  Noliz Leyva-Gonzalez

105.    Mr. Leyva-Gonzalez was arrested without a warrant for criminal trespass in Kinney County, Texas on October 14, 2021 at the "Smith Ranch." The "Smith Ranch" belongs to Kinney County Attorney Brent Smith's brother, who was holding Mr. Leyva-Gonzales at gunpoint, in an effort to arrest Mr. Leyva-Gonzalez himself. Mr. Leyva-Gonzalez requested

appointed counsel at magistration, but no attorney was appointed to until March of 2022. Similarly, Mr. Leyva Gonzalez was not afforded a court date, discovery, or *Brady* information during those six months. Mr. Leyva-Gonzalez is a class representative for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally over-incarcerated.

### iv. Jose Carlos Gomez-Colorado

106.    Mr. Gomez-Colorado was arrested without a warrant for criminal trespass in Kinney County, Texas on October 14, 2021 at the "Smith Ranch." The "Smith Ranch" belongs to Kinney County Attorney Brent Smith's brother, who was holding Mr. Gomez-Colorado at gunpoint, in an effort to arrest Mr. Gomez-Colorado himself. Mr. Gomez-Colorado requested appointed counsel at magistration, but no attorney was appointed to until March of 2022. Similarly, Mr. Gomez-Colorado was not afforded a court date, discovery, or *Brady* information during those six months. Mr. Gomez-Colorado is a class representative for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally over-incarcerated.

### f)    Unconstitutional incarceration under the equal protection, due process, and supremacy clauses.

### i. Israel Baylon Arellano

107.    Mr. Arellano was arrested without a warrant for criminal trespass in Kinney County, Texas on February 24th, 2022. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint.  Mr. Arellano is still awaiting trial in custody.  Mr. Arellano is a class representative for both the class of persons

unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally incarcerated under the Supremacy Clause.

### ii.  Jose Marcos Lopez Lozano

108.    Mr. Marcos Lopez Lozano was arrested without a warrant for criminal trespass in Kinney County, Texas on February 24th, 2022. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint.  Mr. Marcos Lopez Lozano is still awaiting trial in custody. Mr. Marcos Lopez Lozano is a class representative for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally incarcerated under the Supremacy Clause.

### iii.  Miguel Angel Lopez Lozano

109.    Mr. Angel Lopez Lozano was arrested without a warrant for criminal trespass in Kinney County, Texas on February 24th, 2022. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint.  Mr. Angel Lopez Lozano is still awaiting trial in custody. Mr. Angel Lopez Lozano is a class representative for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally incarcerated under the Supremacy Clause.

### iv. Francisco Villalpando Ramos

110.    Mr. Villalpando Ramos was arrested without a warrant for criminal trespass in Kinney County, Texas on February 24th, 2022. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint.  Mr. Villalpando Ramos is still awaiting trial in custody. Mr. Villalpando Ramos is a class representative for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally incarcerated under the Supremacy Clause.

### v. Cesar Augusto Galindo Escoto

111.    Mr. Galindo Escoto was arrested without a warrant for criminal trespass in Kinney County, Texas on February 24th, 2022. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint.  Mr. Galindo Escoto is still awaiting trial in custody. Mr. Galindo Escoto is a class representative for both the class of persons unconstitutionally arrested and incarcerated under OLS based upon race, immigration status and/or national origin as well as the class of persons unconstitutionally incarcerated under the Supremacy Clause.

### 3. Class Factors

#### a) Numerosity

112.    The requirements of Fed. R. Civ. P. 23(a)(1) are satisfied for these classes in that there are too many Class Members for joinder of all of them to be practicable.  These Class Members exceed over 2,000 in number.

113.    On December 9, 2021, Texas RioGrande Legal Aid sent a letter to Presiding Judge Stephen Ables reflecting that through November 30, 2021, Kinney County had made 1658 arrests, of whom only 125 had been arraigned, leaving 1533 remaining to be arraigned.  TRLA represented 153 detainees at the time, most of whom were arrested pursuant to the OLS "criminal trespass" system more than 100 days prior and remained in prison.

114.    Of the 3,245 persons who had been booked through the OLS processing centers in Del Rio and Hebbronville as of March 10, 2022, 2,722 (84%) were charged in Kinney County. As of March 10, 2022, there had not been a single trial of an OLS trespass case.  The significant delays in appointment of counsel range between 2 and 139 days.  Usually between 30 and 90 days after arrest, the Kinney County Attorney files an information alleging Class B misdemeanor trespass with an enhancement if convicted to Class A penalty due to the disaster Proclamation, providing a maximum possible sentence of one year in jail.  Generally, it is taking between 90 and 120 days after arrest before the cases are set for arraignment.  73 of the 438 Habeas Petitioners in *In re State ex rel. Brent Smith, Relator, Judge Jan Soifer, Respondent, 438 Habeas Petitioners, Real Parties in Interest,* No. WR-93,354-02 still had no charging instrument filed against them as of March 10, 2022. Complaints alone had been pending in those 73 cases for between 153 and 208 days, with no information filed. On February 28 and March 1, 2022, defense counsel in *438 Habeas Petitioners* filed Article 17.151 applications in the 63rd District Court of Kinney County. As of the date of the filing of the Response on March 10, 2022, those filings had not yet even been accepted by the Kinney County District Clerk, and counsel were notified that the writs would not be heard at least until April 22, 2022, or 53 days after filing, when Article 17.151 requires release after as little as 15 days' detention.

1115.   In *Ex. Parte Eric Uriel Sifuentes*, *et al*., No. 04-21-00579-CR, 2022 WL 202720 at *1, (Tex. App.—San Antonio Jan. 24, 2022), even though 153 OLS detainees in that case were jailed between 114 and 153 days in violation of Article 17.151, all but four had pleaded no contest to leave jail prior to issuance of the appellate mandate directing their immediate release. The 153 *Sifuentes* petitioners applied for habeas relief due to violation of Article 17.151 on November 5, 2021, but the clerk did not accept the filing until December 5, 2021, a hearing was not granted until December 13, 2021, and the appealable order denying habeas relief was not made of record on the court's docket until after December 22, 2021.

