**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **ANGEL SANCHEZ-JIMENEZ;** | § | |
| **JESUS LOZA SANTANA;** | § | |
| **ERASTO ARROYO BARCENAS; GABRIEL** | § | |
| **GUTIERREZ BECERRA; MELVIN** | § | |
| **AMADOR RODAS; JUAN CARLOS** | § | |
| **JIMENEZ PINEDA; DAVID MUNOZ-VEGA;** | § | |
| **IVAN RUANO NAVA; NOLIS LEYVA-** | § | |
| **GONZALEZ; JOSE CARLOS GOMEZ-** | § | |
| **COLORADO; JOSE LUIS DOMINGUEZ-** | § | |
| **ROJAS; ZAQUERO HERNANDEZ-OVILLA;** | § | |
| **MELVIN AMAYA ZELAYA; JESUS** | § | |
| **CURIPOMA; OSCAR SERRANO** | § | |
| **MARTINEZ; IVAN CHRISTIAN** | § | |
| **RODRIGUEZ-RUIZ; ISRAEL BAYLON** | § | |
| **ARELLANO; JOSE LOPEZ LOZANO;** | § | |
| **MIGUEL LOPEZ LOZANO; FRANCISCO** | § | |
| **VILLALPANDO RAMOS; CESAR GALINDO** | § | |
| **ESCOTO,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **VS.** | § | **Case No. Case No. 22-397** |
| | § | |
| **STEVEN MCCRAW in his individual capacity;** | § | |
| **GREG ABBOTT in his individual and official** | § | |
| **capacities; BRYAN COLLIER in his individual** | § | |
| **capacity; BRAD COE in his individual capacity,** | § | |
| **and KINNEY COUNTY, TEXAS** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

---

## PLAINTIFFS' REVISED COMPLAINT

---

TO THE HONORABLE JUDGE OF SAID COURT:


Plaintiffs file this Revised Complaint against Defendants for causes of action arising from

arrest and over-detention, seeking declaratory relief, injunctive relief, class certification and money damages, in support of which Plaintiffs would show the Court the following;

## I. INTRODUCTION

1. Under the guise of state criminal trespass law, Texas officials are targeting migrants with the explicit, stated goal of punishing them based on their immigration status. Using state criminal law, the state of Texas and participating counties have created, and are carrying, out what is, in reality, a system of state immigration enforcement that targets Black and Brown– primarily Latino– individuals for prosecution and enhanced punishment. Under this program, called "Operation Lone Star" (OLS), Texas has arrested more than 5,000[1] people on misdemeanor state criminal trespass charges, incarcerating them in Texas Department of Criminal Justice (TDCJ) TDCJ Briscoe and Segovia Units. Texas has created a separate criminal prosecution and detention system for these individuals, with separate criminal dockets, separate public defender assignments, separate jails (converted state prisons), and even a separate "criminal migrant processing facility" for booking. This separate system is riddled with civil rights violations, including fraudulent probable cause affidavits, failure to appoint counsel, failure to timely file charges, over-incarceration, and even the unilateral replacement of judges. Hundreds of those arrested have waited in jail for weeks or months without a lawyer, or without charges, or without bond, or without a legitimate detention hold or without a court date.

2. The trespass arrests themselves are pretextual and regularly lack probable cause— including cases in which law enforcement has directed individuals from public property to a certain

---

[1] [1] This number is taken from the weekly Briscoe/Segovia active confine census, Appx. 1-20.  Compare Abbott's representation that OLS has "led to more than 208,000 migrant apprehensions."  https://gov.texas.gov/news/post/governor-abbott-dps-texas-national-guard-mark-one-year-anniversary-of-operation-lone-star

location, only to then arrest them for trespass once they get there. Arrest records show profiling based on race/color, national origin, and/or immigration status, including with numerous descriptions of observing or receiving reports of "undocumented migrants" (which they refer to as "UDMs").  Virtually all of those arrested to date are Latino and Black male migrants.

3. State and local officials began implementing the OLS trespass arrest program in July of 2020. The program is now backed by approximately $3 billion in state funding through 2023, with planned expansion to other counties. Officials have said they plan to continue the program for years; one state official recently termed it "indefinite."  Texas is the first state to operationalize a unilateral state immigration policy of this magnitude, using state criminal law to target Black and Brown immigrants for punishment.

4. While Defendant Abbott and DPS have claimed that OLS has taken "dangerous individuals" off our streets, they have provided little proof to substantiate such statements. They have fought two dozen public records requests from news organizations that would give a clearer picture of the operation's accomplishments or failures.  While Governor Abbott claims that OLS has led to "208,000 migrant apprehensions,"[2] records from the Briscoe and Segovia Units used to house migrants arrested under OLS show 4,798 incarcerated through April 8, 2022.  The alleged "success" of OLS is wildly exaggerated.

5. Plaintiffs seek to certify classes to recover damages for illegal over-detention.

## II. PARTIES

6. Plaintiff Erasto Arroyo Barcenas is an individual resident of Mexico. Mr. Barcenas was arrested without a warrant for criminal trespass in Kinney County, Texas on September 9,

---

[2] https://gov.texas.gov/news/post/governor-abbott-dps-texas-national-guard-mark-one-year-anniversary-of-operation-lone-star

2021, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County.  A Kinney County Judge ordered Mr. Barcena's release from state custody on October 12, 2021.  However, the Warden of the Dolph Briscoe Unit refused and/or delayed his release.  Mr. Barcenas' attorneys were forced to file a Petition for Writ of Mandamus compelling Bryan Collier, Executive Director of TDCJ, to direct the release of Mr. Barcena.[3]  The Petition was filed on October 21, 2021 detailing the efforts of Mr. Barcena's attorneys to obtain his release.

7.  Plaintiff Melvin Amador Rodas is an individual resident of Florida. Mr. Rodas was arrested without a warrant for criminal trespass in Kinney County, Texas on September 9, 2021, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. A Kinney County Judge ordered Mr. Rodas' release from state custody on October 12, 2021.  However, Mr. Rodas' attorneys were forced to file a Petition for Writ of Mandamus compelling Bryan Collier, Executive Director of TDCJ, to direct the release of Mr. Rodas.  The Petition was filed on October 21, 2021 detailing the efforts of Mr. Rodas' attorneys to obtain his release.

8.  Plaintiff Juan Carlos Jimenez Pineda is an individual resident of Texas. Mr. Pineda was arrested without a warrant for criminal trespass in Kinney County, Texas on September 9, 2021, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. A Kinney County Judge ordered Mr. Jimenez Pineda's release from state custody on October 12, 2021.  However, Mr. Pineda remained in custody for at least another week, far longer than the 48-hour ICE hold allows, before being transported to Customs and Border Patrol (rather than picked up by ICE as the law requires).

---

[3] See Appx. 122-144, Petition for Writs of Mandamus for Barcenas, Bercerra and Rodas.

9.  Plaintiff Ivan Ruano Nava is an individual resident of Texas. Mr. Ruano Nava was arrested for criminal trespass in Kinney County, Texas on July 25, 2021, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Mr. Munoz Vega was not provided a court-appointed attorney until several months later, on September 20, 2021, and remained in custody without a court date or case filed against him during that time. Mr. Ruano Nava's charges were dismissed on September 28, 2021, after the prosecution failed to prove that he was arrested pursuant to probable cause at a habeas corpus hearing. On September 30, 2021, Mr. Ruano Nava's defense counsel sent a demand letter to the Warden Ramirez of the TDCJ Dolph Briscoe Unit, as well as Kinney County Sherriff Coe, explaining that the ICE detainer expired after 48 hours from the time the defendant is eligible for release. The following day, after Mr. Ruano Nava had still not been released, the Court ordered Mr. Ruano Nava released immediately into the custody of one of his attorneys who was waiting outside of the pretrial prison unit. Jail personnel ignored the order, and instead transported him directly to Customs and Border Patrol in violation of state law.

10. Plaintiff David Munoz Vega is an individual resident of Texas. Mr. Munoz Vega was arrested for criminal trespass in Kinney County, Texas on July 25, 2021, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Mr. Munoz Vega was not provided a court-appointed attorney until several months later, on September 20, 2021, and remained in custody without a court date or case filed against him during that time. Mr. Munoz Vega's charges were dismissed on September 28, 2021, after the prosecution failed to prove that he was arrested pursuant to probable cause at a habeas corpus hearing. On September 30, 2021, Mr. Munoz Vega's defense counsel sent a demand letter to the Warden Ramirez of the TDCJ Dolph Briscoe Unit, as well as Kinney County Sherriff Coe,

explaining that the ICE detainer expired after 48 hours from the time the defendant is eligible for release. The following day, after Mr. Munoz-Vega had still not been released, the Court ordered Mr. Munoz-Vega released immediately into the custody of one of his attorneys who was waiting outside of the pretrial prison unit. Jail personnel ignored the order, and instead transported him directly to CBP in violation of state law.

11. Plaintiff Nolis Leyva-Gonzalez is an individual resident of Mexico. Mr. Leyva-Gonzalez was arrested without a warrant for criminal trespass in Kinney County, Texas on October 14, 2021, under Operation Lone Star, at the "Smith Ranch." The "Smith Ranch" belongs to Kinney County Attorney Brent Smith's brother, who was holding Mr. Leyva-Gonzales gunpoint, in an effort to arrest Mr. Leyva-Gonzalez himself. Mr. Leyva-Gonzalez requested appointed counsel at magistration, but no attorney was appointed until March of 2022. Similarly, Mr. Leyva Gonzalez was not afforded a court date, discovery, or brady information during those six months.