116.   In addition to the delays in appointment of counsel for the Class Members processed through the OLS processing centers, there are at least 155 persons that were forced to waive their right to counsel and sign documents reflecting such waiver in a language they did not understand.

117.   Records from the Briscoe and Segovia units reflect incarceration of approximately 2,887 persons under OLS through March 2022.  Most were Hispanic/Latino males.  Over 80% were arrested only for criminal trespass, with no other associated or alleged crimes.

### b)  Commonality

118.   The claims of the Class Members in both classes raise numerous common issues of fact and/or law, thereby satisfying the requirements of Fed. R. Civ. P. 23(a)(2).  These common legal and factual questions, which may be determined without the necessity of resolving individualized factual disputes concerning any Class Member, include, but are not limited to, the following common contentions:

- The right to be free from illegal detention/arrest under the 4th Amendment;

- The right to have timely and effective legal counsel under the 6th Amendment;

- The right to equal protection under the 14th Amendment;

- Whether the U.S. Constitution protects a detainee's right to comply with a preset bond and, thus, be released from incarceration;

- Whether the U.S. Constitution protects a detainee's right to a timely arraignment so that he or she may have the required bond set and posted for release;

- Whether the U.S. Constitution protects a detainee's right to be released from incarceration upon a court's dismissal of charges;

- Whether the U.S. Constitution protects a detainee's right to be released upon the posting of the required bond;

- Whether the rights set forth above were clearly established;

- Whether the acts or omissions of the Defendants were the proximate cause of the constitutional deprivations of Plaintiffs and the proposed Class Members;

- Whether the Kinney County policymaker was a perpetrator of such constitutional deprivations;

- Whether Kinney County engaged in a pattern or practice of such constitutional deprivations.

### c) Typicality

119.    The claims of the named Plaintiffs are typical of the unnamed Class Members in both classes because they have a common source and rest upon the same legal and remedial theories, thereby satisfying the requirements of Fed. R. Civ. P. 23(a)(3).  For example, the named Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all Class Members were injured or damaged by the same wrongful practices in which Defendants engaged, namely the unconstitutional arrests/detentions, over-incarceration and the failure and refusal to honor the

detainees' Fourth Amendment, due process and equal protection right secured under the U.S. Constitution.

### d)  Adequacy of Representation

120.    The requirements of Fed. R. Civ. P. 23(a)(4) are satisfied in that the named Plaintiffs have a sufficient stake in the litigation to vigorously prosecute their claims on behalf of the Class Members and the named Plaintiffs' interests are aligned with those of the proposed Class. There are no defenses of a unique nature that may be asserted against Plaintiffs individually, as distinguished from the other members of the Class, and the relief sought is common to the Class.  Plaintiffs do not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and have no conflict with any other member of the Class.

121.    Plaintiffs have retained competent counsel experienced in the issues that are the basis of this litigation with respect to: the OLS system, the "alternate" criminal justice system, representation of immigrants in general, and civil rights litigation.  Angelica Cogliano, Addy Miro and E.G. Morris have been representing defendants charged with criminal trespass under OLS since the operation's outset, including many of the plaintiffs named in this suit. They have significant familiarity with the prosecutions occurring in Kinney County, as well as the logistics surrounding the detentions of those incarcerated in the Briscoe and Segovia Units. They have been personally involved in attempting to get the release of OLS defendants who were being illegally detained under state law, and have litigated many of these Constitutional issues at the state level.

122.    Co-counsel Susan Hutchison and Rafe Foreman have been practicing law in the area of civil rights for over thirty-four years each.  They have been involved in representing

individuals harmed by constitutional deprivations through trial and many appeals, addressing constitutional violations, qualified immunity and *Monell* issues, as well as federal statutory civil right issues, including in the following cases:   *Morris v. Dallas County, TX,* Case No. 3:11cv00527, Northern District of TX; *Nagel v. Harris County*, Cause No. 2007-08301, Harris County District Court;   *Bailey v. Metro One Loss Prevention,* Cause No. DC-20-04393, Dallas County District Court; *Clark v. Champion National Security, Inc*., Case No. 3:17cv01802, Northern District of TX; *Hernandez v. Aaron Kloesel,* Case No. 5:20cv00034; Southern District of TX; *Doe v. William Marsh Rice University,* Case No. 4:19cv00658, Southern District of TX; *Garcia v. City of Lubbock, TX,* Case No. 5:20cv00053, Northern District of TX; *Langiano v. City of Fort Worth, TX,* Case No. 4:21cv00808, Northern District of TX; *Brannan v. City of Mesquite, TX,* Case No. 3:19cv01263, Northern District of TX; *Dyer v. City of Mesquite, TX,* Case No. 3:15cv02638, Northern District of TX; *Arnone v. The County of Dallas County, TX,* Case No. 3:17cv03027, Northern District of TX;   *Ruiz v. City of San Antonio, TX,* Case No. 5:21cv00855, Western District of TX;   *Schrader v. TX Dept of Public Safety,* Case No. 4:20cv00160, Northern District of TX;   *Mott v. Tesmec USA, Inc*., Case No. 017-304893-18, Tarrant County District Court; *Doe v. Huntington ISD,* Case No. 9:19cv00133,  Eastern District of TX; ; *Ream v. City of Heath,* Case No. 3:14cv04338, Northern District of TX; *Lincoln v. City of Colleyville, TX,* Case No. 4:15cv00819, Northern District of TX; *Lopez v. Ameritech Millworks, LP,* Cause No. 096-269739-13, Tarrant County District Court; *Clark v. Charter Communications, LLC,* Case No. 3:17cv01085, Northern District of TX;   *McPartlin v. Rhonda Hunter,* Case No. 3:15cv3042, Northern District of TX; *Mohamed v. Irving ISD,* Case No. 3:16cv2283, Northern District of TX; *Bryant v. Danny Gillem,* Case No. 2:18cv122, Northern District of TX; *Hobart v. City of Stafford,* Case No. 4:09cv03332, Southern District of TX; *Hernandez v. Baylor University,* Case

No. 6:16cv69, Western District of TX; *Eaves v. United Technologies Corp,* Case No. 3:19cv1153, Northern District of TX; *Lyons v. Hillard, Inc. dba AutoNation Ford,* Arbitration; They established and settled a class action lawsuit in *Alaniz v. Sam Kane Beef Processors, Inc.;* Case No. 2:07cv00335, Southern District of TX (this was not a civil rights case).