12. Plaintiff Jose Carlos Gomez-Colorado is an individual resident of Texas. Mr. Gomez-Colorado was arrested without a warrant for criminal trespass in Kinney County, Texas on October 14, 2021, under Operation Lone Star, at the "Smith Ranch." The "Smith Ranch" belongs to Kinney County Attorney Brent Smith's brother, who was holding Mr. Gomez-Colorado gunpoint, in an effort to arrest Mr. Gomez-Colorado himself. Mr. Gomez-Colorado requested appointed counsel at magistration, but no attorney was appointed until March of 2022. Similarly, Mr. Gomez-Colorado was not afforded a court date, discovery, or brady information during those six months. over-incarcerated.

13. Plaintiff Jose Luis Dominguez-Rojas is an individual resident of Texas. Mr. Dominguez-Rojas was arrested without a warrant for criminal trespass in Kinney County, Texas on December

24, 2021, under Operation Lone Star. After he was arrested, he was taken to the Segovia Unit in Hidalgo County, Texas. He was not appointed counsel until March 4, 2020, despite requesting representation at magistration, and sat in custody for four months before getting his first court date.

14. Plaintiff Melvin  Amaya Zelaya is an individual resident of Honduras. Mr. Amaya Zelaya was arrested without a warrant for criminal trespass in Kinney County, Texas on December 25, 2021, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint.  Mr. Amaya Zelaya then remained in custody without an appointed attorney, discovery, or court date for months until he was finally assigned counsel on March 4, 2020.

15. Plaintiff Gabriel Gutierrez Becerra is an individual resident of Texas. Mr. Becerra was arrested without a warrant for criminal trespass in Kinney County, Texas on September 9, 2021, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. A Kinney County Judge ordered Mr. Bercerra's release from state custody on October 12, 2021.  However, the Warden of the Dolph Briscoe Unit refused and/or delayed his release.   Mr. Bercerra's attorneys were forced to file a Petition for Writ of Mandamus compelling Bryan Collier, Executive Director of TDCJ, to direct the release of Mr. Bercerra.   The Petition was filed on October 21, 2021 detailing the efforts of Mr. Bercerra's attorneys to obtain his release.

16. Plaintiff Jesus Curipoma is an individual resident of Texas. Mr. Guzman-Curipoma was arrested without a warrant for criminal trespass in Kinney County, Texas on September 9, 2021, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph

Briscoe Unit in Frio County, Texas. Certain TDCJ Units are utilized to detain persons under "Operation Lone Star," as described previously in this Complaint.  Mr. Guzman-Curipoma paid the full amount of cash bail - $2,000.000 – to the Kinney County Sherriff's Office on the same day that he was arrested – September 9, 2021. No ICE detainer had been issued, so Mr. Guzman-Curipoma was entitled to release immediately.  On September 23, 2021, an ICE detainer is suddenly issued for Mr. Guzman-Curipoma, which expires after 48 hours.  Mr. Guzman-Curipoma illegally remained in custody, all the way through October 9, 2021, only being released after exhaustive efforts by defense counsel.

17. Plaintiff Oscar Serrano Martinez is an individual resident of El Salvadore. Mr. Martinez was arrested without a warrant for criminal trespass in Kinney County, Texas on October 28, 2021, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas.

18. Christian Ivan Ruiz-Rodriguez is an individual resident of Texas. Mr. Rodriguez-Ruiz was arrested without a warrant for criminal trespass in Kinney County, Texas on September 24, 2021, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas. A Kinney County Judge ordered Mr. Rodriguez-Ruiz' release from state custody on December 3, 2021. Despite having requested an attorney be appointed on the day of his arrest, Mr. Rodriguez-Ruiz did not get an attorney assigned until October 8, 2021. Mr. Rodriguez-Ruiz entered a plea of nolo contendere on January 12, 2022 and received a punishment of 80 days in custody with credit for time served. As he had been in custody for 111 days at that time, and there was no detainer from Immigration and Customs Enforcement (ICE), Mr. Rodriguez-Ruiz was entitled to release on that day. Sometime between January 14 and January 21, an ICE detainer was issued. Mr. Rodriguez-Ruiz was

still not released even after the expiration of the untimely-issued detainer, despite exhaustive efforts by his appointed counsel. Mr. Rodriguez-Ruiz was not released until January 25, 2022 – over two weeks after he was entitled to release under State law.

19. Israel Baylon Arellano is an individual resident of Texas. Mr. Arellano was arrested without a warrant for criminal trespass in Kinney County, Texas on February 24th, 2022, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas.

20. Jose Lopez Lozano is an individual resident of Texas. Mr. Marcos Lopez Lozano was arrested without a warrant for criminal trespass in Kinney County, Texas on February 24th, 2022, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas.

21. Miguel Lopez Lozano is an individual resident of Texas. Mr. Lopez Lozano was arrested without a warrant for criminal trespass in Kinney County, Texas on February 24th, 2022, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas.

22. Francisco Villalpando Ramos is an individual resident of Texas. Mr. Villalpando Ramos was arrested without a warrant for criminal trespass in Kinney County, Texas on February 24th, 2022, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County.

23. Cesar Galindo Escoto is currently incarcerated in Edinburg, Texas under OLS. Mr. Galindo Escoto was arrested without a warrant for criminal trespass in Kinney County, Texas on February 24th, 2022, under Operation Lone Star. After he was arrested, he was taken to the TDCJ Dolph Briscoe Unit in Frio County, Texas.

24. Defendant Greg Abbott is the Governor of Texas and is sued in his individual capacity. He acted under the color of law of the statutes, ordinances, regulations, policies, customs, and usages of the State of Texas. Defendant Abbott may be served with process at the Office of the Governor, State Insurance Building, 1100 San Jacinto, Austin, TX 78701.

25. Defendant Steven McCraw is the Director of the Department of Public Safety (DPS) and is sued in his individual capacity. He acted under the color of law of the statutes, ordinances, regulations, policies, customs, and usages of the State of Texas. Defendant McCraw may be served with process at 7321 Twilight Shadow Dr., Austin, TX 78749.

26. Defendant Bryan Collier is the Executive Director of the Texas Department of Criminal Justice and is sued in his individual capacity. He acted under the color of law of the statutes, ordinances, regulations, policies, customs, and usages of the State of Texas. Defendant Collier may be served with process at 101 Briar Meadow, Huntsville, TX 77320.

27. Defendant Brad Coe is the Sherriff of Kinney County and is being sued in his individual capacity He acted under the color of law of the statutes, ordinances, regulations, policies, customs, and usages of the State of Texas. Defendant Coe may be served with process at 206 E. Third St., Brackettville, TX 78832.

28. Defendant Kinney County is a Texas county that may be served through the County Judge John Paul Schuster.[4]  He can be served with Summons at 501 S. Ann St., Brackettville, TX 78832.

## III.    JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

---

[4] At the time of the filing of the original complaint, and at the time the underlying claims occurred, through December 31, 2022, Tully Shahan was the County Judge of Kinney County.

30. The proposed Class exceeds 100 persons.  Pursuant to 28 U.S.C. § 1332(d)(6), the aggregate amount of the Class Members' claims substantially exceeds $5,000,000.00 and thus, exceeds the requisite amount in controversy outlined in § 1332(d)(2).

31. Venue is proper in this Court under 28 U.S.C. §1391(b)(1) as the county in which any Defendant resides, in that Defendant Abbott is a resident of Travis County, Texas and all remaining Defendants are residents of Texas.

## IV.    STATEMENT OF THE FACTS

### A. Operation Lone Star was Created, Designed, Funded, and Implemented to Punish Migrants for their Immigration Status

32. On March 6, 2021, Governor Abbott announced Operation Lone Star  ("OLS") as his policy choice to deploy a substantial number of state law enforcement personnel and other resources along the Texas-Mexico border to deter immigration and secure "the international border into Texas.".[5]  Abbot relied on the Texas Disaster Act, Tex. Gov't Code § 418.011, as authority for his policy choice. OLS features three central directives: (1) it authorizes "use of all available resources of state government . . . to assist and protect Texans from criminal activity and property damage;" (2) it "direct[s] DPS to use available resources [to prevent] criminal activity along the border, including criminal trespassing, smuggling, and human trafficking;" and (3) it commits state resources to support pretrial detention of persons arrested under OLS.

33. In April, 2021, Kinney County Judge Tully Shahan issued a local disaster declaration for Kinney County "due to the thousands of illegal aliens invading our great State of Texas."[6] The

---

[5] Press Release, Office of the Texas Governor, *Governor Abbott, DPS Launch "Operation Lone Star" to Address Crisis At Southern Border*, Mar. 6, 2021, https://gov.texas.gov/news/post/governor-abbott-dps-launch-operation-star-to-address-crisis-at- southern-border
[6] Judge Tully Shahan, Declaration of Local State of Disaster, April 21, 2021, https://cokinneytx.civicweb.net/document/16670/3.e%20Declaration%20of%20Local%20State%20of%20Disaster%20for%20Kin.pdf?handle=B7DFA16D4B5F44CE9DBFA7466939E756

declaration, also signed by Kinney County Attorney Brent Smith, requested that Governor Abbott "provide state military forces to aid in controlling conditions in the county by assisting the County Sheriff in the enforcement of law and the preservation of the sovereignty and territorial integrity of the county."