### e) Predominance and Superiority

123.    All of the requirements for Fed. R. Civ. P. 23(b)(3) are satisfied because the common factual and legal issues identified above are sufficiently cohesive to warrant adjudication by representation. In particular, the Plaintiffs and the Class Members have suffered a common cause of injury, namely the violation of their Fourth and Fourteenth Amendment rights caused by the common course of conduct engaged in by Defendants. The Class Members' legal claims arise under the United States Constitution, asserted pursuant to 42 U.S.C. § 1983 and § 1985, therefore, do not involve the application of other states' laws which may have varying degrees of liability and proof. Class action treatment is also superior to other available methods for the fair and efficient adjudication of this controversy, because individual litigation of the claims of all Class Members is economically unfeasible and procedurally impracticable. The likelihood of individual Class Members prosecuting separate claims is remote and, even if every Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation in such cases.  Additionally, individual litigation would also present the potential for varying, inconsistent or contradictory judgments while magnifying the delay and expense to all parties and to the court system, thus resulting in multiple trials of the same legal issue and creating the possibility of repetitious litigation.  As a result, the desirability to concentrate litigation in this forum is significantly present. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance of a class

action.  Relief concerning Plaintiffs' rights under the laws herein alleged and with respect to the Class would be proper.

### f)  Uniform Damages

#### i.  Monetary Damages

124.    Plaintiffs and the Class Members have sustained damages as the result of the unlawful dentition proximately caused by Defendants' acts and omission.  Plaintiffs assert that each Class Member is entitled to $18,000 per day that they were unlawfully incarcerated or unlawfully re-incarcerated (approximately $750 per hour).  Plaintiffs anticipate that at least 100 Class Members were unlawfully detained an average of three (3) days. As such, Plaintiffs allege that the damages to themselves and the Class defined below is $5,400,000.00.  Plaintiffs reserve the right to amend this allegation based upon the discovery that will be conducted in this action.

125.    There are records showing the date of arrest, whether bail was set, the date the person was entitled to be released and the date of release is obtainable from jail records.  Thus, the proposed classes are manageable and, without class treatment, the overwhelming majority of Class Members would not have a viable individual claim.

#### ii.  Declaratory/Injunctive Relief

126.    In seeking an injunction, Plaintiffs can show (1) a substantial likelihood of success on the merits, (2) a substantial threat that Plaintiffs will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the Defendants, and (4) that the injunction will not disserve the public interest. *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005). Plaintiffs have set forth sufficient facts and argument in their Complaint to demonstrate a

substantial likelihood of success on the merits, both with respect to constitutional violations resulting from the implementation of OLS as well as the blatant and ongoing over-incarceration.

### C.   42 U.S.C. 1983 CLAIMS AGAINST INDIVIDUALS IN INDIVIDUAL CAPACITY

#### 1.   <u>Unconstitutional Detentions/Arrests</u>

##### a)  **Detentions/Arrests Violate Fourth Amendment**

##### i.  **No Probable Cause**

127.    "If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Arizona v. United States*, 567 U.S. 387, 407, 132 S. Ct. 2492, 2505, 183 L. Ed. 2d 351 (2012).  The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process. For example, the Attorney General can exercise discretion to issue a warrant for an alien's arrest and detention "pending a decision on whether the alien is to be removed from the United States." *Arizona v. United States*, 567 U.S. 387, 407, 132 S. Ct. 2492, 2505, 183 L. Ed. 2d 351 (2012).  And if an alien is ordered removed after a hearing, the Attorney General will issue a warrant. See 8 CFR § 241.2(a)(1). In both instances, the warrants are executed by federal officers who have received training in the enforcement of immigration law. See §§ 241.2(b), 287.5(e)(3).

128.    In the *Arizona* opinion, the Court examined a section of an Arizona law (Section 6) which attempted to provide state officers even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers. Under state law, officers who believe an alien is removable by reason of some "public offense" would have the power to conduct an arrest on that basis regardless of whether a federal warrant has issued or the alien is likely to escape. This state authority could be exercised without any input

from the Federal Government about whether an arrest is warranted in a particular case. This would allow the State to achieve its own immigration policy. The result could be unnecessary harassment of some aliens (for instance, a veteran, college student, or someone assisting with a criminal investigation) who federal officials determine should not be removed. *Arizona*, 567 U.S. at 408. "This is not the system Congress created." *Id*.

129.    Congress has put in place a system in which state officers may not make warrantless arrests of aliens based on possible removability except in specific, limited circumstances. *Id*. at 410, citing *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941). In *Hines*, the Court noted that an important consideration in assessing the unconstitutionality of the state's exercise of authority in that case was that the "legislation deals with the rights, liberties, and personal freedoms of human beings, and is in an entirely different category from state tax statutes or state pure food laws regulating the labels on cans." *Id*. at 68. Clearly, the instant case deals with the rights, liberties and personal freedoms of human beings, putting it into a category of higher scrutiny.

130.    The Fifth Circuit acknowledges that "absent express direction or authorization by federal statute or federal officials, state and local law enforcement officers may not detain or arrest an individual solely based on known or suspected civil violations of federal immigration law," *City of El Cenizo,* 890 F.3d at 189. (citing *Santos v. Frederick County Board of Commissioners*, 725 F.3d 451, 465 (4th Cir. 2013). "Thus, the seizure in *Santos* violated the Fourth Amendment because the officers detained Santos "before dispatch confirmed with ICE that the warrant was active." *City of El Cenizo,* 890 F.3d at 189. The Fifth Circuit cited with approval *Meledres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012) for the proposition that unilateral detention "based solely on reasonable suspicion or knowledge that a person was

unlawfully present in the United States" was a constitutional violation and noted that in *Meledres*, "as in *Santos*, there was no federal request for assistance before the seizure."  890 F.3d at 189.