34. On May 4, 2021, Kinney County Attorney Brent Smith emailed the Office of the Attorney General of Texas asking that Governor Abbott issue an emergency declaration, which would allow Texas to "take certain steps in the enforcement of its own borders" which would "include the enforcement of current federal immigration law." (Exhibit A). Correspondence between the Kinney County officials and the Office of the Attorney General regarding Operation Lone Star Enforcement continued.

35. On May 31, 2021, Governor Abbott similarly declared a state of "disaster" based on "federal government policies" and federal "inaction" that he claimed had led to "a dramatic increase in the number of individuals unlawfully crossing the international border." The disaster declaration described Operation Lone Star as intended to "deter[] illegal border crossings."[7] Abbott made it clear that he would step into the shoes of what he deemed an "inactive Federal Government."

36. By August, the state had deployed more than 1,250 Texas Department of Public Safety (DPS) troopers to border communities and had also deployed National Guard troops, with plans to increase the National Guard presence to up to 2,500 troops.[8]

---

[7] Gov. Greg Abbott, Proclamation by the Governor of the State of Texas, May 31, 2021, at 1-2, https://gov.texas.gov/uploads/files/press/DISASTER_border_security_IMAGE_05-31-22.pdf.
[8] Texas House Appropriations Committee Hearing.  H.B.9. Relating to making supplemental appropriations relating to border security and giving direction regarding those appropriations.  Aug. 24, 2021, https://tlchouse.granicus.com/MedialPlayer.php?view_id=46&clip_id=22334 (Testimony of Office of the Governor Budget Director Sarah Hicks at approx. 2:46:00)

37. In September 2021, the Texas Legislature passed, and Governor Abbott signed, H.B. 9, a bill which appropriated $1.8 billion in funding to the OLS trespass arrest system and other aspects of Operation Lone Star over the next two years. This funding includes more than $301 million for the Texas National Guard for a two-year period and almost $139 million for DPS for a one-year period.[9] Funding has since increased to over $3 billion for "border security efforts."

38. Kinney County, through the County Judge, County Attorney, and other officials, have continued issuing declarations requesting funding and support from Governor Abbott and other statewide agencies to continue implementing OLS. In October 2021, the Kinney County attorney stated that "Kinney County is looking forward to working with Governor Abbott to implement solutions that allow Texas to secure its own border. Texas will get it done."[10] Correspondence continued between the Kinney County officials, Office of the Attorney General, and Governor Abbott's office regarding Operation Lone Star Enforcement. (Exhibit B). This included weekly conference calls with the Governor's Office. (Exhibit C).

39. State and local officials, including Governor Abbott, have been clear: the underlying purpose of the OLS program is to deter migration and punish migrants for coming to the United States. From officials' public statements and the system's design and implementation, it's plain that the trespass program is a pretextual use of state criminal law, with the underlying interest of harming Black and Brown migrants. Abbott has expressly stated that he "launched Operation

---

[9] An Act Relating to Making Supplemental Appropriations Relating to Border Security and GivingMDirection Regarding Those Appropriations, H.B. 9, 2d C.S.
(2021),Nhttps://capitol.texas.gov/tlodocs/872/billtext/pdf/HB00009F.pdf#navpanes=0 (providing funding for aspects of the OLS trespass arrest program for a two-year period); Press Release, Office of the Texas Governor, Governor Abbott Signs Border Security Funding Into Law, Sept. 17, 2021,https://gov.texas.gov/news/post/governor-abbott-signs- border-security-funding-into-law.
[10] Montoya, Robert, *Border County Asks Abbott to Deploy Texas Military to 'Repel' Illegal Crossings*, Texas Scorecard, October 7, 2021, https://texasscorecard.com/state/border-county-asks-abbott-to-deploy-texas-military-to-repel-illegal-crossings/

Lone Star <u>to do the job that Washington would not</u>" (which presumably, is not to arrest trespassers). "Within weeks of taking office, President Biden turned our southern border into a porous mess where criminal aliens wandered across the Rio Grande River without anyone to interdict them."[11]

**B.  OLS is a Catch and Jail Program**

40. At Governor Abbott's direction, the Texas National Guard has set up fences on private property for the purpose of establishing the "notice" element of state criminal trespass. In other words, the state is attempting to make crossing property criminal where it was not before, to enable the arrest of migrants.  Under the OLS program, DPS officers collaborate with the Texas National Guard and county sheriff's offices to arrest migrants on state misdemeanor criminal trespass charges. Once arrested, individuals are channeled into a separate criminal system that is designed by OLS only for migrants.

41. A DPS briefing in December 2021 stated that over 2,200 people had been arrested on state criminal trespass charges under Operation Lone Star.[12] In March 2022, an Abbott press release stated that "[s]ince the launch of OLS, multi-agency efforts have led to more than 208,000 migrant apprehensions."[13]   There is no breakdown as to how many of these "migrant apprehensions" are related to any type of alleged crime.  However, in a review of the lists of persons incarcerated in Briscoe and Segovia units (the TDCJ Units designated for OLS "migrant arrests") through March 2022, they reflect approximately 2,887 arrests, 2,518 of

---

[11] Press Release, Office of the Texas Governor, https://gov.texas.gov/news/post/governor-abbott-dps-texas-national-guard-mark- one-year-anniversary-of-operation-lone-star
[12] Operation Lone Star Briefing, December 9, 2021, at 2:28,
https://www.facebook.com/watch/live/?ref=watch_permalink&v=277771827651145&t=0 (reporting and showing corresponding data for December 2, 2021).
[13] https://gov.texas.gov/news/post/governor-abbott-dps-texas-national-guard-mark-one-year-anniversary-of-operation-lone-star

whom were arrested for criminal trespass.  Over 80% of those arrested were for criminal trespass with no other charges.

42. According to his "disaster proclamation" regarding the implementation of OLS, Defendant Abbott is the one that "deployed 1,000 troops from the Texas Department of Public Safety (DPS) and hundreds of soldiers from the Texas National Guard to the border," and he is the one that "directed DPS to initiate Operation Lone Star and devote additional law enforcement resources towards deterring illegal border crossings and protecting our border community." In his letter to all Texas sheriffs inviting them to a "Border Security Summit," Abbott reiterated that he initiated OLS and deployed the DPS and National Guard to the border.

43. The following tweets and statements address the direct involvement Defendant Abbott with the enforcement of OLS:

- A DPS Tweet referenced the "enhanced [OLS] operations" as necessary "to stop the flow of migrants entering TX illegally." And it said the "heavy presence on the river" is part of "Operation Lone Star, a state-funded Abbott-led <u>initiative to guard the Texas-Mexico</u> border" (emphasis added).
- The DPS website shows a picture of a boat blockade with the following statement: "Under Texas Gov. Greg Abbott's command, the Department of Public Safety has formed a boat blockade on the Rio Grande to keep undocumented migrants out of South Texas."
- From Governor Abbott's website:  "Governor Abbot's actions to secure the border include: signing laws that provide $3 billion in funding for Texas' border security efforts; launching Operation Lone Star and deploying thousands of National Guard soldiers and Texas Department of Public Safety troopers; arresting and jailing illegal migrants trespassing or committing other state crimes in Texas…"
- Also from Governor Abbott's website: "Since the initial launch of Operation Lone Star in March 2021, the Governor, DPS, and the Texas National Guard have increased the comprehensive efforts of the mission.  Governor Abbott launched a second jail booking facility in Jim Hogg County in February 2022."

44. DPS is the primary agency that arrests individuals on criminal trespass charges under the OLS program. Defendant McCraw is the Director of the DPS and is directly involved in deploying and supervising DPS officers implementing OLS. He has stated that DPS "is

carrying out the mission of OLS on the border counties" in Texas. As of December 2, 2021, DPS had arrested 2,106 people for the OLS trespass arrest program.

45. The following tweets and statements address the direct involvement of Defendant McCraw with the enforcement of OLS:

- While initially limited to two counties along the southern border, Texas DPS Director Steve McCraw said his department would expand the practice to other areas of the Rio Grande Valley, including Brooks and Webb counties.
- From a news briefing by Director McCraw: "Texas continues to work diligently to secure our southern border under the leadership of Governor Abbott and these briefings provide an opportunity for us to share tangible evidence of how combined local and state operations being conducted are protecting communities across the nation."