131.    It is clear that the OLS process of unilateral detention "based solely on reasonable suspicion or knowledge that a person was unlawfully present in the United States" is a violation of the Fourth Amendment.  In the case *sub judice*, it is clear that the OLS process of unilateral detention "based solely on reasonable suspicion or knowledge that a person was unlawfully present in the United States" is a violation of the Fourth Amendment.  In the case *sub judice*, Plaintiff Martinez was "located and detained" as a "<u>migrant</u>." (emphasis added). He was arrested, along with five others, on the Union Pacific Railway.  There were three males and three females. The three female "trespassers" were transported to the Border Patrol Station in Brackettville. The three males were all arrested and sent to the Val Verde Processing Center. *Id*.  The probable cause affidavit for Plaintiff Barcenas states that a state trooper was "notified by DPS SOG of nine <u>migrants</u> trespassing on the Dos Angeles Ranch." *Id*.  (emphasis added).  The probable cause affidavit charging Plaintiff Becerra reflects that that he was also one of the "nine <u>migrants</u>" on the Dos Angeles Ranch. *Id*., (emphasis added). Plaintiff Santana was also identified as one of the "nine <u>migrants</u>."  The probable cause affidavit charging Plaintiff Rodas with trespass reflects that troopers "had apprehended a group of <u>Undocumented Persons</u> (UDPs)" on a ranch...The defendant was one of the UDP's in the group." *Id*. (emphasis added).  Plaintiff Pineda was also identified as one of the <u>Undocumented Persons</u> in the group. *Id*.  The probable cause affidavit charging Plaintiff Colorado with trespassing identifies him as one of two "<u>Illegal Aliens</u>," stating that the "landowners wished to pursue trespassing charges on the <u>Aliens</u>." *Id*. (emphasis added). "There were two civilians armed with long rifles and two <u>illegal aliens</u> lying prone with their

hands on their heads." *Id*. (emphasis added).  The probable cause affidavits for these Plaintiffs reflect detention and arrest based upon immigration status.

### ii. False Probable Cause Affidavits

132.    Under the Fourth Amendment, "a fair and reliable determination of probable cause" must be provided "as a condition for any significant pretrial restraint of liberty." *Baker v. McCollan*, 443 U.S. 137, 142 (1979).  "The Fourth Amendment is the appropriate constitutional basis for [a person's] claim that he was wrongfully arrested due to the knowing or reckless misstatements and omissions in [probable cause] affidavits." *Winfrey v. Rogers*, 901 F.3d 483, 492 (5th Cir. 2018).  Fourth amendment rights are violated if (1) the affiant, in support of the warrant, includes a false statement knowingly and intentionally, or with reckless disregard for the truth and (2) the allegedly false statement is necessary to the finding of probable cause.  *Id*. at 494.

### a) Detentions/Arrests Violate Equal Protection

133.    In *Arizona*, the Supreme Court noted the "constitutional safeguards" that applied to immigration enforcement, including that officers "may not consider race, color or national origin" in implementing its laws.  567 U.S. at 411.  The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises. "Thus we have treated as presumptively invidious those classifications that disadvantage a 'suspect class.'"  *Plyler v. Doe*, 457 U.S. 202, 216–17, 102 S. Ct. 2382, 2394–95, 72 L. Ed. 2d 786 (1982).  "Everyone accepts that a detention based on race, *even one otherwise authorized by law*, violates the Fourteenth Amendment's Equal Protection Clause."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1731, 204 L. Ed. 2d 1 (2019) (emphasis in original).  The Constitution "prohibits selective

enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996).

134.    The implementation of the OLS system has resulted in systemic discrimination on the basis of color, race and/or national origin.   Arrests under OLS are severely racially disparate: the overwhelming majority (if not all) arrests are of Black and Brown men. Trespass arrest affidavits authored by DPS troopers reveal these racial disparities and also show clear indications of profiling based on race and national origin. The ACLU completed an initial analysis in approximately December 2021 of DPS trooper affidavits providing arresting officers' accounts of 168 arrests—72 in Val Verde County and 96 in Kinney County.   The affidavits demonstrated stark racial disparities in arrests: all arrests were of people of color, and almost all were of Latino men. 98% were recorded as "H/M" (Hispanic male) and 2% as "B/M" (Black male). In 57% of cases in Val Verde County, the arrest narrative described the individual's perceived ethnicity, country of origin, and/or perceived immigration status: 17% included perceived ethnicity, 37.5% included country of origin, and 39% included perceived immigration status. For Kinney County, of the 96 arrest affidavits analyzed, 33% described country of origin and/or perceived immigration status: 29% included perceived immigration status, and 8% included country of origin. (These totals for each category equaled more than 100% because some narratives included for example, both perceived race and perceived immigration status.). Beyond these bare statistics, the descriptions in the affidavits' arrest narratives strongly indicated racial profiling. For example, the affidavits for five individuals stated, "Trooper Austin Melvin responded . . . in reference to multiple people seen trespassing by National Guardsmen posted on the property. Upon arriving, I observed multiple Spanish107 males sitting near the following latitude/longitude." Affidavits for several men stated, "Trooper Jimenez saw 6 Hispanic males

trespassing on the Bordelon Crossing property. . . . I saw a Hispanic male open the closed gate to the residential property. The six adult males were undocumented migrants UDM's from Venezuela."   Both sets of affidavits suggested that the individual's perceived ethnicity was relevant to the DPS trooper's understanding that that person was not welcome on the property. Two other affidavits also described observing, and then arresting, Latino men.

135.    DPS troopers' arrest narratives also strongly indicated profiling on the basis of national origin, including perceived immigration status. The arrest narrative in two affidavits stated, "I . . .was advised of a group of non-citizens trespassing on X Bar H Ranch in Kinney County." Several arrest narratives described observing "undocumented migrants." For example, the arrest narrative in one complaint stated, "I observed a group of undocumented persons (UDPS) cross over a chain that enclosed the property." For three affidavits, the narrative stated that a member of the National Guard informed the affiant "that 22 undocumented migrants (UDMs) emerged from marked private property" and stated, "upon arriving, I saw 22 UDMs." Others described "undocumented migrants seen trespassing by National Guardsmen" and "I observed 13 undocumented migrants traveling through the . . . [p]roperty." Another arrest narrative recounted, "I . . . was notified by [a DPS trooper] of several undocumented migrants trespassing on the property. . . . Upon arrival, I located three undocumented migrants."