46. The Kinney County Sheriff's Office is directly involved in arresting individuals for the Operation Lone Star trespass arrest program as well, and the County Attorney prosecutes migrants arrested in the County for trespassing. Additionally, Kinney County officials have not only tolerated, but actively cooperated with, groups of armed private paramilitary organizations such as the Patriots for America and Women Fighting for America in connection with Operation Lone Star.[14]

47. The program is set up to continue for years, and state officials have repeatedly stated and followed through on expanding it beyond Val Verde and Kinney Counties to other counties in Texas.[15] Absent federal intervention, it provides a blueprint for other Texas localities and other

---

[14] Institute for Constitutional Advocacy & Protection, Letter to Sheriff Coe, Judge Shahan, and County Attorney Smith, May 18, 2022, https://www.law.georgetown.edu/icap/wp-content/uploads/sites/32/2022/05/ICAP-Letter-Kinney-County-TX.pdf

[15] E.g., Operation Lone Star Briefing, Oct. 28, 2021, at 12:34,https://www.conchovalleyhomepage.com/news/operation-lone-star-dps-to-hold-fifth-briefing/s DPS gives briefing on ongoing operations at the border (describing state officials' efforts to expand the OLS trespass arrest program to Brooks County,); Operation Lone Star Briefing, Nov. 18, 2021, at 5:41:00 https://www.valleycentral.com/news/local-news/texas-dps-to-hold-briefing-on-operation-lone-star-focuson-apprehension- numbers/rrest numbers at the border | KVEO-TV (valleycentral.com), (DPS official stating that OLS trespass arrests began in Val Verde and Kinney Counties and that "soon we'll expand to other counties"); Hearing on H.B. 9, supra n.3 (Office of the Governor Budget Director Sarah Hicks testifying at 2:49:00, "The vision is that as we go and as we get the agreements in additional counties along the border, we could go up to 3 intake centers and up to 3 total jails.").

states to join in similar use of the criminal system to discriminate against Black and Brown

migrants and seek to effectuate a separate, punitive state immigration system.  Governor Abbott

called upon all Texas sheriffs to join him in a "summit" to train them in implementation of the

OLS program.  Abbott called upon other state governors to send more law enforcement for

OLS.

### C.  OLS Discriminatorily Enforced

48. The OLS trespass arrest program was constructed to target individuals for arrest and punishment

   under state criminal trespass law based on gender and national origin, including immigration

   status.

49. At both the State and Local levels, OLS has had an overt policy whereby only men will be

   arrested. Under the direction of Defendant Abbott and Defendant McGraw, DPS has informed

   local sheriffs "that only men would be arrested on criminal trespass charges" and that "no

   women would be arrested for criminal trespass." (Exhibit D). Additionally, a review of the court

   appointment records that "no women have ever been appointed counsel for OLS misdemeanor

   trespass charges." (Exhibit E). Testimony in front of the appropriations and border safety

   committees and the legislature has also confirmed that this express policy was created and

   followed. In fact, some OLS prosecutors have stipulated to the fact "that women are not

   prosecuted for trespass as part of Operation Lone Star, even when they are found trespassing."

   (Exhibit G).

50. The data confirms this policy of arresting and prosecuting just men. Law enforcement has

   arrested and prosecuted thousands of noncitizens for allegedly trespassing. Of those

   prosecuted, *none* is female; all are male. Even when law enforcement comes across a mixed-

   sex group in which everyone in the group allegedly trespassed, the State prosecutes the men

only. Publicly available probable-cause statements confirm this policy.

51. At least three county court judges presiding over misdemeanor OLS cases have granted relief to defendants based on gender discrimination. Judge Dennis Powell, while presiding over OLS cases in Kinney County, has found in several cases that "the evidence proves purposeful discrimination... The Applicant was arrested and charged, but would not have been arrested if he were a woman; hence, he was treated differently from similarly situated women, based on sex. Hence, the Applicant is the target of selective enforcement based on the constitutionally protected class of sex, in violation of equal protection guaranteed by the U.S. Constitution and the Texas Constitution. Accordingly, the defendant made a prima facie case of sex discrimination. The policy of Operation Lone Star, as it now stands, has a discriminatory effect and is motivated by a discriminatory purpose." (Exhibit F)

52. The OLS misdemeanor catch and jail program is also discriminatorily enforced on the basis of race and national origin. Virtually all of those arrested on trespass charges are Black or Brown, the overwhelming majority of whom are Latino, and virtually all of those arrested are migrants. State troopers' affidavits evidence racial profiling: they describe observing groups of "undocumented migrants" and note Latino ethnicity as apparently relevant to arrest.

53. The ACLU completed an initial analysis in approximately December 2021 of DPS trooper affidavits providing arresting officers' accounts of 168 OLS arrests, 96 of them occurring in Kinney County.[16] The affidavits demonstrated stark racial disparities in arrests: all arrests were of people of color, and almost all were of Latino men. 98% were recorded as "H/M" (Hispanic

---

[16] While affidavits in the OLS trespass arrest program, like similar arrest records, are in theory available to the public, in practice, news sources report that obtaining them has proven highly challenging. Local news states that the Kinney County attorney has "[i]n some cases . . . received the arrest files from DPS on day 29 [after arrest], or even beyond day 30 [after arrest, the date when charges must be filed in certain criminal cases]." Charlotte Cuthbertson, In Pursuit of a Secure Border: Small Texas County Leads Charge Against Border Crime, The Epoch Times, Nov. 11, 2021, https://www.theepochtimes.com/in-pursuit-of-a-secure-border-small-texas-county-leads-charge-againstborder-crime_4084276.html.

male) and 2% as "B/M" (Black male). In the Kinney County arrests specifically, 33% described country of origin and/or perceived immigration status: 29% included perceived immigration status, and 8% included country of origin. These totals for each category equaled more than 100% because some narratives included for example, both perceived race and perceived immigration status.

54. Beyond these bare statistics, the descriptions in the affidavits' arrest narratives strongly indicated racial profiling. For example:

- "Trooper Austin Melvin responded . . . in reference to multiple people seen trespassing by National Guardsmen posted on the property. Upon arriving, I observed multiple Spanish males sitting near the following latitude/longitude."
- "Trooper Jimenez saw 6 Hispanic males trespassing on the Bordelon Crossing property. . . . I saw a Hispanic male open the closed gate to the residential property. The six adult males were undocumented migrants UDM's from Venezuela."

55. DPS troopers' arrest narratives also strongly indicated profiling on the basis of national origin, including perceived immigration status. The arrest narrative in two affidavits stated, "I . . was advised of a group of non-citizens trespassing on X Bar H Ranch in Kinney County." Several arrest narratives described observing "undocumented migrants." For example, three affidavits stated that a member of the National Guard informed the affiant "that 22 undocumented migrants (UDMs) emerged from marked private property" and stated, "upon arriving, I saw 22 UDMs." Another arrest narrative recounted, "I . . . was notified by [a DPS trooper] of several undocumented migrants trespassing on the property. . . . Upon arrival, I located three undocumented migrants."

56. Subsequently, on February 23, 2022, the ACLU supplemented its written complaint with an analysis of an additional 316 trespass arrest affidavits —277 from arrests in Kinney County. ***100% of the arrests in Kinney County were recorded as "H/M"*** (Hispanic male).  In 31% of cases in Kinney County, the arrest narrative describes the individual's country of origin

and/or perceived immigration status: 7% specify the country of origin, and 24% note perceived immigration status. The affidavits without reference to a protected class are typically barebones and boilerplates, leading to misleadingly lower statistics.  As before, beyond the bare statistics, the descriptions in the arrest affidavits indicate racial profiling. Descriptions from arresting officers imply that individuals' perceived immigration status was relevant to the decision to initiate law enforcement action or to arrest. As before, numerous affidavits casually describe individuals as "undocumented" or otherwise describe their perceived immigration status—often apparently based on sight or, as above, appearing to find immigration status as relevant to the arrest determination. The ACLU noted that the list reflecting arrests based on color/race/immigration status was "far from exhaustive."

57. Some examples of these patterns are:

- "I made contact with the Hispanic males and found they were not part of a family unit and were undocumented migrants from Mexico."
- "I . . . apprehended four suspected illegal aliens. After further investigation, Texas DPS confirmed the four individuals were trespassing on the Burr Ranch and were illegal aliens."
- "While working Operation Lone Star at the gravel pit, National Guard Randy Cantu encountered possible non-citizens. Cantu escorted the non- citizens to Trooper Sylvia Alaniz and Prob. Trooper Cassandra Armas."
- Law enforcement describes being "advised of a group of non-citizens trespassing."
- "I observed 3 undocumented adult males walking."
- "I saw seven undocumented adult males jumping a clearly marked fence with a 'no trespassing' sign."
- "[A] total of 2 undocumented male migrants were located."
- "I arrived on scene and observed 5 UDAs [undocumented adults]" and "all other UDAs [except a family unit] were placed under arrest."

58. DPS troopers' emphasis on perceived immigration status evinces discriminatory policing in two ways. First, troopers' statements that they are observing "undocumented migrants"— where the overwhelming majority of those they arrest are Latino—indicate that they are instead using racial profiling to identify those they term "undocumented migrants," whom

they in turn target for arrest and prosecution. The use of ethnicity as a proxy for immigration status is evident in an affidavit that states that a member of the National Guard informed the trooper "that a group of 4 undocumented migrants were seen trespassing on the Bordelon Crossing property . . . While on patrol, I saw one adult Hispanic male sitting and that was found to be single and not part of a family unit." There is no way to ascertain immigration status through sight, and the narratives' conclusory assertions indicate that officers are instead relying on racial profiling.  Second, it indicates that DPS troopers view immigration status as relevant to these state law enforcement arrests for state criminal trespass violations.

59. Notably, Kinney County Attorney Brent Smith recognizes that the troopers' references to immigration status are indicia of racial profiling. In response to criticism that the migrant arrest cases are racially motivated, he falsely claimed that "[t]he criminal complaints make no mention of immigration status."[17] Obviously, Smith knew that his actions in targeting migrants based on immigration status were unconstitutional.  Additionally, both the county attorney and the county sheriff of Kinney County are complaining witnesses in some affidavits. Kinney County Attorney Brent Smith is the complaining witness—that is, the person pressing charges for criminal trespass—in at least five cases. Further, in July 2021, Kinney County Sheriff Brad Coe publicly mentioned three arrests for trespass on County Attorney Smith's ranch, pursuant to Kinney County's efforts to begin arresting migrants for trespass—presumably making Mr. Smith the complaining witness in those cases as well. The ACLU's original complaint documented three cases in which Sheriff Coe was the complaining witness. In the additional affidavits reviewed, the ACLU found five additional cases in which Sheriff Coe was the complaining witness.  This dual involvement is, at

---

[17] Press Release, Kinney County Attorney, Oct. 26, 2021,
https://www.facebook.com/photo/?fbid=125607406514360&set=a.125607456514355.

minimum, yet another concerning irregularity. It is especially so given Kinney County's key role in creating as well as implementing the OLS trespass arrest program.