136.    Subsequently, on February 23, 2022, the ACLU supplemented its written complaint with  analysis of an additional 316 trespass arrests affidavits —277 from arrests in Kinney County and 38 from arrests in Val Verde County.  100% of the arrests in Kinney County were recorded as "H/M" (Hispanic male).  For Val Verde County, 58.3% describe country of origin and/or perceived immigration status: 50% note perceived immigration status and 10.5% specify country of origin. (Some narratives include both immigration status and country of

origin.) In 31% of cases in Kinney County, the arrest narrative describes the individual's country of origin and/or perceived immigration status: 7% specify country of origin and 24% note perceived immigration status. At least one analyzed affidavit in Kinney County specifies race, stating, "I made contact with the Hispanic males and found they were not part of a family unit and were undocumented migrants from Mexico." The lower numbers for Kinney County are in part because many affidavits from arrests in the county, particularly the many involving arrests at the county rail yard, tend to be barebones and boilerplate.  As before, beyond these statistics, the descriptions in the arrest affidavits indicate racial profiling. Descriptions from arresting officers imply that individuals' perceived immigration status was relevant to the decision to initiate law enforcement action or to arrest. For example, one affidavit states, "I . . . apprehended four suspected illegal aliens. After further investigation, Texas DPS confirmed the four individuals were trespassing on the Burr Ranch and were illegal aliens." Another affidavit says, "While working Operation Lone Star at the gravel pit, National Guard Randy Cantu encountered possible non-citizens. Cantu escorted the non- citizens to Trooper Sylvia Alaniz and Prob. Trooper Cassandra Armas. The non-citizens were identified as . . . " A third describes how law enforcement was "advised of a group of non- citizens trespassing." A fourth states, "Trooper Melvin made contact with the males and identified them as undocumented persons from Mexico."

137.   As before, numerous probable cause affidavits describe individuals as "undocumented" or otherwise describe their perceived immigration status—often apparently based on sight or, as above, appearing to find immigration status as relevant to the arrest determination. For instance, one affidavit states, "I observed 3 undocumented adult males walking." Another narrates, "I saw seven undocumented adult males jumping a clearly marked

fence with a 'no trespassing' sign." A third describes other law enforcement informing the affiant "that a total of 2 undocumented male migrants were located." Yet another says, "I arrived on scene and observed 5 UDAs [undocumented adults]" and describes how "all other UDAs [except a family unit] were placed under arrest." The ACLU noted that the list reflecting arrests based on color/race/immigration status was "far from exhaustive."

### b) Detentions/Arrests Violate Due Process

138.    The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process. For example, the Attorney General can exercise discretion to issue a warrant for an alien's arrest and detention "pending a decision on whether the alien is to be removed from the United States." *Arizona v. United States*, 567 U.S. 387, 407, 132 S. Ct. 2492, 2505, 183 L. Ed. 2d 351 (2012).  And if an alien is ordered removed after a hearing, the Attorney General will issue a warrant. See 8 CFR § 241.2(a)(1). In both instances, the warrants are executed by federal officers who have received training in the enforcement of immigration law. See §§ 241.2(b), 287.5(e)(3).

### 2.   Denial of Right to Counsel Violates the 6th Amendment

139.    The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." In *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), the Supreme Court explained that the right arises when a person is charged, at a preliminary hearing, at an indictment, or arraignment." *Id.*, at 175, 111 S.Ct. 2204 (citations and internal quotation marks omitted). Plaintiffs and Class Members have been deliberately denied their Sixth Amendment right to counsel through failure to advise them of such right; refusal to allow them to contact counsel;

and/or being forced to waive such right. These violations of their constitutional rights were deliberate and ongoing.

### 3. Unconstitutional Over-incarceration Violates 4th, 8th and 14th Amendments

140. Addressing the "stop and show me papers" Arizona law (see sec. V(A), *supra*, incorporated by reference), the Supreme Court noted that "[s]ome who support the challenge to § 2(B) argue that, in practice, state officers will be required to delay the release of some detainees for no reason other than to verify their immigration status. Detaining individuals solely to verify their immigration status would raise constitutional concerns." 567 U.S. at 411 (citations omitted). "[I]t would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision." *Id*. The program put in place by Congress does not allow state or local officers to adopt this enforcement mechanism. *Id*. at 413.

141. The Class Members in this case, including the named Plaintiffs, were subjected to an entirely separate criminal justice system based upon their race/color and/or immigration status. They were "processed" through a "processing center" established solely for OLS/immigrant arrestees and placed into state jail facilities re-opened specifically and only for OLS immigrant arrestees. There, they are subjected to continuing unconstitutional over-incarceration as described in the categories set forth in section VI(B), *supra*, incorporated by reference. The Defendants' knowing and intentional refusal to release arrestees who are legally entitled to release violates the Fourth Amendment and, in some cases of lengthy delays, the Eighth Amendment.

142. Furthermore, the over incarceration of arrested immigrants is related, at least in part, to their color/race and/or immigrant status and, as such, violates the Equal Protection

Clause.  "The United States Supreme Court has interpreted the Fourteenth Amendment's Equal Protection Clause as 'essentially a direction that all persons similarly situated should be treated alike.' " *Estes v. State*, 546 S.W.3d 691, 697 (Tex. Crim. App. 2018) (quoting *City of Cleburne, Tex. v. Cleburne Living Ctr*., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)).   In *Arizona*, the Supreme Court noted the "constitutional safeguards" that applied to immigration enforcement, including that officers "may not consider race, color or national origin" in implementing its laws.   567 U.S. at 411.   The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises. "Thus we have treated as presumptively invidious those classifications that disadvantage a 'suspect class.'" *Plyler v. Doe*, 457 U.S. 202, 216–17, 102 S. Ct. 2382, 2394–95, 72 L. Ed. 2d 786 (1982).  "Everyone accepts that a detention based on race, *even one otherwise authorized by law*, violates the Fourteenth Amendment's Equal Protection Clause."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1731, 204 L. Ed. 2d 1 (2019).  The Constitution "prohibits selective enforcement of the law based on considerations such as race."  *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996).