60. The probable cause affidavits for these Plaintiffs reflect detention and arrest based on race, national origin, immigration status, and sex. Plaintiff Martinez was "located and detained" as a "migrant." (emphasis added). He was arrested, along with five others, on the Union Pacific Railway. There were three males and three females. The three female "trespassers" were transported to the Border Patrol Station in Brackettville. The three males were all arrested and sent to the Val Verde Processing Center. The probable cause affidavit for Plaintiffs Barcenas, Becerra, and Santana state that a state trooper was "notified by DPS SOG of nine migrants trespassing on the Dos Angeles Ranch." The probable cause affidavit charging Plaintiffs Rodas and Pineda with trespass reflects that troopers "had apprehended a group of Undocumented Persons (UDPs)" on a ranch...The defendant was one of the UDP's in the group." Plaintiff Colorado with trespassing identifies him as one of two "Illegal Aliens," stating that the "landowners wished to pursue trespassing charges on the Aliens." "There were two civilians armed with long rifles and two illegal aliens lying prone with their hands on their heads." *Id*.

**D. OLS Defendants are prosecuted through a separate and distinct criminal justice system.**

61. Once individuals are arrested under the OLS trespass program, they are channeled into a criminal system that is entirely separate and distinct from the ordinary criminal legal process and pretrial detention system for state misdemeanor charges. Those arrested under the OLS trespass program are not taken to county jails, as is the ordinary process for misdemeanor arrests; instead, they are booked into a separate processing facility in Val Verde County,

which DPS calls a "criminal <u>migrant</u> processing facility."[18] At the processing facility, they are magistrated by judges designated specifically for the OLS trespass program.

62. At least one subset of 155 people arrested in Kinney County in August 2021 were forced to submit involuntary waivers of counsel at the magistration (the initial appearance). Kinney County Judge Shahan, presided over the initial bail-setting hearings for the first several weeks of arrests in Kinney County. Judge Shahan performed these hearings in groups, under a tree in a parking lot, using a sheriff's deputy to interpret parts of the proceeding. He required everyone to submit a waiver of appointed counsel in English, a language that most of those detained under the OLS trespass arrest program do not understand with fluency; the waiver had already been filled out by a county employee before the hearing began, and Judge Shahan did not provide the opportunity to change it. Those who "submitted" a waiver were only able to request counsel weeks later, from the Briscoe prison unit, and then waited several more weeks to actually have an attorney appointed to represent them.

63. After magistration (the initial appearance), they are taken by the Texas Department of Criminal Justice ("TDCJ")—the state prison system—to one of two state prisons hours away that have been converted to jails to hold migrants. In June, the Dolph Briscoe Unit ("Briscoe"), located in Dilley, Texas, transferred non-migrant prisoners to other facilities to make room for those arrested under the OLS trespass system. Briscoe has capacity for about 1,000 people. When Briscoe became full, TDCJ also began holding individuals at the Segovia Unit in Edinburg, Texas.

64. People arrested pursuant to the OLS trespass program have faced dramatic delays in, and in

---

[18] Nov. 18 Operation Lone Star Briefing, supra n. 15, ~ 1:45,
https://www.valleycentral.com/news/localnews/ texas-dps-to-hold-briefing-on-operation-lone-star-focus-on-apprehension-numbers/.

some cases outright refusal of, appointed counsel. Hundreds of indigent arrestees have waited more than a month to be appointed counsel after requesting a lawyer at their initial bail-setting appearance. In September, an attorney at Restoring Justice, a public defense organization with many clients in the OLS trespass arrest program, stated that most of their assigned clients had "sat in prison without attorneys for nearly six weeks."[19]   Most of these individuals were unaware of any aspect of the criminal process and their rights, including that they could bond out.

65. Because people detained receive no notice from the court or detention facility of who their court-appointed lawyer is or whether someone has been appointed at all, they frequently resort to calling non-profit organizations to try to determine whether they have a lawyer and who it might be. The problem is so endemic that LPDO has established a separate toll-free phone number exclusively for OLS detainees to call and inquire whether they have a lawyer yet and who that might be.  Hundreds of people arrested under OLS were detained without counsel and without charging documents for longer than state law allows them to be detained without being formally charged with a crime.

66. Kinney County then prosecutes those arrested for state criminal trespass, on charges that prosecutors have enhanced by one misdemeanor class because of the pretextual disaster declaration predicated on migration and state law providing for disaster enhancements. The entire criminal process takes place in a separate criminal system specifically for OLS trespass arrests.  Prosecutions take place along a separate track from ordinary criminal cases in the county, on dedicated dockets, with a different pool of public defenders and with different

---

[19] Jolie McCullough, Migrants arrested by Texas in border crackdown are being imprisoned for weeks without legal help or formal charges, Tex. Tribune, Sept. 27, 2021,  https://www.texastribune.org/2021/09/27/texas-border-migrants-jail/.

judges. The criminal process is under greater centralized state control than ordinary misdemeanor criminal trespass prosecutions, which are run by counties.

67. Within this separate, makeshift criminal system, state and local agencies are failing to follow basic rules of criminal procedure and to protect the rights of those charged. Kinney County prosecutors denied due process guarantees by failing even to file charges for a huge number of people who were detained. For hundreds of people, that failure, in combination with the severely dilatory appointment of counsel, resulted in weeks of detention past the date at which release was required.[20]

68. Delays across the criminal process continued. On November 30, 2021, the Texas Tribune reported that more than 90 men arrested under the OLS trespass program had their first court date canceled because two Kinney County officials tested positive for COVID-19.[21]   An October press release by Kinney County even referred to "the piles of cases that have stacked up as a result of Operation Lone Star."

69. Texas law requires prosecutors to file charges within a certain timeframe, the number of days varying depending on the classification of the charge, or to allow the person to be released on a personal bond if charges have not been filed within the timeframe. Alternatively, prosecutors can allow the bond to be reduced to an amount affordable for the defendant.  Those detained pursuant to OLS must therefore be released either on bond or by a reduced bail amount if the state is not prepared to prosecute within 15 or, at most, 30 days. Yet, several hundred individuals arrested under the OLS trespass program were detained far past either filing

---

[20] Arelis Hernandez et al., Hundreds of migrants held for weeks without charges as Texas's border crackdown overwhelms justice system, Wash. Post, Sept. 30, 2021, https://www.washingtonpost.com/nation/2021/09/30/texas-migrant-arrests-release/.
[21] Jolie McCullough, Coronavirus shuts down legal proceedings in latest misstep for Texas border crackdown, Tex. Tribune, Nov. 30, 2021, https://www.texastribune.org/2021/11/30/texas-migrantsarrests-coronavirus/?mc_cid=be5170f623&mc_eid=612589b377

deadline. By September 27, 2021, Brent Smith, the Kinney County misdemeanor prosecutor, had filed charges against, at most, 75 people out of over 700 who had been arrested by Kinney County under the OLS trespass program and were still detained.[22] A generous estimate places Smith's charging rate at that time at slightly above 10 percent, meaning that the County likely violated state statute and the due process guarantees of the federal and state constitutions with respect to nearly 90 percent of the Kinney County OLS trespass arrests during this period.

70. The lack of charges in these cases further frustrated detainees' due process rights first because many of them sat waiting for a lawyer beyond the date at which they were entitled to release and then because the attorneys who finally were appointed were stymied from applying for clients' release. Attorneys were told they could not file habeas petitions on behalf of their clients—simply because clerks had no case numbers for the unfiled misdemeanors, even though pretrial writs of habeas corpus are distinct legal matters.

71. In 73 cases complaints alone have been pending between 153 and 208 days. Generally, cases are set for arraignment between 90 and 120 days after arrest. At arraignment, defendants are offered the opportunity to plead guilty for "time served" to be released for jail regardless of whether the cases have merit. If they refuse to give up their rights associated with trial, they remain in jail indefinitely.  To date, few if any trials have been scheduled in Kinney County and none have taken place.

72. The uniform "time served" offers merit special attention.  The vast majority of the thousands of OLS trespass charges involve materially identical facts and defendants with no criminal history.  Yet their "time-served" sentences—by the same court for the same offense by persons with identical characteristics—vary enormously.  The sentences range from 45 days

---

[22] *Id.*

on the low end to 145 days on the high end.  The sentences depend not on what is fair for the crime charged, but instead exclusively on how quickly the system produces the defendant in court for arraignment.  This appears to be punishment before trial.

73. Hearings on writs of habeas corpus to enforce the clear dictates of the constitution have not proven to be an adequate remedy.  Months-long delays have occurred from the filing of the writs to a hearing date, defeating the purpose of the remedy. Judges appointed to handle the cases who've expressed a willingness to grant relief have been removed through efforts of Kinney County officials. Judges in Kinney County now simply refuse to set habeas petitions for hearing or do so after lengthy delay.