143.    The implementation of the OLS system has resulted in systemic discrimination on the basis of color, race and/or national origin, including with respect to the refusal to release arrestees detained pursuant to the OLS system.   Those that are being over-detained are all Hispanic males detained based on their race/skin color and arrested based on their national origin/immigration status.

144.    Each individual listed below was acting under color of law at the time of the constitutional deprivations.  Each acted with conscious and deliberate indifference to the rights of Plaintiffs and the Class Members.

a)      **Greg Abbott**

145.    Governor Abbott makes no bones about his OLS system.  His written and verbally acknowledged policy is to arrest people based on their immigration status, and to do it without federal assistance, authority or intervention.   He takes personal credit/responsibility for thousands of such arrests made at his specific direction.  Arrests based upon skin color, race and/or possible removability violate the Fourth and Fourteenth Amendments to the United States Constitution.  Abbott's OLS system is the direct and moving force behind the unconstitutional arrests and incarceration of the Plaintiffs and the Class Members.   Furthermore, Abbott is aware of the requirements of 8 U.S.C. § 1357, "Power of immigration officers and employees," which requires state and local officers to work in conjunction with the Federal Government as immigration officers and requires specific training.   Abbott has consciously and deliberately chosen to violate these requirements and deliberately chosen not to train state officers with respect to the constitutional implications of arresting persons based on race, skin color and/or immigration status.  This lack of training and failure of supervision is the direct and moving force of the violations of the rights of the named Plaintiffs and the Class Members.  If the officers directed by Abbott were trained to follow federal immigration law and policies, including constitutional restraints relating to probable cause and equal protection, they would not be making arrests based upon color/race and/or immigration status.  Thus, Abbott is liable for the harms and damages sustained by the Plaintiffs and Class Members.

b)      **Steven McCraw**

146.    Director McCraw also acknowledges that the purpose of OLS is to arrest people based on their color/race and/or immigration status, and to do it without federal assistance, authority or intervention.   He is the Director of the Texas Department of Public Safety,

responsible for the arrests of thousands of immigrants, including Plaintiffs and Class Members. Arrests based upon skin color, race and/or possible removability violate the Fourth and Fourteenth Amendments to the United States Constitution.  The OLS system implemented by McCraw is the direct and moving force behind the unconstitutional arrests and incarceration of the Plaintiffs and the Class Members.   Furthermore, McCraw is aware of the requirements of 8 U.S.C. § 1357, "Power of immigration officers and employees," which requires state and local officers to work in conjunction with the Federal Government as immigration officers and requires specific training.   McCraw has consciously and deliberately chosen to violate these requirements and deliberately chosen not to train state officers with respect to the constitutional implications of arresting persons based on race, skin color and/or immigration status.  This lack of training and failure of supervision is the direct and moving force of the violations of the rights of the named Plaintiffs and the Class Members.  If McCraw's officers were trained to follow federal immigration law and policies, including constitutional restraints relating to probable cause and equal protection, they would not be making arrests based upon color/race and/or immigration status.   Thus, McCraw is liable for the harms and damages sustained by the Plaintiffs and Class Members.

### c)   Bryan Collier

147.   Bryan Collier is the Executive Director of the Texas Department of Public Safety and oversees Texas prisons, including the Briscoe and Segovia Units, where OLS is incarcerating the immigrants arrested.   Collier has established a *de facto* policy of over-incarceration, resulting in an ongoing pattern of violations of the constitutional rights of the Plaintiffs and Class Members. Collier has established this policy with deliberate indifference to the rights of the detainees.

148.    Additionally, "a supervisory defendant is subject to § 1983 liability when he breaches a duty imposed by law, and this breach causes plaintiff's constitutional injury." *Doe v. Rains Cty. Indep. Sch. Dist.*, 66 F.3d 1402, 1412 (5th Cir. 1995).   The Fifth Circuit has established a three-part test for determining when a supervisory official can be held liable for the conduct of a subordinate: (1) the [supervisor] failed to supervise or train the subordinate; (2) a causal connection exists between the failure to supervise or train and the violation of the plaintiff's rights, and (3) such failure to supervise or train amounted to gross negligence or deliberate indifference. *Hinshaw v. Doffer,* 785 F.2d 1260, 1263 (5th Cir.1986); *see also Bowen v. Watkins,* 669 F.2d 979, 988 (5th Cir.1982); *Douthit v. Jones,* 641 F.2d 345, 346–47 (5th Cir.1981); *Barksdale v. King,* 699 F.2d 744, 746–48 (5th Cir.1983). Collier's failure to train/supervise the TDCJ employees running the Briscoe and Segovia units is evident from the ongoing and continuing failure of those facilities to release detainees after they are legally entitled to release.   Collier's deliberate indifference to the rights of the detainees is well established through the conscious refusal to release detainees.   It has taken the filing of writs of habeas corpus to obtain release of detainees that had already been ordered released.   Collier's failure to train and/or supervise the TDCJ employees regarding the duty to release detainees who are legally entitled to release has been the moving force behind the unconstitutional over-incarceration of Plaintiffs and the Class Members.

### D.    42 U.S.C. § 1983 AGAINST KINNEY COUNTY AND BRAD COE INDIVIDUALLY

#### 1. <u>Coe is Kinney County Policymaker</u>

149.    A sheriff is the county's final policymaker in the area of law enforcement and running the county jails. *Familias Unidas v. Briscoe,* 619 F.2d 391, 404 (5th Cir.1980) (noting

that an elected county official, such as the sheriff, holds "virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state statute and is accountable to no one other than the voters for his conduct therein); Tex. Local Gov't.Code § 351.041(a) ("[t]he sheriff of each county is the keeper of the county jail. The sheriff shall safely keep all prisoners committed to the jail by lawful authority, subject to an order of the proper court."); Tex. Local Gov't Code § 351.041(b) ("[t]he sheriff may appoint a jailer to operate the jail and meet the needs of the prisoners, but the sheriff shall continue to exercise supervision and control over the jail.").  Liability under § 1983 attaches to local government officers "whose [unlawful] decisions represent the official policy of the local governmental unit." *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Whether an officer has been given this authority is "a question of state law." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). "Official policy" includes unwritten widespread practices that are "so common and well settled as to constitute a custom that fairly represents municipal policy." *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992) (quoting *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (en banc) ). And unlawful decisions include "acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Jett*, 491 U.S. at 737, 109 S.Ct. 2702 (internal quotation marks omitted).