74. The irregularities in this system extend even to the judicial assignments process and the identity of the judges themselves. The state courts reassigned judges to process, on dockets separate from ordinary county misdemeanor cases, OLS trespass arrest cases in the two counties in which the arrests occur, Val Verde and Kinney. In Kinney County, in the face of unfiled charges and speedy trial violations, those judges have granted motions for release. Kinney County officials grew dissatisfied, and, as a result, County Judge Shahan, began– outside of the process provided for by Texas law–to refashion the bench as he saw fit by replacing visiting judges.  Judge Shahan's actions in removing duly-appointed visiting judges with whom he disagreed and instead seating his preferred replacements subverted the distribution of judicial assignment power under Texas law, threatened to subject detained people to still further delays, and undermined the bench's integrity and appearance of impartiality.

75. The following is an excerpt from the Response of Real Parties in Interest Opposing Relator's Application for a Writ of Prohibition, In re State ex rel. Brent Smith, Relator, Judge Jan Soifer,

Respondent, 438 Habeas Petitioners, Real Parties in Interest, No. WR-93,354-02, filed March 10, 2022.  Of the 3,245 persons who had been booked through the OLS processing centers in Del Rio and Hebbronville at the time of the filing of the Response, 2,722 (84%) were charged in Kinney County. As of the Response filing date, there had not been a single trial of an OLS trespass case. Instead, an ad hoc system emerged to dispense justice. It operates as follows: (1) arresting officers take OLS detainees to a tent in Val Verde County where they appear before a specially designated OLS magistrate via video link for proceedings pursuant to Tex. Code Crim P. Art. 15.17;  (2) the magistrates set bond for persons charged with misdemeanor trespass and no criminal history at generally between $1,000 and $10,000; (3) the pretrial detainees, who are almost always indigent, have no means of posting bond, and are transferred more than 100 miles away from the county of arrest to await trial in state prison facilities, the first time this has been done in Texas history; (4) the Texas Supreme Court issued an order under which counsel are appointed to represent OLS detainees, yet significant delays in appointment of counsel routinely occur, and appointment after arrest ranges between 2 and 139 days; (5) usually between 30 and 90 days after arrest, the Kinney County Attorney files an information alleging Class B misdemeanor trespass with an enhancement if convicted to Class A penalty due to the disaster Proclamation, providing a maximum possible sentence of one year in jail; (6) generally between 90 and 120 days after arrest, judges set the cases for arraignment, where each OLS detainee is offered a sentence of "time served" in exchange for a guilty plea; and (7) counsel for detainees must advise their clients that the only way to contest the trespass charge is to remain in jail.  73 of the 438 Habeas Petitioners still had no charging instrument filed against them as of the date of the filing of the Response. Complaints alone had been pending in those 73 cases for between 153 and 208 days, with no information

filed.

76. Individuals arrested and charged with criminal trespass allegations under OLS are prosecuted differently than those facing the same charges outside of OLS. According to Katy Dyer, University of Texas School of Law Clinical Professor, OLS is "a completely separate and unequal legal system for those suspected of being noncitizens and charged with the minor charge of criminal trespass." She has testified about the difference in representing of similarly situated defendants charged with criminal trespass separately from OLSL: "When somebody faces a criminal trespass charge, I would typically advise them that they are not looking at jail time.  Most prosecutors aren't seeking jail time or hefty fines on a case like that.  Many, many criminal trespass cases get dismissed, and they are treated as much less serious offenses in the criminal legal system.  It is rare for somebody to be held on pretrial detention on a criminal trespass case."**OLS Defendants are Routinely Over-Detained**

76. Snapshot data shows the extreme delays in this separate system. The Wall Street Journal reported that 53% of the 1,006 people detained on November 1 under the OLS trespass arrest program (533 people) had been jailed longer than 30 days, 14% (141 people) longer than 60 days, and 2 people–both Cuban migrants–for 98 days.

77. Egregious delays persist even after individuals are ordered released. The Kinney County Sheriff's Office and TDCJ have repeatedly failed to timely release OLS arrestees. Time and again, those who have been granted personal bond, paid bail, or had their cases dismissed have remained confined in the absence of any legal authority for their detention and, in at least one instance, in the face of a court order mandating release. In short, in this separate system, unlawful prolonged detention is routine.

78. To try to effectuate release, defense attorneys who have learned that their clients remain

detained have been forced to shuttle for days between the County Sheriff's Office; the newly devised Val Verde Processing Center; and the TDCJ facilities, Briscoe and Segovia. In many cases, defense attorneys' release advocacy has been stymied not just by OLS' improvised and convoluted custodial arrangements, but by misinformation from TDCJ as to their clients' release status. Attorneys who have won personal bonds for their clients report having been told by TDCJ that their clients had been released from custody only to find, days later, that those same clients had in fact been transferred to another TDCJ facility, with no plan for their release.

79. As of November 18, 2021, 1,071 people were detained under Operation Lone Star, with 535 at Briscoe and 536 at Segovia.  In the latter part of 2021, the Texas Jail Project gathered facts regarding the egregious prison conditions from about 68 detained people at Briscoe and Segovia and their family members. Benjamin Drachman, the Jail Project staffer who speaks with detainees and family members, concluded "that people in Briscoe and Segovia are desperate," explaining that they "had not received any help for months and were eager to talk to [him]. Some of the stories are traumatizing."[23] In addition, seven people arrested under OLS have provided declarations detailing similarly atrocious conditions. Food, medical care, and telephone access are all inadequate. As of April 2022, those jail numbers have increased to approximately 2,887.

## V.    CLASS DESIGNATION

80. Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), Individual Plaintiffs seek to certify classes comprising

(1) Individuals who were arrested, detained, and prosecuted under the OLS misdemeanor trespass

---

[23] Nov. 18 Operation Lone Star Briefing, supra n. 13, at 10:00. This total may include individuals detained for smuggling or other non-trespass crimes at Briscoe.

catch and jail program

(2) Individuals incarcerated under the OLS misdemeanor trespass catch and jail program past their release dates, *i.e.,* past the dates that bond is posted, a plea is entered and sentence is complete, or charges have been dismissed when there is no alternate hold keeping them in custody.

81. A class action is the only practicable means by which Individual Plaintiffs and the Class members can seek redress for Defendants' illegal and unconstitutional program.

82. As set forth below, this action satisfies the numerosity, commonality, typicality, and adequacy requirements of Federal Rule of Civil Procedure 23(a).   This action also satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3).

### A.  Numerosity

83. The requirements of Fed. R. Civ. P. 23(a)(1) are satisfied for these classes in that there are too many Class Members for joinder of all of them to be practicable.   These Class Members exceed over 2,000 in number. They all come from different countries and locations, and many intend to relocate to other parts of the United States after the conclusion of their cases. The members of the proposed Class also lack the financial resources to bring an independent action or be joined in this action.   Future members of the Class are likely to be similarly indigent.

84. Further, the size of the Class is likely to increase. Operation Lone Star – and its misdemeanor catch and jail program, has been approved for funding for at least the next few years. Kinney County and Texas State actors, including the Defendants, have indicated their intent to continue  with their unconstitutional practices.

### B.  Commonality

85. The claims of the Class Members in both classes raise numerous common issues of fact and/or

law, thereby satisfying the requirements of Fed. R. Civ. P. 23(a)(2).  These common legal and factual questions, which may be determined without the necessity of resolving individualized factual disputes concerning any Class Member, include, but are not limited to, the following common contentions:

- The right to be free from illegal detention/arrest under the 4th Amendment;

- The right to have timely and effective legal counsel under the 6th Amendment;

- The right to equal protection under the 14th Amendment;

- Whether Defendants targeted Plaintiffs because of their common race, ethnicity, sex and/or national origin;

- Whether Defendants targeted Plaintiffs because of their status as non-citizens;

- Whether the U.S. Constitution protects a detainee's right to comply with a preset bond and, thus, be released from incarceration;

- Whether the U.S. Constitution protects a detainee's right to a timely arraignment so that he or she may have the required bond set and posted for release;

- Whether the U.S. Constitution protects a detainee's right to be released from incarceration upon a court's dismissal of charges;

- Whether the U.S. Constitution protects a detainee's right to be released upon the posting of the required bond;

- Whether the rights set forth above were clearly established;

- Whether the acts or omissions of the Defendants were the proximate cause of the constitutional deprivations of Plaintiffs and the proposed Class Members;

- Whether the Kinney County policymaker was a perpetrator of such constitutional deprivations;

- Whether Kinney County engaged in a pattern or practice of such constitutional deprivations.

### C. **Typicality**

86. The claims of the named Plaintiffs are typical of the unnamed Class Members in both classes because they have a common source and rest upon the same legal and remedial theories, thereby satisfying the requirements of Fed. R. Civ. P. 23(a)(3). The claims of Individual Plaintiffs are typical of the claims of the proposed Class as a whole.  Individual Plaintiffs' claims arise from a scheme perpetrated against the entire Class, and accordingly each Class member possesses the same claims as Individual Plaintiffs. Future Class members subjected to Defendants' scheme will also possess similar claims.

87. For example, the named Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all Class Members were injured or damaged by the same wrongful practices in which Defendants engaged, namely the unconstitutional arrests/detentions, over-incarceration and the failure and refusal to honor the detainees' Fourth Amendment, due process and equal protection right secured under the U.S. Constitution.