150.    Brad Coe was, and is, at all times relevant to this Complaint, the policymaker for Kinney County law enforcement and acting under color of state law.  He is liable individually for the constitutional violations in which he was directly engaged and, as a policymaker for Kinney County with respect to law enforcement, establishes liability on the County under *Monell*.

### 2. *Monell*

151.    To establish municipal liability (a "*Monell* claim") under § 1983, "a plaintiff must show the deprivation of a federally protected right caused by action taken pursuant to an official municipal policy." *Valle v. City of Hous.*, 613 F.3d 536, 541 (5th Cir. 2010) (internal quotations omitted). A plaintiff must identify "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy (or custom)." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002)

152.    The Fifth Circuit defines official policy as:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.  *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.) (per curiam), *aff'd in relevant part*, 739 F.2d 993 (5th Cir. 1984) (en banc).

153.    The final showing required by *Monell* is a determination of whether the policies at issue were the "moving force" behind a constitutional violation. *Duvall,* 631 F.3d at 209. In other words, in addition to culpability, Plaintiff must show a direct causal link between the jail's

policies and a constitutional deprivation. *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir.2001).

154.    In the instant case, Brad Coe, the Kinney County policymaker with respect to its law enforcement and operation of its jails.  Coe has openly acknowledged his official policy of using "trespass" allegations as an immigration enforcement mechanism.  His policy is to arrest anyone that "looks" like an immigrant, in violation of the Fourth and Fourteenth Amendments. His policy is to substantially delay or deny the right to counsel in violation of the Sixth Amendment.  His policy is to delay or refuse release of those incarcerated that are entitled to release in violation of the Fourth Amendment.  These policies are the direct and moving force of the violations of the rights of the named Plaintiffs and the Class Members.

155.    Additionally "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011).  A municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." City of *Canton, Ohio v. Harris*, 489 U.S., 378, 388 (1989). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 1391, 137 L. Ed. 2d 626 (1997). Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.*, at 407, 117 S.Ct. 1382. The city's " 'policy of inaction' " in light of notice that its program will cause

constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton,* 489 U.S., at 395, 109 S.Ct. 1197.  A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Bryan Cty*., 520 U.S., at 409, 117 S.Ct. 1382. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id*., at 407, 117 S.Ct. 1382.

156.   In the instant case, Kinney County is, and has been, aware—through its policymaker, Brad Coe—of the necessity to train its law enforcement officers regarding the constitutional rights involved in arresting and incarcerating immigrants.  Federal law specifically requires that any officer engaging in immigration-officer functions must be specially trained.   8 U.S.C. § 1357, "Power of immigration officers and employees," specifies immigration-officer functions and describes circumstances under which state and local officers can perform those functions only with specific training. Under Section 1357, immigration-officer functions include the power "to interrogate" and "to arrest" aliens without a warrant. *Id*. § 1357(a)(1)-(2). Section 1357 further provides that states and political subdivisions can enter into written agreements with the Federal Government, so that state and local officers can perform immigration-officer functions. *Id*. § 1357(g). These agreements require that local officers must be "determined by the Attorney General to be qualified"; that they receive appropriate <u>training "regarding the enforcement of relevant Federal immigration laws</u>"; that their powers and duties are set forth in a written agreement; that they "<u>adhere to Federal law</u> relating to that function" and that they are

"subject to the direction and supervision of the Attorney General." *Id*. § 1357(g)(1)-(5) (emphasis added).

157.    Kinney County has chosen to engage in immigration-officer functions without training its officers and in violation of section 1357.  The result has been ongoing and continuing violations of the constitutional rights of the immigrants as described herein.    Brad Coe, in his affidavit acknowledges that, as of July 8, 2021 (the date of the affidavit), "[t]he overwhelming majority of detainees that [his] office has arrested are either illegal aliens or involved in activity relating to illegal immigration."  Sheriff Coe was a Border Patrol officer for thirty years before being elected Sheriff of Kinney County and, as such, was aware of the training that was required of his officers before engaging in an acknowledged plan to arrest immigrants.  Coe's deliberate decision not to follow section 1357 "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton,* 489 U.S., at 395, 109 S.Ct. 1197.  This lack of training and failure of supervision is the direct and moving force of the violations of the rights of the named Plaintiffs and the Class Members.  If Coe's officers were trained to follow federal immigration law and policies, including constitutional restraints relating to probable cause and equal protection, they would not be making arrests based upon color/race and/or immigration status. Thus, Kinney County is liable for the harms and damages sustained by the Plaintiffs and Class Members.

158.    Kinney County and Brad Coe have further engaged in an ongoing pattern and practice of denial of the right to counsel in violation of the Sixth Amendment and over-incarceration in violation of the Fourth and Fourteenth Amendments for Plaintiffs and Class Members.   As demonstrated by the facts set forth herein, such violations were deliberate, ongoing and done under color of law.  Kinney County and Brad Coe and liable for the harms and

damages suffered by Plaintiffs and Class Members as a result of the pattern of ongoing constitutional violations.

E.    CONSPIRACY

1. **42 U.S.C. 1983**

159.    "To state a claim for conspiracy under § 1983, a plaintiff must allege the existence of (1) an agreement to do an illegal act and (2) an actual constitutional deprivation." *Whisenant v. City of Haltom*, 106 F. App'x 915, 917 (5th Cir. 2004) (per curiam) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)).  In the instant case, the agreement between Abbott, McCraw and Coe to engage in "immigration enforcement" is clear and on record.  It is also clear that they agreed to implement the OLS immigration enforcement without the involvement of the Federal Government and based upon observed race/color and/or immigration status in violation of the United States Constitution.  This agreement to implement OLS in such a manner resulted in violations of the constitutional rights of Plaintiffs and the Class Members.  The rights in question were clearly established at the time that OLS was implemented and the actions taken in concert with such agreement/implementation were objectively unreasonable.