88. The requirements of Fed. R. Civ. P. 23(a)(4) are satisfied in that the named Plaintiffs have a sufficient stake in the litigation to vigorously prosecute their claims on behalf of the Class Members and the named Plaintiffs' interests are aligned with those of the proposed Class. There are no defenses of a unique nature that may be asserted against Plaintiffs individually, as distinguished from the other members of the Class, and the relief sought is common to the Class. Plaintiffs do not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and have no conflict with any other member of the Class.

### D. **Adequacy of Representation**

89. Plaintiffs have retained competent counsel experienced in the issues that are the basis of this litigation with respect to: the OLS system, the "alternate" criminal justice system, representation of immigrants in general, and civil rights litigation. Angelica Cogliano, Addy Miro and E.G. Morris have been representing defendants charged with criminal trespass under OLS since the operation's outset, including many of the plaintiffs named in this suit. They have significant familiarity with the prosecutions occurring in Kinney County, as well as the logistics surrounding the detentions of those incarcerated in the Briscoe and Segovia Units. They have been personally involved in attempting to get the release of OLS defendants who were being illegally detained under state law, and have litigated many of these Constitutional issues at the state level.

90. Co-counsel Susan Hutchison and Rafe Foreman have been practicing law in the area of civil rights for over thirty-four years each. They have been involved in representing individuals harmed by constitutional deprivations through trial and many appeals, addressing constitutional violations, qualified immunity and Monell issues, as well as federal statutory civil right issues, including in the following cases: Morris v. Dallas County, TX, Case No. 3:11cv00527, Northern District of TX; Nagel v. Harris County, Cause No. 2007-08301, Harris County District Court; Bailey v. Metro One Loss Prevention, Cause No. DC-20-04393, Dallas County District Court; Clark v. Champion National Security, Inc., Case No. 3:17cv01802, Northern District of TX; Hernandez v. Aaron Kloesel, Case No. 5:20cv00034; Southern District of TX; Doe v. William Marsh Rice University, Case No. 4:19cv00658, Southern District of TX; Garcia v. City of Lubbock, TX, Case No. 5:20cv00053, Northern District of TX; Langiano v. City of Fort Worth, TX, Case No. 4:21cv00808, Northern District of TX; Brannan v. City of Mesquite, TX, Case No. 3:19cv01263, Northern District of TX;

Dyer v. City of Mesquite, TX, Case No. 3:15cv02638, Northern District of TX; Arnone v. The County of Dallas County, TX, Case No. 3:17cv03027, Northern District of TX;  Ruiz v. City of San Antonio, TX, Case No. 5:21cv00855, Western District of TX;  Schrader v. TX Dept of Public Safety, Case No. 4:20cv00160, Northern District of TX;  Mott v. Tesmec USA, Inc., Case No. 017-304893-18, Tarrant County District Court; Doe v. Huntington ISD, Case No. 9:19cv00133,  Eastern District of TX; ; Ream v. City of Heath, Case No. 3:14cv04338, Northern District of TX; Lincoln v. City of Colleyville, TX, Case No. 4:15cv00819, Northern District of TX; Lopez v. Ameritech Millworks, LP, Cause No. 096-269739-13, Tarrant County District Court; Clark v. Charter Communications, LLC, Case No. 3:17cv01085, Northern District of TX;  McPartlin v. Rhonda Hunter, Case No. 3:15cv3042, Northern District of TX; Mohamed v. Irving ISD, Case No. 3:16cv2283, Northern District of TX; Bryant v. Danny Gillem, Case No. 2:18cv122, Northern District of TX; Hobart v. City of Stafford, Case No. 4:09cv03332, Southern District of TX; Hernandez v. Baylor University, Case No. 6:16cv69, Western District of TX; Eaves v. United Technologies Corp, Case No. 3:19cv1153, Northern District of TX; Lyons v. Hillard, Inc. dba AutoNation Ford, Arbitration;  They established and settled a class action lawsuit in Alaniz v. Sam Kane Beef Processors, Inc.; Case No. 2:07cv00335, Southern District of TX (this was not a civil rights case).

### E.  Predominance and Superiority

91. All of the requirements for Fed. R. Civ. P. 23(b)(3) are satisfied because the common factual and legal issues identified above are sufficiently cohesive to warrant adjudication by representation. In particular, the Plaintiffs and the Class Members have suffered a common cause of injury, namely the violation of their Fourth and Fourteenth Amendment rights caused

by the common course of conduct engaged in by Defendants. The Class Members' legal claims arise under the United States Constitution, asserted pursuant to 42 U.S.C. § 1983 and § 1985, therefore, do not involve the application of other states' laws which may have varying degrees of liability and proof. Class action treatment is also superior to other available methods for the fair and efficient adjudication of this controversy, because individual litigation of the claims of all Class Members is economically unfeasible and procedurally impracticable. The likelihood of individual Class Members prosecuting separate claims is remote and, even if every Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation in such cases. Additionally, individual litigation would also present the potential for varying, inconsistent or contradictory judgments while magnifying the delay and expense to all parties and to the court system, thus resulting in multiple trials of the same legal issue and creating the possibility of repetitious litigation. As a result, the desirability to concentrate litigation in this forum is significantly present. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance of a class action. Relief concerning Plaintiffs' rights under the laws herein alleged and with respect to the Class would be proper.

## VI.    CLAIMS FOR RELIEF

**Count One: Defendants Violated Plaintiffs' Equal Protection and Due Process Rights by Creating, Directing, and Enforcing a Policy to Only Arrest and Prosecute Male Migrants**
*(Brought Against Defendants McCraw, Abbott, Coe, and Kinney County)*

92. Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

93. The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deny

to any person within its jurisdiction the equal protection of the laws." The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises. "Thus we have treated as presumptively invidious those classifications that disadvantage a 'suspect class.'" *Plyler v. Doe*, 457 U.S. 202, 216–17, 102 S. Ct. 2382, 2394–95, 72 L. Ed. 2d 786 (1982). The Constitution "prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89 (1996) Thus, even when a statute "be fair on its face and impartial in appearance," the law is violated when the statute "is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances[.]" *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886).

94. While a state has wide "discretion" to choose when to enforce its criminal laws, this discretion is not "unfettered." *United States v. Batchelder*, 442 U.S. 114, 124–25 (1979) (internal quotation marks omitted). However, the "enforcement of criminal laws is . . . subject to constitutional constraints." *Id.*. "Everyone accepts that a detention based on race, *even one otherwise authorized by law*, violates the Fourteenth Amendment's Equal Protection Clause." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1731, 204 L. Ed. 2d 1 (2019). Additionally, in *Arizona*, the Supreme Court noted the "constitutional safeguards" that applied to immigration enforcement, including that officers "may not consider race, color or national origin" in implementing its laws. 567 U.S. at 411.

95. The implementation of the OLS misdemeanor trespass arrest program has resulted in systemic discrimination on the basis of gender, color, race, and national origin. The arrests and prosecutions for criminal trespass are severely disparate: every plaintiff was at least suspected

of being of foreign origin, and the overwhelming majority of arrestees are Black and Brown men. Under OLS, Defendants Coe, McGraw, Abbott, and Kinney County directed that arrests for criminal trespass only be made if there is evidence that the individual is male and was not born in the United States. As none of the law enforcement involved in making OLS arrests, nor any of the Defendants, have the authority under Federal law to determine their citizenship or residency status, this disparate treatment is based solely on national origin. Additionally, both women and men have been found allegedly trespassing, but of the thousands of cases brought under OLS, not a single arrest or prosecution has been brought against a woman for trespassing. In fact, Kinney County has not charged any individual with criminal trespass, or any other charge, in the two years preceding the implementation of OLS. This disparate treatment is overtly based on impermissible considerations of race, gender, and national origin, as articulated in the stated goals of OLS – a state-based reformed immigration policy. Defendants have no compelling interest in imposing such a policy, and the policy is not narrowly tailored. Multiple local state judges presiding over OLS criminal cases have ruled that the implementation of the program against only one gender is impermissible violation of the Constitution.

96. Class Plaintiffs have suffered harm as a direct and proximate result of Defendants' actions.

**Count Two:** **Defendants Violated Plaintiffs' Fourteenth Amendment Substantive Due Process Rights by Depriving the Arrestee/Defendants of Due Process of Law**
*(Brought Against Defendants McGraw, Abbott, Collier, Coe, and Kinney County)*

97. Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

98. The Fourteenth Amendment to the U.S. Constitution prohibits states from depriving "any

person of life, liberty, or property, without due process of law." The Due Process Clause of the Fourteenth Amendment was intended to prevent the government from abusing its power or employing it as an instrument of oppression.

99. Defendants designed and implemented the OLS trespass arrest and jail program without regard to the required safeguards of due process. The Defendants overtly created and maintain a "separate but not-equal" criminal justice system in which they only jail and prosecute individuals from this program. Additionally, the Due Process Clause of the Fourteenth Amendment prohibits the Defendants from jailing the Plaintiffs indefinitely and without any meaningful legal process through which they could challenge their detention. Defendants' calculated scheme, undertaken in bad faith and with wanton indifference to Class Plaintiffs' well-being, deprived Class Plaintiffs of their most basic liberty interests, including, but not limited to, their freedom of movement and their human dignity.

100. These actions deprived Class Plaintiffs of their liberty interest without due process of law, and Class Plaintiffs suffered harm as a direct result.