160.    The agreement between Coe and Collier to deny detainees the right to counsel and to refuse to release those who are lawfully entitled to release is also in violation of the rights of detainees under the United States Constitution and resulted in the deprivation of such rights to Plaintiffs and the Class Members.  The rights in question were clearly established at the time of the deprivations and the conduct of Coe and Collier is, and has been, objectively unreasonable.  Thus, the Defendants are liable to Plaintiffs and the Class Members under 42 U.S.C. § 1983.

### 2. 42 U.S.C. § 1985

161. To state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege: (1) a conspiracy involving two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States. In so doing, the plaintiff must show that the conspiracy was motivated by a class-based animus. The conspiracy between Abbott, McCraw and Coe (and others) to implement OLS was specifically for the purpose of depriving a class of persons of the equal protection of the laws. It is clear that arresting and incarcerating someone on the basis of their race/color and/or immigration status is a violation of equal protection. Defendants acted in furtherance of the conspiracy by implementing OLS in the manner that directly resulted in the injuries to Plaintiffs and the Class Members described herein. Thus, Defendants are liable pursuant to 42 U.S.C. § 1985.

162. The agreement between Coe and Collier to deny detainees the right to counsel and to refuse to release those who are lawfully entitled to release is also in violation of the rights of detainees under the United States Constitution and resulted in the deprivation of such rights to Plaintiffs and the Class Members. The rights in question were clearly established at the time of the deprivations and the conduct of Coe and Collier is, and has been, objectively unreasonable. Thus, the Defendants are liable to Plaintiffs and the Class Members under 42 U.S.C. § 1985.

## VII.   PRAYER FOR RELIEF

WHEREFORE, the named Plaintiffs and Class Members demand judgment against Defendants on each Count of the Complaint and pray for the following relief:

1. Issue an Order certifying that this action may be maintained as a class action,

appointing Plaintiffs and their counsel to represent the Classes, and directing that reasonable notice of this action be given by Defendants to all Class Members;

2. Enter a judgment declaring that any person arrested based on race, immigration status and/or national origin under OLS violates federal law;

3. Enter a judgment declaring that Defendants' refusal to release detainees after posting cash bond violates state and federal law;

4. Enter a judgment declaring that Defendants' refusal to release detainees after entering a plea violates state and federal law;

5. Enter a judgment declaring that Defendants' refusal to release detainees after a dismissal of charges violates state and federal law;

6. Enter a judgment declaring that Defendants' refusal to release detainees after a personal bond violates state and federal law;

7. Enter a judgment declaring that Defendants' refusal to afford detainees constitutional rights at the time of detention violates state and federal law;

8. Issue an injunction ordering Defendants to discontinue a separate system of arrest, prosecution and detention for immigrants versus other arrestees;

9. Issue an injunction ordering Defendants to immediately release detainees detained and/or arrested based upon race, immigration status, or national origin and charged with criminal trespass;

10. Issue an injunction ordering Defendants to immediately release detainees after posting cash bond;

11. Issue an injunction ordering Defendants to immediately release detainees after entering a plea;

  
12. Issue an injunction ordering Defendants to immediately release detainees after charges are dismissed;

13. Issue an injunction ordering Defendant to immediately release detainees after a personal bond;

14. Issue an injunction ordering Defendant to adhere to the constitutional rights of each detainee, including the right to counsel;

15. Award Plaintiffs and members of the Damages Class monetary damages on a class-wide basis for time unlawfully spent in custody and establish a procedure for class members to seek individualized damages beyond general damages;

16. Award Plaintiffs and other Class Members reasonable attorneys' fees and costs pursuant to 42 U.S.C. 1988

17. Grant any reasonable request to amend Plaintiffs' Class Action Complaint to conform to the discovery and evidence obtained in this Class Action;

18. Empanel a jury to try this matter;

19. Such other and further relief that justice may require.


Respectfully submitted,


s/Susan E. Hutchison
Texas Bar No. 10354100
sehservice@FightsforRight.com

S. Rafe Foreman
Texas Bar No. 07255200
srfservice@fightsforright.com

HUTCHISON & FOREMAN, PLLC
1312 Texas Ave. Suite #101
Lubbock, Texas 79401

Phone:  806-491-4911
Fax:  806-491-9911

Angelica Cogliano, SBN 24101635
Addy Miro, SBN 24055984
E.G. Morris, SBN 14477700
505 West 12th Street, Suite 206
Austin, TX 78701

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

     On this day of June 27, 2022, Plaintiffs served their Second Amended Complaint on the following counsel for Defendants via ECF:

Benjamin L. Dower
Deputy Chief, General Litigation Division
benjamin.dower@oag.texas.gov
Attorney-in-Charge
Kimberly Gdula
kimberly.gdula@oag.texas.gov
William D. Wassdorf
will.wassdorf@oag.texas.gov
Allison M. Collins
Allison.collins@oag.texas.gov
Assistant Attorneys General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
ATTORNEYS FOR DEFENDANT
GOVERNOR GREG ABBOTT

Jason T. Bramow
jason.bramow@oag.texas.gov
Attorney-in-Charge
Jessica L. Weltge
jessica.weltge@oag.texas.gov
Marlayna M. Ellis
marlayna.ellis@oag.texas.gov
Assistant Attorneys General
Office of the Attorney General
Law Enforcement Defense Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

ATTORNEYS FOR DEFENDANTS
EXECUTIVE DIRECTOR BRYAN COLLIER
EXECUTIVE DIRECTOR STEVEN MCCRAW

Scott M. Tschirhart
smtschirhart@rampagelaw.com
Denton Navarro Rocha Bernal & Zech, P.C.
2500 W. William Cannon Drive, Suite 609
Austin, Texas 78745
ATTORNEYS FOR DEFENDANTS
SHERIFF BRAD COE AND KINNEY COUNTY