**Count Three: Defendants Violate Plaintiffs' Six Amendment Right to Counsel**
*(Brought Against Defendants Abbott, Coe, and Kinney County)*

101. Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

102. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." In McNeil v. Wisconsin, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), the Supreme Court explained that the right arises when a person is charged, at a preliminary hearing, at an indictment, or arraignment." Id., at 175, 111 S.Ct. 2204 (citations and internal quotation marks omitted).

103. Defendants created, directed, and implemented a policy to deliberately deny Plaintiffs and Class

Members their Sixth Amendment right to counsel through failure to advise them of such right, refusal to allow them to contact counsel, and often being forced to waive those rights. These violations of their constitutional rights were deliberate and ongoing.

104.   Class Plaintiffs have suffered harm as a direct and proximate result of Defendants' actions.

**Count Four: Defendants Violated Plaintiffs' Fourth Amendment Rights by Detaining them solely to Determine Immigration Status, and By Keeping Them Incarcerated After they were Entitled to Release**
*(Brought Against Defendants McCraw, Collier, Abbott, Coe, and Kinney County)*

105.   Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

106.   The Fourth Amendment to the U.S. Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. The OLS process of unilateral detention "based solely on reasonable suspicion or knowledge that a person was unlawfully present in the United States" is a violation of the Fourth Amendment. "If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Arizona v. United States*, 567 U.S. 387, 407, 132 S. Ct. 2492, 2505, 183 L. Ed. 2d 351 (2012). The federal statutory structure instructs when it is appropriate to arrest an alien during the removal process. For example, the Attorney General can exercise discretion to issue a warrant for an alien's arrest and detention "pending a decision on whether the alien is to be removed from the United States." *Arizona v. United States*, 567 U.S. 387, 407, 132 S. Ct. 2492, 2505, 183 L. Ed. 2d 351 (2012). And if an alien is ordered removed after a hearing, the Attorney General will issue a warrant. See 8 CFR § 241.2(a)(1). In both instances, the warrants are executed by federal officers who have received training in the enforcement of immigration law. See §§ 241.2(b), 287.5(e)(3).

107. In the *Arizona* opinion, the Court examined a section of an Arizona law (Section 6) which attempted to provide state officers even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers. Under state law, officers who believe an alien is removable by reason of some "public offense" would have the power to conduct an arrest on that basis regardless of whether a federal warrant has issued or the alien is likely to escape. This state authority could be exercised without any input from the Federal Government about whether an arrest is warranted in a particular case. This would allow the State to achieve its own immigration policy. The result could be unnecessary harassment of some aliens (for instance, a veteran, college student, or someone assisting with a criminal investigation) who federal officials determine should not be removed.   *Arizona*, 567 U.S. at 408. "This is not the system Congress created." *Id.*

108. The Fifth Circuit acknowledges that "absent express direction or authorization by federal statute or federal officials, state and local law enforcement officers may not detain or arrest an individual solely based on known or suspected civil violations of federal immigration law," *City of El Cenizo,* 890 F.3d at 189. (citing *Santos v. Frederick County Board of Commissioners*, 725 F.3d 451, 465 (4th Cir. 2013).  "Thus, the seizure in *Santos* violated the Fourth Amendment because the officers detained Santos "before dispatch confirmed with ICE that the warrant was active." *City of El Cenizo,* 890 F.3d at 189.  The Fifth Circuit cited with approval *Meledres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012) for the proposition that unilateral detention "based solely on reasonable suspicion or knowledge that a person was unlawfully present in the United States" was a constitutional violation and noted that in *Meledres*, "as in *Santos*, there was no federal request for assistance before

the seizure." 890 F.3d at 189.

109.    Here, the Defendants created, directed, and implemented a policy in which arresting officers are required to continuously detain individuals in order to confirm or deny the detainee/arrestee's immigration and residency status. Additionally, the Defendants created, directed, and implemented a policy to keep the arrestee/defendants in custody following their entitlement to release due to case resolution or a bond being posted. Often, class Plaintiffs were over-detained because the Defendants wanted them to be deported or removed by ICE, and so kept them in custody solely for immigration purposes outside their authority.

110.    Class Plaintiffs have suffered harm as a direct and proximate result of Defendants' actions.

**Count Five: Defendants conspired to violate the Defendant's Civil Rights in Violation of 42 U.S.C. § 1985(3)**
*(Brought Against Defendants McCraw, Collier, Abbott, Coe, and Kinney County)*

111.    Class Plaintiffs re-allege and incorporate each and every allegation made in the preceding paragraphs as if fully set forth herein.

112.    To state a claim for conspiracy under § 1983, a plaintiff must allege the existence of (1) an agreement to do an illegal act and (2) an actual constitutional deprivation." *Whisenant v. City of Haltom*, 106 F. App'x 915, 917 (5th Cir. 2004) (per curiam) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)). To state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege: (1) a conspiracy involving two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States. In so

doing, the plaintiff must show that the conspiracy was motivated by a class-based animus.

113.   In the instant case, the agreement between Abbott, McCraw, Collier, Coe, and Kinney County to engage in "immigration enforcement" is clear and on record.  It is also clear that they agreed to implement the OLS immigration enforcement without the involvement of the Federal Government and based upon observed race/color and/or immigration status in violation of the United States Constitution.  This agreement to implement OLS in such a manner resulted in violations of the constitutional rights of Plaintiffs and the Class Members.  The rights in question were clearly established at the time that OLS was implemented and the actions taken in concert with such agreement/implementation were objectively unreasonable. Additionally, the agreement to deny detainees the right to counsel and to refuse to release those who are lawfully entitled to release is also in violation of the rights of detainees under the United States Constitution and resulted in the deprivation of such rights to Plaintiffs and the Class Members.  The rights in question were clearly established at the time of the deprivations and the conduct is, and has been, objectively unreasonable. Thus, the Defendants are liable to Plaintiffs and the Class Members under 42 U.S.C. § 1985.

114.   Class Plaintiffs have been harmed as a direct and proximate result of Defendants' conspiracy.

**PRAYER FOR RELIEF**

WHEREFORE, the named Plaintiffs and Class Members demand judgment against Defendants on each Count of the Complaint and pray for the following relief:

1. Issue an Order certifying that this action may be maintained as a class action, appointing Plaintiffs and their counsel to represent the Classes, and directing that reasonable notice of this action be given by Defendants to all Class Members;

2. Enter a judgment declaring that any person arrested based on race, immigration status and/or national origin under OLS violates federal law;

3. Enter a Judgment declaring that the Defendants violated the due process rights of the class members detained or prosecuted under the OLS trespass arrest program;

4. Enter a judgment declaring that Defendants' refusal to release detainees after posting cash bond violates state and federal law;

5. Enter a judgment declaring that Defendants' refusal to release detainees after entering a plea violates state and federal law;

6. Enter a judgment declaring that Defendants' refusal to release detainees after a dismissal of charges violates state and federal law;

7. Enter a judgment declaring that Defendants' refusal to release detainees after a personal bond violates state and federal law;

8. Enter a judgment declaring that Defendants' refusal to afford detainees constitutional rights at the time of detention violates state and federal law;

9. Award Plaintiffs and members of the Damages Class monetary damages on a class-wide basis for time unlawfully spent in custody and establish a procedure for class members to seek individualized damages beyond general damages;

10. Award Plaintiffs and other Class Members reasonable attorneys' fees and costs pursuant to 42 U.S.C. 1988

11. Grant any reasonable request to amend Plaintiffs' Class Action Complaint to conform
to the discovery and evidence obtained in this Class Action;

12. Empanel a jury to try this matter;

13. Such other and further relief that justice may require.

Respectfully Submitted,

s/Angelica Cogliano
Angelica Cogliano, SBN 24101635
Angelica@coglianolaw.com
Addy Miro, SBN 24055984
E.G. Morris, SBN 14477700
505 West 12th Street, Suite 206
Austin, TX 78701

Susan Hutchison, SBN 10354100
S. Rafe Foreman, SBN 07255200
HUTCHISON & FOREMAN, PLLC
500 East 4th St., Ste. 100
Fort Worth, TX  76102
Phone:  817-336-5533
Fax:  817-887-5471

On this day of May 4, 2023, Plaintiffs served their Revised nded Complaint on the following counsel for Defendants via ECF:

Benjamin L. Dower
Deputy Chief, General Litigation Division
benjamin.dower@oag.texas.gov
Attorney-in-Charge
Kimberly Gdula
kimberly.gdula@oag.texas.gov
William D. Wassdorf
will.wassdorf@oag.texas.gov
Allison M. Collins
Allison.collins@oag.texas.gov
Assistant Attorneys General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
ATTORNEYS FOR DEFENDANT
GOVERNOR GREG ABBOTT

Jason T. Bramow
jason.bramow@oag.texas.gov
Attorney-in-Charge
Jessica L. Weltge
jessica.weltge@oag.texas.gov
Marlayna M. Ellis
marlayna.ellis@oag.texas.gov
Assistant Attorneys General
Office of the Attorney General
Law Enforcement Defense Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
ATTORNEYS FOR DEFENDANTS   EXECUTIVE DIRECTOR BRYAN COLLIER
EXECUTIVE DIRECTOR STEVEN MCCRAW

Scott M. Tschirhart
smtschirhart@rampagelaw.com
Denton Navarro Rocha Bernal & Zech, P.C. 2500 W. William Cannon Drive, Suite 609
Austin, Texas 78745
ATTORNEYS FOR DEFENDANTS
SHERIFF BRAD COE AND KINNEY COUNTY